


15 Warren Street, Suite 36
Hackensack, New Jersey 07601
*Phone 201-831-1086*

147 74th Street
Brooklyn, New York 11209
*Phone 347-770-7712*

*Fax 347-772-3074*
www.luriestrupinsky.com

**Joshua M. Lurie, Esq.** *(licensed in NY, NJ, VT)*
**Eugene Strupinsky, Esq.** *(licensed in NY)*

July 30, 2018

**Via ECF**

Hon. Lisa M. Smith, U.S.M.J.
United States District Court
For the Southern District of New York
Hon. Charles L. Brieant, Jr. Federal Building & U.S. Courthouse
300 Quarropas Street, Courtroom 520
White Plains, New York 10601-4150

Re: Avatar Outsourcing, Inc., et al. v. Stewart, et al.
Civil Case No. 7:16-cv-09337-KMK-LMS

Dear Magistrate Judge Smith:

I write to request a pre-motion hearing, as Judge Karas directed that I apply for on June 19, 2018, in anticipation of Plaintiffs filing for appropriate sanctions under Fed.R.Civ.P. 37. The Court denied the request, without prejudice on July 17, 2018 due to the failure to provide the applicable transcripts (which were not provided by the vendor until July 19, 2018 and several inquiries about the delay). We now resubmit the application with the applicable citations to the deposition transcripts.

While the issues of discovery non-compliance by the Defendants was before this court many times in the past, based upon information solicited during the depositions of Mr. Stewart (**Exhibit A**) and the fact witness Edivict Valenzuela (**Exhibit B**), it is now evident that the discovery violations are either the willful conduct of Mr. Stewart or, and we do not allege so, his lawyers' office.

As discussed below, we seek an appropriate sanction which includes negative inferences as to the documents and video due to the lack of disclosure and willful spoliation as well as monetary sanctions for the costs to which Plaintiffs have been forced to pay as a result of these discovery games by these defendants.

As recently reiterated by the Second Circuit in the matter of Klipsch Group, Inc. v. ePRO E-Commerce Limited, 880 F.3d 620, 628 (2d Cir 2018), "[t]he party seeking discovery sanctions on the basis of spoliation must show by a preponderance of the evidence: (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would





support that claim or defense." (citing Chin v. Port Auth. of N.Y. and N.J., 685 F.2d 135, 162 (2d Cir. 2012). Thereafter, "[o]nce a court has concluded that a party was under an obligation to preserve the evidence that it destroyed, it must then consider whether the evidence was intentionally destroyed, and the likely contents of that evidence. The determination of an appropriate sanction for spoliation, if any, is confined to the discretion of the trial judge[.]". Fujitsu Ltd. v. Fed. Exp. Corp., 247 F.3d 423, 436 (2d Cir. 2001).

The salient facts evidence that discovery compliance by Defendants Stewart and David TPO, LLC has been a massive issue in this matter, requiring multiple hearings, telephone conferences, and letters submitted to the Court.

This matter was referred to Your Honor on November 28, 2017 as a result of, upon information and belief, our letter to the Court on November 24, 2017 where, for the first time, we sought sanctions as a result Defendants willful refusal to answer discovery *after* counsel for Defendants consented to the dates for service of requests and responses.

Thereafter, on December 14, 2017, the parties, through counsel, appeared before Your Honor and agreed to some new dates in lieu of sanctions. Defendants failed to comply with those obligations as well.

On January 3, 2018, we wrote to the court to advise of the continued conduct of these Defendants in noncompliance of discovery obligations and continued violations of the Court's multiple discovery orders. Another conference was held on January 18, 2018 where most of the issues were resolved and we thought this would be the end – but it was not. Defendants again blew their deadlines.

On January 30, 2018, we again wrote to seek sanctions for the continued discovery violations.

We appeared, again, on February 14, 2018 and more issues were apparently resolved on the record – as we believed at that time. Yet it was at the depositions that we realized that there is far more information willfully withheld by the defense due to, among other reasons, Mr. Stewart's sideline conduct of determining what he must produce in his own opinion notwithstanding the Court Rules and, *inter alia*, dictating when he gives consent to produce certain relevant information. See Deposition of David Stewart, June 5, 2018, at 80:16-22 (hereafter "Stewart Dep. at __"). He also appeared to be willing to withhold documentation because he subjectively wanted to decide how it related to my clients (see, e.g., Stewart Dep at 170:1-8 where Mr. Stewart attempted to refuse to answer a question by saying that he needed to determine "to see how it relates to Avatar"). Further, it is evident that a substantial amount of paper documentation is currently being withheld by Mr. Stewart which are directly relevant to the pendant state actions – including the violations of the non-compete agreements and professional negligence claims including the financial records as discussed below.





These statements are supported by the deposition testimony of Mr. Stewart and of the third-party witness, Ms. Valenzuela. Mr. Stewart testified, *inter alia*, that he had to consent to what was being produced and that everything we had is what he consented to. Id. However, he also testified that Plaintiff George Kaltner's personal assistant, Bria Christian, provided him with relevant videos which were never produced in this case. Stewart Dep. at 79:2-81:4. Some discussion was made during the deposition about the fact that we had imaged the hard drives of his laptop (Stewart Dep at 80:23-25) but, without knowing what to look for (as the existence of these videos was never disclosed), it would be impossible to look at *every single file or video on hundreds of gigabytes of data* to try to find a needle in a haystack which would, potentially, include looking at hours upon hours of videos – trying to find something relevant. Such runs contrary of the parties' respective obligations under Fed.R.Civ.P. 26. My client has already spent tens of thousands of dollars on legal fees and costs for discovery in this case – including performing some of Defendants' obligations (and discussed below) – and it is improper to demand they pay more in the hopes of finding something that we were not even notified about in the initial disclosures or responses to discovery. Further, my client has a good faith basis to believe that this video would support my clients' allegations against Mr. Stewart and David TPO, LLC as to the pendant state claims. (See **Exhibit C**; Stefani Dep at 107:2-108).

Further, Mr. Stewarts deposition evidenced that he was trying to keep relevant information from us. During his deposition, we asked him about discussions by text messaged he had with an individual who we now know to be his daughter which he thought were "protected" and not to be produced even though they contain a bevy of relevant admissions and facts. Stewart Dep at 140:24-141:8. Those discussions referenced that he had "sold his soul to the devil" in bringing these cases (Stewart Dep at 139:20-140:23),[1] massive financial issues (139:10-19; 167:13-19; 168:8-12; 169:3-13; 171:1-13), and even solicited his daughter for money to support bringing more lawsuits (170:17-25).

Similarly, that my client had to pay for the discovery to which Mr. Stewart was obligated to produce is predicated upon a falsehood by these defendants to this Court multiple times. Mr. Stewart, on his own and through his counsel, advised that he could not afford to perform discovery. However, during his depositions, we learned that Mr. Stewart's monthly expenses are only about 33% of his take-home pay (about $1,000.00 (Stewart Dep at 155:6-7; 159:13-15) out of $3,000.00 monthly (Stewart Dep at 159:9-12)) and that the reason that he plead poverty is because his position as to what constitutes poverty is making less than $120,000.00/annum (Stewart Dep at 145:19-146:1). In other words, Defendants were more than able to pay for discovery of their own

[1] During Mr. Stewart's deposition, when confronted with his use of common terms or proverbs, he made claims that they meant something far from their actual meaning and which should be known by him. For example, Mr. Stewart claimed that "selling your soul to the devil" meant "going to hell and come back." Stewart Dep at 140:12-20. Also, while referencing the claims made in another matter before this Court, where Mr. Stewart solicited an individual to bring a case against my clients through Mr. Chen, he laughed about the allegations calling them "alternative facts." When confronted with this, Mr. Stewart again tried to create an odd definition for a lie (Stewart Dep at 212:8-213:13; 222:3-223:2).





electronic devices, refused to do so, claimed poverty, and then state that they did not provide relevant discovery because maybe, just maybe, we would find it ourselves (See e.g. Stewart Dep at 24:11-23). Such runs counter to the disclosure obligations in the Federal Rules and has caused my clients to pay thousands of dollars in legal fees and costs. Indeed, as discussed in Klipsch, supra, at p. 631:

> The extremely broad discovery permitted by the Federal Rules depends on the parties' voluntary participation. The system functions because, in the vast majority of cases, we can rely on each side to preserve evidence and to disclose relevant information when asked (and sometimes even before then) without being forced to proceed at the point of a court order. See Cine Forty–Second St. Theatre Corp. v. Allied Artists Pictures Corp., 602 F.2d 1062, 1068 (2d Cir. 1979) (observing that "embroil[ing] trial judges in day-to-day supervision of discovery" is "a result directly contrary to the overall scheme of the federal discovery rules"). The courts are ill-equipped to address parties that do not voluntarily comply: we do not have our own investigatory powers, and even if we did, the spoliation of evidence would frequently be extremely difficult for any outsider to detect.
>
> Moreover, noncompliance vastly increases the cost of litigation by drawing out deadlines and necessitating motion practice. But "[a]n undertaking on the scale of the large contemporary suit brooks none of the dilation, posturing, and harassment once expected in litigation." Id. at 1067–68. Accordingly, we have held that discovery sanctions are proper even against parties who have belatedly complied with their obligations, because an alternative rule "would encourage dilatory tactics, and compliance with discovery orders would come only when the backs of counsel and the litigants were against the wall." Id. at 1068; see also S. New Eng. Tel. Co. v. Glob. NAPs Inc., 624 F.3d 123, 149 (2d Cir. 2010). When, as a result of an opponent's persistently uncooperative behavior, it appears reasonable ex ante to conduct expensive corrective discovery efforts, we see no reason why the party required to undertake those efforts should not be compensated simply because it eventually turned out that the obstructive conduct had hidden nothing of real value to the case. Those costs must be placed on the uncooperative opponent in order to deter recalcitrant parties from the cavalier destruction or concealment of materials that the law requires them to retain and disclose.





Continuing this conduct of spoliation, in Ms. Valenzuela's deposition, she advised that there was a folder for David TPO, LLC and that it included all records for that business. See Deposition of Edivict "Stefani" Valenzuela, dated June 18, 2018 at 71:4-73:2 (hereafter "Stefani Dep at ___"). Apparently, Mr. Stewart took it with him and refused to either acknowledge its existence to my client or produce it in discovery. My clients have a good faith belief that this folder would also prove the allegations against Mr. Stewart and David TPO, LLC.

Therefore, it is evident that Defendants not only have refused to comply with discovery but have willfully withheld relevant documentation as to this case and made false claims to hide us from obtaining such documentation. Now, after discovery is over, we learn about the extent of discovery willfully kept and, likely, destroyed at this juncture. Thus, an appropriate sanction should be entered as to the discovery including counsel fees, costs and negative inferences thereto.

Similarly, it is important that Court also take into consideration the efforts made by the defense to bar us access to an important witness to the case. It took months to secure the deposition of Ms. Valenzuela after we sent her a letter seeking to meet with her. We now understand that, upon receipt of the letter, she contacted Mr. Stewart who asked her to meet with his lawyer, Mr. Chen (Stefani Dep at 58:1-23). Taking Ms. Valenzuela's statements as true, Mr. Chen advised her that Rule 11 does not apply and to file preemptively when you have done something wrong, tried to work with her to stop her from being deposed by offering to represent her in bringing her own case against my clients (something she did not seek and was only looking for counsel to represent her during the deposition) and advising her that, if she brought an action against my clients for employment claims, she would not have to testify in this case along with other claims. (Stefani dep at 56:7-65:22).[2]

This conduct of trying to find a way to stop relevant testimony is improper and appropriate sanctions should be awarded for such conduct as well.[3]

---

[2] A recorded statement was also made of Ms. Valenzuela prior to her deposition during which time, and also on the call, were her lawyer, Steven Schuster, Esq. (a member of the New Jersey bar), and Mr. Kaltner. This is being provided separately to Mr. Chen under our continuing discovery obligations – which have not been reciprocated (See Stewart Dep at 234:1-235:4).

[3] Neither my clients nor I are averring any form of misconduct on behalf of Mr. Chen. Rather, we believe that Mr. Stewart told Ms. Valenzuela to talk to Mr. Chen. We believe that Mr. Stewart advised her that Mr. Chen would represent her for free. Thereafter, we believe that Mr. Stewart told Mr. Chen that Ms. Valenzuela wanted to meet him to bring an action against my clients for FLSA violations and to work out a way to not testify in this case. We view the totality of facts as evidence that Mr. Stewart would even seek to deceive his own lawyers in a further attempt to hide evidence which is relevant and shows that Mr. Stewart's defenses are specious at best and, in addition, the companion FLSA case is frivolous and predicated upon falsehoods that – if known – would result in immediate dismissal.





Along this same issue, Mr. Chen has made himself a fact witness yet again and as tacitly admitted during the May 30th telephone conference. He met telephonically with a fact witness in the case, on his own (Stefani Dep at 61:7-8), and she has made allegations about the conduct which raises questions of fact in this case. On the last telephone conference with the Court on May 30, 2018, the Court warned Mr. Chen, again, of being a witness in the case. We renew our prior statements that he has made himself a fact witness over and over again.

The citations are only a small sampling of the discovery violations confirmed in deposition and we now believe that there is a substantial amount of additional documentation (both in paper and electronically) that have not been identified pursuant to Rule 26 so we would, at the very least, know where to look. Indeed, within the greater than 3,500 pages of text messages (confirmed in the depositions), there are innumerable admissions of wrongdoing by Mr. Stewart that raises questions as to his credibility – not only here but in the companion FLSA case including: seeking money to bring law suits from his friends and colleagues with promises of 15-20% returns (Stewart Dep at 148:9-16; 162:10-22); trying to have others bring lawsuits (Stefani Dep at 26:14-27:9; 54:8-18); discussing how Mr. Stewart was a supervisor at my clients' companies with several people working below him, training them, and creating procedures (Stefani Dep at 20:1-2; 24:17-25:12); that Mr. Stewart had been chastised for causing harm or otherwise failing to do some task properly (Stefani Dep at 107:2-108:1); admissions violations of the noncompete agreements (113:1-114:10).

Consistent with our application, we request that the Court hold a hearing to discuss this motion and set a briefing schedule where the deposition transcripts and totality of facts can be presented to the Court for a proper adjudication. As a common sanction is the imposition of counsel fees, we would request that the Court provide us with an opportunity to produce our time records, in camera or under seal, for the Court's review into a proper loadstar award.

We thank the Court for its consideration of the within request. Should the Court have any questions, I am at Your Honor's disposal.

Respectfully submitted,

Joshua M. Lurie, Esq.

JML:me

cc: Jacob Chen, Esq. (via ECF)

E
X
H
I
B
I
T

A

EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
CIVIL CASE NO. 7:16-cv-09337-KMK-LMS

GEORGE KALTNER (individually); COMPLIANT DIALER INC. d/b/a AVATAR OUTSOURCING; VOICELESS TECHNOLOGIES INC., SALES TECHNOLOGIES, INC., (defunct); and AVATAR TECHNOLOGIES, INC., (defunct),

Plaintiffs,

VS.

Deposition of:
DAVID STEWART

DAVID STEWART (individually); DAVID TPO, LLC (a New York Limited Liability Company); AVATAR DIALLER, LTD. (a foreign for-profit entity); DIALER360. LTD. (a foreign for-profit entity); PRIMO DIALLER, LTD. (a foreign for-profit entity); DAVID STEWART (in his official capacity as an agent of Avatar Dialler, Ltd. and Dialer360, Ltd.); DAVID STEWART (in his official capacity as the managing or controlling member of David TPO, LLC); AVATARDIALLER.COM (an internet domain name); JOHN DOES 1-80 (fictitious name to represent owners, operators, employees, directors, managers, and individuals with controlling interests in Avatar Dialler, Ltd., Dialer360, Ltd. and/or Primo Dialler, Ltd.); and CORPORATIONS A-1 (fictitious name to represent business entities with controlling interests in Avatar Dialler, Ltd., Dialer360, Ltd. and/or Primo Dialler, Ltd.),

Defendants.

\- - -

JUNE 5, 2018

\- - -

REPORTED BY: ASHLEY L. GRABOWSKI

Job No. NJ2930894

Transcript of the deposition of DAVID STEWART, called for Oral Examination in the above-captioned matter, said deposition taken pursuant to Supreme Court Rules of Practice and Procedure by and before ASHLEY L. GRABOWSKI, a Shorthand Reporter and Notary Public for the State of New York, at the offices of DAI and ASSOCIATES, P.C. 1500 BROADWAY, 22ND FLOOR, NEW YORK, NEW YORK 10036, commencing at 11:32 P.M.



A P P E A R A N C E S:

JOSHUA M. LURIE, ESQ.
Lurie Strupinsky, LLP
2 University Plaza Drive, Suite 100
Hackensack, New Jersey 07601
ATTORNEYS FOR PLAINTIFFS

JACOB CHEN
Dai and Associates P.C.
1500 Broadway, 22nd Floor
New York, New York 10036
ATTORNEY FOR DEFENDANTS

ALSO PRESENT: GREGGORY HOLDERMAN (VIDEOGRAPHER)



I N D E X


| WITNESS | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| DAVID STEWART | | | |
| BY: MR. LURIE | 17 | | |


E X H I B I T S


| PAGE # | DESCRIPTION | ID |
|---|---|---|
| 35 | NON COMPETE AGREEMENT | 1 |
| 47 | FACEBOOK | 2 |
| 48 | AGREEMENT | 3 |
| 53 | FACEBOOK | 4 |
| 56 | FACEBOOK | 5 |
| 61 | FACEBOOK | 6 |
| 74 | MESSAGE | 7 |
| 136 | TEXTS | 8 |
| 138 | TEXTS | 9 |
| 141 | TEXTS | 10 |
| 147 | TEXTS | 11 |
| 150 | AGREEMENT | 12 |
| 161 | TEXTS | 13 |
| 162 | FORWARDED COMMUNICATIONS | 14 |
| 166 | TEXTS | 15 |
| 169 | TEXTS | 16 |
| 180 | TEXTS | 17 |
| 219 | TEXTS | 18 |
| 224 | FACEBOOK | 19 & 20 |




R E Q U E S T S

| DESCRIPTION | PAGES |
|---|---|
| NONE | |

STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that the sealing, filing and certification of the within Examination Before Trial be waived; that all objections, except as to form, are reserved to the time of trial;

That the transcript may be signed before any Notary Public with the same force and effect as if signed before a Clerk or Judge of the Court;

That this Examination Before Trial may be utilized for all purposes as provided by the CPLR;

That all rights provided to all parties by the CPLR shall not be deemed waived and the appropriate sections of the CPLR shall be controlling with respect thereto.

IT IS FURTHER STIPULATED AND AGREED by and between the attorneys for the respective parties hereto that a copy of this Examination Before Trial shall be furnished, without charge, to the attorney representing the witness testifying herein.



THE VIDEOGRAPHER: I have begun the recording.

MR. LURIE: Thank you.

(At this time, a phone call is being made to the court.)

THE CLERK: Judge Smith's chambers.

MR. LURIE: Yes. Good morning, this a Joshua Lurie.

MR. CHEN: And Jacob Chen.

MR. LURIE: And we have a, a deposition that was scheduled this morning. And we would like to speak with the magistrate with respect to an issue with it.

THE CLERK: Okay. Can you just describe what the issue is, please?

MR. LURIE: Sure. The deposition was noticed for 10 o'clock in the morning. I, this is Joshua Lurie. I'm plaintiff's counsel. I called. I was stuck in a little bit of traffic, to advise that I was running a little late, and we may wind up starting around 10:30.

THE CLERK: Okay.

MR. LURIE: At 10:45, the deponent still had not arrived. Turns out that he apparently mistook the dates. He just appeared, now.



It's 11:15 A.M. after being noticed; so he's an hour and fifteen minutes late. I have been prepared to go for approximately an hour at this juncture.

THE CLERK: Okay.

MR. LURIE: And this is obviously of an issue due to the cost for the deposition. We have both a videographer and a court reporter present. They have been present since at least 10 o'clock this morning. And additionally, there have been legal fees which have been expended sitting here and waiting for the deponent to appear.

So, my issue was, I don't know how the magistrate wants to attend to this, since depositions were a significant issue at the last conference call last week, including the scheduling of the depositions for today.

THE CLERK: So, I'm a little unclear as to what the issue is. The deposition was noticed for 10 A.M. The deponent got in at 11:15 A.M. You're prepared to depose this witness for an hour, and I guess the issue is that the hour and fifteen minute period that you were waiting, you want to be -- you want to assess



costs for that period?

MR. LURIE: For an hour period on that, yes. Because once again, I did call and say that the deposition may start as late as 10:30, due to New York City traffic. The deposition is taking place in Times Square. So we're talking about approximately a one-hour period of time that has been unnecessarily wasted due to the deponent not appearing timely.

THE CLERK: And this is the defendant's 30B6 witness?

MR. LURIE: No. This is the defendant himself.

THE CLERK: Oh, the defendant himself.

MR. LURIE: This is the -- yes, this is the Kaltner V Stewart and this is the deposition of David Stewart.

THE CLERK: Okay. Um --

MR. CHEN: So this is Jacob Chen on behalf of Mr. Stewart. I had a preparation session with Mr. Stewart yesterday. I told him about the deposition that was taking place on Thursday, and apparently he misunderstood me. He got that date in his head, and he thought that was the actual date of the deposition, not

Page 10

realizing what I meant was that that's the deposition of the plaintiffs, which I invited him to attend if he has time available. So he didn't realize that the deposition was today until we were able to reach him, and then he immediately headed down as quickly as he was able to, and is here now and is ready to proceed with the deposition.

THE CLERK: Right, right. Okay. Hold on one second. Let me see if the judge is around.

MR. LURIE: Thank you.

THE VIDEOGRAPHER: Just a reminder, I'm still recording.

THE JUDGE: Good morning, counsel.

MR. LURIE: Good morning, Judge.

MR. CHEN: Good morning.

THE JUDGE: What seems to be the problem?

MR. LURIE: Your Honor, as we mentioned to your clerk, this -- we're here for the deposition of Mr. Stewart. It was noticed for 10 o'clock this morning. I was stuck in a little bit of traffic getting through into the city. The deposition is taking place as Mr. Chen's office in Times Square. I emailed Mr. Chen saying, I'm stuck in a little bit of

Page 11

traffic; and the deposition may start as late as 10:30. I did arrive at the office approximately 10 o'clock, which was the noticed time for the deposition. At that point Mr. Chen popped in his head and said, I thought we were going to be about 10:30. I said, that's fine.

At 10:30 the deposition did not begin. I spoke to Mr. Chen who advised me that he was -- his client was not here. He had not advised his client in advance that I had asked to be a little bit later, and he was unable to reach him at that time. At 10:45, now I've been sitting here for, and ready to go with the deposition for about a half an hour, Mr. Chen comes back in, says that he was able to get in touch with his client, that his client had a mistake with respect to the dates and was on his way.

Mr. Stewart appeared here approximately the same time that we called up the court, which was at 11:15. So for approximately one hour, we've been sitting here waiting to be able to begin this deposition. And at the very least, 45 minutes from when we should have been

Page 12

able to begin due to Mr. Stewart's failure to timely appear, even if he was confused with respect to the deposition date. While counsel, I'm sure will make his point about this, he had a deposition prep session yesterday, which was just told to your law clerk, your Honor's law clerk; and he confused the dates after that? I really don't understand what's happened. But once again, we've been sitting here waiting. We have both the videographer and the court reporter as noticed. And we've been ready to go. We're being assessed costs for the time that we were sitting waiting. My client's being assessed legal fees for the time sat -- that he's sat waiting. And as trivial as this sounds, Judge, I drove into the city, parking in the parking lot, a cost that would be assessed to my client. I'm not going to make the early bird release from the parking garage, which is an additional cost that my client -- should not have been subject to, which is the result of Mr. Stewart's failure to appear at the time that he was noticed.

MR. CHEN: Your Honor, this a Jacob Chen on behalf of Mr. Stewart. During yesterday's

Page 13

preparation session, I had invited him to the deposition of Mr. Kaltner, which was taking place on Thursday. But I think I mixed up to the dates; so when I told him that, I think I mixed up the dates in his mind; and he thought the deposition was taking place on Thursday. As soon as I called him -- as soon as I was able to reach him, he immediately headed down from work. And he is now here. And he's prepared to have his deposition taken.

And I understand where Mr. Lurie is coming from, but it's an honest mistake on his part. He was not trying to cause Mr. Lurie to miss the early bird special on his parking garage. You know, and he's here. He's ready to be deposed and ready to have his questions taken. And immediately as soon as I advised him, he -- as soon as I reached him, he left work and came down here and is repaired to have his questions taken.

THE JUDGE: So Mr. Lurie, if this was essential to raise this with the court right now to further delay the deposition so that you could satisfy yourself that your client would be reimbursed for this amount of costs? This

is not something you could have submitted on paper tomorrow, for example, in order to use the time that you have wisely? Is that right?

MR. LURIE: Your Honor, respectfully, Mr. Stewart when we called the court was not here. He arrived after we started making this call and preparing for it.

MR. CHEN: That's not the case. He arrived and then we made the call.

THE JUDGE: You said to me moments ago that he arrived at the same time that the first call was being made, at which point it was possible to say, oh, I'm sorry, we'll make a submission to the court.

I just don't understand, Mr. Lurie. You knew he was on his way. You couldn't wait five more minutes? Okay. Maybe you couldn't. But this still required calling back. Not a good use of your time. Go forward with the deposition. Make your application in writing.

MR. LURIE: Yes, Judge.

MR. CHEN: Thank you, your Honor.

THE VIDEOGRAPHER: All right. I'm going to stop this recording.

(A short break was taken.)



THE VIDEOGRAPHER: We are now on the record. The time on the video monitor is 11:30 A.M. on June 5th, 2018. Please note that the microphones you're wearing are sensitive. They can pickup whispering, private conversations, just something to be aware of throughout the deposition. Also, if you can, please turn off your cell phones. I understand if you're unable to do so. Please just keep them away from the wires in the center of the table and the wires that you're wearing, as they can interfere with the deposition audio.

Recording will continue until all parties agree to go off the record. This is media unit number one during the video recorded deposition of David Stewart in the matter of George Kaltner, et al, V. David Stewart, et al, filed in the United States District Court for the Southern District of New York, case number 7:16-CV-09337-KMK-LMS. This deposition is being held at Dai and Associates, P.C., located at 1500 Broadway, New York, New York.

My name is Greggory Holderman. I'm the videographer from the firm Veritext, New York. Our court reporter today is Ashley Grabowski,



also from Veritext. I'm not authorized to administer an oath. I'm not related to the parties in this action, nor am I financially interested in the outcome.

Counselors, would you please identify yourselves and state whom you represent for the record?

MR. LURIE: Good morning. Joshua Lurie, L-U-R-I-E. And I'm here on behalf of the plaintiffs; Compliant Dialer, Inc.; Avatar Technologies, Inc.; Sales Technologies, Inc,; Voiceless Technologies, Inc.; and George Kaltner.

MR. CHEN: And this is Jacob Chen from Dai and Associates on behalf of Mr. Stewart.

THE VIDEOGRAPHER: Thank you. Will the court reporter please swear in the witness?

(At this time, the witness was sworn in by the court reporter.)



DAVID STEWART, using the address of 610 West 150 Street, Apartment 5-J, New York, New York 10031, having been duly sworn by the Notary, testified as follows:

DIRECT EXAMINATION BY: MR. LURIE

Q Good morning, Mr. Stewart.

A Good morning.

Q My name is Joshua Lurie. I represent Compliant Dialer, Inc.; Avatar Technologies, Inc.; Sales Technologies, Inc.; Voiceless Technologies Inc. and George Kaltner in this matter. Before we begin, I have some preliminary questions for you.

Other than in the companion case to this matter, which is the FLSA matter being litigated in the Southern District between the same parties, have you ever been deposed?

A No. I don't think so.

Q Are you currently under the influence of any drugs or alcohol that may impair your ability to give truthful testimony today?

A No.

Q And are you able to provide me with true and complete answers today?

A Yes, I can.

Q Now, I apologize that this is going to be

Page 18

a little bit representative. There are just the general ground rules. I do this in every single deposition. It just makes things work a little bit easier. This is a deposition, while taking place in this informal setting in your attorney's office, you're here to provide testimony. Testimony is the same as if you were testifying in court. The court reporter to my right, to your left, will be taking everything down that we say, and the videographer is recording everything that we say today. The court reporter at the end will create a transcript, which could be read in court as though you've testified to the statements in the transcript. Do you understand?

A Yes.

Q Now, because this is being recorded, in two different ways, it's very important that a few guide lines are met. The first is that we do not talk over one another. Please allow me to finish my question before providing any answer. If we speak at the same time, the court reporter cannot properly keep track of the discussion. Do you understand?

A Yes.

Q Okay. All of your answers must be verbal, that has with words. Yes, no. Please do not use

Page 19

nonverbal responses, such as shaking your head, or nodding, or using verbal sounds such as uh-huh or uh-uh. So, while it may make sense on the video recording, it will not make sense on the transcript. It won't properly translate to the transcript. Do you understand?

A Yes.

Q At times your attorney may object to my questions. Most often, these are objections to the form of the question and meant to preserve the record. You will still be required to answer the question if you can. The only times you should not answer my question is if you were specifically directed not to. Typically, this is because of a legal privilege. It's possible that we attorneys may have a brief discussion, either within your presence or in certain circumstances ask you to excuse us, so we can discuss the issue outside of your presence. Do you understand?

A Yes.

Q If you cannot provide an answer because you cannot understand the question, please let me know. It's very possible that I've asked a question which is confusing. We don't want you to be confused. We want you to provide true and complete

Page 20

answers. Do you understand?

A Yes.

Q When you are answering a question, I expect you to provide me with the true and complete responses. Are you able to provide true and complete responses today?

A Yes.

Q If I ask you for something specific and you cannot provide specifics, do not guess. We do not want guesses. You may estimate it, if possible. Also, if you do not know the answer, that's perfectly acceptable as well. You can tell me you don't know the answer. However, please do remember, if do provide an answer to the question, we will rely upon your statement, and we will construe it as any response that you understood the question, that you're being precise and you're being true, accurate, and complete in your response. Do you understand?

A Yes.

Q At any time you need a break to use the bathroom or for any or reason, please let me know. This is not an endurance test for you. However, I will ask that if there's any pending question that you finish answering it. Do you understand?

Page 21

A Yes.

Q Now, this is where it's a little bit interesting. I understand that you've been deposed in the companion case; and I'm going to do my best not to repeat those questions. However, at some points, that just may be inevitable. We generally have been instructed by the court not to seek testimony about any of these issues, which you've already answered in your prior deposition. So if I start going down that line of questions, which has already been in the other deposition, we will likely stop. And your attorney will likely advise me that this was already asked at the other deposition in depth. That's not to say there maybe little points that we may touch on that, but just be prepared that there may be some interruptions if we start going down a sort of questioning route that we have already addressed in another deposition.

Now, final rule is, once we begin, you're not to speak with your attorney about anything with respect to the case until the deposition is concluded. You're under oath and providing testimony. Therefore, you've had an opportunity to speak with your lawyer with respect to this deposition?

Page 22

A Yes.
Q Do you need any additional time to speak with him before we begin?
A I would always take time, you know, if it's --
Q Do you require any additional time with your attorney before we begin?
A Oh, yeah. I'll take time.
MR. LURIE: Let's go off the record for five minutes.
THE VIDEOGRAPHER: We are now off the record. The time on the video monitor is 11:38 A.M.
(A short break was taken.)
THE VIDEOGRAPHER: We are now on the record. The time on the video monitor is 11:40 A.M.
Q We're back on the record. You had a moment to step outside and speak with your attorney before we begin. Have you reviewed any documents in order to prepare yourself for today?
A Yes.
Q What did you look at to prepare for today?
A There was, like, three documents. I don't remember their names. I just --

Page 23

Q Could you describe the documents?
A Interrogatories, the complaint, and the notice to show.
Q I'm sorry. When you say notice to show, what does that mean?
A To appear here.
Q So your deposition notice?
A Yes.
Q So you did receive a copy of the discovery request of the deposition notice, the interrogatories, and also discovery requests in this matter?
A Um, yeah.
Q Did you review them?
A To an extent, yeah.
Q Did anyone except for your attorney, or anyone working for your attorney, help you to answer any of those interrogatories --
A No.
Q Once again, wait for me to finish the question.
A No.
Q It's for the court reporter's benefit. It's normal in a conversation. You know where I'm going, and you want to just jump in, but --

Page 24

A Yeah.
Q Please -- now, in this case, you've produced approximately 600 pages of documents. Is that accurate?
A I'm not sure.
Q A substantial --
A It could be 600 or more.
Q A substantial amount of documents, correct?
A Yes.
Q Can you tell me what you did to search for the documents that you produced?
A I believe they were part of the laptop that I used personally and while I was working.
MR. CHEN: I do want to state to state on the record that in addition to the documents he produced, he turned over access to his online email accounts, turned over access to his online social media accounts, and turned over his phone and laptop for a clone to be made. So, in addition to the paper documents he produced, he also turned over authorizations and a tremendous amount of digital documents.
MR. LURIE: Yes. Thank you, counsel.
Q At this point, I'm just interested in what

Page 25

you personally did in order to collect documents, which were provided pursuant to the discovery requests. We'll get a little bit more into that in a second. I apologize. These are just general questions that I ask at every deposition. Have you ever been convicted of any crime, misdemeanor, felony, or anything like that?
A No.
Q Have you ever been involved in any other civil lawsuits besides -- just for the ease of this -- this matter and it's companion case, as well as the department of labor case where all the parties are the same?
A There was something from the Philippines that was issued by your client to me.
Q Is that the only other civil action that you've been involved in?
A To the best of my knowledge, yeah.
Q Do you understand what I mean when I say a civil action?
A Meaning -- explain a little further.
Q What I mean by this, anything where there are two private parties who are suing one another for monitary damages or to be directed to do something, or -- let me correct this. I'll make

this a little bit easier. Anything where your liberty or money cannot be taken from a court, specifically a criminal action. So basically anything that's not a criminal action, have you been --

A So would something like in small claims court matter?

Q Yes. Have you had small claims court action?

A I probably had two of those, maybe.

Q What were they with respect to?

A I don't recall.

Q Do you recall approximately when those took place?

A About prior to 2011.

Q Were they in collection on credit card type cases, motor vehicle accident?

A Oh, no. It was seizure of my computers.

Q Seizure of your computers?

A Yeah.

Q What does that mean?

A I was working with George Kaltner and Oscar, and I brought my personal laptop to the company; and they didn't pay the bill. And the guy went and seized the laptop. And so I went to file



for my equipment.

Q So you went to a court because of a prior job. You had brought in a personal laptop, and the owner of that business took it?

A Yes. The owner of the space.

Q The owner of the space took that. Okay. And what was the outcome of that matter?

A I lost.

Q You lost?

A Yeah.

Q Okay. Was there a trial?

A Um, I don't remember. It was, um, I went there about three times; and the judge ruled against it. After -- I don't remember too much about it. It was --

Q Where was this court? Which court was this?

A Um, small claims in Harlem. 122nd in east side.

Q So this would be the city court of New York City, small claims?

A To the best of my knowledge, yeah.

Q Now, we started talking a little bit about these documents produced, that you produced in this case. There are approximately -- and I will



represent, approximately 600 pages of paper documents, which you directly produced, not including anything electronically obtained. And that was through both discovery, as well as attached to various pleadings. Does that sound about accurate?

A I would assume based on your numbers, I could only go by that because I don't have this document, you know, in front of me.

Q I understand. But you provided your attorney with a sizable amount of documents and said, here this is what you need to answer these discovery requests?

A Yes.

Q And many of those documents were either emails or documents from the time that you were providing service to my client. Is that correct?

A Repeat that again.

Q Sure. Maybe this will -- we should step back a little bit.

A Mm-hmm.

Q I know that there's a dispute about this, so I'm not going to utilize anything. So if it works out just to make this for the ease because of the dispute, can we agree that we will say that you



were providing services to my client? That way, we're not arguing about employment, versus nonemployment? We're just talking about services provided. Is a that fair?

MR. CHEN: Sure.

Q There was a time you were providing services to my client, correct?

A I wouldn't call it services. I would call it, I was an employee.

MR. CHEN: But just because we don't want to spend, you know, two hours of, you know -- every time the question is asked --

THE WITNESS: Why not just go with employee of the client?

MR. CHEN: Mr. Lurie is not going to say that you were an employee. And every time he asks you -- he doesn't want to have so stay, you know, we understand there's a dispute as to whether or not you were an employee. And were his questions, you know, very long, paragraph format in which the entire record gets messed up.

THE WITNESS: In my frame of mind, you know, it throws me off. I want to be honest, that you know, if I'm providing service and I'm

Page 30

a contractor --

MR. CHEN: So for the convenience of everyone when Mr. Lurie asks you, did you provide -- when he asks you about the services you provided, everyone understands that you are not admitting that you were an independent contractor. He's not going to say that because you said you provided services. You were an independent contractor. And that clears everything up.

THE WITNESS: Okay.

MR. LURIE: Yes. And once again it's because, we attorneys are not here to testify. It's to obtain your information. And I don't want to make disputes at this point. This is to get information. So once again, utilizing that term. There was a period of time that you were providing services for my clients, correct?

A Yes.

MR. CHEN: Just one more note. When you say your clients, I understand you're here on the capacity representing Mr. Kaltner, Compliant Dialer --

MR. LURIE: Compliant.

Page 31

MR. CHEN: Compliant Dialer. But also Avatar Philippines and a number of entities.

MR. LURIE: Avatar Philippines is not a party to this action. Voiceless Technologies.

MR. CHEN: You represent a number of entities, and we're not discussing which --

MR. LURIE: Not at all.

MR. CHEN: -- entities that you're providing services for, just that you represent a number of entities that he provided services to, a number of entities without your questioning or prejudicing anyone in one way or another about which entities he provided services for.

MR. LURIE: Yes. To make this even simpler, at some point you were providing services to, at the very least, a company called Sales Technologist Inc., correct?

A Yes.

Q Avatar Technologies, Inc.?

A Yes.

Q And a company towards the very end, at least, that was called Avatar Outsourcing, Inc.?

A Never.

Q You didn't provide services for Avatar

Page 32

Outsourcing?

A No.

Q Generally you were providing services for George Kaltner?

A Yes.

Q So during that time, you had access to an email account with these business entities?

A Yes.

Q And you had access to various documents as a result of your providing services for these business entities, correct?

A Yes.

Q And in producing documents in this case, many of these documents were emails from those business email accounts, correct?

A Yes.

Q And many of them were documents that you came into possession of while you were providing services for those entities, correct?

A Yes.

Q When -- jump a little bit forward. In approximately April of 2014, you ceased providing services. There's a dispute. I don't want to get into the dispute aspect of it, but you were no longer providing services for these entities,

Page 33

correct?

A Yes.

Q Why didn't return these documents to these companies?

A At the time of my firing, the documents was requested at the time. But I had a lot of devices that had this information on it.

Q You didn't go through them looking for these documents that were business records to return them?

A No.

Q You didn't go to destroy them?

A No. It was never asked of me. It wasn't in the policy or -- never -- no one -- you know.

Q Do you believe that you -- strike that. Some of these were confidential business records, correct?

A I'm not sure.

Q There were internal discussions with accountants regarding the finance of the business, correct?

A I would have to see a few just to fully --

Q Let's go through a couple of these. Do you recall producing in this case any emails with the accountants for Avatar Technologies?

A Avatar Technologies accountants. To the best of my knowledge, yes.
Q Why did you have those documents after you ceased providing services for Avatar Technologies?
A I had them on my devices. I'm not sure what, you know --
Q Do you recall producing in this case emails between attorneys settling a case in Texas where you were asked to issue a payment?
A I would have to take a look. I'm not specific --
Q I'm asking for your recollection. Do you recall providing that to your attorney to produce in this case?
A I'm not sure. Like, what, it's -- there's a ton of files.
Q Let me ask you this. What was your basis for believing that you could continue to hold documents from your -- the company or companies that you formally provided services for?
A Based on the agreement they would have with me. I used -- normally companies would say, have procedures to say, you have return these. I used it on the laptop, personal and for the company. So I don't know how to --



Q Let's mark this one as Stewart One. It's a confidentiality non circumvention, non compete agreement between Avatar Technologies Inc. and David TPO, LLC.
(Stewart One was marked for identification.)
Mr. Stewart, what's being placed before you, which has been marked as Stewart One for identification purposes, I'd ask to you just briefly take a look at this document and tell me if you recognize this document?
A Yes, I do.
Q Being at the final page of this document, is that your signature?
A Yes, it is.
Q Now, I understand that your position in this case and the companion case is that, David TPO, LLC is a fictitious business. It's just, you are David TPO, LLC. Is that correct?
MR. CHEN: I don't believe that's his position in this case or the companion case. I believe in the companion case. We've stated -- at the legal position we've taken is different from how you characterized it just now.
MR. LURIE: Let me put it this way.



Q Has it been your position that the business known as David TPO LLC, while a legal entity was created for the purposes of paying you as an independent contractor, rather than as an employee, is that an accurate representation of your position?
MR. CHEN: Sorry. Can you repeat that?
Q It was an entity that was created for the purpose of having Avatar Technologies and Sales Technologies Inc. pay you as an independent contractor rather than as an employee?
MR. CHEN: Without ascribing to who made the decision to create the company or who made the decision to use the company to make the payments?
MR. LURIE: Yes. We're not going down that route, just that that's been your position. Is that a fair assessment?
A So David TPO is a company that George created for me to get payments.
Q Please. Mr. Stewart --
A I just want to be accurate, 100 percent.
Q No. Mr. Stewart, I'm going to be very, very direct with you. Listen to the question, answer the question. If you try to put something on



to the record that is not my question, I will ask you to stop. Listen to my question. Answer my question. David TPO, LLC, was an entity created and we are not going down the route of who told you to create it or whose decision it was.
MR. CHEN: Or who created it.
Q Or who created it. It was an entity that was created in your position, this has been your position, in order to pay you as an independent contractor and not as an employee. Is that correct?
A Yes.
Q And so therefore, any contract that was signed for David TPO, LLC would necessarily be a contract with David Stewart, correct?
A I see that the contract is signed by me.
Q Mr. Stewart --
A But not --
Q Mr. Stewart, once again, please listen to my question and answer my question. If we're going to go down this road, we are not going to be providing answers to my question. I will have another discussion with your attorney off -- without you being present. And I will ask him again to direct you to answer my questions. Has it been your consistent position that David TPO -- strike that.

Page 38

Has it been your position that a business signature for David TPO and in contract with David TPO is really a contract with you?

A From what's presented here, this contract was issued to --

MR. LURIE: Okay. Let's go off the record.

MR. CHEN: He's answering the question.

MR. LURIE: He's not.

MR. CHEN: You're asking him for a legal conclusion, whether or not his signature on behalf of David TPO binds him individually.

MR. LURIE: Counsel.

MR. CHEN: It's a legal conclusion.

MR. LURIE: Counsel, I've asked him if it's been his position. And this is the third time that he has --

MR. CHEN: He --

MR. LURIE: Counsel, please allow me to finish my statement.

THE WITNESS: I wasn't allowed to finish my statement.

MR. LURIE: I would like Mr. Stewart to step out of the room.

THE VIDEOGRAPHER: Counsel, I'm still on

Page 39

the record.

MR. LURIE: I would like Mr. Stewart to step out of the room.

THE VIDEOGRAPHER: Should we go off the record?

MR. LURIE: I want to go off the record just for the time that he's stepping out.

THE VIDEOGRAPHER: Okay. We are now off the record. The time on the video monitor is 12:01 P.M.

(A short break was taken.)

THE VIDEOGRAPHER: We are now on the record. The time on the video monitor is 12:03 P.M.

MR. CHEN: So, David, if Mr. Lurie asks you a question and he says it's a yes or no question, try to answer yes or no. If you don't understand the question, state that you don't understand. If the question is impossible to answer in a yes or no, then, you know, say that it is impossible to answer in a yes or no and as briefly as possible, explain why. But only if the answer is in fact impossible to answer as yes or no. Otherwise just, you know, be straight forward. Answer

Page 40

yes, no, I don't understand.

THE WITNESS: Yeah, but my issue is the question is coming in such a frame that based on what I know as truth -- and this is my deposition, I'm speaking the truth --

MR. CHEN: But just listen to Mr. Lurie's question and --

THE WITNESS: Okay.

MR. CHEN: -- try your best to answer it as accurately as possible. But if you don't understand, say you don't understand. If you can, though, answer yes or no. Try to answer yes or no.

THE WITNESS: All right. I'll give it my best.

Q Mr. Stewart, and I mentioned this at the beginning, you're here to provide testimony to my questions, okay? And there's a little bit of a confusion here. This is not your place to set forth any positions that you have with this case. You can do that with your attorney at a separate time. Today you're here to listen to my questions and answer my questions, only my questions. If you are going to refuse to answer my questions because you want to go onto some type of diatribe that is in

Page 41

favor of your position in this case, we will stop the deposition, we will have the magistrate back on the record, and we will deal with it with the court. So once again, Mr. Stewart, looking at this document, Stewart One for identification purposes, we've already agreed that is your signature on the last page, correct?

A Yes, it is.

Q Those are your initials on each page?

A Yes, it is.

Q Did you personally believe that you had to abide by the terms of this agreement?

A That's a no.

Q You didn't believe that you needed to comply with an agreement that you signed?

A I did not believe that.

Q Why not?

A Because this was something put together for all of the employees, and it was circulated after I had been working there for at least two years.

Q So why did you believe that you did not have to comply with this agreement?

A Because it was -- I'm not sure what to say about that.

Page 42

Q Well, you previously just testified and said, it's your position that you didn't have to comply with this agreement; and then you testified that the reasoning why was, you were already, quote on quote, employed for about two years before signing this agreement. So, is it correct, then -- is my understanding correct that, because of the fact that you were already providing services for Avatar Technologies Inc. by having a subsequent agreement that you signed, you don't have to abide by the terms?

A I never read this when I first signed it.

Q Those are your signatures, correct?

A Yes.

Q Those are your initials?

A Yup.

Q Is it fair to assume that someone who is looking at this would say you had signed it and agreed to it?

MR. CHEN: Objection. You can answer.

A We -- I was the one to distribute this to the office, so I just signed it because everyone else did.

Q So you distributed this? So you had this in front of you for a period of time?

Page 43

A Someone -- George sent it to me and said, hey, have everyone sign this. It didn't specify, you know, like -- not even sure.

Q You didn't think to read it?

A No.

Q Why don't you read this now?

MR. CHEN: For the record, I do want to point out that the document is very small font. It's a photo copy of an original document, where it's shrunk. And it's pretty tightly spaced out. So if you have one in a larger font?

MR. LURIE: I don't. Unfortunately this is what I have.

MR. CHEN: Okay.

A Can I ask a question? What was the period for this confidentiality --

Q No. You may not ask any questions of me, Mr. Stewart. I just asked to you read this document.

A Okay. I read some of it, yes.

Q Okay. What's your understanding of what this agreement is?

A Confidentiality, non circumvent, non compete agreement.

Page 44

Q And looking on page two --

MR. CHEN: Let the record reflect that he ended that statement with a question mark in his voice.

Q Fair. Your attention to the second page, section five, which is return of confidential information. You read this document, this paragraph?

A Read it.

Q Now, you previously testified, correct me if I'm wrong, that when you ceased providing services, you were told to return documents; but they were spread across multiple devices, correct?

A Yup.

Q So you think that at the very least that you were being told to return any confidential documents that you weren't to retain them?

MR. CHEN: Could you repeat the question?

MR. LURIE: Sure.

Q Do you think at the very least that you were told to return any confidential documents and not retain them?

A All right. Now that I read that. It does say it.

Q Why did you retain the documents?

Page 45

A I had -- to me, this, like -- when this was negotiated, I did not -- I'm not even sure if I ever got a signed copy back from the company. Well, to be honest, I did not think this was executable.

Q But you previously testified that you didn't even look at it?

A As I'm reading here. I signed it, and that was it, the day it was issued and passed around.

Q So, prior to today --

A Mm-hmm.

Q -- you've never read this document in depth?

A I don't think I read this fully or focused on it.

Q Do you think that it's fair that when you ceased providing services or whatever it is, by a business, that any business records, you should give them back?

A I don't know how to answer that question.

Q If you had an employee and you gave them documents for your business, and they stopped working for you, would you expect them to give you your documents back?

A I've never owned a company, so I'm not

sure.
Q Hypothetical. If you owned a business, you gave confidential business documents to your employee, terminated the agreement --
A To my employee? Of course.
Q To your agent, to your independent contractor, anyone. You give them confidential business records, okay? And you end that relationship. Wouldn't you expect them back?
A I guess that's what the HR department works on. I don't know how that should be.
Q Do you think you should post them online?
A I'm not sure what confidential business document I posted online, so please help me with that.
Q Do you think that the employment records, including all employees of a business on payroll and their pay would be considered a confidential business record?
MR. CHEN: I --
A What company are we discussing?
Q Not my question. Once again, do you believe that a payroll summary including all employees of a business and their pay would be something that would be a confidential business



record?
MR. CHEN: I object to the questioning in so far as a legal conclusion. But you may answer, if you know.
A Payroll of?
Q Mr. Chen, can you please direct your client to answer the question?
A What was the question?
MR. CHEN: He asked, are the names of employees and how much they're paid, do you consider that confidential information?
THE WITNESS: Yes.
Q Do you think that should be posted online?
A No.
MR. LURIE: Show you what's been -- let's mark this as Stewart Two.
(Stewart Two was marked for identification.)
MR. CHEN: Note my objection that he's not qualified to answer whether or not --
MR. LURIE: It's confidential. I understand.
MR. CHEN: It constitutes as business information.
MR. LURIE: Six pages.



THE WITNESS: Um.
Q Mr. Stewart, I placed before you what's been marked as Stewart Two for identification purposes. Please take a moment to look at this document and tell me when you've completed.
A Yes.
Q Did you previously utilize a Facebook profile where you called yourself Kal El?
A Yes.
Q And is this a post that you made under the name Kal El?
A Yes.
Q And is this the payroll summary for Avatar Technologies Philippines Inc.?
A Yes.
Q And you provided some services for Avatar Technologies Philippines Inc., correct?
A No.
MR. CHEN: Who are not a party to this litigation?
MR. LURIE: They're not a party in this litigation. They don't exist anymore. Stewart three.
(Stewart Three was marked for identification.)



Q Mr. Stewart, I placed before you what's been marked as Stewart Three for identification purposes.
A Mm-hmm.
Q Have you ever seen this document before?
A Yes, I have.
Q With looking at the last page, third page, is that your signature?
A Yes, it is.
Q I'm just going to read the first line, first sub paragraph of the first page. Please tell me if I read this correctly. This agreement is made between David A. Stewart, employee and Avatar Technologies Philippines Inc. on August 13th, 2014, and shall form an integral part of employee's contract hereto attached. Did I read that correctly?
A Yes.
Q So is it still your contention that you never provided any services in any way to Avatar Technologies Philippines Inc.?
A Never provided services.
Q You had an employment agreement with them, correct?
A Yes. Did you see that as an employment

Page 50

agreement?
Q Never did any auditing for them?
A Nope. I'm not qualified for doing an audit.
Q You're not qualified to perform any audits?
A No.
Q Any form of audit?
A No.
Q You had no involvements with the payroll for Avatar Technologies Philippines Inc.?
A Payroll? No.
Q Any billing for Avatar Technologies Philippines Inc?
A No.
Q Work with a couple of employees over there?
A Worked. I was -- I think I was able to work in the Philippines, but I've never worked for a corporation in the Philippines.
Q Did you provide services for one?
A Provide services. Getting paid for services? Never.
Q Do you know someone named Agrain [ph]?
A Do I know that person?

Page 51

Q Yes.
A Yes.
Q Who is Agrain?
A An employee of sales technologies that sits in the Philippines.
Q Okay. Do you know she is in the United States now, right?
A Yes.
Q You know her last name is now Tal, correct? Tal, T-A-L. Are you aware of that?
A Yes. Well, not of the last name fully. But I know she's here.
Q You're aware that she got married to a U.S. citizen, correct?
A Okay.
Q Yes?
A Yes.
Q Even if you were not an employee -- well, strike that. How would you get a copy of this payroll record, payroll summary, for Avatar Technologies Philippines Inc.?
A Someone might have emailed it to me.
Q Who?
A Not sure.
Q When?

Page 52

A I don't know.
Q Do you still have the email?
A It should be in the records that I sent over, if I --
Q I'll represent to you, I have seen no email that's from anyone over in the Philippines saying, David Stewart, here's a copy of the payroll summary for Avatar Technologies Philippines. Can I ask you what you mean by, why are these sent to me to post, question mark, oops, any way, there they are?
MR. CHEN: I want to note that the Facebook post -- this is three, this is --
MR. LURIE: Two.
MR. CHEN: Two does not have a date on it, as far as I can tell. There's a time stamp, but there's not a date.
MR. LURIE: Noted.
Q Mr. Stewart, what did you mean by that?
A Why are these sent to me -- post -- oops. Here they are any way -- I guess -- I guess they were -- I was assuming they were sent to me, or making up a story that they were sent to me. I don't even -- but what does this have to do with --
Q Okay. Mr. Stewart --

Page 53

A Avatar U.S. --
MR. LURIE: Let's do this as four.
(Stewart Four was marked for identification.)
Q Mr. Stewart I placed before you what's been marked as Stewart Four for identification purposes. Do you recognize that?
A Yes.
Q Poster is Kal El again, correct?
A Uh-huh.
Q And that's you?
A To the best of my knowledge, yes.
Q Now, this is an attachment of some type of photo. Is that correct?
A Yup.
Q What is that photograph?
A It's Philippines system report, priority report, I think. Priority system report.
Q Shows some monthly earnings on it, correct?
A 80,000 pesos.
Q What is the position?
A Director and VP of compliance.
Q What's the date stamp on that?
A June 10th. What year, I'm not sure.

Q Well, let's take a look down at the picture in the lower left-hand corner of that. What's the date stamp that was received?
A May 2015.
Q May of 2015, you were not providing any services for any of my clients, correct?
A Okay.
Q Is that correct?
A Yes.
Q Now, another claim here -- strike that. You've read the complaint in this matter, correct?
A Yes.
Q You're familiar with the complaint in this matter?
A Not to an extent. But you can refresh me.
Q And you have drafted a separate complaint against my client for violations of labor laws, correct?
A To the best --
Q To the best what?
A Yes.
Q And is it fair to say that in both of these complaints that it addresses Avatar Technologies Philippines Inc. as at least having some type of relationship with George Kaltner?



A I've seen that in there.
Q So a fair assessment to say that in your complaint you said it was George Kaltner?
A Yes.
Q So, please tell me how you got a copy of an internal report, whatever it is, from Avatar Technologies Philippines Inc. on June 10th?
A I'm not sure. You would have to check in my email to see where --
Q Who's --
A -- this came from.
Q Who's Marco Jabien [ph]?
A An employee -- he was -- I guess he was employed by Avatar, I would assume.
Q Avatar what?
A Avatar Technologies Philippines.
Q Why is he your friend on Facebook?
A Why not?
Q How did you come to know him?
A Facebook friends.
Q How did you become Facebook friends?
A Maybe through another friend.
Q Who?
A I'm not sure. I have heard of the name. Never met the guy.



Q What do you mean by, I giveth and taketh requests too?
A Giveth and taketh requests to? I'm not sure. That would be an assumption.
Q Well, those are your words, correct?
A Yup.
Q You typed that?
A Yup.
Q No one else typed that for you, correct?
A Nope.
MR. LURIE: Stewart Five.
(Stewart Five was marked for identification.)
THE WITNESS: Oh, I guess I was responding to --
MR. LURIE: No pending question, Mr. Stewart.
MR. CHEN: He was answering your last question. I think my client wants to supplement his answer to your last question.
Q Are you guessing with this response, Mr. Stewart?
A No. I just read the, PM me this person's earning amount of dough, L-O-L.
So, he's making a joke, and I responded to



him. I giveth and I taketh requests too.
Q Did you -- strike that. What does PM stand for?
A That would be, call him or, you know, dial him on the Facebook.
Q Do you have --
A A personal message.
Q Personal message?
A Yeah. I guess that's what --
Q Did you personal message him?
A I have talked to him before. It would be on my Facebook feeds that you guys have.
Q So you've spoken to Marco Jabien, but he's a Facebook friend. You don't know how you met him, but you're having conversations with him?
A I met him on Facebook; and I knew that he worked for Avatar Technologies Philippines, and I remember his face, yes. I remember who this guy is now. I do.
Q What did you discuss with Marco Jabien in private messages?
A I'm not sure. That would be -- I gave the guys all access to that. So you'll be able to read it.
Q Is Kal El still an active Facebook

profile?
A Oh, no. I tried to --
Q Please.
A I was trying to retrieve it, but I couldn't prove my identity.
Q Who is Tria Ducay?
A I would assume a Filipino who worked for Avatar Technologies, Rainbow Slushy.
Q Do you know that, or do you believe that?
A Tria. Let's see. I know that.
Q She worked for which business?
A Both.
Q And who is JM Ibara [ph]?
A A person that might have worked for Rainbow Slushy, I think, only.
Q Mr. Stewart, I present before you what's been marked as Stewart Five for identification purposes. Please take a look at this document and let me know when you've completed your review.
A Yes. I know what this is.
Q Do you recognize this document?
A Of course.
Q What do you mean -- strike that. What is this document?
A This is a public information that I



posted, yes.
Q What do you mean by, you just got to know where to look?
A Yes. You have to know where to look to find these public information.
Q Why are you looking for this?
A Avatar. Why? To know the standings of -- what date was this? June 9th -- to know the standings of the company.
Q Why did you want to know the standings of the company?
A Just to know things.
Q Why?
A I worked for the company. I care for, you know, to know things. When are they -- reports they posted and stuff.
Q Did they post this?
A No. This is public information.
Q Why did you post it?
A Because it was public, and I like posting. I didn't have --
Q Did you like posting the payroll records for Avatar Technologies Philippines?
A That was -- that was -- why did I post this? Not sure why I posted that.



Q Mr. Stewart, why are you posting any of this?
A Oh, I remember now. Let's see. What's this? June -- I'm trying to think to see. Why did I post these? I need a date here. Can I get the date of this?
Q It says June 9th.
MR. CHEN: Which document are you referring to when you ask for the date?
A The Kal post --
Q Stewart Five is June 9th.
A June 9th.
Q Stewart Four is June 10th.
A Oh, I was heading to the Philippines, I think. I had purchased tickets to the Philippines.
Q So why are you posting the payroll records for a company which you claim you provided no services for?
A I don't even know.
Q You have no reason to do so?
A I don't know what was going on at the time at Philippines, Avatar Philippines. But, it must have been something happening, either someone sent me this and said post it or --
Q Who?



A I'm not even sure.
Q Were you asking people for documents?
A No.
Q Do you know someone named Carmel Adolofo Lozada?
A Employee of Avatar Philippines.
Q Okay.
MR. LURIE: Let's do this as Stewart Six.
(Stewart Six was marked for identification.)
Q Mr. Stewart, I placed before you what has been marked as Stewart Six for identification purposes. Do you recognize this document?
A Yes.
Q What is this document?
A A Facebook message with an employee of Avatar Philippines.
Q Do you recall having this conversation with Carmel Adolofo Lozada?
A Yes, I do.
Q What does -- what did you mean when you wrote to her and said, where can I get copies of those papers from?
A The closure of Avatar Philippines.
Q Which papers?

Page 62

A The documents that the company is closed.
Q Why did you need those documents?
A To know their status.
Q Why did you need to know their status?
A I think there was a dispute with Avatar Philippines and a friend of mine.
Q Who?
A Mia -- I forgot Mia's last name. It was Mia, Fritz, and Maria.
Q What was the dispute?
A They weren't -- I think they weren't getting paid something.
Q What weren't they getting paid?
A Their, like, final salary or something.
Q Are you in an attorney in the Philippines?
A No.
Q Are you -- I believe you previously testified that said you weren't even permitted to provide work in the Philippines, correct?
A I wasn't.
Q So what were you going to do if you got copies of those papers?
A I would send it back to them.
Q Send it back to who?
A Fritz, Maria, and Mia.

Page 63

Q You wouldn't post them online?
A If they were public information.
Q Are the payroll records public information?
A No. But at the time, I was not -- I didn't work for them. So I didn't deal --
Q Do you know if closing documentation for business in the Philippines is public information?
A I don't know the rules of the Philippines. It's similar to this post here. You can go up and get public information. And I could have sent it out.
Q What's your purpose for posting these documents related to a business that you claim you never provided service for on Facebook?
A Someone was having an issue -- my friends were having an issue with -- based on the closure, why they're closing. And I wanted to -- you know, I requested for closing a document to a person that should not -- I think -- I don't have a date stamp here, but she was not an employee; and the same way I can get it here in America, I thought they could just go on their website and find out if the company closed.
Q Why didn't you?

Page 64

A I didn't know how to access that. I only know how to do it from the U.S. side.
Q You previously testified that, shortly after you ceased providing services for my clients, you went to the Philippines, correct?
A Yes, I did.
Q When did you go to the Philippines?
A About, July 15th.
Q And how long were you there?
A Two and half to three weeks.
Q What was your purpose of going to the Philippines?
A Vacation to see my friends.
Q Lot of friends in the Philippines?
A Yeah.
Q How do you have all these friends in the Philippines?
A I met them.
Q When did you meet them?
A Between June 3rd, 2014 to September 29th of 2000 something -- 2000 -- September 29, 2014.
Q What were you doing in that time frame?
A I was sent to the Philippines.
Q What were you doing in the Philippines?
A I was sent to -- I was sent to snoop on

Page 65

people stealing money.
Q Who?
A Or items. Anyone.
Q What other reasons did you go to the Philippines for that long period of time?
A That was it. That's what I was sent for. And then there was a, what do you call it, a trip in the middle; so I was -- after the trip -- yeah. That's when I returned.
Q You mentioned a company previously called Rainbow Slushy?
A Uh-huh.
Q What is Rainbow Slushy?
A One of George's entities in the Philippines.
Q Do you have any involvement with Rainbow Slushy at all?
A Yeah.
Q What was your involvement with Rainbow Slushy?
A To make sure they don't steal items.
Q Who doesn't steal items?
A Staff.
Q Did you go to check to see if people were stealing items?

Page 66

A Yes. I would walk around on my, you know, when I finished with my Avatar Technologies U.S. work.
Q What was your Avatar Technologies U.S. work?
A Billing.
MR. CHEN: From what time period?
Q He just said his work. I just want to know -- during that time -- let's say we're over there, while you're over there in this period of time from approximately, you said, June through September of 2014?
A Mm-hmm.
Q What was your Avatar Technologies work during that time?
A To make sure the billing was correct, and to, you know, make sure the recurring profiles generate, and make sure the money is collected.
Q Collected for who?
A Avatar Technologies U.S.
Q What was the business of Avatar Technologies U.S.?
A It was a -- we did -- what do you call it. It's like a phone company -- well, you should know.
Q No. I want to hear from you. What is

Page 67

your understanding of what the work was that Avatar Technologies United States did?
A They create -- what do you call it, software, and enable people to make a ton load of calls. And they bill these clients.
Q That's your understanding of what they did for the business?
A Yeah. And they got into other projects, but, you know.
Q So you traveled over to the Philippines for about three weeks, you said, in July of 2015?
A Yes, I did.
Q Did you go to the Philippines again after that point?
A Of course.
Q Why did you go -- strike that. When did you go to the Philippines again after that?
A February of 2016.
Q What was the purpose of your trip to the Philippines in February of 2016?
A I was going there to help someone start a call center.
Q Who?
A Ted Nehls. N-E-H-L-S.
MR. LURIE: Correct. N-E-H-L-S.

Page 68

Q Anyone else?
A That was my link.
Q Did you go over there to help open this business?
A Yes.
Q Were there any other people who were involved in the opening of this business?
A As -- what do you mean, like, the funder?
Q Who is the funder?
A Jeff Torrez.
Q Who is Jeff Torrez?
A Jeff Torrez was a client of Avatar Technologies U.S. -- I expressed this in the other deposition too.
MR. CHEN: No. That's okay.
Q As I said, we may touch upon these things, and your counsel will advise if this has been thoroughly investigated. So Jeff Torrez was a client of Avatar Technologies U.S.?
A Yes.
Q To the best of your knowledge, you had a contract with Avatar Technologies U.S.?
A I'm not sure.
Q Going back, to touch upon this -- not going down this too much. You said that you did

Page 69

billing for Avatar Technologies Inc. in the U.S.?
A Yes.
Q You sent out the bills?
A Yes.
Q You're familiar with the bills?
A Yes.
Q You're familiar with all the language contained within the bills?
A No.
Q To the best of your recollection, can you tell me without looking at one of these documents -- I presume that you sent out hundreds of thousands of these bills?
A Mm-hmm.
Q Describe what the bill would look like?
A An invoice from Fresh Books.
Q How many pages would such a document be?
A I don't know. The one.
Q It's a single-page document?
A Yeah. The Fresh Books invoice. Oh. No, no, no, no. If it's the profile, the profile should have, like, pages on it. It depends on how much language is on it. As a matter of fact, we sent that to you to check it out, I think. I'm not -- yeah.

Page 70

Q So you're generally familiar with the terms and conditions for the retention of Avatar?
A Well, never read it; but, because I wasn't a client, so, I'm just --
Q You were sending this out to all of the clients of Avatar Technologies, correct?
A Yeah.
Q If anyone ever had a question about it, would they call you? Who would they call?
A If they had a question --
Q If they had a question about the terms and conditions on the invoice, who would they call?
A George, I would assume.
Q Where was this call center that you were opening with Ted Nehls in the Philippines?
A Baguio, Philippines. B-A-G-A -- I'm sorry. I'm not sure how to spell it again.
MR. LURIE: Do it phonetically for the time being.
THE WITNESS: Yeah.
Q When approximately did you start doing that business?
A What was that?
Q Approximately when did you start to open that business?

Page 71

A Oh. Well, I didn't start. I went over there in February 15th of February 16 -- I mean February 2016, and I guess I would start.
Q Was the business already operational at that time?
A No.
Q So you were over there to help set this new business up?
A Yes.
Q Did you hire anyone for the business?
A No.
Q Were you trying to hire anyone for the business?
A No.
Q Mr. Stewart, do you utilize a piece of software called Viber? V-I-B-E-R.
A Yes.
Q Yes?
A Yes.
Q Whats Viber?
A Just an app to -- communication app.
Q Do you utilize that regularly?
A I would say so.
Q Do you have a telephone number associated with Viber?

Page 72

A Yes.
Q What's your telephone number associated with Viber?
A XXX-XXX-XXXX.
Q Is that the same number as your cell phone?
A Yes.
MR. LURIE: I will put a notation on the record that that should be redacted out in case we ever have to go and utilize this.
MR. CHEN: Sure. Thank you.
Q Are you familiar with a Viber telephone number of 639-159-308-942?
A No. I don't recall the numbers. It could live -- I don't recall the number. Sorry.
Q Do you still have the Viber app on your telephone?
A Yes.
Q Do you keep track of your conversations on the Viber app on your telephone?
A No.
Q You delete them?
A Of course.
Q Do you have a separate, for no better term, to utilize for this, contact list on Viber

Page 73

that is separate from the contact list on your cell phone?
A No.
Q So if you were going to call someone on Viber, how would you do so?
A It would be directly through the app.
Q How would you find the person that you wanted to speak to?
A How would I find the person? I would have to have their number or -- yeah. I would have to have their phone number in my phone, or if someone else changes the number, then I'll have some random person.
Q Do you have -- strike that. Do you have in your cell phone contact lists? Do you have contacts in the Philippines as well?
A Yeah.
Q So if we were to ask to you take a look at your contact list right now on your cell phone, you might be able to look up certain telephone numbers?
A No.
Q Why not?
A Because I don't have my phone with me.
Q Did you bring your phone with you to this deposition today?

A Yes.
Q Where is your cell phone now?
A I left it outside.
Q It's in your attorney's office?
A Yeah, I guess, yeah to take care of that.
Q Viber also have picture images for the contacts?
A Of -- yeah. Viber, What's App. They all do.
Q Let's do this as Stewart Seven.
(Stewart Seven was marked for identification.)
Q Mr. Stewart, now placed before you has been marked as Stewart Seven for identification purposes. Please take a moment to look at this document.
A I know this document very well.
Q What is this document?
A A message between me and Marby Cordera [ph] of the Philippines.
Q This is a discussion that you had, correct?
A Yes. It doesn't show where I started the discussion, but this is an excerpt from a large file.



Q It says in here, question to her about, do you want to work in Manila. Is that correct?
A Yes.
Q Were you seeking employees to work at a company in Manila?
A Nope.
Q Why were you asking her if she wants to go work in Manila.
A Because I know who Marby Cordera is.
Q Who is Marby Cordera?
A It's just a girl that worked for Avatar known as Avatar's spy, so when she contact me, I know what to expect.
Q So let me ask you this once again.
A Mm-hmm.
Q So why would you ask her if she wanted a job in Manila?
A I don't know where the conversation started, but that would be a question I would pose to someone that's looking to gain information from me.
Q So you would pass off that you were looking to hire people for a job?
A I would throw almost anything to Marby.
Q You would lie to her?



A Oh, yeah.
Q Scroll down a little bit in this.
A Mm-hmm.
Q It says, send me your resume. DavidS@AvatarDialler -- with two L's -- .com.
A Uh-huh.
Q What's Avatardialler.com?
A As I stated before, I copied that from the web and added it to my name, David S.
Q Where did you find it on the web?
A Just Google, avatar, and it gives you a bunch of companies. And Avatar Dialler would be so easy for her to be gullible and seek more information.
Q Okay. You claim you had no involvement with this business, correct?
A Zero. You guys have all my records, and not an ounce.
Q Mr. Stewart, once again, please just answer the question. Your position is you had no involvement with the business called Avatardialler.com? Correct?
A Yes.
Q If you had no involvement, why are you telling people that you're part of that company?



A As I told you, I know exactly who I'm speaking to. I could list all the guys that look to seek information for, that works in Avatar Philippines to give to their CEO to give to Avatar U.S. CEO.
Q Why would there be spies trying to contact you?
A I worked there. This is what they do.
Q Oh, you worked for Avatar Philippines?
A No. I worked for Avatar U.S. in the Philippines.
Q You just said that she's an employee in the Philippines?
A Yeah. I met her in the Philippines. She came to my hotel.
Q And she was an employee of Avatar Philippines?
A Avatar Philippines via -- I think she worked for Avatar, in Avatar Philippines for Avatar U.S. I would assume.
Q You don't know?
A To the best of my knowledge, she worked mostly with George.
Q So, then your purpose was to just pass yourself off as this business Avatar Dialler to her?

A With her, anything she wants to know, I would, you know, give her a goose chase.
Q So you wanted her to think you were a business called Avatardialler.com, correct?
A Based on -- from this limited scope here, I'm not sure what started the conversation to make me go that far and give her bogus. I believe I was in the U.S. at the time this was done.
Q So you're reaching out internationally to contact people to say that you're a business?
MR. CHEN: Objection.
A I believe she contacted me, asking me for work, like other Avatar guys.
MR. CHEN: Let's take a break. There's no pending question. And I need to use the restroom. And you look like you're leafing through some documents.
MR. LURIE: Yeah. I'm breaking up the exhibits.
THE VIDEOGRAPHER: We are now off the record. The time on the video monitor is 1:02 P.M.

THE VIDEOGRAPHER: We are now on the record. The time on the video monitor is 1:46



P.M.
Q Mr. Stewart, we're back from a sort of sudden lunch break, which we decided to take at the last minute. I'm going to step back a little bit from where we were, before we took this little bit of a break. While we were discussing a conversation with an individual on Viber, we'll get back to that a little bit later on. Can I ask you who Breeya Christian is?
A An employee of Avatar Technologies, Inc. Sales Technologies and a fitness company. I forgot the name. And Comic Salt [ph].
Q Are you still in contact with her?
A I've seen her once or twice after I left the company.
Q Did you talk to her on the phone?
A Pretty sure, yes.
Q Text message?
A Yeah.
Q Did you discuss any aspects of this case with her?
A Not sure.
Q Did you ask her to provide you with any documents?
A Not sure.



Q Did she provide you with any documents?
A I think she shared a video or two with me.
Q Did you produce those?
A If I got them, most likely I would send them to my lawyer.
Q Did you review the documents before they were produced in this case?
A Review the documents of?
Q Any time -- you got a document request in this case, correct?
A Uh-huh.
Q Yes?
A Yes.
Q Did you review that request?
A To the best of my knowledge.
Q And any documents that were requested from you, you produced?
A Yes, I would give consent to produce.
Q Well, that wasn't my question. Not that you consented to produce. Did you produce?
A Well, there was discovery. And I gave up everything that I had.
Q Did you produce any videos in this matter?
A It's a part of the laptop that you guys -- it should be there.



Q Pursuant to the discovery request in this case, did you produce any videos that were requested?
A Not sure.
Q Who is Rauti Ulloa? U-L-L-O-A?
A Rauti Ulloa? Rauti is a friend of mine that I invited to an interview with Avatar Sales Technologies she got the job. And then he also of course, since worked with both Avatar and Sales Technologies.
Q Did you discuss any aspects of this case with him?
A No. Not to my knowledge.
Q Text message him, anything having to do with this matter?
A Other than borrowing some money from him.
Q Let's talk about that a little bit later, as well. Who is Jason Gentry? G-E-N-T-R-Y.
A Jason Gentry is an employee of Avatar Technologies, Inc., that worked in the Philippines.
Q Did you discuss any aspects of this case with him?
A Aspects as to, I'm getting sued by George Kaltner? Yes.
Q Did you discuss what the case was about?

Page 82

A Yeah. I told him.
Q What did you tell him?
A I got a frivolous lawsuit from George about copyright infringement, and we laughed.
Q Talk with him on the telephone?
A Yeah.
Q Text message?
A Yeah.
Q Email?
A Yeah. I would say so.
Q Did he provide you with any documents?
A Relating to himself, yeah.
Q What did he produce, what --
A I'm not sure what. But I know he sent me some stuff of --
Q What did he provide you?
A Documents that was in my email.
Q What documents?
A I'm not sure exactly what documents, but in my email.
Q Mr. Stewart, did you search your emails in order to produce documents for this case?
A Yes.
Q And if there were documents in this case, did you print them?

Page 83

A If there was document that I --
Q If there was a document that was relevant to this case, did you print them?
A I would forward them via email to Jacob.
Q And Jacob being your attorney?
A My attorney.
Q So any document that you received from a Jason Gentry, you would have provided to your attorney and said, here is this produced?
A Yeah. I would say so.
MR. CHEN: Again, I want to note for the record, he turned over all his emails, gave you -- gave, you know, counsel for the plaintiffs in this case access to all of his emails to give them the liberty to conduct any search, which they so desire.
Q Thank you, Mr. Chen. But as I'm sure you know, that does not remove the obligation to comply with rule 34. So, did Mr. Gentry provide you with any photographs or pictures?
A I'm not sure. You would have to refresh me of that photo. And pictures of what, exactly?
Q Did Mr. Gentry provide you with any videos relevant to this case?
A Relevant to this case? I don't know.

Page 84

Q Who is Stephanie Valdez?
A A fictitious name Avatar Technologies, Inc. used for Edevict Vaneeszula. E-D-E-V-I-C-T. Vaneeszula, V-A-N-E-E-S-Z-U-L-A, closest of my knowledge to her name.
Q Do you know for a fact that that's a fictitious name?
A Oh, yeah.
Q How do you know that?
A Because her last name was very difficult to pronounce, so.
Q Is her name Edevict Stephanie Vaneeszula?
A Yeah.
Q Did you discuss any aspects of this case with her?
A I'm pretty sure I told her I was getting sued. And I referred her to my attorney.
Q Why did you refer her to your attorney?
A Because she was a witness to my employment.
Q She was a witness. When did you refer her?
A I'm not sure.
Q When was the last time you spoke with her?
A I would say after she received a letter

Page 85

from you.
Q You communicated with her after that period of time?
A She called me and, like, what the hell is this?
Q What did you tell her?
A To speak to Jacob.
Q Did you have any other discussions with her?
A No. Not that I know of.
Q So all you did was say, I'm not going to talk to you, talk to my attorney?
A Basically. I don't recall exactly if I texted her or, you know. I most likely reached out to her via text, and I don't have anything in there. So you guys --
Q When did you reach out to her via text message?
A I don't recall. I've had a relationship with her, like, I would text her, like, hey, let's have lunch. We had lunch a few times when I was in New Jersey. So, yeah, you know.
Q Have you had any text messages with her since January 3rd of 2018?
A January 3rd, 2018? I would assume -- I

Page 86

could produce it if I do.
Q Have you not produced those documents?
A I don't how to answer that.
Q Have you produced any -- strike that. Who is Daniella Daniel?
A A friend of mine.
Q I want to discuss your background a little bit. This is not -- this is going to come off a little weird. It's not when you think, initially. You weren't born in the United States, correct?
A No.
Q When did you come to the United States?
A About 1983.
Q Are you a citizen?
A Yes.
Q It's not what you think with that. I'm just getting your back ground for the terms of educational aspect. Where did you go to high school?
A Park West High School.
Q Where is that?
A 50th Street and 10th Avenue.
Q Manhattan?
A Yeah.
Q Did you go to college?

Page 87

A Yes.
Q Where did you go to college?
A Queens Borough Community, TCI Technical School, and Monroe College Business College.
Q Let's go through each one of those separately. So the first one you said you went to Queens Borough?
A Community college.
Q Community. Did you graduate?
A No.
Q How many credits approximately, do you recall having?
A Thirty to forty.
Q When did you attend Queens Borough community college?
A '92 to '94. 1992 to 1994.
Q You did not graduate?
A No.
Q And then it was after that that you attended -- I'm sorry it was TDI?
A TCI.
Q TCI?
A Technical Career Institute.
Q What year did you begin attending TCI?
A I think, like, 2003.

Page 88

Q Between then, you also mentioned Monroe College?
A Uh-huh.
Q Yes?
A Yes.
Q When did you attend Monroe College?
A 2008. Around 2008.
Q Did you graduate from TCI?
A Yes.
Q What year did you graduate?
A Two years from -- so I guess, 2005.
Q And did you receive a degree or a certificate?
A Yes.
Q What did you receive as a graduate from --
A Computer information technology.
Q That was a certificate or a degree?
A Degree. Associates.
Q And then Monroe College, you said you went to business school?
A Yes.
Q And you began in, you believe 2008?
A Yeah.
Q Did you graduate from Monroe College?
A Yes.

Page 89

Q What year did you graduate?
A 2009.
Q What degree did you receive, if any?
A Information technology. Bachelor's.
Q Between 1994 and 2003, were you employed?
A Yes, different times.
Q Were you attending any other education, obtaining any other education between 1994 and 2003?
A No. Not that I recall.
Q Let's step back to '94. Did you -- were you working in 1994?
A I don't believe so. Not sure.
Q What's the first job that you remember having?
A First or after 1994?
Q After Queens Borough Community College.
A Okay. I worked at Jamaica Hospital.
Q When did you begin working at Jamaica Hospital?
A 1995.
Q What was your job at Jamaica hospital?
A Customer information rep, or patient information rep. Patient information rep, I think.
Q How long were you working for Jamaica hospital?

Page 90

A I think I left in 2002.
Q Did you have any other positions at Jamaica Hospital besides being a patient information rep?
A No.
Q After -- why did you leave from working at Jamaica Hospital?
A I left to go back to school.
Q That was to TCI?
A Yes.
Q Was TCI a full-time or part-time?
A Full time.
Q Did you have any employment between 2003 and 2005, other than going to TCI?
A Yes. Only in the college, college work study.
Q After you graduated from TCI, did you get a job?
A Yes.
Q Where was your first job after graduating from TCI?
A Managed Systems Inc.
Q When were you hired by managed systems?
A I think, it was close to my birthday, so I think August, 2005, I think. Yeah. I believe.

Page 91

Q What was your position at Managed Systems?
A It varies. I started as an office manager; and I ended as, I assume -- I think the title -- I'm not sure if this was my official title. But it was logistic manager, was what I believed it was.
Q When did you leave managed systems?
A 2008, I believe. Close to my birthday, so.
Q Where did you work after managed systems?
A Is this officially or unofficially?
Q Either way.
A I worked on a project with George and Oscar.
Q What was the project with George and Oscar?
A They were doing something called Star National Bank or -- yeah. Star National Bank or something like that.
Q And what were you doing with this starting up of something called Star National Bank?
A I was there dealing with -- I'm not sure. I used to sit there, and I had to, like, sort through, like, leads or something. I'm not sure. It was a brief moment because that was the incident

Page 92

where they took my laptops.
Q Okay. What year was that?
A After two years. About -- after 2008. After my release from.
Q Managed systems?
A Yeah, no. From Managed Systems.
Q So approximately 2009?
A Yeah. It was, like, a month. So, I don't remember.
Q Okay. What happened after that?
A Um --
Q Let me correct myself. I'm going to strike my statement because I'm getting a little bit too -- not being direct enough. What was your next job after providing services for Star National Bank?
A Yeah. I'm not sure even if -- I worked with George in his home at Sales Dialer Pro. I'm sorry.
Q When did you provide services for Sales Dialer Pro?
A Sometime in 2009. It was only for, like, a few months when he was in Bement Avenue of Staten Island.
Q Where was the next place where you worked?
A I believe that was -- wow -- oh, I was

Page 93

assigned -- George introduced me to a guy named Eric Kuvicin of All State merchants processing at 40 Rector Street.
Q What was your job for All State Merchants?
A I had to deploy an application to manage how the offices interact and transfer documents.
Q When was this, approximately?
A Sometime in 2009, 2010.
Q But no initial title with All State Merchants?
A No.
Q How long were you there for?
A Maybe six to eight months.
Q When was the next job that you had?
A I had a friend working with Eastern Security, and I don't remember dates because it was more like helping him out. So, I would -- I worked for Eastern Security for about six to eight months.
Q What is Eastern Security?
A It's a security company.
Q What type of security company?
A Just security for, like, the Gucci or whatever vender that hires them.
Q So, like, a security guard?
A Yeah.

Page 94

Q What was your position there?
A Security guard.
Q Where was the next place you worked?
A Sales Technologies.
Q So we're up to, as the parties in this matter?
A Yes.
Q And now, looking at this, we have approximately six employers from the time that you received your bachelor's, before providing services for my clients?
A Uh-huh.
Q In any of those jobs or contracts or whatever it maybe that you were providing services for any entity, were you doing any financial work?
A No.
Q Were you doing any billing work?
A No.
Q Were you doing any accounting work?
A No.
Q Do you have any education with respect to accounting?
A I took two years of accounting in college. They required two years. That's about it.
Q Do you have -- strike that. You don't

Page 95

have a degree in accounting, correct?
A No.
Q You do not have a degree in finance and no experience doing any real major accounting work, correct?
A No.
Q Subsequent to providing services for my clients, approximately April of 2015, have you been employed?
MR. CHEN: Could you repeat that?
THE WITNESS: Yeah.
Q Have you been employed?
A After 2015?
Q After approximately April of 2015?
A Have I been employed? Yes.
Q By whom?
A Uber Technologies and Lyft Technologies, I guess.
Q And that's Lyft, with a Y?
A Yes.
Q What is Hoover Technologies?
MR. CHEN: Uber.
MR. LURIE: Oh, Uber. U-B-E-R?
A Uh-huh.
Q Have you provided services for any other

Page 96

entities?
MR. CHEN: Quick note. So, I assume at some point you want to know where he works now?
Q I'm getting to that, yeah. I'm just going through this whole --
MR. CHEN: I suspect my client is uncomfortable where he works now because he's afraid your client might harass him or at his workplace or take some measures. I understand it's customary background questions for that information to come up. But it also doesn't seem where he's working right now after the case is commenced is relevant to the action.
MR. LURIE: Your objection is noted.
MR. CHEN: So -- so in so far as the question of where he is working right now, if it's after the commencement of this action, I would direct him not to answer unless there is some sort of protection, which -- some confidentiality agreement where your client would not know who he's working for now.
MR. LURIE: Mr. Chen, while I appreciate that statement, that's not an appropriate objection under the federal rules. You have every right subsequent to this deposition to

Page 97

make an application to the court pursuant to federal rule 26F, for a protective order with respect to that information. At this point in my deposition, I do have the right to ask about his employment.
MR. CHEN: I will ask -- I will direct my client not to answer. You can leave a blank in the transcript. I will raise my objection to the court. If the court directs him to answer, he'll fill in the blank with his current employer.
MR. LURIE: Let's get the court on the phone now preemptively, since you're directing that he won't provide his full information in violation of federal rule 26 --
MR. CHEN: I do want to point out that the magistrate judge in your previous issue raised, she believes that, you know, if we can address it or resolve it after the deposition, she will rather us do that so instead of waisting time at the deposition. If there's a blank, he can put in the name of his current employer when I raise it to the magistrate judge. If she directs him to do so, he can just fill in the blank with the name of the employer.

Page 98

MR. LURIE: Mr. Chen, with all due respect, that's not how this works.

MR. CHEN: I understand.

MR. LURIE: Your client will respond to a question in the deposition. If you have an issue with it, and it can be during the deposition, you can call the judge. Pursuant --

MR. CHEN: I understand.

MR. LURIE: -- rule 26F, and ask for a protective order.

MR. CHEN: I was proposing a compromise, which, to see if that will work with you. But since it doesn't work with you, I'm happy to jump on a call with the judge to address the question of whether or not Mr. Stewart needs to answer where he is currently employed.

MR. LURIE: Okay. Let's do it now. Let's stay on the record. You can call because this is your issue. I have her number ready. (914)390-4130.

THE CLERK: Judge Smith's chambers.

MR. CHEN: Hi. Good afternoon. We have the parties on line in the case of Kaltner versus Stewart; and we're currently in the

Page 99

middle of the deposition of Mr. Stewart. And the counsels have an issue they would like to raise with her honor about a question that was asked.

THE CLERK: Okay. One moment.

MR. CHEN: A question that was about to be asked.

THE CLERK: Hi. This is David, Judge Smith's law clerk. Are the parties for Kaltner on the line?

MR. LURIE: Yes.

MR. CHEN: Yes.

THE CLERK: Can you just once again let us know what the issue is in this dispute?

MR. CHEN: The issue is Mr. Lurie was about to ask Mr. Stewart questions about his current employment after this case has been commenced, and our position is that it's not relevant but more to the point, we're concerned that his client might utilize that information for the purposes of harassing Mr. Stewart. And I would ask opposing counsel if we can give him the information a way that it doesn't go to his client. And he refused that. And I also offered the proposition of leaving the

Page 100

transcript blank, so we can address it with the magistrate judge after the deposition, with a blank in the transcript for him to fill in if her Honor orders us to do so. And he has de-declined that as well. So we are now on the phone with the court to see if she can address this, I guess right now.

THE CLERK: Okay. And what's his current job?

MR. CHEN: Mr. Stewart? Well, sir, the thing is we don't want him to disclose -- I'm asking not to have him disclose where he is working right now.

THE CLERK: Okay.

MR. LURIE: And this is --

THE CLERK: And your concern is that the plaintiff -- the plaintiff would use that to harass him?

MR. CHEN: Yes. Assuming they don't have that information already.

MR. LURIE: This is Joshua Lurie on behalf of the plaintiffs. Mr. Stewart made his current employment an issue multiple times in this matter, specifically with response to his ability to deal with sanctions, his reasonings

Page 101

in this case, his ability to pay, any judgment. There's been innumerable times when his employment has been raised, specifically as of most recent, he continuously states he's just an Uber driver. He can't afford certain things. There have been orders by this court with respect to paying for the receipt of discovery, which was not produced specifically because Mr. Stewart claimed he was financially unable to do so because he was a, quote on quote, Uber driver.

THE CLERK: Mm-hmm.

MR. CHEN: And that's not a dispute, which he disclosed that he works for Uber and Lyft.

MR. LURIE: This case also relates to, amongst other things, the -- a professional negligence claim. It's one of the pending state actions included in here. And amongst the other things, which we have been investigating about, is his ability to be a bookkeeper, finance, accounting, et cetera. I believe that I have a right to inquire to whether or not subsequent to his employment that he's continuing along with this conduct and performance. I believe that it's entirely

Page 102

relevant, and I made very clear to counsel, if he believes there's a risk of harassment, there's a method to deal with that, which would be through an application for a protective order pursuant to federal rule 26C; and he can set forth his basis for the need of such a protective order.

There is already one protective order in place in this matter. So if he believes there's a separate need so that that information can be converted into attorneys eyes only, he can provide that and give his basis once again.

MR. CHEN: I propose it's a reasonable compromise, we leave a blank in the transcript. I make my application to the court. Mr. Lurie opposes the application and state's why it should be in the record; and if, you know, the magistrate judge orders my client to disclose the information, then we will just write it into the transcript. And if she decides that it's attorney's eyes only, we can address it that way. And if she decides he does not have to disclose that has information, then the transcript remains with a blank, if it's too

Page 103

complicated to address over the telephone.

MR. LURIE: And of course, the issue with that is during this, if there are follow-up questions, that my -- I am now prejudiced for my ability to continue the inquiry with respect to this. This is a deposition. It's relevant.

MR. CHEN: I have no issue with Mr. Lurie asking what he does. It's just where he does that I'm concerned about.

THE CLERK: Okay. Hold on one second, please.

THE JUDGE: Good afternoon, counsel.

MR. CHEN: Good afternoon, your Honor.

MR. LURIE: Good afternoon, judge.

MR. CHEN: Sorry to call you again. This Jacob Chen from Dai and Associates on behalf of Mr. Stewart. I believe as your law secretary, might have briefly advised you on, in short we are at a point in the deposition where Mr. Lurie was about to ask questions to Mr. Stewart about where he works now; and as he explained that he wants to know whether or not Mr. Stewart is working in the realm of bookkeeping and accounting and so on and so forth.

I have no objection to him continuing the

Page 104

line of questions about what Mr. Stewart is doing now. I would like, however, to have either a protective order or just omit entirely the location and the name of the company he works now because he's afraid of harassment by Mr. Kaltner. That's pretty much the sort of it.

MR. LURIE: Judge, once again this is Joshua Lurie on behalf of the plaintiffs. I really don't even know where to begin with this. This is a standard deposition question. Mr. Stewart believes that there maybe some form of harassment. He's got claims he can make if anything takes. I made clear to Mr. Chen prior to this call that this is the type of information which is typically subject to a, if he legitimately believe it, to a protective order pursuant to 26C, and he can make the application. It can be as simple as a redaction out on all public records, except for attorneys' eyes only as to the name of the employer. But I don't believe that this was, it was necessary to go down this route in calling the courts, since this a something that's just typical and could have been handled

Page 105

very easily, very quickly at the end of this deposition by an application for protective order, which would really result in nothing more than, hate to say it, a couple of black outs on the deposition transcript in the certain copies of it and just notice that the un-redacted versions of the deposition transcripts are for attorneys eyes only and for production of trial.

MR. CHEN: I have no issues with that, if Mr. Lurie consents, which he did not advise me he was consenting to that. I did propose for a blank to be in the transcript, so that after the deposition I make an application to the court, and then the court can issue whether it needs to be put in and whether or not it will be redacted for Mr. Stewart to fill in later after the deposition, when I make an application.

THE JUDGE: Well, we're not going that route. That doesn't accord with rule 30. Rule 30 is very clear. A person may instruct a deponent not to answer, only when necessary to preserve a privilege, to enforce a limitation ordered by the court -- that means already

Page 106

ordered by the court -- or to present a motion under rule 30D3. A motion under 30D3 would have to be on the grounds that the deposition is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party. And I don't hear that as a basis either. So I think Mr. Lurie's suggestion is an appropriate one.

I suggest that you try to resolve it in that fashion. And of course, Mr. Lurie, you and your client are well aware that you won't want to be on the receiving end of a motion seeking sanction for some kind of conduct impacting on the defendant's current employment.

MR. LURIE: Absolutely, judge. We don't want to have anymore lawsuits in this related to these parties. So, yes, absolutely. But once again, our position is, and we thank you, your Honor, because I do believe this would just be subject to the protective order application.

THE JUDGE: I think that makes a great deal of sense. Why don't you move forward in that fashion?

Page 107

MR. CHEN: Will do, your Honor. Thank you.

MR. LURIE: Thank you, Judge.

Q And just so that the record is on here, you might want to make a notation for this after the deposition for your application for a protective order and go from there.

MR. CHEN: I just want to note on the record that this is what I intend to do, either today or sometime tomorrow, depending on how late the deposition goes today.

MR. LURIE: We'll try and move through.

Q Mr. Stewart, are you still driving for Uber and Lyft?

A On occasion, yes.

Q Are you currently employed?

A Yes.

Q Are you currently employed on a full-time basis?

A Yes.

Q And by whom are you employed?

A Mint Events Inc.

Q Can you please spell that?

A M-I-N-T-S, E-V-E-N-T-S, Inc.

Q And where is that located?

Page 108

A 251 East 110th Street, New York City, 10029.

Q Located in Manhattan?

A Yeah.

Q What type of company is Mints Events?

A It's a party event company.

Q And whats your employment there? What's your job?

A Billing and collection.

Q I presume from the title, your job is to send out bills and collect payments?

A Yes, it is.

Q Do you do any other services for this company?

A Some deliveries.

Q Do you do any accounting work?

A I have access to QuickBooks.

Q Do you do the bookkeeping?

A No. That's Ginger-something. That's a bookkeeper.

Q The company has a separate bookkeeper? Do you -- strike that. In a professional sense for your job doing billing and collections, do you interact with the bookkeeper other than to provide information with respect to the billings and

Page 109

collections?

A I would say, yes.

Q Do you assist her in any ways with the bookkeeping duties?

A I enter my payments when I receive them. I remote into it and enter the payment of the invoice.

Q And this is in QuickBooks, you're saying?

A Do I reconcile? No. I don't. Journal entry? No.

Q Do you do any auditing of it?

A No.

Q So it's -- basically it's billed -- you send out the bills, and when payments come in, you collect and type it into the computer?

A Yes.

Q When did you begin working for this company?

A I think -- officially, I'm not sure. I think it was April 1st. I think. Yeah.

Q Of this year?

A Yes. 2018.

Q And unofficially, when were you providing services?

A Since January.

Page 110

Q And that was also providing billing and collection work?
A Yes.
Q And they made you a full-time employee?
A Yes.
Q Now, name has been out there several times. So I'm going to get very specific on this. Your familiar with George Kaltner, correct?
A Yes.
Q When did you first meet him?
A 2004, when I started Managed Systems.
Q How did you meet him?
A An agency referred me to a posting. And that's when I met him.
Q What agency?
A I think We Work, or -- I don't know. America Works. Yeah. That was the name. Woo.
Q And you continued working for Managed Systems, as eventually I believe your testimony was logistics manager at some juncture?
A At the end, towards the end, yes.
Q And managed systems closed down?
A Yes.
Q Were you there when it closed down?
A No.

Page 111

Q Were you terminated before that, or were -- did you just leave?
A I was terminated.
Q And now, as we said, sometime in 2011 or 2012, you started to provide services for Mr. Kaltner again, correct?
A Yes.
Q Tell me how that began?
A A phone call to George's number that I had in my phone; and I called it, and he picked up, said hey, Dave, come over. I think it was a Friday; and I have a new project we're working on. And I joined. I went over there. He showed me how to bill, the air time of the dialer system, and that's where it all started.
Q Did you discuss your background with him between the times of working for Managed Systems and -- besides these couple of little projects that you had with him along the lines, did you discuss your background with him at that point?
A Yeah. He -- I guess he asked me, you know, what I did. And I -- where have you been; and, like, oh, I went to Monroe College to get an IT degree.
Q Did you discuss any experience or

Page 112

qualifications that you gained in the time between?
A No. To the best of my knowledge, no. He knew me as an employee of Managed Systems, so.
Q While you were providing services for Sales Technologies and later Avatar Technologies, Inc., did you hire anyone?
A No.
Q Did you fire anyone?
A No.
Q Did you manage anyone?
A No.
Q Did you train anyone?
A Yes.
Q Who did you train?
A Staff in Philippines.
Q Staff in the Philippines. What did you train them in?
A How to collect and apply the money to the invoices when they -- the wires that come into the bank account.
Q What other documents did you -- strike that. What other duties did you have while providing services for either Sales Technologies or Avatar Technologies, Inc.?
A Reboot servers if they were down, office

Page 113

manage the building, interact with clients for issues they were having with their bills.
Q Customer service, type thing?
A Customer service.
Q Anything else?
A Order food, reserve airline tickets, all of the stuff I answered in the FL --
MR. CHEN: FLSA.
A FLSA.
Q Okay. Did you ever provide any audits for Sales Technologies?
A No.
Q Any audits for Avatar Technologies, Inc.?
A Not to my knowledge.
Q Did you interact with the accountants?
A Yes.
Q Why were you interacting with the accountants?
A Whatever information they did not know, they would ask me; and then I would get the information from George.
Q Do you have access to QuickBooks there?
A Of course.
Q What were you doing on QuickBooks over there?

Page 114

A QuickBooks no. We used Fresh Books.
Q You had access to Fresh Books?
A Yes.
Q What were you doing on Fresh Books.
A That's where the billing application is.
Q So you were doing billing?
A Uh-huh.
Q Collections?
A Yes.
Q Were you reconciling anything?
A For Avatar -- Sales Technologies? No.
Q You had so reconciliations at all?
A No.
Q Were you interacting with salespeople for Avatar or Sales Technologies?
A Yes. Both.
Q Were you auditing their commissions?
A I was told to examine them.
Q Did you have them pay you to do that?
A What was that?
Q Did you have any of these salespeople pay you to provide these audits?
A Rauti would pay me $100 to prepare his commissions.
Q I'm sorry. Who was?

Page 115

A Rauti would pay me $100 to prepare his commissions to make sure it's accurate and nothing is missing.
Q Anyone else?
A I was ordered to do Peter's commission but there was no payment there.
Q You previously spoke about Avatar Technologies Philippines, correct?
A Yes.
Q You're familiar with that?
A Yes.
Q Who owned it?
A That's --
Q Do you know who owned it?
A On paper, or --
Q At all. Do you know what owned it?
A On paper I know exactly who owned it.
Q On paper who owned it?
A On paper it says Anamee Tehada.
Q Avatar Technologies Philippines is owned by Anamee Tehada?
A Yeah. Public records show.
Q Anyone else have any ownership in Avatar Technologies philippines?
A George.

Page 116

Q He owns it?
A I don't know the percentage, but he has some interactions there. I don't know on paper. I don't know what it is. I'm not sure.
Q Do you know when Avatar Technologies Philippines came into existence?
A Not the exact date.
Q Generally, can you estimate?
A Sometime in 2013, I would say. Or 2012.
Q Were you providing services for George Kaltner, Sales Technologies, Avatar Technologies at the time that Avatar Technologies Philippines came into being?
A Yes.
Q Were you involved in the formation of Avatar Technologies Philippines?
A Define formation.
Q Do you know when Avatar Technologies Philippines actually became a business in the Philippines?
A No. Not fully.
Q Do you -- were you -- strike that. Is it your testimony today that Avatar Technologies Philippines was formed on paper by Anamee Tehada but was actually formed by George Kaltner?

Page 117

A Anamee Tehada on paper, formed by George Kaltner, yes, with some people in the Philippines or something.
Q With some people in the Philippines. They formed it?
A Somehow, yes. Also --
Q Do you know who ran Avatar Technologies Philippines?
A Define ran.
Q Who was the CEO? Do you know who the CEO was?
A CEO on paper?
Q CEO on paper. Who was the CEO on paper of Avatar Technologies Philippines.
A That's Ted Nehls.
Q Who was it actually?
A On paper, it's Ted Nehls.
Q But you said that's on paper. So --
A I would say George ran both Avatar Technologies U.S. and Avatar Technologies Philippines.
Q From its inception?
A Yeah.
Q And but it was on paper run by Ted Nehls?
A Yeah.

Page 118

Q So Ted Nehls didn't do anything at all over in the Philippines?
A I don't -- I'm not sure of your question.
Q Did he -- was he doing any actual real work over there?
A That's something to discuss with Ted. I'm not sure.
Q In your opinion, you're saying that he was only CEO on paper. So what did he do, to the best of your knowledge?
A He ran Avatar Philippines.
Q So he was running the business?
A Yeah.
Q He was the CEO?
A Yeah.
Q On paper and in actuality?
A Yeah. On paper in the Philippines, he was, you know, the CEO.
Q But you were saying it's just on paper. I don't understand what you mean by this.
A All right. You have U.S. documents and you have Philippines. He was in the Philippines and his title is the CEO.
Q Was he doing, to the best of your knowledge, was he performing as CEO in the

Page 119

Philippines?
A Yes.
Q Do you have experience or knowledge about how a corporation operates?
A No. I don't fully --
Q Are you familiar with something that's called a board of directors?
A Yeah.
Q What's your understanding of what a board of directors does?
A Board of directors is a bunch of people that manage a company, I guess. That's the most I can say about it.
Q Do you, personally -- if you don't, I want you to tell me. Don't guess. Don't speculate.
A Okay.
Q Do you know the difference between a CEO of a business, and a chairperson, or president, or -- I'm sorry. Chairperson or --
A No.
Q Board of directors?
A No.
Q So you don't understand how those two interact at all?
A No, never paid much attention to it.

Page 120

MR. CHEN: You never went to law school?
THE WITNESS: Yeah.
Q Never know. I mean, know people who went to business school and know this a lot better than I do, and I've got plenty experience. Okay. So --
MR. CHEN: If there's no question pending, I need to use the restroom.
THE VIDEOGRAPHER: We're now off the record. The time of the video monitor is 2:44 P.M.
(A short break was taken.)
THE VIDEOGRAPHER: We're now on the record. The time on the video monitor is 2:52 P.M.
Q Mr. Stewart, please just refresh my recollection. When was the first time that you traveled to the Philippines?
A About June, 2014.
Q What was your basis for going to the Philippines at that time, what was yours reason?
A My reason?
Q Yes.
A By boss sent me to the Philippines to check on employees, possibly stealing. He got a message from an employee that stated that there

Page 121

might be theft of items going on.
Q And this was approximately in June of 2014?
A Mm-hmm.
Q Are you familiar with the company called that either existed then or may still exist called Surrogate Technologies?
A Am I familiar with the name? Yes.
Q To the best of your knowledge, what is surrogate technologies?
A There's a company that is in the Philippines. And they do business in the Philippines as a call center.
Q Know anything else about Surrogate Technologies?
A They're ex-employees of Avatar, operating it, and ex-employees of that company over in Avatar spying for them -- spying on them.
Q You're familiar that there was an extensive litigation going on in the Philippines with respect to Surrogate Technologies, correct?
A Yes.
Q What was your knowledge of what that litigation was?
A That litigation, what I knew they were

Page 122

trying to -- Avatar was trying to block them from operating.
Q Do you know what their basis was to block them from operating?
A Theft -- I believe the same thing I'm going through here, copyright infringement and operating outside of the non-compete.
Q To the best of your knowledge, what is a copyright infringement?
A To the best of my knowledge, um, using the name and operating under that name, or something similar.
MR. CHEN: I'll object to the line of questioning; but, you know, you can ask and he'll try to answer to the best of his abilities.
MR. LURIE: Yeah. I understand.
Q Do you know the difference between a copyright and a trademark?
A No. I've just heard those words and yeah.
Q Are you familiar with a company in New Jersey called RPI or Residential Programs Inc.?
A Oh, yeah.
Q What is RPI?
A Client of Avatar.

Page 123

Q Do you know anything else about RPI?
A They were in a heated battle with Avatar technologies.
Q Do you know what that battle was about?
A Something about copyright infringement, I assume.
Q Do you recall being asked at some point to go to the Philippines to bring a quote-on-quote wet-ink affidavit and quote-on-quote wet-ink legal memorandum to a judge regarding U.S. copyright laws?
A I don't know the specifics of what's on the document, but I was sent there with the document to drop it off.
Q And did you read those documents by any chance?
A No.
Q You don't know what the purpose was for those documents?
A Oh, I do.
Q What was the purpose of those documents?
A To shut down Surrogate Technologies or to -- yeah.
Q So, it was a legal proceeding providing something to a judge in order to further the shutting down of a competitor?

Page 124

A I don't know the specific of the, you know, legal proceeding; but I know from what happened.
Q Did you tell anyone that -- strike that. Do you know who wrote the documents that you were bringing to the Philippines?
A Who's the author of it?
Q Yes.
A Like, the lawyer?
Q Yes. Who was the lawyer?
A Mr. Strupinsky.
Q And he had drafted some legal documents, and you were delivering them to a judge in the Philippines?
A Delivering them -- I was supposed to be delivering them to Ted to bring to a judge, with other things.
Q Do you understand how a Filipino legal system works?
A No.
Q Do you understand how a subpoena in the Philippines works?
A No.
Q Do you understand with respect to costs associated with subpoenas being executed in the

Page 125

Philippines? And we talked briefly about this. You're familiar with a company called Rainbow Slushies and Pretzels?
A Yeah.
Q And what is Rainbow Slushies and Pretzels? Or what was Rainbow Slushies and Pretzels?
A One of George's projects to create some kind of -- a chain of stores to sell Rainbow Slushies and Pretzels.
Q Like, a food-type vender?
A Yeah.
Q Were you involved in the formation of Rainbow Slushies and Pretzels?
A No.
Q Were you involved in any way with Rainbow Slushies and Pretzels?
A Yes.
Q And in what way were you involved with Rainbow Slushies and Pretzels?
A George instructed me to watch how they spend and make sure they don't overspend when they're buying items, and watch out for people padding the invoices and stuff.
Q Not exactly sure that I understand what you mean by padding the invoices.

Page 126

A He was skeptical of people getting kick backs from when they purchased items.
Q What people getting kick backs?
A Other employees of Avatar who was placed in Rainbow Slushy.
Q Who was placed in Rainbow Slushy?
A A lot of different Avatar personnel.
Q When you say they were placed there, do you know if they applied for a job?
A No. They were just shifted.
Q You're confident of that?
A No. I just saw people.
Q You don't know if there was an advertisement placed and that said, tired of working nights, come sell pretzels?
A Not sure about that.
Q By the way, do you know what the hours were for Avatar Technologies Philippines were?
A The hours for Avatar Technologies Philippines?
Q What time were they operating?
A It was 24 hours, basically.
Q Do you know where Avatar Technologies Philippines' clients were?
A Avatar Philippines' clients. You would

Page 127

have to define clients of Avatar Philippines.
Q What did Avatar Technologies Philippines do? What was their business?
A Yeah, they were a call center. They employed staff.
Q And what were they a call center for?
A For Avatar U.S.
Q And you're confident of that?
A They worked together.
Q You're confident that Avatar Technologies Philippines was a call center for Avatar Technologies U.S., correct?
A To the best of my knowledge.
Q And is it your position that the client, that Avatar Technologies Philippines had no clients, they were clients of Avatar Technologies U.S.?
A I wouldn't know how to answer that, when it comes to Avatar Philippines and their clients.
Q Do you -- strike that. Do you know who Avatar Technologies Philippines was making calls for?
A Yes. I would -- best of my knowledge would be Avatar -- Avatar Technologies U.S. United Dental Envision, and Sales Technologies.
Q So all U.S. companies?

Page 128

A One, two, three, and some other entities like Australia or something.
Q You believe they had some Australian clients?
A Yeah. They had -- I remember Australia was something happening with that.
Q Is it -- strike that. Is it your testimony today that you had no official responsibilities with Rainbow Slushies and Pretzels other than to basically spy and determine whether or not any employees were taking kick backs?
MR. CHEN: What do you mean by official?
A Yes.
MR. CHEN: Objection to the form as to the use of the word official.
Q Do you understand what I mean?
A No. I would like to be explained and official --
Q What -- when you went -- it's your testimony here today that you were sent to the Philippines as to Rainbow Slushies and Pretzels to spy upon employees, correct?
A To make sure they don't over spend.
Q And to make sure that they're not receiving kick backs?

Page 129

A Uh-huh.
Q Yes?
A Yes.
Q Did you have any official formal title as to Rainbow Slushies and Pretzels?
A No. Not to my knowledge.
Q Did you have anything -- strike that. Were you to do anything else at all with respect to Rainbow Slushies and Pretzels?
A Maybe I created a spread sheet for them to manage items they purchased.
Q Like a -- strike that. What do you mean a spread sheet to manage items that they purchased?
A They would purchase flour, sugar; and I created a spread sheet that shows when the level is low, and for them to reorder items.
Q So, in other words, I hate to say it this way, a glorified shopping list?
A Yes.
Q Any other duties as to Rainbow Slushies and Pretzels?
A Their accounting team would send me the weekly -- the daily totals, and I would put them in a spread sheet and send that to George.
Q So you were doing some accounting work for

Page 130

them?

A I built spread sheets and I could, you know, tally them up and produce a number basic stuff.

Q If I understand this correctly, and please correct me if I'm wrong, somewhat low level auditing of what was going on with the costs?

A If you say so.

Q If I'm not correct in what I'm saying, please tell me that I'm wrong.

A I don't know if I would say auditing. I am the connection to what people sent information, and I get it to George. I'm, like, secretary and all that other stuff.

Q You're basically --

A A conduit.

Q I believe that you've said this in other depositions, so correct me if I'm wrong. You're basically George's number two. That's what you were -- and I hate to -- as in pretty much, you were the one who you would go to before anything would need to be elevated to quote-on-quote the owner, correct?

A Not go to. I worked there. I worked with George for years. So he would tell me where he's going, and I would just -- I'm a communicator. I

Page 131

communicate information.

Q When did you return to the U.S.?

A About September 29th, either September or October 29th, I'm not sure.

Q This is of 2014?

A Yeah.

Q Yes?

A Yes.

Q Starting to do that over and over before the court reporter starts to do that to. Was Rainbow Slushies and Pretzels till operating by the time you returned to the United States?

A Yes.

Q Still operating now?

A No.

Q Are you familiar with when Rainbow Slushy closed?

A Pretty sure it was in my email, that we're shutting down Rainbow Slushies and Pretzels. We're losing money, or something like that, George wrote to the staff down there. And Oscar liquidated the assets.

Q Do you recall when that was?

A No. I'm not sure, sometime in maybe November or December of 2014.

Page 132

Q Do you recall what the reasoning was that it closed down?

A They were losing money.

Q Jump a little bit forward now, April of 2015. Started providing services for my client, then, correct?

A Yes.

Q I don't want to get into the dispute over -- okay. Did you -- strike that. Did you communicate with any employees or -- strike that. Did you communicate with any employees of Avatar Technologies after you ceased providing services in April of 2015?

A Avatar Technologies U.S.?

Q U.S.

A Of course.

Q Who were you in contact with at that time?

A I spoke to Allen, I spoke to Stephanie, I spoke to Breeya, I spoke to Ben most likely, Rauti.

Q Who -- just so we have clarity on this. Who is Allen?

A Allen was the --

Q What's his last name?

A Allen Webb, W-E-B-B. He was in charge of all of the equipments at the job.

Page 133

Q What do you mean by equipment?

A All of the servers, like, constructing -- putting them online.

Q So he built the servers?

A Yeah.

Q Who else?

A I assume Ben.

Q That's Ben Tal?

A Tal.

Q T-A-L. What was Ben's position?

A He did the same thing Allen did, but then he was sent to the Philippines to work in Avatar Technologies Philippines.

Q So he was building and running servers?

A Yes.

Q Who else?

A You want me to list every -- I'm not sure if I 100% booked them; but there were people in the office at the time.

Q Mr. Stewart, how many cell phones do you have?

A Currently?

Q Yes.

A One.

Q How many cell phone numbers do you have?

A One.
Q In July of 2017 how many cell phone numbers did you have?
A July of 2017?
Q Yes.
A One.
Q Do you pay your cell phone bill?
A Yes.
Q Are you familiar with your cell phone bill?
A Yes.
Q Who is your cell phone bill with?
A July, 2017? That's a year from now? I would assume Sprint. Yeah. Sprint.
Q Have you changed your cell phone carrier?
A Prior to that, I was with T-Mobile, maybe. And I was at Verizon at one point.
Q Subsequent to July of 2015 [sic], have you changed your cell phone carrier?
A July -- after July 2015?
Q 2017.
A Yeah. It changed over the years. I changed from one to the next, to the next.
Q I understand.
A I don't remember, exactly.



Q Just listen to my question and answer the question if you know the answer. Subsequent to July of 2017, less than a year ago, have you changed your cell phone carrier?
A Less than a year ago, not from Sprint, no.
Q Who's telephone number then is XXX-XXX-XXXX. Same thing respect to the things we said about cell phones before.
A What's the number?
Q XXX-XXX-XXXX.
A I don't remember numbers. But XXX, yeah, I'm not sure.
Q What about XXX-XXX-XXXX?
A Those might be numbers on my bill -- must be a relative.
Q How many relatives have cell phones on your bill?
A Plan? It's about six of us.
Q You pay for it all?
A Yeah.
Q Who are the relatives?
A My daughter, spouse, cousins.
Q And you pay for all of their cell phones?
A Uh-huh.
Q Did you have any communications with



people asking them to invest in lawsuits against George Kaltner?
A I'm not sure. You would have to show me a document to refresh my memory or something.
Q Sure, let's do this one next.
MR. CHEN: Eight.
MR. LURIE: Getting to my list that I have on here too before -- if I don't keep track of where they are on my page -- let's do this as eight.
(Stewart Eight was marked for identification.)
Q Mr. Stewart, I'm presenting to you what's been premarked as Stewart Eight for identification purposes. This is an excerpt. I'll represent to you this was taken out of, say, except of a text message taken from your cell phone; and this is with the telephone number XXX-XXX-XXXX; and as I understand based upon prior parts of this text, and we'll get into this a little bit more. I believe that this was a text with the individual I asked you about Daniella Daniel. Ask you just to read the first line here, first text message from this telephone number.
A You said you want me to read this out?



Q Just -- not out loud. Just read to yourself the first text message that you received on this page. Obviously, once again, this is an excerpt. Please let me know when you've had an opportunity read that first section.
A I finished reading it.
Q Do you recognize this telephone number?
A No.
Q Do you know people's telephone numbers, or are you just one of those people that keep your cell phone with names and stuff?
A Yeah. I have names.
Q So if you were to take out your cell phone and plug in the number, it would tell you who this is, correct?
A Most likely, yes.
Q What is whomever this is taking about when saying checking up on my investment?
A I'm not sure. Did you ever have -- a casual conversation.
MR. CHEN: Sorry. What's the question before the before the witness? I'm a little lost, here.
Q I was asking him what he was talking about what type of investment he os discussing here. This

Page 138

person is checking up on their investment.

MR. CHEN: If you know what that conversation is about.

MR. LURIE: If you know.

A I don't recall what this is about. A person that's not even near Avatar or anything, so just a conversation -- I don't know the relevance of it.

Q That's fine. You can not know the relevance of it. That's not important.

MR. LURIE: Let's do this as nine.

(Stewart Nine was marked for identification.)

A I recall. I know what this is. Would you like me to explain?

Q No. That's okay.

MR. CHEN: By this, you mean Exhibit Nine?

THE WITNESS: Exhibit Eight.

MR. CHEN: Oh, you figured out the --

THE WITNESS: Yeah.

Q Mr. Stewart, I'm placing before you what's been marked as Stewart Nine for identification purposes. I'd ask you to take a look at this document and read it in it's entirety. Have you had an opportunity to finish reading this?

Page 139

A Yes.

Q Do you recognize this document?

A Yes.

Q Who's number is XXX-XXX-XXXX?

A Very personal, this. So do I have to put it on the record?

Q Yes.

MR. CHEN: Yeah. Just answer it. And --

A This is my daughter.

Q This is an excerpt, once again, from your text messages. Says in here, in the middle of the page, on October 24th, 2017 at 8:17 A.M., my first born, I've neglected you so much. I hate this property shit, but we'll be out of it.

What is this property shit that you're referencing?

A It's a misspell.

Q And what was it supposed to be?

A Poverty.

Q And then going down a little bit further, you say, I've worked hard over the past two years to get funds beyond me needed L-O-L. And the next one says, I even sold my soul to the devil. What does that mean?

A I'm fighting the fight.

Page 140

Q Who's the devil that you sold your soul to?

A That would be where we are right now.

Q So your position is that by litigating a case, you have sold your soul to the devil?

A Yeah. I'm fighting a fight because this was initiated.

Q Once again is, is it your position here that selling your soul to the devil, that term, you're referring to being involved in litigation?

A That's the -- you know.

Q Let me ask you, Mr. Stewart, what is your understanding of the proverb of selling your soul to the devil? What does that mean?

A I've never read it; but I've heard the phrase.

Q What does that phrase mean to you?

A Going to hell and come back.

Q That's your understanding of what selling your soul to the devil means?

A Uh-huh.

Q Yes?

A Yes. To the best of my knowledge.

MR. LURIE: Let's mark this as Stewart Ten.

Page 141

(Stewart Ten was marked for identification.)

THE WITNESS: I thought these were protected.

MR. CHEN: They are here for the purposes of the litigation.

THE WITNESS: And how far do these go? I don't want my daughter's number --

MR. LURIE: Would you like to go off the record for a moment?

MR. CHEN: Yeah, sure.

THE VIDEOGRAPHER: We are now off the record. The time on the video monitor is 3:25 P.M.

(A short break was taken.)

THE VIDEOGRAPHER: We are new on the record. The time on the video monitor is 3:32 P.M.

Q Mr. Stewart placed before you at this time is what's been premarked as Stewart Ten for identification purposes. Please take a moment to look at that document.

Do you recognize this document, Mr. Stewart?

A I'm reading through it. I recognize just

this conversation. I don't know the number or a name of this person. I see a number here, but I can't --

Q I understand because of how people don't remember telephone numbers anymore. I'll tell you an anecdote of just how bad that is. I tried to call home yesterday and called my office number because they start with the same area codes because that's the only number that I know.

I really only want to ask you one question about this document. In there, this document is dated October 13th -- well, strike that. There's some communications in here dated October 13, 2016, correct?

A Yeah.

Q You send a text message to whomever this is at 5:16 P.M. and amongst the things you say in there, it says I'm supposed to see my ex-girlfriend to get the, 5k needed to send to my players -- I presume that's to your lawyers. Is that correct?

A Yeah.

Q Were you -- strike that. Who is the -- to the best of you're recollection, who is this ex-girlfriend that your referencing that you're to be getting 5,000 from?



A I have no idea.

Q Mr. Stewart, when did you begin driving for Uber and Lyft?

A October 2016. Oh. Yeah.

Q So in approximately April of 2015, until October of 2016, did you have any sources of income?

A Not that I know of. 2015 to October --

Q April of 2015 through approximately October of 2016, did you have any sources of income?

A Not sure.

Q Were you working at any time in that period?

A No. I don't think so.

Q During the time you were providing services for my clients, what was your approximate take home?

A When I was providing services for avatar sales technologies?

Q Yes.

A 8,000.

Q $8,000 per month?

A Per month.

Q So approximately $96,000 a year?

A Mm-hmm.

Q And how much approximately are you making



now? Strike that.

A Currently?

Q Prior to your current employment, driving for Uber and Lyft, approximately how much money were you making in a given month?

A Maybe, like, 2000.

Q So about 25 percent of your prior take home?

A Mm-hmm.

Q And for a period of approximately 18 months, you have had no income, correct?

A I believe so.

Q You were struggling, correct?

A I don't know how struggling I was, but I could survive.

Q You were -- strike that. Were you talking to people about intending to file for bankruptcy during that period of time?

A I'm not sure. I've never really thought of bankruptcy.

Q Do you know what bankruptcy is, technically what bankruptcy -- not just the word that we use, bankruptcy. Do you know what bankruptcy is?

A Yeah. When you gather all your assets and



go to a lawyer and say, I have all these -- I mean, not assets, but all your bills, and say, I can't afford to pay and get me out of here.

Q Do you recall telling people that you were bankrupt?

A Possibly, yeah. I could see me saying that.

Q Would that have been within this period of time between, roughly April of 2015 through October of 2016?

A Possibly.

Q And once again, my apologies. My intention is not to make you upset when I say this. When you had the discussion with your daughter in October of last year, 2017, you talk about poverty.

A Uh-huh.

Q Were you unable to pay your bills at that time?

A No. I'm always able to pay my bills. But -- my thoughts of poverty is making anything less 120,000 a year. So anything less than that, I would consider poverty.

Q So for these years that you were providing services for Avatar Technologies and Sales Technologies, you were living in poverty?

Page 146

A I always thought I was living in poverty.
Q Do you know what the average wage is for a person who lives in New York City?
A That's -- those people -- I only think of my version of that.
Q Would it surprise you that the average wage in New York City is less than $50,000 a year?
A No.
Q So your position is, unless you were -- strike that. Do you know what the average wage is in New York City to be considered in the top 10 percent of income?
A No.
Q Would it surprise you if it's not that far away from $120,000 a year?
A Not something I care much about.
Q So, your position is that you are in poverty, unless you're in the top 10 percent of income?
A My number was 120 a year. So, I don't -- I never read about it, but that's how I view poverty.
Q Okay. And you were telling people that you're getting out of this poverty shit at this point, correct?

Page 147

A Yeah. I always have optimism.
Q Do this as Stewart 11.
(Stewart Eleven was marked for identification.)
MR. LURIE: I warned you. I got a lot of these exhibits.
Q Mr. Stewart, I'm presenting to you what's been marked as Stewart Eleven for identification purposes. Looking at this document, a lot of it is some type of a link for PayPal. What I'm specifically interested in, is the first -- or a better way to put this, text -- the text message dated 6-12-17 at 4:58 A.M. Take a look at that for me. When you finish reading, just that one little section, let me know.
A Okay.
Q First question for you is, what is My Cash?
A It's a an app to, like, Zelle to transfer money.
Q And you indicate that your -- is that your profile name on My Cash, being dollar sign, David TPO?
A Yup.
Q May I ask you why you utilize David TPO?

Page 148

A It's easier to remember.
Q In this text message you're asking for somebody to send you $2,000 and they'll pay you back 15 percent on capital?
A Yeah.
Q Who is that person that you sent this to?
A I'm not sure. I just know it was somebody with this number.
Q What are you soliciting $2,000 for?
A I think this is a request for $2,000. I'm not selling anything.
Q Soliciting. You're requesting. You're requesting $2,000?
A To borrow, I guess.
Q And pay back 15% on capital?
A Yep.
Q You have a lot of people you borrowed money for and promised to pay them back a percentage?
A Is it -- did I do this a lot? I'm not sure.
Q Did you enter into any written promissory agreements with anyone for loaning you money?
A Yeah.
Q Who?

Page 149

A I believe Rauti.
Q What was the purpose of borrowing money from Rauti?
A To help me file my cases, take care of my legal fees.
Q Did you tell them that the purpose was to file lawsuits?
A He didn't want to know.
Q He didn't want to know what the purpose was for the money? You just asked him for money?
A Yes.
Q How much money did he lend you?
A 10,000.
Q You know someone well enough that they're going to lend you $10,000?
A He's family.
Q What?
A He's family.
Q He's your family?
A Yeah.
Q Are you related to him?
A Yeah. Through lines of cousins and --
Q What's your relationship with him?
A My cousin -- my wife is his cousin's -- I mean, his wife's cousin.

Page 150

Q So your --
A Or my partner. My partner and his partner are cousins.
Q So are you married?
A No.
Q You referred to the term my wife, now, several times.
A Just a lose phrase used.
Q And is your partner Yoledy?
A Yes.
Q You never legally married her?
A No.
Q Who is Stephanie Bariba.
A Oh. That's -- oh, my friend Stephanie. That's just a friend of mine.
Q Let's do this as Stewart 12.
(Stewart Twelve was marked for identification.)
Q Mr. Stewart, I'm presenting to you what's been marked as Stewart 12 for identification purposes. It's specifically a photograph of a lined piece of paper. I ask you to tell me if you recognize the document that this is a photograph of?
A Yes.
Q What is this document?

Page 151

A An agreement.
Q What agreement?
A To borrow money.
Q To borrow money from whom?
A My friend Stephanie.
Q What's the date of this agreement?
A 9-13-2017.
Q Okay. And what amount were you -- strike that. What was the purpose of borrowing money from her?
A I had some bills to pay. And I borrowed money.
Q And has agreed to pay interest in the amount of $250, correct?
A Yes.
Q So 25 percent interest within one year?
A Yup.
Q What bills did you need to pay?
A I'm not sure. I might have wanted to take a trip or something. I don't know.
Q Did you take a trip in September of 2017?
A Maybe I just came back from a trip.
Q Where would you have come back from in September of 2017?
A I think I went to the Dominican Republic,

Page 152

maybe. 2017 -- no, no. I'm not sure what that was for.
Q You don't remember the purpose of borrowing a thousand dollars from --
A Most likely to pay some kind of bills.
Q But you were never struggling, correct?
A Struggling --
Q You never had financial struggles?
A Maybe I needed, like, some extra money that day or something. I had to deal with something that I needed a thousand dollars. I was, like, oh, can I get a thousand dollars? She said, sure.
Q How much is your rent?
A I don't really have rent.
Q You live in an apartment?
A Yes.
Q Do you own the apartment?
A No.
Q Who owns the apartment?
A My grandmother.
Q She owns it, or is she the tenant?
A Tenant.
Q Does she pay rent?
A Yes.
Q Do you pay her rent?

Page 153

A Not really. She would, you know -- I would help her if she ever low on her rent.
Q Who else lives in this apartment?
A My partner and two kids.
MR. CHEN: He testified earlier to that in the FSLA case.
Q And your grandmother also lives there?
A Yeah.
Q Anyone else?
A No.
Q And your grandmother pays all the rent?
A If she's low, I'm there.
Q When's the last time you paid rent?
A Not a -- I don't know. It's -- that's -- we're family, so.
Q Do you remember the last time that you had to pay any money for rent?
A I always contribute.
Q How much do you contribute?
A Could be all, or some, part. It varies.
Q How much was the last amount that you paid?
A The last amount?
Q Yes.
A The entire rent.

Page 154

Q What was the entire rent?
A 852-something.
Q Rent controlled apartment, I take it?
A Very much so.
Q Those of us who have ever looked at an apartment here know 852 in the city is a shock. Do you pay utilities?
A Yeah.
Q What are the utilities that you pay?
A Gas, light, cable.
Q How much do you pay for cable?
A I'm not sure.
Q Approximately how much do you pay for cable?
A Fifty dollars, a hundred dollars. I'm not sure.
Q Do you pay the bills yourself?
A No. I don't touch. I drop money and other people take care of the bills and stuff. I don't deal with that.
Q How much money did you drop?
A I don't know. It varies.
Q How much money did you provide -- strike that. Who do you provide the money to to pay these bills?

Page 155

A Yoledy.
Q And how much money do you provide to her --
A I don't deal with that at all. She goes into the account and takes what ever she needs.
Q Can you estimate your monthly expenses?
A Thousand dollars.
Q Do you have to pay any student loans?
A Oh, yes.
Q How much do you pay in student loans a month?
A I'm not sure. I postponed them for the last four years, I guess. So I don't have to pay.
Q Do you pay car insurance?
A Oh, yeah.
Q How much is your car insurance?
A That, I know is 700 and something.
Q A year?
A Every six months.
Q So approximately 1400 in change?
A Yes.
Q And are you still driving the Honda?
A The Honda?
Q The Honda that -- I don't know what the model is, the fast back that you received from Mr. Kaltner?

Page 156

A Oh. That Honda. Yeah.
Q You're still driving that vehicle?
A Yeah.
Q So no car payments?
A No.
Q Pay for maintenance plan?
A No.
Q Strike that. Does Uber or Lyft reimburse you for gas?
A No.
Q Do they reimburse you for tolls?
A Yes.
Q Is it part of what you get paid from --
A It's separate. Tolls is reimbursed automatically every time you travel with the passenger.
Q So you have a passenger in the car, you drive through the Lincoln Tunnel, for example, from Jersey to New York, you get a 13-dollar extra charge on your --
A Yeah.
Q You have to cover your own gas costs?
A Yes.
Q Approximately what was your monthly gas payment?

Page 157

A I'm not sure.
Q Did you do it on a credit card, or did you do it in cash?
A It's done through the Uber app. So I never monitored.
Q If you were to take a look at the Uber app, would it be able to tell you how much your monthly gas costs were?
A If I was to put it in a Excel spreadsheet, yes, I would know. But I never --
Q Is that available on the Uber app?
A It's there. I don't know if I can copy it and put it in Excel.
Q If you were to estimate, how much money did you have to spend on gas per month?
A I never even paid attention. I did it once in a spread sheet, but I didn't --
Q You previously -- strike that. Do you know how much your cell phone bill is?
A 250 a month.
Q Do you know approximately how much -- strike that. Do you have any credit cards?
A Yeah.
Q Do you have balances on those credit

Page 158

cards?
A Yes.
Q Approximately what is your monthly payment on credit card balances?
A Maybe a thousand dollars.
Q When you gave me the amount of thousand dollars in expenses, did you include your credit card?
A No.
Q Did you include your cell phone?
A No. Just apartment expenses. That was my determination.
Q So your estimate, to me, that you're bringing in about $20,000 -- or $2,000 a month, correct?
A Mm-hmm.
Q And you're paying a thousand dollars in living expenses. So that's a thousand?
A Mm-hmm.
Q A thousand dollars in credit card, and $250 a month itself?
A Yeah.
Q Any other expenses?
A Not that I know.
Q You're paying approximately $2,250 a month in expenses and bringing in approximately $2,000 a month, thereby having a net of negative $250 per month, correct?

Page 159

A It varies with the Uber. Like, you know, I also do Lyft. You know. So.
Q Well, I believe I asked you what your total monthly income was from driving Uber and Lyft.
A Oh.
Q So what's your total approximate monthly income?
A Oh. Um, I guess you can total, maybe 3K, yeah.
Q So it's still about one-third of your prior income?
A Yeah.
Q Have your expenses decreased since you were providing services to Avatar Technologies?
A Yeah. I don't have much expenses other than that stuff.
Q Are these the same expenses generally that you had at that time?
A They increased. But --
Q What increased?
A Credit cards, you know. I used them at times.

Page 160

Q So your credit card costs have increased at the time you were providing services, ending in approximately in April of 2015?
A Yeah.
Q How many individuals do you owe money to?
A Maybe two.
Q Two people?
A That I know of.
Q Who are the two people you owe money to?
A Stephanie and Rauti. That's it.
Q So you have outstanding debts of, to individuals of approximately $11,000 plus interest?
A Yes.
Q How much interest did you agree to pay Rauti?
A Yes, we didn't agree on any anything because --
Q So it's just to take $10,000 and pay me back when you can?
A Yeah. Basically.
MR. LURIE: If you're done with that line of questioning, can we take a quick break?
THE VIDEOGRAPHER: We are now off the record. The time on the video monitor is 3:57 P.M.

Page 161

(A short break was taken.)
THE VIDEOGRAPHER: We are now on the record. The time on the video monitor is 4:02 P.M.
MR. LURIE: Let's do this as Stewart 13.
(Stewart Thirteen was marked for identification.)
MR. CHEN: What number are we on?
MR. LURIE: Thirteen.
MR. CHEN: Thirteen.
Q Mr. Stewart, I'm presenting to you what's been marked as Stewart 13 for identification purposes. Take a moment to look at this document.
A Yep.
Q Do you recognize this telephone number?
A Oh, yeah.
Q Whose telephone number is this?
A Oh, I don't know exactly who. But it looks like --
Q Do you have belief as to who this telephone numbers is attached to?
A Maybe one of my family members.
Q What family member?
A A cousin of mine.
Q Which cousin?

Page 162

A Starting to see that this 3-1-5 have to be, like, someone at that lives upstate.
Q Upstate where?
A New York County, Albany-ish.
Q You have family up there?
A Yeah.
Q Do you have any belief as to who this is?
A It's fuzzy. But let met see. Yeah. No, no. Not for sure.
Q Seems like again, in approximately June of last year, you were seeking to have people -- strike that. Seems that in approximately June of last year, you were trying to have people invest in something with you; and in this case, you were promising 15 to 20 percent back as a recharge. Is that an accurate reading?
A Yeah. Yeah.
Q What investment is this?
A To -- legal bills.
Q So you're seeking people to invest in your lawsuits, promising them 15 to 20 percent?
A Uh-huh.
MR. LURIE: Let's do this as Stewart 14.
(Stewart Fourteen was marked for identification.)

Page 163

MR. LURIE: I told you, Jacob, I'm trying not to go down that route, but --
MR. CHEN: Right.
Q Mr. Stewart, now presenting you with a document that's been marked as Stewart 14 for identification purposes. I'd ask to you briefly take a look at this document as well.
A Okay.
Q Have you had an opportunity to review this document?
A Yeah.
Q You're aware that by forwarding communications with your attorney that they are no longer privileged, correct?
A Okay.
Q Are you aware of that?
A No. I don't know that.
Q If you would like your attorney to kind of give you go the explanation on that, I would give him the opportunity to do so because obviously some of these are what you were probably going to be privileged communications.
A Oh.
Q But by presenting them to someone else, there's no longer a privilege.

Page 164

A So you're saying if there's legal -- if we speak legally and then I forward it to someone, it's no longer privileged?
Q Correct.
A Oh, great.
Q So in this discussion, you are now -- is this the same telephone number and communication as with what was marked as Stewart 13?
A Oh, yeah. Same number.
Q So at some point you forwarded this individual a privileged conversation you were having with your attorney, correct?
A Yeah.
Q What was the purpose of forwarding this discussion to a third party?
A As I'm looking at this, I don't know the person. Happy Father's Day -- what was your question?
Q What was your purpose in forwarding this communication with your lawyer to a third party?
A I'm looking at this. And by it saying happy Father's Day below, I'm just thinking this is my child. And I'm having a conversation and sent them something, but --
Q I can represent to you that this wasn't

Page 165

your child. And in fact, you joke about that afterwards.
A Yeah. I don't understand because it says happy Father's Day below. But I'm not sure why you --
Q But just focusing on this message at 16, 17, 12:27 P.M. forwarding a discussion you were having with your lawyer to this person. What was the purpose in forwarding that discussion to them?
A I believe this is when I was pro se, or -- I don't -- and I don't know why I would forward this to -- I don't even know who this person is.
Q Did you forward that same message to anyone else?
A Not sure. Maybe I was looking for some advice or something. This is -- let's see, 13 -- Oh, this is when I was seeking a loan.
Q So you were forwarding privileged conversations with people for the purposes of inducing them to loan you money?
A I have to say yes.
Q Were you successful in obtaining money from anyone else besides Rauti and Stephanie Barima?
A I don't think so.
Q I'm going to apologize about this one.

Page 166

For whatever reason, it didn't print the third copy so --

MR. CHEN: I'll just --

MR. LURIE: So this will be Stewart 15, two pages.

(Stewart Fifteen was marked for identification.)

MR. LURIE: I'm just focusing on his third message on here, starting at the bottom and then going on to the next page.

Q Mr. Stewart, I present you a document marked as Stewart 15 for identification purposes. I understand you're currently reading the document. It's two pages, and I would ask you to let me know when you have finished reading this document.

A Yes. Finished.

Q Both pages?

A Oh, second person. Okay.

Q This is another text message with your daughter, correct?

A Yes.

Q And in here, you're being asked about whether or not a credit card still works. Is that correct?

A Yes.

Page 167

Q And you're following up to ask her about how much she spent on it, correct?

A Yes.

Q Looking at this -- by the way, this document, these messages are dated June 16, 2017, correct?

A Okay.

Q Is that correct?

A Yes.

Q Is that the same date as the message we addressed in Stewart 14?

A Yes.

Q Now, at about 10:45 in the morning you text your daughter, I wish but I have to file the case and look to earn money to stay afloat until my big paydays come. Some typos in there. And you forward the same message from your attorney as we discussed in Stewart 14. Is that correct?

A Uh-huh. Yes. It is.

Q What is this big payday coming?

A My FSLA case.

Q What happens if you don't get paid out on the FSLA case?

A I'm not -- I don't think negatively.

Q This isn't negative. It's just, you are

Page 168

confident in the FSLA case, which is noble. But what happens if you lose?

A That's life. Keep going.

Q But you're seeking money to stay afloat, correct?

A It is what it said.

Q But you're not struggling financially?

A I can't do some of the things I normally do with her, you know, where she gets the credit card and just spends because she's a 16 year old child. I have to control spending. But it was a strain to have these cases.

Q Do you talk to your daughter lot about these cases?

A Yeah.

Q You had several discussions with her about curbing her spending as a result of these cases?

A No, I'm not sure.

Q Do you recall having conversations with her about taking it easy on you because of you are struggling financially?

A You're asking me if I had that conversation?

Q Do you recall having any conversation about that?

Page 169

A I don't know. We talk and laugh and joke, so.

Q Do you recall chastising your daughter for emptying out some type of savings account that she had? Her rainy day fund?

A I'm not sure. I'm not sure.

Q Do you recall telling her that as a result, you're not going to be able to put money back into it?

A Produce, so I can just review it, if you can refresh my memory.

Q I'm asking if you recall.

A No. I don't recall.

MR. LURIE: Stewart 16.

(Stewart Sixteen was marked for identification.)

Q Mr. Stewart, now being presented with a document that's been marked as Stewart 16 for identification purposes. For the record, it's four pages long, and it's Bates stamped S-T-space-I-P-space-dash-0-1-4-3-5, through 1-4-3-8. Please take a look.

A Okay. There are conversations between me and my daughter.

Q Do you recall any of these conversations?

Page 170

A Let me just read it to see how it relates to Avatar --

Q Mr. Stewart, I would ask you to keep your commentary aside unless you're going to be representing yourself as your own counsel by raising these issues of objection is entirely improper. I would ask your attorney to, if there is any objection, speak any objection.

A Sorry. First and last. Okay. Conversation read.

Q In this discussion, your daughter is asking you whether a credit cards work; and if not, if you can put, like, $200. That's a message of July 3rd, '17 at 7:46 P.M. Is that an accurate reading?

A Yes.

Q And at 11:13 P.M., you respond, hey, here is an excellent question, how much money do you have in your birthday stash, question mark. These are emergency time, and I need to know these figures. You can get exponential returns investing in it. Are you -- strike that. What are you asking your daughter to invest in?

A Maybe my cases, to give me her birthday money, maybe.

Page 171

Q Mr. Stewart, what do you mean by emergency time? And I presume you mean emergency times.

A I'm not sure what was happening then, but I might have needed cash, or I asked her to go into her birthday funds.

Q Well, later on, on the second page Bates stamped 1436, your second message says, this is -- I'm sorry. Your message on July 4th at 12:02 P.M. says -- I can't even do $200 now, and the credit cards are maxed out. Mr. Stewart, were you having financial problems in July of last year?

A I might have been. Most likely. July of 2017.

Q Once again, continuing through here, you're forwarding more of your conversations with your attorneys with respect to these companion cases, correct?

A Yes.

Q I'm going to pull you back briefly to look at Stewart 15 on the second page, Bates stamped 1414. First line of the message that you forward before you copy and paste your message from your attorney, you write, just so you can imagine what I'm dealing with, comma, here's a conversation with my lawyer about case number four of four. Do you

Page 172

see that?

A Mm-hmm.

Q What other cases are there?

A I had a few in the Philippines.

Q How many in the Philippines?

A I don't know. I think there were three total.

Q Three cases in the Philippines?

A That was created.

Q What kind of cases are those in the Philippines?

A I don't even know.

Q Are you defending those cases in the Philippines?

A They are sitting there waiting for things to happen.

Q What things to happen?

A Well --

Q Let me make it this way. Are you the plaintiff or the defendant in those cases?

A I am the defendant.

Q In three cases in the Philippines?

A At least three cases filed against me.

Q Are they filed against you, personally?

A Yes.

Page 173

Q Who are the plaintiffs?

A Oscar Varuk.

Q With regard to?

A Similar things that Avatar exclaimed about finances and money missing and stuff like that. And threating, and issues of that --

Q What do you mean by threating?

A I believe in one of them. I was -- they said I called someone and threatened to blow up the building.

Q You previously talked about for utilization of -- strike that. When were you in the Philippines again in 2015?

A 2015, July. July to August.

Q What about 2016?

A February, to May.

THE VIDEOGRAPHER: Mr. Chen, I think your microphone just dropped.

MR. CHEN: Thank you. I'm not sure how much of my coughing you want on the --

THE VIDEOGRAPHER: It's okay. Thank you.

Q Did you post using your Kal El account indicating something using -- strike that. Do you know what a hash tag is?

A Yes.

Page 174

Q What's a hash tag?
A A trending statement or phrase.
Q How would you -- how would one write out a hash tag?
A Well, based on the official rules, I don't know. I would just say, hash tag, stop bullying, or something like that.
Q When you say hash tag, is there a symbol that --
A Pound sign.
Q Pound sign. What's with the hash tag, one match can make a big explosion, mean?
A That's from a song.
Q What song?
A Not sure of the artist. But it's a song -- I would have to look that up to -- a female artist.
Q What do you think that term means?
A What do I think it means? That I'm willing to fight the good fight.
Q Who is Nico Tan?
A Who I believe it is?
Q You -- who, who -- strike that. Do you know somebody named Nico Tan?
A Someone, no.

Page 175

Q Who do you believe is -- strike that. Have you ever heard the name Nico Tan?
A Yes.
Q Where have you heard the name Nico Tan?
A Facebook. Facebook friend request to me and a couple of other ex-Avatar employees.
Q Who do you believe is Nico Tan?
A Oscar Varuk.
Q Had a bunch of nicknames when you were providing services to my clients, correct?
A Huh?
Q You guys used a bunch of nicknames when you were providing services to my clients, correct?
A Yes.
Q You went by the name David Rose?
A Yes. David S. Rose.
Q David S. Rose?
A Stewart Rose. Rose was a family name I heard of, so I used it.
Q And did George Kaltner have a nickname?
A George Van Kaltner, and -- I'm not sure. Other ones.
Q Did Oscar have a nickname?
A Oscar. Yeah. Oscar Reed.
Q Did you ever refer to Oscar as, my man?

Page 176

A Pretty sure I've called a lot of people, my man.
Q Mean that, like, in a somewhat --
A Like my boy.
Q -- in a derogatory way?
A No.
Q So if you were posting something on Facebook, saying about, my man is doing something? Who would that be, that's upsetting you?
A Depends on --
Q Somebody is posting on -- strike that. If you were complaining about this case on Facebook, and you referred to my man, who would my man be?
A Complaining about --
Q This specific litigation.
A Yeah. I don't think -- I would have to see the context of where you're getting this from.
Q Issue --
A It's very broad.
Q Once again, I would ask your commentary to cease. And have your attorney can, if necessary --
MR. CHEN: I think that was just a part of his answer to your question explaining why he's having difficulty answering.
MR. LURIE: Thank you, Jacob. But --

Page 177

THE WITNESS: Yeah.
MR. LURIE: Let's try to keep it to the questions. Who is Michael C, capital C, in quotes?
A Fictitious name.
Q Who is Michael Ceeya?
A Avatar employee.
Q Familiar with him?
A Oh, of course.
Q Friends with him?
A Well, that's what I thought.
Q Were you asking Michael C. to provide you with internal documents from Avatar?
A No. I don't need internal documents from Avatar.
Q You never reached out to him to provide you with anything?
A I never needed it.
Q Didn't ask if you needed it. Did you ever ask him for any documents?
A Most likely blowing smoke into Oscar's right-hand man's ear because he's one of the spies, so.
Q Lot of spies, right?
A Oh, yeah.

Page 178

Q Why are there so many spies against you?
A No. Not against me. It's the paranoia of the company.
Q Well, you just mentioned, there was a couple of spies.
A Oh, yeah. So far.
Q Why are people spying on you?
A Not on me. They report the information to --
Q This woman who we referenced a little bit earlier -- let's pull up this document. Talked about her before.
A Marby Cordero.
Q Marby Cordero. You referenced her as a spy?
A Yeah. That's her job.
Q Her job was to be a spy?
A Yeah.
Q Why is she reaching out you?
A To get information to bring back to the people that hired her. Or not even at the time, she was not even hired by them. When she spoke to me there, she wasn't an employee.
Q Why would Michael Ceeya want to spy on you?

Page 179

A You would have to ask Oscar that.
Q Who else is spying on you?
A I didn't say spying on me. They're the spies of the company.
Q And they're reaching out to you?
A Yeah. Why are they reaching out to me?
Q Yeah. Why are they reaching out to you?
A Because they're ordered to from their leader.
Q Why do you think they are reaching out to you?
A Why?
Q Yes. Why do you think they're reaching out to you?
A Because Oscar has a strong dislike for me.
Q You start providing service for them in April of 2015, correct?
A I stopped, yes.
Q Couldn't you just have gone on your way and let bygones be bygones?
A That's what I did.
Q You did not try reach out to anyone in the business to get you things, internal documents, or --
A I did not need any internal documents.

Page 180

Q A 137 pages. Stewart 17.
(Stewart Seventeen was marked for identification.)
MR. LURIE: Looking for the other copy of this, so bare with me. I thought I had an extra copy of this. If you have the documents accessible on your system there, this is in group 17 of the text messages, Bates stamped -- going to be referring by Bates stamp numbers, as well. If you want, I can pull this back up and email you as well. Probably actually will be easier for you to have it on the computer screen than it is going through paper.
MR. CHEN: Which --
MR. LURIE: It's in the -- well, I mean did I send it to you in just the complete document?
MR. CHEN: I have it in front of me. What numbers?
MR. LURIE: 3-5-3-6.
MR. CHEN: 3-5-3-6.
MR. LURIE: Three six. And it actually should go to approximately the end of it. I think there were only two pages at the end after pages 3,5 -- I'm sorry. 3-6-7-3.

Page 181

MR. CHEN: So 3-5-3-6 to --
MR. LURIE: Yes. To 3-6.
MR. CHEN: 3-6 --
MR. LURIE: -- 7-3. Do you have that in front of you, Jacob?
MR. CHEN: I have it.
MR. LURIE: Okay. I'll be jealous you have it on the computer screen.
Q Mr. Stewart, presented before you is a document, which has been marked as -- I lost -- Stewart 17 for identification purposes. It's a 137 page document Bates stamps beginning at 3536 and ending at 3673. Obviously, this is a sizable document. And rather than having you read through the whole thing --
MR. CHEN: Can I unplug this? Just go quickly off the record.
THE VIDEOGRAPHER: Go off the record?
MR. CHEN: Yeah.
THE VIDEOGRAPHER: We are now off the record. The time on the video monitor is 4:40 P.M.
(A short break was taken.)
THE VIDEOGRAPHER: We are now on the record, the time on the video monitor is 4:44

Page 182

P.M.

Q Mr. Stewart, before you right now is a document marked as Stewart 17 for identification purposes. As we indicated before, it is a 137 pages long. Now, before we start going through this document, have you reviewed your text messages before this deposition today?

A Not really.

Q Were you aware that we would be looking through your text messages?

A Yeah.

Q And so -- strike that.

A Yes.

Q Are you an individual who keeps text messages or deletes text messages?

A I just -- it's there. Sometimes when I see device almost full or whatever.

Q So it's normal practice you just retain all of your --

A Yeah. I never pay attention to it.

Q Do you know -- strike that. Do you recognize the telephone number on this X-XXX-XXX-XXXX?

A No. I don't recognize telephone numbers.

Q Do you know who this is a communication

Page 183

with?

A I would assume this is Ms. Velez.

Q And by that we are talking about Stephanie Valdez, also known as Edevict Veneeszula?

A Yes.

Q Do you recall having conversations with her --

A Yes.

Q -- going back -- finish the question. Going as far as back as May 8 of 2015?

A Yes.

Q Okay. May of 2015, this is a short time after you ceased providing services for my clients, correct?

A Yes, it is.

Q But you had some money that you were still due under an agreement with them, correct?

A Yes.

Q How much money were you due as a additional amount of money paid out after April of 2015?

A Due as in the sense of --

Q Did you make an agreement to receive additional money after you ceased providing services?

Page 184

A That was offered to me.

Q Who offered it to you?

A George.

Q How much was offered?

A Full salary for the next six months.

Q Was it $14,000?

A That's the amount they sent through.

Q We talk about that in here, about $14,000. Is that correct?

A Yeah. That's the --

Q You were intending to receive $14,000?

A That's what I received, but --

Q Let me just ask you once again. We briefly touched on this, but, Ms. Veneeszula, what was her position with Avatar Technologies, Sales Technologies, whatever it may be?

A She was -- she managed payroll. She did some accounts payable. She backs me up if I'm not available. What else she does?

Q Let me ask you this. Do you know how she came to be employed by Avatar technologies?

A Yes.

Q How did she become employed?

A I introduced her to George.

Q You knew her previously?

Page 185

A Yes.

Q How --

A We went to school together.

Q Where did you go to school together?

A Monroe School.

Q When you would return to receive your bachelor's degree?

A Yes.

Q And -- strike that. You introduced her to Mr. Kaltner?

A Yes.

Q Why did you introduce her to Mr. Kaltner?

A What was happening? I think I needed help with doing the billing and all of the service tickets for both companies. So, Breeya was helping me at first, but she wasn't, you know, the right fit. And then George took her on as his personal secretary, so --

Q So Breeya was the personal assistant?

A Yeah. Did a lot of work for him and, yeah, baby sitting and stuff.

Q And so you needed help with your services that you were providing, correct?

A I needed help with the work that was -- that I had to do.

Page 186

Q And did you ask Mr. Kaltner if you could bring someone in to assist you?
A What did I do? I don't remember what happened. I think it was towards the first of the year. And they were hiring new staff.
Q First of what year?
A I think it was the beginning of the year when they were -- you know, they were looking to expand because things were getting bigger with the company.
Q Which year? 2013? '14?
A I think 2000 -- I'm not sure. I just know I brought her in because I knew her; and I new she was in accounting, and she would be able to most of the stuff that I couldn't do. So I invited her to the company.
Q What was -- you stated she was in accounting. Do you know what her prior position was before being hired?
A No.
Q What made you believe that she was in accounting?
A Oh, she took accounting in college. I think that was on her resume when she submitted it. Pretty sure it was.

Page 187

Q Did you recommend her?
A In capacity, yes. Said she should be an asset to the company.
Q Did work alongside her?
A Yes.
Q Did you train her?
A I showed her basically all the things I knew.
Q So you trained her to do the work you were providing?
A Well, some of the work that she did, I trained her with.
Q Did she report to you?
A No.
Q On the second text message that you received from her on May 8th of 2015, on Bates stamp 3536?
A Yeah.
Q She writes you and said, I thought you took all of those statements. Do you know what she is referring to?
A I'm not sure.
MR. CHEN: Sorry. Which page?
THE WITNESS: The first page.
MR. LURIE: 3536. First page, second

Page 188

message.
MR. CHEN: Are you going doing through all of these documents?
MR. LURIE: No. I'm going to go give you the page number as I'm addressing them to make life easier, and it's going to take way too long and there's a lot of -- obviously we don't care about them discussing having dinner.
MR. CHEN: I do recall this was an issue on the Kaltner deposition, but I'll go over these pages as you list them out. Then I'll review the page and we can ask questions about --
MR. LURIE: Makes things a little bit easier that way.
Q Going to flip now, the next page 3537, May 8, 2015 at 7:37 A.M. For ease, we'll call her, I believe everyone referred to her as Steph or Stephanie.
A Ms. Velez.
Q Writes to you and said, make sure if you have the statements, or which ones do you need so I can get them to you -- you with just the letter U -- we basically have four days to get anything. I'm assuming you'll have Max hijack all of my stuff as

Page 189

soon as I tell him I'm leaving.
MR. CHEN: Just a correction, four days only to get everything.
MR. LURIE: Only to get anything.
Q What statements is she referring to?
A Yeah, I don't know what statements she needed or, you know, I needed that she would -- four days.
Q Why would there be documents that she would have access to that are statements that you need?
A I don't know. Payroll. That's the only thing that she did that I wouldn't be able to have.
Q When you say -- so you wanted the company's payroll?
A No. I don't know what it is. I'm saying that's the only function that I never touched that she would have something that I would need -- you know, statements.
Q Now, to the next page 3538 going down a little bit further. This is a discussion on same date. Now at specifically looking at the message of 11:40 --
A Uh-huh.
Q A.M. at 45 -- 11:40:45. She writes to you

Page 190

and says, are you serious, question mark, dot, dot, dot, you -- just the letter you -- want to go through the laptop now, period. He is going to say it's company equipment just as he did with the phone. Next message: I'm guessing it's all part of the new plan. Next message: So I'll just -- J-I-S-T -- follow through, T-H-R-U. What is the new plan that she's referencing?
A I don't know about that. But I know the context of this.
Q What's the context?
A I was trying to purchase the MacBook Air so I could send it to the Philippines.
Q Why did you want to send a MacBook Air to the Philippines?
A To my girlfriend.
Q You had a girlfriend in the Philippines as well?
A Yes.
Q Okay. So, do you have any idea what the plan is that you're -- that's being referenced? Or do you believe it's just sending a laptop to --
A Yeah. I guess it's part of the plan. And I'm not sure what that is.
Q Flipping to the next page, 3539 message

Page 191

dated May 9th, 2015, 6:33 A.M. 24. And I'll go through this, each one. First message says, delete all the messages between and you I on your corporate phone. Next message comes in and just says two. Why are you telling her to delete all the messages between the two of you on the corporate phone?
A The conversation we had about the laptop and stuff.
Q Why would you want to have that deleted off the corporate phone?
A So that she shouldn't be talking to me, I guess.
Q Well, this is you saying so. Not her.
A Oh. Yeah. I would tell her to delete it. Obviously I didn't delete it.
Q Why were you telling her to delete it then?
A Because, in Avatar, whenever someone is terminated, you couldn't speak to them. You're not supposed to have any communication with them. It's what they say.
Q You continued to communicate with her afterwards?
A Oh, yeah.
Q She continued to communicate with you?

Page 192

A That's up to her.
Q Do you know whether or not she deleted these messages?
A No. I don't know.
Q Flip to the next page. There's a discussion starting in the middle of the page, May 11th, 2015. 7:34 A.M.
A Mm-hmm.
Q Once again, why are you talking with her at such early periods of time?
A I don't know. She's up.
Q So, this one you're talking about a raise proposal for Agrain?
A Agrain.
Q She's taking 35,000 thousand a month. But I don't know if it'll look outrageous, she's at 25,000 now. And you respond back saying, propose it, let them say no, and reduce it to 30,000. We're talking about pesos, correct?
A Yes.
Q Do you know what the equivalent is between the exchanging rate between the dollar and the Philippine peso is?
A Fifty to one, I guess.
Q So, you said that you didn't have any

Page 193

involvement with payroll, correct?
A Yeah.
Q So why are you, after no longer providing services for Avatar, or Sales Technologies, or whatever business, you're having discussions with her regarding someone's pay?
A That's payroll left the Philippines.
Q So you were involved with payroll in the Philippines?
A No. That's her salary -- I suggested -- she wanted to -- since I'm not there any longer Agrain has more responsibilities. So they were going to, you know -- she asked me for my suggestion of what should she get paid, hey, give her 35k.
Q Why did you weigh in at all? You just said that you wanted to walk away and not have any --
A It's a friend of mine, Agrain. I put her and Ben together.
Q There's a discussion, now looking at page 3543. Sent a message --
MR. CHEN: Let me take a moment to review it. Okay.
Q Sent a message on May 13, 2015 at 7 o'clock in the morning, 7:03, asking, stating, also

that 5K should be sent tomorrow, comma, right? I got to pay lawyers fees, lawyer fees L-O-L. She responds back, looking a little bit further down, 5-13-2015, 7:17 A.M. She states, they are interviewing controllers tomorrow, so the accountant Ken will be there. Further down she says, I'll try to 5K, but it's 4k, actually. So. I'll ask you a couple questions about that.

A Mm-hmm.

Q Why would she be telling you about interviewing controllers and accountants and that Ken will be there?

A Just friendly updates.

Q Who's Ken?

A CFO.

Q Why did you care what's going on at Avatar when you wanted to just walk away?

A Fun gossip and stuff. It was not -- you know.

Q Going further down, she says, she responds back, I'll try 5K; but it's 4K, actually. So were you supposed to receive $4,000 or $5,000?

A A lot of was supposed to be much more than that, but it is what it is.

Q Well, you don't respond back and say,



supposed to be a lot more than that, right?

A Huh?

Q You don't respond back at any point and say, it's supposed to be a lot more than that, where's my six months?

MR. CHEN: Sorry. The negatives -- what's your questioning again? If you could frame -- can you phrase it in a nonnegative way?

MR. LURIE: If this an objection to the form of the question --

MR. CHEN: Yes.

MR. LURIE: -- I'll restate my question.

Q Did you at any time respond to her saying, it's not supposed to be 4,000, it's supposed to be six months salary, which would be 47 -- almost $47,000, $46,000?

A I addressed that later on, not in this context, but directly to George.

Q Take a look at the next page 3544, going down a little bit below, half way through the page, time stamped 7:34:11. Did you have an opportunity to read that?

A Yeah.

Q Mr. Stewart, you write, do you know every process and bill is completely from me? Next text,



the guy just gave a one-day tutorial back in 2011. Response -- I'll give it shortened. I know you created it all.

What billing processes did you create?

A Well, when the Fresh Books system was handed to me, with the air time billing, George, showed me one weekend, two weekends, and that was it. So I would do the Excel sheet. Of course, I like the Excel. And I would copy and paste all of the items in there and show them how to bill from it. So that's where I pass it to Breeya, Breeya passed it to Stephanie, and then Stephanie passed it to Agrain.

Q So basically you're saying that the billing processes that are utilized at Avatar Technologies are your creation?

A Yeah. They -- yes.

Q Jump forward to page 3548.

MR. CHEN: Four --

MR. LURIE: Eight.

Q Have you had an opportunity to read through this?

A Oh, yeah.

Q Now, May 18, 2015, starting with the time stamp 6:36:35 A.M. Next time he asked -- asks you



about me, you with just the letter U, period, states that I learned some things about Avatar; and I'm super pissed off. Next message, 6:44:27 A.M. For one, comma, Oscar is a convicted criminal. And there's a link. Next line, 6:44:55, theft by deception. Next line 6:57:15, if George ask, tell him I sent it to you. Next line, 6:57:32, I'll sent, with a T, it to the other phone.

Mr. Stewart, I thought you said you were wanting to just walk away and not be dealing with any drama, any issues with Avatar?

A Yeah. But I didn't have an issue with George. As you could see, I told you to send it to George. The issue here seems like it's with Oscar.

Q Why are you researching Oscar?

A The guy has a serious dislike for me from my time in the Philippines.

Q Do you have a serious dislike for him as well?

A I don't have dislike for anyone.

Q Why are you researching the guy?

A Because he has a strong dislike for me, and I can prove it in the writings and names that I was called by him.

Q So you're dealing with someone who's a

Page 198

jerk, right?
A Uh-huh.
Q He doesn't appear to like you.
A No.
Q You're not working alongside him anymore, right?
A Nope.
Q You're not working with him, correct?
A No.
Q You're having no communications with this person?
A Nope.
Q Can't you just say, man, that guy's a jerk, I'm so glad to never have to deal with him again?
A What did I do? I posted something to her. I don't see --
Q My question is, why are you bothering to continue looking this guy up?
A I am giving it to George, so he's aware of his employee and, you know, the status.
Q Mr. Stewart --
A For the record, he was the guy that they thought was stealing money when I first got to the Philippines. You know -- just.

Page 199

Q Mr. Stewart, did you expect to be able to return to working or providing services to George Kaltner after you were released in April of 2015?
A No.
Q You never expected to ever go back?
A No.
Q Did you ever want to go back?
A Oh, I'd love to.
Q You didn't think that things would just, whatever was the result of this dispute, would just kind of boil over and you'd be welcome back as so many other times?
MR. CHEN: What time frame?
MR. LURIE: Asking in general. It's a general question.
A Oscar did send me a message one day welcoming me back. But of course I know that was a trap or something, some set up, because. I wish I had those communications to show you guys.
Q Mr. Stewart, I'd ask you to take a look now at page 3555.
MR. CHEN: I'm going to take a quick second to look at that.
MR. LURIE: Very, very, simple what I'm going to ask; so I wouldn't bother reading

Page 200

through everything.
Q Let me know when you've turned to that page, Mr. Stewart.
A Yep.
Q The third message down that you've sent, you sent a message on August 10th, 2015 at 12:20 P.M.?
A Yep.
Q Writing, it's on with me and George. Next message that you send is October 11th, 2016 a little bit more than 14 months later.
A Mm-hmm.
Q Were you still in communication with Stephanie during that period of time?
A I'm not sure.
Q Did you have a falling out with her?
A Not that I -- I'm not sure about why she -- wow, that's a gap.
Q Just had about a 14-month period you just stopped talking to her?
A Well --
Q Is that accurate?
A Yeah. It's -- I guess she didn't want to hear about George because that's the last message I see here.

Page 201

Q Why are you still talking about George in now, August of 2015?
A Why?
Q Right.
A Because that's when I returned from the Philippines.
Q So where why are you talking about George?
A Because they sent me a letter to my hotel after finding out where I was, and so that was upsetting that they would follow me and serve me a letter.
Q Well, let me make sure that I understand. When you were in the Philippines during that time, you were opening up a competing call center, correct?
A 2015, no. I went on vacation in July 2015, to August 3rd.
Q August 3rd of 2015?
A Yep. I mean --
Q Drawing your attention to 3564.
A Okay. Read it.
Q Draw your attention a little bit further down, looking at January 3rd, 2017, now at 8:53 A.M. You respond back to a message from Stephanie saying, heading to court. She responds back, really? And

you respond back -- try and quote this as much as possible and correct the typos in here. George is such a dumb, D-I-C, comma, suing me for Avatar Dialler, two L's, dot com. He thinks I own that company and I'm arrival, A-R-R-I-V-A-L, to Avatar Technologies. He's a fucking idiot and wasting my fucking time, so I'm speaking to lawyers to countersue and try to get $250,000 out of him.

Mr. Stewart, before getting into this with your references were you not sending messages to people saying, come contact me at Avatardialler.com?

A I said that I spoke -- I had a conversation once with an ex-employee. And from there, you guys decided to bring an entire case.

Q You previously said, you're not familiar with trademarks, correct?

A Not familiar, yeah.

Q You don't know what a trademark is?

A To the sense -- you know, unless the company owns it, and --

Q Were you still providing -- strike that. You were still providing services for Avatar at the time it was applying for its trademark, correct?

A I guess so. I'm not sure when they got their trademark services and stuff.



Q Do you know what Avatar has a trademark in?

A No.

Q Are you -- you have no -- strike that. Do you believe that you can go out and put up a sign that says, I am Citi Gas, C-I-T-I, knowing that's Citibank's logo? Can you do that?

A No. I'm not sure.

Q What do you think would happen if you did that?

A I don't know.

Q You might get a letter from Citibank saying, why are you using our name and logo?

A I don't remember getting a letter from Avatar to say why I used that email address.

Q Do you believe that you would get something saying, something from a lawyer -- Mr. Stewart, are utilizing your cell phone at this time?

A No.

Q I see your hands down there, and you're fidgeting.

A Oh, no.

Q I just want to make sure.

A Oh, no. I was shaking. Sorry. I think I need a bathroom break soon.



MR. CHEN: Is there a pending question?

MR. LURIE: The pending question was, whether or not you think --

MR. CHEN: What would Citibank do if you held --

MR. LURIE: Yeah. If you held yourself -- if you were to go out there -- I'll just do this quickly so we can take a bathroom break. Do you believe that -- you don't think that Citibank, if you had done that, would send you a letter saying, give me all of your money?

A I seriously doubt it. Not without some kind of a process.

MR. LURIE: Go off the record.

THE VIDEOGRAPHER: Okay. We are now off the record. The time object on the video monitor is 5:18 P.M.

(A short break was taken.)

THE VIDEOGRAPHER: We are now on the record. The time on the video monitor is 5:28 P.M.

Q Mr. Stewart, continuing along on this same document, I'm going to ask you to turn to page 3565. Starting with your second message down, you say, he has zero evidence and of course I have all the



evidence. What is all the evidence?

A I have zero evidence.

MR. CHEN: Are you asking him what he meant by, I have all the evidence? Or are you asking him what is all the evidence?

Q Let's do it in two parts. I think that's a good way to do this. What did you mean by all the evidence?

A Yeah, like, there's no, evidence. You know, I Googled the info so I know of the company. But I have nothing to do with the company.

Q Have you ever heard of a term called passing off?

A No.

Q Your next line -- let me go back. So what is all of the evidence that you're referencing here? Can you identify what that is?

A Let me just read the next statement. Oh, I have all the evidence for my case to win, and when one finishes, to pay for the other.

Q Mr. Stewart, you previously just stated you don't know what passing off is, correct?

A I didn't read the -- I didn't read the second line.

Q Once again, Mr. Stewart, you don't

understand what the concept of trademark laws regarding passing off is, correct?

A No, I don't.

Q When you were served with this complaint, you originally put in your appearance on your pro se, correct?

A Yes.

Q Did you research the allegations in the complaint against you?

A Not much. I consulted with the pro se lawyers down at 57-500 Center Street.

Q So you went down to the pro se office, the New York Bar Association pro se office --

A Yeah.

Q -- and asked them for advice?

A Mm-hmm.

Q Don't want to know anything that you asked, or I don't want to know what they told you. Of course Jacob and I probably have some thoughts on what the results were. But, did you take any efforts at that time to try to learn personally what the allegations in the complaint were, with respect to Avatar Dialler and you?

A Did I -- did I take time to learn about it?



Q Yes.

A No. Because I was 100 percent confident that I had not done anything with that company or know of that company.

Q Looking to the next page 3566, towards the bottom of the page starting at the time stamp 2:37:54. We're going to continue this on to the next page. You see a question that says, why are you putting that stuff on FB, question mark?

Do you see that?

A Oh, yeah.

Q What stuff are you putting on Facebook?

A I'm not sure what, but I believe I was trying to do fund raising to -- I was trying to raise funds. I was thinking about doing -- what do you call it? Go Fund Me.

Q Crowd sourcing?

A Yeah.

Q Next response you get besides, you respond back and you receive another response from Stephanie. And she says, but you sharing your moves online. You respond back and say, my real moves are never shared, girl. This is just the bait and switch.

What are your real moves?



A I really don't even know. But I put this, my real moves -- yeah. It's just a conversation with a person. So, I don't know.

Q Flipping to the next page, receive a response, uhm, U-H-M, and you respond back, I need them to settle. I don't want this case to be dragged out; so it's attracting attention so all the ex-employees will be inclined to testify on my behalf.

A Yeah.

Q What does that mean?

A I would say for the ex-employees to support me in proving my case.

Q Which case?

A I'm not sure which case was happening at this time.

Q This one seems like you're discussing -- strike that. Going further down on this page, time stamped 2:58:34. They'll get subpoenas. Who will get subpoenas?

A I have no idea what this is in reference to, the subpoena.

Q Going to the next page, Bates stamped 3568, starting with the time stamp now, 3:12:09 P.M. They can't win against me. Remember that I prepared



for this, years of preparation. What were you preparing for?

A That's my bragging about my mental abilities. That's the most I can say, you know, like, I'm built to fight. I'm built to, you know -- that's how I look at things. I've always been a person that does my job, so.

Q Well, the next response back is, yes, I know you prepared.

A Yeah.

Q What were you preparing?

A That -- I don't know the context of what I prepared, but either, thought you were like Ben -- I don't know. This is very difficult right there, not fully thought out.

Q Going down to the next page 3569. Time stamped 3:38:23.

MR. CHEN: Give me a sec to look through these pages. There's a lot of content.

MR. LURIE: It's entertaining, too.

MR. CHEN: Okay.

Q You write, fuck Ted. Soon I can make some money off Ted. I'll fuck him over. He's a total fucking douche. I keep them close though, because I'm the ultimate enemy.

Page 210

What do you mean by that?
A This is conversation, um, 1, 3, 7 -- oh, because -- I believe this is -- this is 2017, so, Ted and I was in the Philippines, and he did some things that I didn't like, so.
Q What did he do that you didn't like?
A Just, you know, personal things. Like, you know.
Q What personal things?
A Like smoking, you know, dealing with girls that I like -- we were together in the Philippines, so you know.
Q What money were you planning to make off of Ted?
A I don't know. It's just another world.
Q What do you mean by this is another world?
A No, I'm saying, I don't know exactly. This is 2017, so it's two years after Avatar, approximately two years. January, I already came back from the Philippines. Yeah, I don't know really what this -- I had nothing where I was working with Ted at this time, so --
Q Have you had any communication with Ted as of late?
A No.

Page 211

Q When was the last tame time you remember speaking to him?
A I don't know. I can't tell. It would be in my messages if I did. Might have sent me a link for it. I'm not sure.
Q Did you have any Facebook conversations with him?
A Ted?
Q Yes.
A I don't think he's a Facebook friend.
Q Did you ever ask anyone to pass along information to Ted through Facebook?
A I'm not sure. That one would have to be in records.
Q Okay. Besides being in the Philippines and being around his smoking and going after the same women as you, Ted do anything else to you?
A I would -- yeah, pretty sure.
Q What else did Ted do to you?
A Things, like, I remember George had some information on me. And it was, you know, it could only come from Ted.
Q What information is that?
A I remember he said he fired me or something, I remember.

Page 212

Q So, when was that approximately, when you heard this from Ted?
A I didn't hear from Ted. I saw it in a filing that you guys had, that said I was stalking George or something; and I sent pictures to his job. I don't know. I breeze through these things and keep it moving, stay focused.
Q Bear with me. I'm just trying to get to a certain page. Going through this document trying to find a page. Can I ask you what your understanding of the term alternative facts means?
A Alternative facts?
Q Alternative facts.
A It's a famous phrase from Kelly Anne Conway.
Q What does it mean?
A My interpretation of it?
Q Yeah. Your interpretation.
A It's like building your own truth.
Q A lie?
A Hm?
Q It's a lie.
A Depends on who's, you know.
Q Well, you're billing your own truth?
A Yeah.

Page 213

Q Well, if your building your own truth, is it the truth?
A It's for the fact to decide, so --
Q So if someone started saying that a statement, and you were to respond and say that's an alternative fact, what would you mean by that? Personally, what would you mean by telling someone it's an alternative fact?
A I'm not sure.
Q Would you basically telling them what they're saying is a lie?
A It's a catchy word. It's, they believe it's true.
Q Jumping way, way, way back, page 3665.
A I'm at 3665.
Q Take a moment. Counsel, when your done --
MR. CHEN: I finished reading that.
THE WITNESS: I'm finished.
MR. LURIE: Counsel?
MR. CHEN: Yeah.
Q Starting with your first statement, this is dated 7-29-17 at 8:13:24 A.M. In response to a question of whether or not the case settled.
A Wait, wait, I'm on the wrong page, then.
Q 3665.

Page 214

A 366 -- I'm on 3655. Okay. Let me get a second. Okay.

Q Once again, there's a question for you from Stephanie. So the case settled. Your response, know that MF is playing hard ball and Ted is collaborating with him against me. I found out when he received a phone call from Ted while he was in the waiting area. If Ted gets involved, I'm going to ruin his life by putting him in jail for conspiracy. I expressed that to Jason a couple of days ago for him to relay that message to him.

What did Ted do that's conspiracy that is going to put him in jail?

A I don't know. This is just me talking out of anger. I don't --

Q Let me ask you this.

A I know things that he's done that's bad.

Q What has Ted done that's bad?

A He was alleged for stealing money, beating his wife, and other bad things that I don't -- I don't really have proof. That's the things that I heard.

Q What things have you heard?

A That he was a drunk, and beats his wife, and he was the one of the guys stealing money. Him

Page 215

and Oscar lived in a house together, so --

Q What does conspiracy mean to you?

A To -- I might have used the wrong word there, but conspiracy meaning to be a part of something -- to me, to be a part of something and harming or hurting that thing that you're apart of.

Q And this reference to Jason, that's Jason Gentry?

A I would assume so. They're best friends.

Q You're friends with Jason?

A Huh? Jason is a nice guy.

Q This might sound kind of weird. Mr. Stewart, you do post a lot on Facebook, correct?

A Fairly.

Q You sort of express your political views on Facebook and other places?

A I don't know if it's really political views. I just throw it out there and based on what I'm reading at the time. I just post it.

Q Would you consider yourself a liberal?

A I voted for one. That's about it. Last year. Maybe. I mean, the last election --

Q You happen to -- strike that. In communications with people, did you post a lot of positive things about, for example, Mueller and

Page 216

Comey?

A Oh. I love those guys.

Q A lot of negative things about trump?

MR. CHEN: I'm going to obviously object to --

A I love Trump too. Without Trump, I wouldn't know a lot of things that I --

MR. CHEN: I'm going to object to this line of questioning that's about his political beliefs, unless there's a specific point that you're getting into.

MR. LURIE: There is, but I'm going to move on. Moving to the next page.

MR. CHEN: What page?

MR. LURIE: Actually, flip two pages 3667. In total at the bottom. There's three messages from you at the very bottom dated 7-29-17. All are approximately 9:40 to 9:41 A.M.

A Okay.

Q You state FLSA exhausted 10K. Other project exhausted 15K to total 40K.

You're speaking about legal fees. What's the other projects that you're referencing here?

A That's -- where is number, one, two -- I don't know exactly how to phrase this because this

Page 217

is just me throwing numbers out there to her. And I'm pretty sure I spent more than that.

Q Jumping ahead, page 3669. I only want to direct you to two text messages on 8-15-17 at 2 o'clock P.M.

A All right. Three --

Q Right in the middle of the page, page 3669.

A Okay. Read it.

Q You write, did I tell you Ted snitched on me to George about when I went to Baguio, B-A-G-U-I-O, last year? I'm going to put Ted in jail for that shit.

So, what did Ted -- what do you believe Ted told George about you going to Baguio?

A Oh. It was -- he told -- it was in one of the filings that you made that had something about me getting fired for reasons of the "me too" movement, something about sexually harassing someone.

Q What are you going to put Ted in jail for?

A That's just me.

Q You vent a lot?

A Huh?

Q You vent a lot?

Page 218

A To my friends, yeah.
Q You tell them you're going to put people in jail?
A Yeah, I guess I did it more than once.
Q Let's skip down to the next page, 3671. Date 11-28-17, time stamped 7:17 A.M.
A 7:17 A.M.
MR. CHEN: Sorry. What page? I think I'm at the wrong one.
THE WITNESS: 3671?
Q 3671, yes.
A Okay. Read it.
Q You write, when you get a chance, try to recall this day, April 10, 2014. This is the date that George came to my office and brutally attacked me out of no where, space between no and where, yelling and screaming, you fucked up. Next he sent you that email on the following Saturday to reduce my salary to half. Who was present at the office that day, question mark? Ted Nehls, Peter Cafala [ph], Randy Ulloa [ph], Edevict Veneeszula. Was Breeya, comma, Ken, or Dylan also there, question mark.
Is that an accurate reading?
A Yep.

Page 219

Q What do you think George was yelling at you for, quote on quote, fucking up?
A I have no idea until this day.
Q What do you believe he was referencing?
A The whole raid thing with -- that's what I remember. The whole raid thing with surrogate and RPI and those other things. I didn't go to the raid, you know. It was, like, it's going. I refused to.
Q The raid took place in April of 2014?
A No. I think it's -- no, no, no. That's a typo.
Q When did the raid take place?
A This should have been 2015. The raid took place in August of 2014.
Q Okay. Let's do this now. Stewart 18.
(Stewart Eighteen was marked for identification.)
Q Once again, we'll go through some of the pages and make this a little bit easier. Do you recognize this document? Let me make it easier. Do you recognize these communications?
A I see them. But, you know, as I read them, I would probably get a better picture.
Q Who's Jason Gent, G-E-N-T?

Page 220

A I would assume that's Jason Gentry, fellow employee.
Q Telephone number it says is, XXX-XXX-XXXX, correct?
A Mm-hmm.
Q Do you recognize that telephone number to be that of --
A No. But of course.
Q Do you believe these to be messages with Jason Gentry?
A I'm not sure. Oh, if that's him signing his name, then I would assume that. Yeah.
Q Did you previously at any time ask Jason Gentry to fund litigation?
A I'm not sure if I did. I asked a lot of people.
Q Did you make any deals with Jason Gentry with respect to this current litigation?
A Did I --
Q Strike that. That was a confusing question. I've confused myself with it. You're aware that Jason Gentry has also filed an action against Mr. Kaltner, correct?
A Yes.
Q Now, besides the fact that you introduced

Page 221

him to counsel, do you have any financial investments in that litigation?
A No, no.
Q Were you assisting him in drafting the pleading in that pattern?
A Drafting -- what do you mean drafting?
Q Did you help him write his story for the complaint?
A I don't think I did that. Not sure why I would write that.
Q Moving forward to page 3033.
A 3033.
Q Looking at specifically a time stamp, 11-19-17 5:05:47 P.M. You write, I read the filing. If I was normal, I would be jealous. Paragraph 62 looks odd. I forgot what that type of information is called, semicolon. Privilege or alternative facts. Any way, it's damaging. Wow, comma, nicely stated.
A Okay.
Q What did you mean by that?
A Must have read something from a case that I commented on.
Q What did you mean by it being alternative facts?

Page 222

A Pretty sure I probably Googled that and added it in.

Q Let's step back a little bit. Previously talking to him about, he had sent you the link to the complaint that he filed against -- the, my client. You state later on that you read the filing, paragraph 62 is alternative facts. What did you mean by, paragraph 62 is alternative facts?

A I would assume that's in his filing. I don't know what the content of paragraph 62 is.

Q Well, why would you tell -- mention to someone that something is an alternative fact?

A I don't know the content of what that is. I hear it a lot on TV, you know? I watch a lot of MS-NBC, Fox News --

Q Someone says -- strike that. So you have no concept of what the quote-on-quote term alternative facts means?

A Hey, I just know it's a legal term that's used.

Q It's a legal term?

A Yeah.

Q To the best of your recollection, the complaint written by -- strike that. To the best of your recollection the complaint filed by Jason

Page 223

Gentry, did it contain any other alternative facts?

A I wouldn't know.

Q Let's jump around a little bit. Previously, we talked about this with Avatar Dialler. You have no involvement with the company?

A No.

Q Why are you telling people that you were part of the company?

MR. CHEN: Objection. I think he said repeatedly person; and also, I think he's answered that question about three times at this point.

MR. LURIE: Well, it's little bit different. Because we talked specifically about certain people.

Q Did you post on Facebook identifying that Avatar -- strike that. Do you recall posting anything on Facebook where you referred to Avatar Dialler with two L's as your company? And I believe you responded to my client and told them that they could do something somewhat perverse?

A I'm not sure. I just know what I looked at that filing. I'm like, at least they could have just checked the email address, and they would have been like, oh.

Page 224

Q Let's do 19.

(Stewart Nineteen was marked for identification.)

Q At the same time, let's do 20.

(Stewart Twenty was marked for identification.)

Q I apologize. 20 is not the most legible document. I ask you to take a look at documents that have both been marked as Stewart 19 and 20 for identification purposes. Did you post on Facebook at some point, Sales Dialer Pro, comma, Avatar Technologies Inc. comma, Avatar Outsourcing Inc, comma, Voiceless Technologies Inc. comma, Sales Technologies Inc, comma, Lucky Seven and its owners can go suck balls, dot, dot, dot, dot, L-M-F-A-O explanation point. Long live Avatar Dialler, with two L's, dot com. Go suck that, b!tches, with an exclamation point replaced for the I in bitches.

A It could be anything like that.

Q Do you recall posting this on Facebook?

A Oh, yes. I do.

Q Now, looking at Stewart 20 for identification purposes. Once again, I apologize this is not the most legible document. But I believe that this post says -- correct me if I'm

Page 225

wrong. No court can stop my company, semicolon, you'll just be opening Pandora's box. You steal. I steal. My man steal. We all steal, so live with it and back the fuck down. Night will take up Queen.

Is that an accurate reading?

A Yes.

Q Did you post that on Facebook?

A Yes. I did.

Q What's your company?

A I don't have a company. This is not directed at any specific company.

Q Do you recall when you posted that?

A No. I'm trying to see the date.

Q Unfortunately, I -- the realty of exhibits is it's as they're provided to you.

A Who is Nico Tan? That's Oscar?

Q Once again, my questions to you, not your questions to me.

A Oh. Oh, yeah. I did post this. You know why? Prior to knowing fully -- all right. So this is the Nico Tan, guy. All right. I recall this now.

Q Why are you posting these documents saying, long live Avatar Dialler, and no one can stop my company?

A Because this actor, I did not know who they were. And I suspected it was Oscar because he friend requested a bunch of us; so I put that out there for them to reply to it; and I remember exact -- because Nico Tan is not anybody that I knew of.
Q Is this your Facebook page?
A Yes, it is.
Q So you're just putting this out here hoping to bait people by passing yourself off as a company?
A I wanted to know who Nico Tan really was, just like how Sara Ferrer is another one that I made a lot of statements to find out who's behind these fake accounts.
Q What if no one put any response to that from this quote-on-quote fake account. You still post it up there saying, long live Avatardialler.com, and then long live my company.
A So if they're not Avatar Dialler, Nico Tan, then I don't understand how you guys --
Q So you were holding yourself out to be the owner of Avatar Dialler, hoping to bait someone named Nico Tan into believing that?
A No. I wanted Nico Tan to reply.
Q Why?



A So I can know who exactly is this person.
Q So you were trying to bait him into --
A I was trying to figure your out the identity similar to the Sara Ferrer. I make a lot of statements.
Q So you held yourself off -- you passed yourself off as the owner of Avatardialler.com for the purpose of hoping that Nico Tan would comment on it so you could try to figure out who he was?
A Yeah.
MR. CHEN: Objection. That's not his testimony.
A Here, that's two separate things.
Q Then what's your company?
A If I would have said Avatar Dialler, then that would be more. But I didn't state a company. I did it to get response, to figure out who's looking to attack me on Facebook.
Q Do you ever reach out to any employees and offer to pay them for information?
A I don't believe I had ever paid any employee for information.
Q Did you offer to pay them money for information?
A I would have to see --



Q Do you recall ever offering anyone money to provide information?
A I don't recall exactly.
Q Do you recall ever offering anyone to pay them to provide you with statements about my clients?
A I don't recall. I would have to see.
Q You were providing services for my clients since at least 2012, correct?
A I have worked for them since 2011.
Q You provided services for my clients since at least 2012, correct, yes?
A Yes.
Q And at that time, do you recall seeing them going to court to fight to keep their trademark?
A I've seen things. But I never really paid much attention to it.
Q We talked about other times when other employees or agents violated contracts with non compete agreements with my clients, correct?
A Repeat.
Q Sure. During the time that you were providing services for my clients, you previously testified that you saw what happens when individuals



or either employees or contractors for my clients violate their non complete, correct?
A I've never seen what happened to contractors that violate the non compete. I'm not sure.
Q You previously testified that you were aware that when other parties violate their non compete agreements that my clients institute a litigation, correct?
A I'm not sure. I would have to see -- I don't remember that statement too much.
Q Did you not previously testify that when individuals or former employees of Avatar Technologies Philippines left and opened up Surrogate Technologies?
A Oh, okay.
Q But they filed an action for violating their non compete agreements?
A Yeah. You're talking about another country; so that's what confuses me. I don't see how that worked.
Q But you previously testified to that, correct?
A That they go after these guys for violating their -- I don't know what non compete

they had, or if they went for non compete.
Q Wasn't your testimony that for violating non compete agreements?
A No, it's competitors. They were competitors of Avatar. They were ex-employees. Never said they violated the agreement.
Q Okay. You saw that there was a quite bit the of litigation going on with my client while you were providing services, correct?
A Quite a bit as --
Q There were multiple lawsuits that were filed while you were providing services, correct?
A Yes. I assumed.
Q My clients --
A I never paid attention to when the lawsuits are coming in. I didn't read the specifics. So I just know sometimes they send, pay this or pay that; or send this to someone else to take care of.
Q But you're aware that they -- my clients were litigious?
A To the extent that they had proof, yeah. When they went after RPI and Surrogate, they hacked into their server and got the information that they had the proof to say, you know, this client is with



them and us at the same time. That's what I recall from the RPI issue.
Q Did you not think that by -- strike that. Now, this has been asked and answered. So let me get through the predicate first before the question. You testified that you believed that people were spying. There were people who were spies. There were -- who were contacting you, and someone who you believe to be Oscar Varuk was creating a fake Facebook page and utilizing it to try to friend you, and you don't know what the purpose was and that you were willing to go out and post up information to try and bait them into taking some type of action?
A No. Not taking an action. I just want them to respond to this, and if those actors are from Avatar, then I would know, hey the guy responded, so --
Q Isn't a response an action?
A Oh, I didn't hear action. I heard actor. Sorry.
Q Action. They would take some type of action, correct?
A Response of action, yes. Not legal action.
Q You didn't anticipate legal action?



A Of course not, because I don't have any entity or, you know. I was -- when I first uttered the word Avatar Dialler, I was speaking to a friend. Then that conversation got --
Q You said that she was the spy?
A Oh, yeah.
Q She was George's spy?
A Yeah.
Q But she's your friend?
A Yeah. We communicated nice, went to the pool in Philippines, and we interact a lot.
Q You didn't think that my clients would bring an action against you for passing yourself off as Avatar Dialler?
A Not in the context of me communicating with Marby Cordero about blowing smoke up her when she's not an employee of Avatar Philippines. I never think of that, especially when you can just check the email addresses or something. Max Duncan was the master, figuring out things.
Q So, once again, you did not anticipate litigation. But you don't know about trademark law, correct?
A Exactly. Especially because since the company existed. So I would never think to say, oh,



they don't have the right to that name.
Q But once again, you don't know trademark law, correct?
A No, I don't.
Q So, subsequent to approximately January of this year, 2018, have you been in communication with Rauti Ulloa?
A Yeah. Of course.
Q When was the last time you spoke with him?
A We spoke at a wedding last time.
Q When was that?
A Not sure. It's -- it was in Queens. It was --
Q A week ago?
A No, no, no.
Q A month?
A No, more like six months. Maybe it was, maybe, like, in November. It was getting chilly. So October, November.
Q So since January of 2018, have you had any communications with Mr. Ulloa?
A I -- oh, yes. I did. I did. I did. I did.
Q What -- how did you communicate with him?
A Via text.

Page 234

Q Do you have additional text messages since January of 2018?
A I spoke to Rauti -- no, I think I called him -- yes. I called him and he said something about, he doesn't work at Avatar anymore. Yeah. I think it was something like that.
Q Counsel, obviously there's a continuation obligation of discovery and --
MR. CHEN: You still have access to his phones.
MR. LURIE: I don't access to the phone. I made an image of the hard drive.
MR. CHEN: What happened to the telephone -- don't you have access to his phone?
MR. LURIE: No. I only have access to what existed up until the time of what existed at the exact time. So all the text messages since January --
MR. CHEN: I will look at the subsequent text messages to see if it conforms to any of your discovery demands.
MR. LURIE: Specifically, obviously --
MR. CHEN: I don't have it in front of me, so I don't know exactly which demand that that text message would be in relation to.

Page 235

MR. LURIE: I understand. Once again, we can talk a little bit more about that off the record.
MR. CHEN: Sure.
Q Mr. Stewart, once again, I'm trying to understand this. You wanted to -- you are no longer providing services for my clients as of April of 2015?
A Mm-hmm.
Q Why didn't you just say, enough is enough, move on and not just post documents on Facebook, or put up copies of letters saying that you're a persona no grata or anything else? Why couldn't you just walk away?
A That information was sent to me by someone.
Q By whom?
A That was after I left Avatar.
Q So why couldn't you have just said, you know, these guys are real jerks?
A That was one of their jerk things. I was, like, why would they put this up there?
Q Why are you going and taking that and copying the language and posting it onto Facebook?
A I don't know.

Page 236

Q Why are you continuing for a period of time to just complain and crying?
A That all started back in August when I got my first letter; and then when I attempted to communicate with George, next thing you know, we ended up in going legal; and by the time I filed my FSLA, he then sent me a lawsuit saying, you know, you have copy -- you've done copyright infringement.
Q Do you recall receiving a letter from Eugene Strupinsky in August of 2015, basically telling you that you're violating agreements, and if you don't agree to sign a confession of judgment that we would reserve all rights to bring any actions we deem necessary?
A That's when I consulted counsel.
Q So you didn't think that as of August of 2015, that hey, these guys are real jerks, they're such big jerks, they're getting their attorneys and they're threatening me, bullying me. I know you have utilized that term when we talked about it. Didn't think to say, I don't want to have anything to do with these people. I don't want to bother them, I don't want to see them, I don't want to do anything with them? Why didn't just walk away then?
A I believe it was too late because they

Page 237

initiated this. I walked away. I took a trip to the Philippines. There was no need to start serving me papers. I never had a company prior. I never intended to own a company, and --
Q But you're hoping to open up a company called Callvation in the Philippines, right?
A What was that?
Q What was the name of the company you were attempting to open up in the Philippines?
A I was -- we didn't have a name yet. But I --
Q What was the intended name?
A I don't know the -- it might have been -- I think it's Opus BPO or something like that. I'm not sure.
Q Did you receive payment from a company called Callvation?
A Yes, I did.
Q Who is Callvation?
A Jeff Torrez.
Q Jeff Torrez.
A Mm-hmm.
Q Out of curiosity, what do you know about Jeff Torrez?
A Not much other than a guy I, you know, got

Page 238

paid from.
Q For this call center?
A Yeah.
Q This is more just a comment, rather than a question. I'd Google him. I believe your counsel is going to.
A Yeah. I heard some -- I mean --
Q Are you familiar with what is going on with him?
A No, no. But I just sensed a bad actor.
Q But, even still, you already thought Ted was a slime bag, right?
A My outlook on life sometimes -- I try not to judge. I know Ted is who he is. And you know --
Q Wasn't this just that you were struggling financially, just were looking for anything at that point?
A Not anything. I was looking to travel to the Philippines. I actually love the place.
Q You want to move there?
A Oh, I would. But for now, I can't travel there.
Q No further questions.
THE VIDEOGRAPHER: We're now off the record. The time on the video monitor is 6:27

Page 239

P.M.
(At 6:27 P.M. the witness was excused and the deposition was concluded.)

Page 240

WITNESS CERTIFICATION

I have read the foregoing transcript of my deposition and find it to be true and accurate to the best of my knowledge and belief.

__________________________
DAVID STEWART (Witness)

Sworn to before me
on this day of 2018.

NOTARY PUBLIC

Page 241

C E R T I F I C A T E

I, ASHLEY GRABOWSKI, a Shorthand Reporter and Notary Public of the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth, was duly sworn, and that such examination is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this day, JUNE 5, 2018.

ASHLEY GRABOWSKI

[signature]

ERRATA SHEET
VERITEXT LEGAL SOLUTIONS
800-567-8658
ASSIGNMENT NO. CS2930894
CASE NAME: George Kaltner, Et Al. v. David Stewart
DATE OF DEPOSITION: 6/5/2018
WITNESS' NAME: David Stewart

PAGE/LINE(S)/ CHANGE REASON
____/_______/_________________/__________
____/_______/_________________/__________
____/_______/_________________/__________
____/_______/_________________/__________
____/_______/_________________/__________
____/_______/_________________/__________
____/_______/_________________/__________
____/_______/_________________/__________
____/_______/_________________/__________
____/_______/_________________/__________
____/_______/_________________/__________
____/_______/_________________/__________
____/_______/_________________/__________
____/_______/_________________/__________
____/_______/_________________/__________
____/_______/_________________/__________
____/_______/_________________/__________
____/_______/_________________/__________
____/_______/_________________/__________
____/_______/_________________/__________
____/_______/_________________/__________
____/_______/_________________/__________
____/_______/_________________/__________
____/_______/_________________/__________
____/_______/_________________/__________
____/_______/_________________/__________
____/_______/_________________/__________

________________________
David Stewart
(Notary not required in California)
SUBSCRIBED AND SWORN TO
BEFORE ME THIS______DAY
OF_______________, 2018.

_______________________
NOTARY PUBLIC
MY COMMISSION EXPIRES__________________



Veritext Legal Solutions
290 W. Mt. Pleasant Ave. - Suite 3200
Livingston, New Jersey 07039
Toll Free: 800-227-8440 Fax: 973-629-1287

June 20, 2018
To: Jacob Chen, Esq
Case Name: George Kaltner, Et Al. v. David Stewart
Veritext Reference Number: 2930894
Witness: David Stewart Deposition Date: 6/5/2018
Dear Sir:

The deposition transcript taken in the above-referenced matter, with the reading and signing having not been expressly waived, has been completed and is available for review and signature. Please call our office to make arrangements for a convenient location to accomplish this or if you prefer a certified transcript can be purchased, which can be sent to you or the deponent directly.

If the jurat is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,
Production Department

Cc: Joshua M. Lurie Esq.

**&**

**&** 4:25

**0**

**0-1-4-3-5** 169:21
**07039** 243:2
**07601** 3:3
**09337** 1:2 15:20

**1**

**1** 1:16 4:7 210:2
**1-4-3-8** 169:21
**1-80** 1:13
**10** 4:16 7:17 8:10 8:21 10:21 11:3 146:11,18 218:14
**10,000** 149:13,15 160:18
**100** 3:3 36:22 114:23 115:1 133:18 207:2
**10029** 108:2
**10031** 17:2
**10036** 2:8 3:6
**10:30** 7:21 9:4 11:2,6,8
**10:45** 7:23 11:13 167:13
**10k** 216:20
**10th** 53:25 55:7 60:13 86:22 200:6
**11** 4:17 147:2
**11,000** 160:12
**11-19-17** 221:14
**11-28-17** 218:6
**110th** 108:1
**11:13** 170:17
**11:15** 8:1,21 11:22
**11:32** 2:8
**11:40:45** 189:25
**11th** 192:7 200:10
**12** 4:18 150:16,20
**120** 146:20
**120,000** 145:21 146:15
**122nd** 27:18
**12:01** 39:10
**12:02** 171:8
**12:27** 165:7
**13** 4:19 142:13 156:20 161:5,12 164:8 165:16 193:24
**136** 4:14
**137** 180:1 181:11 182:4
**138** 4:15
**13th** 49:14 142:12
**14** 4:20 162:23 163:5 167:11,18 186:11 200:11,19
**14,000** 184:6,8,11
**1400** 155:20
**141** 4:16
**1414** 171:21
**1436** 171:7
**147** 4:17
**15** 4:21 148:4,15 162:15,21 166:4 166:12 171:20
**150** 4:18 17:1
**1500** 2:7 3:6 15:22
**15k** 216:21
**15th** 64:8 71:2
**16** 4:22 71:2 165:6 167:5 168:10 169:14,18
**161** 4:19
**162** 4:20
**166** 4:21
**169** 4:22
**17** 4:4,23 165:7 170:14 180:1,8 181:11 182:3
**18** 4:24 144:10 196:24 219:16
**180** 4:23
**19** 4:25 224:1,9
**1983** 86:13
**1992** 87:16
**1994** 87:16 89:5,8 89:11,15
**1995** 89:20
**1st** 109:20

**2**

**2** 3:3 4:8 217:4
**2,000** 148:3,9,10 148:13 158:14 159:1
**2,250** 158:25
**20** 4:25 162:15,21 224:4,7,9,22 243:4
**20,000** 158:14
**200** 170:13 171:9
**2000** 64:21,21 144:6 186:12
**2002** 90:1
**2003** 87:25 89:5,8 90:13
**2004** 110:11
**2005** 88:11 90:14 90:25
**2008** 88:7,7,22 91:8 92:3
**2009** 89:2 92:7,21 93:8
**2010** 93:8
**2011** 26:15 111:4 196:1 228:10
**2012** 111:5 116:9 228:9,12
**2013** 116:9 186:11
**2014** 32:22 49:14 64:20,21 66:12 120:18 121:3 131:5,25 218:14 219:10,15
**2015** 54:4,5 67:11 95:8,13,14 132:5 132:13 134:18,20 143:5,7,8 145:9 160:3 173:13,14 179:17 183:10,12 183:21 187:16 188:17 191:1 192:7 193:24 196:24 199:3 200:6 201:2,16,17 201:18 219:14 235:8 236:10,17
**2016** 67:18,20 71:3 142:13 143:4,6,9 145:10 173:15 200:10
**2017** 134:2,4,13,21 135:3 139:12 145:15 151:21,24 152:1 167:5 171:13 201:23 210:3,18
**2018** 1:21 15:3 85:24,25 109:22 233:6,20 234:2 240:10 241:15 242:22 243:4
**219** 4:24
**224** 4:25
**22nd** 2:7 3:6
**24** 126:22 191:1
**24th** 139:12
**25** 144:7 151:16

**25,000** 192:17
**250** 151:14 157:21 158:21 159:2
**250,000** 202:8
**251** 108:1
**26** 97:15
**26c** 102:5 104:18
**26f** 97:2 98:10
**29** 64:21
**290** 243:1
**2930894** 243:7
**29th** 64:20 131:3,4
**2:37:54** 207:7
**2:58:34** 208:19

**3**

**3** 4:9 210:2
**3,5** 180:25
**3-1-5** 162:1
**3-5-3-6** 180:20,21 181:1
**3-6** 181:2,3
**3-6-7-3** 180:25
**30** 105:21,22
**30,000** 192:18
**3033** 221:11,12
**30b6** 9:11
**30d3** 106:2,2
**3200** 243:1
**34** 83:19
**35** 4:7
**35,000** 192:15
**3536** 181:12 187:17,25
**3537** 188:16
**3538** 189:20
**3539** 190:25
**3543** 193:21
**3544** 195:19
**3548** 196:18
**3555** 199:21
**3564** 201:20
**3565** 204:23
**3566** 207:5
**3568** 208:24
**3569** 209:16
**35k** 193:14
**3655** 214:1
**366** 214:1
**3665** 213:14,15,25
**3667** 216:15
**3669** 217:3,8
**3671** 218:5,10,11
**3673** 181:13
**390-4130** 98:21
**3:12:09** 208:24
**3:38:23** 209:17
**3k** 159:11
**3rd** 64:20 85:24,25 170:14 201:17,18 201:23

**4**

**4** 4:10
**4,000** 194:22 195:14
**40** 93:2
**40k** 216:21
**45** 11:25 189:25
**46,000** 195:16
**47** 4:8 195:15
**47,000** 195:16
**48** 4:9
**4:58** 147:13
**4k** 194:7,21
**4th** 171:8

**5**

**5** 1:21 4:11 17:2 241:15
**5,000** 142:25 194:22
**5-13-2015** 194:4
**50,000** 146:7
**50th** 86:22
**53** 4:10
**56** 4:11
**57-500** 206:11
**5:05:47** 221:14
**5:16** 142:17
**5:18** 204:17
**5k** 142:19 194:1,7 194:21
**5th** 15:3

**6**

**6** 4:12
**6-12-17** 147:13
**6/5/2018** 242:3 243:8
**600** 24:3,7 28:1
**61** 4:12
**610** 17:1
**62** 221:15 222:7,8 222:10
**639-159-308-942** 72:13
**6:33** 191:1
**6:36:35** 196:25
**6:44:27** 197:3
**6:44:55** 197:5
**6:57:15** 197:6
**6:57:32** 197:7

**7**

**7** 4:13 193:24 210:2
**7-29-17** 213:22 216:17
**7-3** 181:4
**700** 155:17
**74** 4:13
**7:03** 193:25
**7:16** 1:2 15:20
**7:17** 194:4 218:6,7
**7:34** 192:7
**7:34:11** 195:21
**7:37** 188:17
**7:46** 170:14

**8**

**8** 4:14 183:10 188:17
**8,000** 143:20,21
**8-15-17** 217:4
**80,000** 53:21
**800-227-8440** 243:2
**800-567-8658** 242:2
**852** 154:2,6
**8:13:24** 213:22
**8:17** 139:12
**8:53** 201:23
**8th** 187:16

**9**

**9** 4:15
**9-13-2017** 151:7
**914** 98:21
**92** 87:16
**94** 87:16 89:10
**96,000** 143:23
**973-629-1287** 243:2
**9:40** 216:18
**9:41** 216:18
**9th** 59:8 60:7,11 60:12 191:1

**a**

**a.m.** 8:1,21,21 15:3 22:13,17 139:12 147:13 188:17 189:25 191:1 192:7 194:4

196:25 197:3 201:23 213:22 216:18 218:6,7
**abide** 41:12 42:10
**abilities** 122:16 209:4
**ability** 17:19 100:25 101:1,20 103:5
**able** 10:5,7 11:16 11:24 12:1 13:8 17:22 20:5 50:18 57:23 73:20 145:19 157:8 169:8 186:14 189:13 199:1
**absolutely** 106:16 106:18
**acceptable** 20:12
**access** 24:17,18 32:6,9 57:23 64:1 83:14 108:17 113:22 114:2 189:10 234:9,11 234:14,15
**accessible** 180:7
**accident** 26:17
**accomplish** 243:15
**accord** 105:21
**account** 32:7 112:20 155:5 169:4 173:22 226:16
**accountant** 194:5
**accountants** 33:20 33:25 34:1 113:15 113:18 194:11
**accounting** 94:19 94:22,23 95:1,4 101:21 103:24 108:16 129:22,25
186:14,18,22,23
**accounts** 24:18,19 32:15 184:18 226:14
**accurate** 20:18 24:4 28:6 36:5,22 115:2 162:16 170:14 200:22 218:24 225:5 240:3
**accurately** 40:10
**action** 16:3 25:16 25:20 26:3,4,9 31:4 96:13,17 220:22 229:17 231:13,14,18,19 231:21,22,23,24 231:25 232:13 241:11
**actions** 101:18 236:14
**active** 57:25
**actor** 226:1 231:19 238:10
**actors** 231:15
**actual** 9:25 118:4
**actuality** 118:16
**added** 76:9 222:2
**addition** 24:16,21
**additional** 12:20 22:2,6 183:20,24 234:1
**additionally** 8:10
**address** 17:1 97:18 98:15 100:1 100:6 102:22 103:1 203:15 223:24
**addressed** 21:18 167:11 195:17
**addresses** 54:23 232:19
**addressing** 188:5
**administer** 16:2
**admitting** 30:6
**adolofo** 61:4,19
**advance** 11:11
**advertisement** 126:14
**advice** 165:16 206:15
**advise** 7:20 21:12 68:17 105:11
**advised** 11:9,10 13:17 103:18
**affidavit** 123:9
**afford** 101:5 145:3
**afloat** 167:15 168:4
**afraid** 96:8 104:5
**afternoon** 98:23 103:12,13,14
**agency** 110:13,15
**agent** 1:11 46:6
**agents** 228:20
**ago** 14:10 135:3,5 214:11 233:14
**agrain** 50:24 51:3 192:13,14 193:12 193:18 196:13
**agree** 15:14 28:25 160:14,16 236:12
**agreed** 6:3,18 41:6 42:19 151:13
**agreement** 4:7,9 4:18 34:21 35:3 41:12,15,23 42:3,6 42:10 43:23,25 46:4 49:12,23 50:1 96:20 151:1 151:2,6 183:17,23
230:6
**agreements** 148:23 228:21 229:8,18 230:3 236:11
**ahead** 217:3
**air** 111:14 190:12 190:14 196:6
**airline** 113:6
**al** 15:17,17 242:3 243:6
**albany** 162:4
**alcohol** 17:19
**allegations** 206:8 206:22
**alleged** 214:19
**allen** 132:18,21,22 132:24 133:11
**allow** 18:19 38:19
**allowed** 38:21
**alongside** 187:4 198:5
**alternative** 212:11 212:12,13 213:6,8 221:17,24 222:7,8 222:12,18 223:1
**america** 63:22 110:17
**amount** 13:25 24:8,23 28:11 56:24 151:8,14 153:21,23 158:6 183:20 184:7
**anamee** 115:19,21 116:24 117:1
**anecdote** 142:6
**anger** 214:15
**anne** 212:14
**annoys** 106:5
**answer** 18:20 19:11,13,21 20:11

20:13,14 23:17 28:12 36:25 37:2 37:19,24 39:17,20 39:21,23,24,25 40:9,12,12,23,24 42:20 45:20 47:4 47:7,20 56:20 76:20 86:3 96:18 97:7,9 98:17 105:23 122:15 127:17 135:1,2 139:8 176:23
**answered** 21:9 113:7 223:11 231:4
**answering** 20:3,25 38:8 56:18 176:24
**answers** 17:23 18:24 20:1 37:21
**anticipate** 231:25 232:21
**anybody** 226:5
**anymore** 48:22 106:17 142:5 198:5 234:5
**apart** 215:6
**apartment** 17:2 152:15,17,19 153:3 154:3,6 158:11
**apologies** 145:12
**apologize** 17:25 25:4 165:25 224:7 224:23
**app** 71:21,21 72:16,20 73:6 74:8 147:19 157:5 157:8,12
**apparently** 7:24 9:23
**appear** 8:13 12:2 12:22 23:6 198:3
**appearance** 206:5
**appeared** 7:25 11:20
**appearing** 9:9
**application** 14:20 93:5 97:1 102:4 102:16,17 104:19 105:2,14,19 106:22 107:6 114:5
**applied** 126:9
**apply** 112:18
**applying** 202:23
**appreciate** 96:22
**appropriate** 6:16 96:23 106:8
**approximate** 143:15 159:9
**approximately** 8:3 9:7 11:3,20,22 24:3 26:13 27:25 28:1 32:22 66:11 70:21,24 87:11 92:7 93:7 94:9 95:8,14 121:2 143:5,8,23,25 144:4,10 154:13 155:20 156:25 157:22 158:3,25 159:1 160:3,12 162:10,12 180:23 210:19 212:1 216:18 233:5
**april** 32:22 95:8 95:14 109:20 132:4,13 143:5,8 145:9 160:3 179:17 183:20 199:3 218:14
219:10 235:7
**area** 142:8 214:8
**arguing** 29:2
**arrangements** 243:14
**arrival** 202:5
**arrive** 11:2
**arrived** 7:24 14:6 14:9,11
**artist** 174:15,17
**ascribing** 36:12
**ashley** 1:23 2:5 15:25 241:3,16
**aside** 170:4
**asked** 11:11 19:23 21:13 29:12 33:13 34:9 38:15 43:19 47:9 99:4,7 111:21 123:7 136:21 149:10 159:6 166:22 171:4 193:13 196:25 206:15,18 220:15 231:4
**asking** 34:12 38:10 61:2 75:7 78:12 100:12 103:8 136:1 137:24 148:2 168:22 169:12 170:12,22 177:12 193:25 199:14 205:3,5
**asks** 29:17 30:3,4 39:15 196:25
**aspect** 32:24 86:18
**aspects** 79:20 81:11,21,23 84:14
**assess** 8:25
**assessed** 12:12,14 12:18
**assessment** 36:18 55:2
**asset** 187:3
**assets** 131:22 144:25 145:2
**assigned** 93:1
**assignment** 242:2
**assist** 109:3 186:2
**assistant** 185:19
**assisting** 221:4
**associated** 71:24 72:2 124:25
**associates** 2:7 3:5 15:21 16:15 88:18 103:16
**association** 206:13
**assume** 28:7 42:17 55:14 58:7 70:13 77:20 85:25 91:3 96:2 123:6 133:7 134:14 183:2 215:9 220:1,12 222:9
**assumed** 230:13
**assuming** 52:22 100:19 188:25
**assumption** 56:4
**attached** 28:4 49:16 161:21
**attachment** 53:13
**attack** 227:18
**attacked** 218:15
**attempted** 236:4
**attempting** 237:9
**attend** 8:15 10:3 87:14 88:6
**attended** 87:20
**attending** 87:24 89:7
**attention** 44:5 119:25 157:17

182:20 201:20,22 208:7 228:18 230:15
**attorney** 3:7 6:21 19:8 21:12,20 22:7,19 23:16,17 28:11 34:13 37:22 40:21 62:15 83:5 83:6,9 84:17,18 85:12 163:13,18 164:12 167:17 170:7 171:23 176:21
**attorney's** 18:5 74:4 102:22
**attorneys** 3:4 6:4 6:19 19:15 30:13 34:8 102:11 104:21 105:8 171:16 236:18
**attracting** 208:7
**audio** 15:12
**audit** 50:4,8
**auditing** 50:2 109:11 114:17 130:6,11
**audits** 50:6 113:10 113:13 114:22
**august** 49:14 90:25 173:14 200:6 201:2,17,18 219:15 236:3,10 236:16
**australia** 128:2,5
**australian** 128:3
**author** 124:7
**authorizations** 24:22
**authorized** 16:1
**automatically** 156:16
**available** 10:3 157:12 184:19 243:12
**avatar** 1:3,4,9,11 1:15,17 16:10 17:9 31:2,3,20,23 31:25 33:25 34:1 34:4 35:3 36:9 42:9 48:13,16 49:13,20 50:11,13 51:20 52:8 53:1 54:23 55:6,14,15 55:16 57:17 58:8 59:7,23 60:22 61:6,17,24 62:5 66:2,4,14,20,21 67:1 68:12,19,22 69:1 70:2,6 75:11 76:11,12 77:3,4,9 77:10,16,18,19,19 77:19,25 78:13 79:10 81:7,9,19 84:2 112:5,24 113:13 114:11,15 115:7,20,23 116:5 116:11,12,16,18 116:23 117:7,14 117:19,20 118:11 121:16,17 122:1 122:25 123:2 126:4,7,18,19,23 126:25 127:1,2,7 127:10,11,15,16 127:18,20,23,23 132:11,14 133:12 138:6 143:17 145:24 159:17 170:2 173:4 175:6 177:7,13,15 184:15,21 191:18 193:4 194:16 196:15 197:2,11 202:3,5,22 203:1 203:15 206:23 210:18 223:4,17 223:18 224:11,12 224:16 225:24 226:19,22 227:15 229:13 230:5 231:16 232:3,14 232:17 234:5 235:18
**avatar's** 75:12
**avatardialler** 76:5
**avatardialler.com** 1:13 76:7,22 78:4 202:11 226:18 227:7
**ave** 243:1
**avenue** 86:22 92:22
**average** 146:2,6 146:10
**aware** 15:6 51:10 51:13 106:11 163:12,16 182:9 198:20 220:22 229:7 230:20

**b**

**b** 1:3 4:5 70:16 71:16 95:23 132:24,24 217:12 224:17
**baby** 185:21
**bachelor's** 89:4 94:10 185:7
**back** 11:16 14:18 22:18 28:20 41:2 45:3,19,24 46:9 62:23,24 68:24 79:2,4,7 86:17 89:10 90:8 140:18 148:3,15,18 151:22,23 155:25 160:19 162:15 169:9 171:19 178:20 180:10 183:9,10 192:17 194:3,21,25 195:3 196:1 199:5,7,11 199:17 201:24,25 202:1 205:15 207:20,22 208:5 209:8 210:20 213:14 222:3 225:4 236:3
**background** 86:7 96:10 111:16,20
**backs** 126:2,3 128:11,25 184:18
**bad** 106:4 142:6 214:17,18,20 238:10
**bag** 238:12
**baguio** 70:16 217:11,15
**bait** 207:23 226:9 226:22 227:2 231:13
**balances** 157:25 158:4
**ball** 214:5
**balls** 224:15
**bank** 91:18,18,21 92:15 112:20
**bankrupt** 145:5
**bankruptcy** 144:17,20,21,22 144:23,24
**bar** 206:13
**bare** 180:5
**bariba** 150:13

**barima** 165:23
**based** 28:7 34:21 40:3 63:17 78:5 136:19 174:5 215:18
**basic** 130:3
**basically** 26:3 85:13 109:13 126:22 128:10 130:15,19 160:20 187:7 188:24 196:14 213:10 236:10
**basis** 34:17 102:6 102:13 106:7 107:19 120:19 122:3
**bates** 169:20 171:6 171:20 180:8,9 181:12 187:16 208:23
**bathroom** 20:22 203:25 204:8
**battle** 123:2,4
**bear** 212:8
**beating** 214:19
**beats** 214:24
**began** 88:22 111:8
**beginning** 40:17 181:12 186:7
**begun** 7:1
**behalf** 9:19 12:25 16:9,15 38:12 100:21 103:16 104:9 208:9
**belief** 161:20 162:7 240:4
**beliefs** 216:10
**believe** 24:13 33:15 35:20,22 41:11,14,16,22 46:23 58:9 62:17 78:7,12 88:22 89:12 90:25 91:8 92:25 101:22,25 103:17 104:17,22 106:20 110:19 122:5 128:3 130:17 136:20 144:12 149:1 159:6 165:10 173:8 174:22 175:1,7 186:21 188:18 190:22 203:5,16 204:9 207:13 210:3 213:12 217:14 219:4 220:9 223:19 224:25 227:21 231:9 236:25 238:5
**believed** 91:5 231:6
**believes** 97:18 102:2,9 104:12
**believing** 34:18 226:23
**bement** 92:22
**ben** 132:19 133:7 133:8 193:19 209:13
**ben's** 133:10
**benefit** 23:23
**best** 21:4 25:18 27:22 34:2 40:9 40:15 53:12 54:19 54:20 68:21 69:10 77:22 80:15 112:2 118:9,24 121:9 122:8,10,15 127:13,22 140:23 142:23 215:9 222:23,24 240:4
**better** 72:24 120:4 147:12 219:24
**beyond** 139:22
**big** 167:16,20 174:12 236:18
**bigger** 186:9
**bill** 26:24 67:5 69:15 111:14 134:7,10,12 135:14,17 157:20 195:25 196:10
**billed** 109:13
**billing** 50:13 66:6 66:16 69:1 94:17 108:9,23 110:1 114:5,6 185:14 196:4,6,15 212:24
**billings** 108:25
**bills** 69:3,5,8,13 108:11 109:14 113:2 145:2,17,19 151:11,18 152:5 154:17,19,25 162:19
**binds** 38:12
**bird** 12:19 13:14
**birthday** 90:24 91:8 170:19,24 171:5
**bit** 7:19 10:22,25 11:12 18:1,3 21:2 25:3 26:1 27:23 28:20 32:21 40:18 76:2 79:4,5,8 81:17 86:8 92:13 132:4 136:20 139:20 178:10 188:14 189:21 194:3 195:20 200:11 201:22 219:20 222:3 223:3,13 230:7,10 235:2
**bitches** 224:18
**black** 105:4
**blank** 97:7,10,21 97:25 100:1,3 102:15,25 105:13
**block** 122:1,3
**blood** 241:11
**blow** 173:9
**blowing** 177:21 232:16
**board** 119:7,9,11 119:21
**bogus** 78:7
**boil** 199:11
**booked** 133:18
**bookkeeper** 101:21 108:20,21 108:24
**bookkeeping** 103:23 108:18 109:4
**books** 69:16,20 114:1,2,4 196:5
**born** 86:10 139:13
**borough** 87:3,7,14 89:16
**borrow** 148:14 151:3,4
**borrowed** 148:17 151:11
**borrowing** 81:16 149:2 151:9 152:4
**boss** 120:23
**bother** 199:25 236:22
**bothering** 198:18
**bottom** 166:9 207:6 216:16,17

**box** 225:2
**boy** 176:4
**bpo** 237:14
**bragging** 209:3
**break** 14:25 20:21 22:14 39:11 78:14 79:3,6 120:11 141:15 160:22 161:1 181:23 203:25 204:8,18
**breaking** 78:18
**breeya** 79:8 132:19 185:15,19 196:11,11 218:22
**breeze** 212:6
**brief** 19:16 91:25
**briefly** 35:9 39:22 103:18 125:1 163:6 171:19 184:14
**bring** 73:24 123:8 124:16 178:20 186:2 202:14 232:13 236:13
**bringing** 124:6 158:14 159:1
**broad** 176:19
**broadway** 2:7 3:6 15:22
**brought** 26:23 27:3 186:13
**brutally** 218:15
**building** 113:1 133:14 173:10 212:19 213:1
**built** 130:2 133:4 209:5,5
**bullying** 174:6 236:19
**bunch** 76:12 119:11 175:9,12 226:3
**business** 1:16 27:4 32:7,11,15 33:9,16 33:20 35:18 36:2 38:1 45:18,18,22 46:2,3,8,13,17,19 46:24,25 47:23 58:11 63:8,14 66:21 67:7 68:4,7 70:22,25 71:4,8,10 71:13 76:16,21 77:25 78:4,10 87:4 88:20 116:19 118:12 119:18 120:4 121:12 127:3 179:23 193:5
**buying** 125:22
**bygones** 179:20,20

**c**

**c** 3:1 84:3 177:3,3 177:12 202:3 203:6 241:1,1
**cable** 154:10,11,14
**cafala** 218:20
**california** 242:21
**call** 7:4 8:17 9:3 14:6,9,12 29:8,8 57:4 65:7 66:23 67:3,22 70:9,9,12 70:14 73:4 98:7 98:15,19 103:15 104:15 111:9 121:13 127:4,6,11 142:7 188:17 201:14 207:16 214:7 238:2 243:13
**called** 2:2 7:19 11:21 13:7 14:5 31:18,23 48:8 65:10 71:16 76:21 78:4 85:4 91:17 91:21 111:10 119:7 121:5,6 122:22 125:2 142:7 173:9 176:1 197:24 205:12 221:17 234:3,4 237:6,17
**calling** 14:18 104:24
**calls** 67:5 127:20
**callvation** 237:6 237:17,19
**capacity** 1:11,12 30:23 187:2
**capital** 148:4,15 177:3
**captioned** 2:2
**car** 155:14,16 156:5,18
**card** 26:16 157:3 158:4,8,20 160:1 166:23 168:10
**cards** 157:23 158:1 159:24 170:12 171:10
**care** 59:14 74:5 146:16 149:4 154:19 188:8 194:16 230:19
**career** 87:23
**carmel** 61:4,19
**carrier** 134:15,19 135:4
**case** 1:2 14:8 15:19 17:13 21:4 21:21 24:2 25:11 25:12 27:25 32:13 33:24 34:7,8,14 35:17,17,21,21,22 40:20 41:1 72:9 79:20 80:7,10 81:2,11,21,25 82:22,24 83:3,14 83:24,25 84:14 96:13 98:24 99:17 101:1,15 140:5 153:6 162:14 167:15,21,23 168:1 171:25 176:12 202:14 205:19 208:6,13 208:14,15 213:23 214:4 221:22 242:3 243:6
**cases** 26:17 149:4 168:12,14,17 170:24 171:17 172:3,8,10,13,20 172:22,23
**cash** 147:18,22 157:4 171:4
**casual** 137:20
**catchy** 213:12
**cause** 13:13
**cc** 243:25
**cease** 176:21
**ceased** 32:22 34:4 44:11 45:17 64:4 132:12 183:13,24
**ceeya** 177:6 178:24
**cell** 15:8 72:5 73:1 73:15,19 74:2 133:20,25 134:2,7 134:9,12,15,19 135:4,8,16,23 136:17 137:10,13 157:20 158:10 203:18

**center** 15:10 67:22 70:14 121:13 127:4,6,11 201:14 206:11 238:2
**ceo** 77:4,5 117:10 117:10,12,13,13 118:9,14,18,23,25 119:17
**certain** 19:17 73:20 101:5 105:6 212:9 223:15
**certificate** 88:13 88:17
**certification** 6:5 240:1
**certified** 243:15
**certify** 241:5,10
**cetera** 101:21
**cfo** 194:15
**chain** 125:8
**chairperson** 119:18,19
**chambers** 7:6 98:22
**chance** 123:15 218:13
**change** 155:20 242:5
**changed** 134:15 134:19,22,23 135:3
**changes** 73:12
**characterized** 35:24
**charge** 6:21 132:24 156:20
**chase** 78:2
**chastising** 169:3
**check** 55:8 65:24 69:24 120:24 232:19
**checked** 223:24
**checking** 137:18 138:1
**chen** 3:5 7:9,9 9:19,19 10:16,25 11:5,9,15 12:24,24 14:8,22 16:14,14 24:15 29:5,10,15 30:2,21 31:1,5,8 35:20 36:7,12 37:6 38:8,10,14,18 39:15 40:6,9 42:20 43:7,15 44:2,18 46:20 47:2,6,9,19,23 48:19 52:12,15 56:18 60:8 66:7 68:15 72:11 78:11 78:14 83:11,17 95:10,22 96:2,6,15 96:22 97:6,16 98:1,3,9,12,23 99:6,12,15 100:10 100:19 101:13 102:14 103:7,13 103:15,16 104:14 105:10 107:1,8 113:8 120:1,6 122:13 128:12,14 136:6 137:21 138:2,17,19 139:8 141:5,11 153:5 161:8,10 163:3 166:3 173:17,19 176:22 180:14,18 180:21 181:1,3,6 181:16,19 187:23 188:2,9 189:2 193:22 195:6,11 196:19 199:13,22 204:1,4 205:3 209:18,21 213:17 213:20 216:4,8,14 218:8 223:9 227:11 234:9,13 234:19,23 235:4 243:5
**chen's** 10:24
**child** 164:23 165:1 168:11
**chilly** 233:18
**christian** 79:9
**circulated** 41:19
**circumstances** 19:17
**circumvent** 43:24
**circumvention** 35:2
**citi** 203:6
**citibank** 203:12 204:4,10
**citibank's** 203:7
**citizen** 51:14 86:14
**city** 9:5 10:23 12:16 27:20,21 108:1 146:3,7,11 154:6
**civil** 1:2 25:10,16 25:20
**claim** 54:10 60:17 63:14 76:15 101:17
**claimed** 101:9
**claims** 26:6,8 27:18,21 104:13
**clarity** 132:20
**clear** 102:1 104:14 105:22
**clears** 30:9
**clerk** 6:11 7:6,14 7:22 8:5,19 9:10 9:14,18 10:9,19 12:6,7 98:22 99:5 99:8,9,13 100:8,14 100:16 101:12 103:10
**client** 11:10,11,17 11:17 12:18,20 13:24 25:15 28:17 29:1,7,14 47:7 54:17 56:19 68:12 68:19 70:4 96:6,8 96:20 97:7 98:4 99:20,24 102:19 106:11 122:25 127:14 132:5 222:6 223:20 230:8,25
**client's** 12:13
**clients** 30:18,22 54:6 64:4 67:5 70:6 94:11 95:8 113:1 126:24,25 127:1,15,16,18 128:4 143:15 175:10,13 183:13 228:6,8,11,21,24 229:1,8 230:14,20 232:12 235:7
**clone** 24:20
**close** 90:24 91:8 209:24
**closed** 62:1 63:24 110:22,24 131:17 132:2
**closest** 84:4
**closing** 63:7,18,19
**closure** 61:24 63:17
**codes** 142:8
**collaborating** 214:6

**collect** 25:1 108:11 109:15 112:18
**collected** 66:18,19
**collection** 26:16 108:9 110:2
**collections** 108:23 109:1 114:8
**college** 86:25 87:2 87:4,4,8,15 88:2,6 88:19,24 89:16 90:15,15 94:23 111:23 186:23
**com** 76:5 202:4 224:17
**come** 55:19 86:8 86:12 96:11 109:14 111:11 112:19 126:15 140:18 151:23 167:16 202:11 211:22
**comes** 11:16 127:18 191:4
**comey** 216:1
**comic** 79:12
**coming** 13:11 40:3 167:20 230:16
**comma** 171:24 194:1 197:4 202:3 218:22 221:18 224:11,12,13,13 224:14
**commenced** 96:13 99:18
**commencement** 96:17
**commencing** 2:8
**comment** 227:8 238:4
**commentary** 170:4 176:20
**commented** 221:23
**commission** 115:5 242:25
**commissions** 114:17,24 115:2
**communicate** 131:1 132:10,11 191:22,25 233:24 236:5
**communicated** 85:2 232:10
**communicating** 232:15
**communication** 71:21 164:7,20 182:25 191:20 200:13 210:23 233:6
**communications** 4:20 135:25 142:13 163:13,22 198:10 199:19 215:24 219:22 233:21
**communicator** 130:25
**community** 87:3,8 87:9,15 89:16
**companies** 33:4 34:19,22 76:12 127:25 185:15
**companion** 17:13 21:4 25:11 35:17 35:21,22 171:16
**company** 1:9 26:24 31:17,22 34:19,24 36:13,14 36:19 45:3,25 46:21 59:9,11,14 60:17 62:1 63:23 65:10 66:24 75:5 76:25 79:11,15 93:20,21 104:4 108:5,6,14,21 109:18 119:12 121:5,11,17 122:21 125:2 178:3 179:4 186:10,16 187:3 190:4 202:5,20 205:10,11 207:3,4 223:5,8,19 225:1,9 225:10,11,25 226:10,18 227:14 227:16 232:25 237:3,4,5,8,16
**company's** 189:15
**compete** 4:7 35:2 43:25 122:7 228:21 229:4,8,18 229:25 230:1,3
**competing** 201:14
**competitor** 123:25
**competitors** 230:4 230:5
**complain** 236:2
**complaining** 176:12,14
**complaint** 23:2 54:11,13,16 55:3 206:4,9,22 221:8 222:5,24,25
**complaints** 54:23
**complete** 17:23 19:25 20:4,6,18 180:16 229:2
**completed** 48:5 58:19 243:12
**completely** 195:25
**compliance** 53:23
**compliant** 1:3 16:10 17:9 30:24 30:25 31:1
**complicated** 103:1
**comply** 41:15,23 42:3 83:18
**compromise** 98:12 102:15
**computer** 88:16 109:15 180:12 181:8
**computers** 26:18 26:19
**concept** 206:1 222:17
**concern** 100:16
**concerned** 99:19 103:9
**concluded** 21:22 239:3
**conclusion** 38:11 38:14 47:3
**conditions** 70:2,12
**conduct** 83:15 101:24 106:13
**conducted** 106:4
**conduit** 130:16
**conference** 8:17
**confession** 236:12
**confident** 126:11 127:8,10 168:1 207:2
**confidential** 33:16 44:6,16,21 46:3,7 46:13,18,25 47:11 47:21
**confidentiality** 35:2 43:17,24 96:20
**conforms** 234:20

**confused** 12:2,7 19:25 220:21
**confuses** 229:20
**confusing** 19:24 220:20
**confusion** 40:19
**connection** 130:12
**consent** 80:18
**consented** 80:20
**consenting** 105:12
**consents** 105:11
**consider** 47:11 145:22 215:20
**considered** 46:18 146:11
**consistent** 37:25
**conspiracy** 214:10 214:12 215:2,4
**constitutes** 47:23
**constructing** 133:2
**construe** 20:15
**consulted** 206:10 236:15
**contact** 72:25 73:1 73:15,19 75:12 77:6 78:10 79:13 132:17 202:11
**contacted** 78:12
**contacting** 231:8
**contacts** 73:16 74:7
**contain** 223:1
**contained** 69:8
**content** 209:19 222:10,13
**contention** 49:19
**context** 176:17 190:10,11 195:18 209:12 232:15
**continuation** 234:7
**continue** 15:13 34:18 103:5 198:19 207:7
**continued** 110:18 191:22,25
**continuing** 101:24 103:25 171:14 204:22 236:1
**continuously** 101:4
**contract** 37:12,14 37:15 38:2,3,4 49:16 68:22
**contractor** 30:1,7 30:9 36:4,11 37:10 46:7
**contractors** 229:1 229:4
**contracts** 94:13 228:20
**contribute** 153:18 153:19
**control** 168:11
**controlled** 154:3
**controllers** 194:5 194:11
**controlling** 1:12 1:15,16 6:17
**convenience** 30:2
**convenient** 243:14
**conversation** 23:24 61:18 75:18 78:6 79:6 137:20 138:3,7 142:1 164:11,23 168:23 168:24 170:10 171:24 191:7 202:13 208:2 210:2 232:4
**conversations** 15:5 57:15 72:19 165:19 168:19 169:23,25 171:15 183:6 211:6
**converted** 102:11
**convicted** 25:6 197:4
**conway** 212:15
**copied** 76:8
**copies** 61:22 62:22 105:6 235:12
**copy** 6:20 23:9 43:9 45:3 51:19 52:7 55:5 157:13 166:1 171:22 180:4,6 196:9 236:8
**copying** 235:24
**copyright** 82:4 122:6,9,19 123:5 123:10 236:8
**cordera** 74:19 75:9,10
**cordero** 178:13,14 232:16
**corner** 54:2
**corporate** 191:3,6 191:10
**corporation** 50:20 119:4
**corporations** 1:16
**correct** 24:9 25:25 28:17 29:7 30:19 31:18 32:11,15,19 33:1,17,21 35:19 37:10,14 41:7 42:6,7,13 44:10,13 48:17 49:24 51:10 51:14 53:9,14,20 54:6,8,11,18 56:5 56:9 62:19 64:5 66:16 67:25 70:6 74:22 75:2 76:16 76:22 78:4 80:10 86:10 92:12 95:1 95:5 110:8 111:6 115:8 121:21 127:12 128:22 130:6,9,18,22 132:6 137:15 142:14,20 144:11 144:13 146:25 151:14 152:6 158:15 159:3 163:14 164:4,12 166:20,24 167:2,6 167:8,18 168:5 171:17 175:10,13 179:17 183:14,17 184:9 185:23 192:19 193:1 198:8 201:15 202:2,16,23 205:22 206:2,6 215:13 220:4,23 224:25 228:9,12 228:21 229:2,9,23 230:9,12 231:22 232:23 233:3
**correction** 189:2
**correctly** 49:12,17 130:5
**cost** 8:7 12:17,20
**costs** 9:1 12:12 13:25 124:24 130:7 156:23 157:9 160:1
**coughing** 173:20
**counsel** 7:18 10:14 12:3 24:24 38:13 38:15,19,25 68:17

83:13 99:22 102:1 103:12 170:5 213:16,19 221:1 234:7 236:15 238:5
**counselors** 16:5
**counsels** 99:2
**countersue** 202:8
**country** 229:20
**county** 162:4
**couple** 33:23 50:16 105:4 111:18 175:6 178:5 194:8 214:10
**course** 46:5 58:22 67:15 72:23 81:9 103:2 106:10 113:23 132:16 177:9 196:8 199:17 204:25 206:19 220:8 232:1 233:8
**court** 1:1 2:4 6:11 7:5 8:8 11:21 12:10 13:22 14:5 14:14 15:18,25 16:17,19 18:7,7,10 18:12,21 21:7 23:23 26:2,7,8 27:2,16,16,20 41:3 97:1,9,9,12 100:6 101:6 102:16 105:15,15,25 106:1 131:10 201:25 225:1 228:15
**courts** 104:24
**cousin** 149:24,25 161:24,25
**cousin's** 149:24
**cousins** 135:22 149:22 150:3
**cover** 156:23
**cplr** 6:13,15,16
**create** 18:11 36:13 37:5 67:3 125:7 196:4
**created** 36:3,8,20 37:3,6,7,8 129:10 129:15 172:9 196:3
**creating** 231:9
**creation** 196:16
**credit** 26:16 157:3 157:23,25 158:4,7 158:20 159:24 160:1 166:23 168:9 170:12 171:9
**credits** 87:11
**crime** 25:6
**criminal** 26:3,4 197:4
**cross** 4:2
**crowd** 207:17
**crying** 236:2
**cs2930894** 242:2
**curbing** 168:17
**curiosity** 237:23
**current** 97:10,22 99:17 100:8,23 106:14 144:3 220:18
**currently** 17:18 98:17,25 107:16 107:18 133:22 144:2 166:13
**customary** 96:10
**customer** 89:22 113:3,4
**cv** 1:2 15:20

**d**

**d** 1:3 4:1 84:3 202:3
**dai** 2:7 3:5 15:21 16:14 103:16
**daily** 129:23
**damages** 25:24
**damaging** 221:18
**daniel** 86:5 136:22
**daniella** 86:5 136:22
**dash** 169:21
**date** 9:24,25 12:3 52:15,17 53:24 54:3 59:8 60:5,6,9 63:20 116:7 151:6 167:10 189:22 218:6,14 225:13 242:3 243:8
**dated** 142:12,13 147:13 167:5 191:1 213:22 216:17
**dates** 7:25 11:18 12:7 13:4,5 93:16
**daughter** 135:22 139:9 145:14 166:20 167:14 168:13 169:3,24 170:11,23
**daughter's** 141:8
**dave** 111:11
**david** 1:8,9,9,11 1:12,13 2:1 4:3 9:17 15:16,17 17:1 35:3,17,19 36:2,19 37:3,13,14 37:25 38:2,2,12 39:15 49:13 52:7 76:9 99:8 147:22 147:25 175:15,16 175:17 240:7 242:3,4,20 243:6,8
**davids** 76:5
**day** 45:8 152:10 164:17,22 165:4 169:5 196:1 199:16 218:14,20 219:3 240:10 241:15 242:22
**days** 188:24 189:2 189:8 214:11 243:18
**de** 100:5
**deal** 41:3 63:6 100:25 102:3 106:24 152:10 154:20 155:4 198:14
**dealing** 91:22 171:24 197:10,25 210:10
**deals** 220:17
**dear** 243:9
**debts** 160:11
**december** 131:25
**deception** 197:6
**decide** 213:3
**decided** 79:3 202:14
**decides** 102:21,23
**decision** 36:13,14 37:5
**declined** 100:5
**decreased** 159:16
**deem** 236:14
**deemed** 6:15 243:20
**defendant** 9:12,14 172:20,21

**defendant's** 9:10 106:14
**defendants** 1:19 3:7
**defending** 172:13
**define** 116:17 117:9 127:1
**defunct** 1:4,4
**degree** 88:12,17 88:18 89:3 95:1,3 111:24 185:7
**delay** 13:23
**delete** 72:22 191:2 191:5,14,15,16
**deleted** 191:9 192:2
**deletes** 182:15
**deliveries** 108:15
**delivering** 124:13 124:15,16
**demand** 234:24
**demands** 234:21
**dental** 127:24
**department** 25:12 46:10 243:23
**depending** 107:10
**depends** 69:22 176:10 212:23
**deploy** 93:5
**deponent** 7:23 8:13,21 9:9 105:23 106:6 243:17
**depose** 8:22
**deposed** 13:16 17:16 21:3
**deposition** 1:7 2:1 2:3 7:10,16 8:7,20 9:4,5,17,22,25 10:2,4,8,20,23 11:1,4,8,15,24 12:3,5 13:2,6,10 13:23 14:20 15:7 15:12,15,20 18:3,4 21:9,11,13,18,21 21:25 23:7,10 25:5 40:5 41:2 68:14 73:25 96:25 97:4,19,21 98:5,7 99:1 100:2 103:6 103:19 104:11 105:2,5,7,14,18 106:3 107:6,11 182:7 188:10 239:3 240:3 242:3 243:8,10
**depositions** 8:16 8:18 130:18
**depth** 21:14 45:13
**derogatory** 176:5
**describe** 7:14 23:1 69:15
**description** 4:6 5:2
**desire** 83:16
**destroy** 33:12
**determination** 158:12
**determine** 128:10
**device** 182:17
**devices** 33:7 34:5 44:13
**devil** 139:23 140:1 140:5,9,14,20
**dial** 57:4
**dialer** 1:3 16:10 17:9 30:24 31:1 92:17,20 111:14 224:11
**dialer360** 1:10,12 1:15,17
**dialler** 1:9,10,11 1:15,15,17,17 76:12 77:25 202:4 206:23 223:5,19 224:16 225:24 226:19,22 227:15 232:3,14
**diatribe** 40:25
**difference** 119:17 122:18
**different** 18:17 35:23 89:6 126:7 223:14
**difficult** 84:10 209:14
**difficulty** 176:24
**digital** 24:23
**dinner** 188:8
**direct** 4:2 17:5 36:24 37:24 47:6 92:14 96:18 97:6 217:4
**directed** 19:14 25:24 225:11
**directing** 97:13
**directly** 28:2 73:6 195:18 243:17
**director** 53:23
**directors** 1:14 119:7,10,11,21
**directs** 97:9,24
**disclose** 100:11,12 102:19,24
**disclosed** 101:14
**discovery** 23:9,11 25:2 28:4,13 80:21 81:1 101:8 234:8,21
**discuss** 19:18 57:20 79:20 81:11 81:21,25 84:14 86:7 111:16,19,25 118:6
**discussed** 167:18
**discussing** 31:6 46:21 79:6 137:25 188:8 208:17
**discussion** 18:22 19:16 37:22 74:21 74:24 145:14 164:6,15 165:7,9 170:11 189:21 192:6 193:20
**discussions** 33:19 85:8 168:16 193:5
**dislike** 179:15 197:16,18,20,22
**dispute** 28:22,25 29:18 32:23,24 62:5,10 99:14 101:13 132:8 199:10
**disputes** 30:15
**distribute** 42:21
**distributed** 42:24
**district** 1:1,1 15:18,19 17:15
**document** 28:9 35:10,11,13 41:5 43:8,9,20 44:7 45:12 46:14 48:5 49:5 58:18,21,24 60:8 61:13,15 63:19 69:17,19 74:16,17,18 80:9 83:1,2,7 123:12,12 136:4 138:24 139:2 141:22,23 142:11,11 147:9 150:23,25 161:13 163:5,7,10 166:11 166:13,15 167:5

169:18 178:11 180:17 181:10,12 181:14 182:3,6 204:23 212:9 219:21 224:8,24
**documentation** 63:7
**documents** 22:20 22:24 23:1 24:3,8 24:12,16,21,23 25:1 27:24 28:2 28:11,15,16 32:9 32:13,14,17 33:3,5 33:9 34:3,19 44:12,17,21,25 45:22,24 46:3 61:2 62:1,2 63:14 69:11 78:17 79:24 80:1,6,8,16 82:11 82:17,18,19,22,24 86:2 93:6 112:21 118:21 123:14,18 123:20 124:5,12 177:13,14,20 179:23,25 180:6 188:3 189:9 224:8 225:23 235:11
**doing** 50:3 64:22 64:24 70:21 91:17 91:20 94:15,17,19 95:4 104:2 108:23 113:24 114:4,6 118:4,24 129:25 176:8 185:14 188:2 207:15
**dollar** 147:22 156:20 192:22
**dollars** 152:4,11 152:12 154:15,15 155:7 158:5,7,17 158:20
**domain** 1:13
**dominican** 151:25
**dot** 190:1,1,2 202:4 224:15,15 224:15,15,17
**doubt** 204:12
**douche** 209:24
**dough** 56:24
**drafted** 54:16 124:12
**drafting** 221:4,6,6
**dragged** 208:7
**drama** 197:11
**draw** 201:22
**drawing** 201:20
**drive** 3:3 156:19 234:12
**driver** 101:5,11
**driving** 107:13 143:2 144:3 155:22 156:3 159:7
**drop** 123:13 154:18,21
**dropped** 173:18
**drove** 12:16
**drugs** 17:19
**drunk** 214:24
**ducay** 58:6
**due** 8:7 9:5,8 12:1 98:1 183:17,19,22
**duly** 17:3 241:7
**dumb** 202:3
**duncan** 232:19
**duties** 109:4 112:22 129:20
**dylan** 218:22

**e**

**e** 3:1,1 4:1,5 5:1,1 16:9 67:24,25 71:16 81:18 84:3 84:3,4,4 95:23 107:24,24 132:24 219:25 241:1,1
**ear** 177:22
**earlier** 153:5 178:11
**early** 12:19 13:14 192:10
**earn** 167:15
**earning** 56:24
**earnings** 53:19
**ease** 25:10 28:24 188:17
**easier** 18:4 26:1 148:1 180:12 188:6,15 219:20 219:21
**easily** 105:1
**east** 27:18 108:1
**eastern** 93:15,18 93:19
**easy** 76:13 168:20
**edevict** 84:3,12 183:4 218:21
**education** 89:7,8 94:21
**educational** 86:18
**effect** 6:10
**efforts** 206:21
**eight** 93:13,18 136:6,10,11,14 138:18 196:20
**eighteen** 219:17
**either** 19:16 28:15 60:23 91:12 104:3 106:7 107:9 112:23 121:6 131:3 209:13 229:1
**el** 48:8,11 53:9 57:25 173:22
**election** 215:22
**electronically** 28:3
**elevated** 130:22
**eleven** 147:3,8
**email** 24:18 32:7 32:15 52:2,6 55:9 82:9,17,20 83:4 131:18 180:11 203:15 218:18 223:24 232:19
**emailed** 10:24 51:22
**emails** 28:16 32:14 33:24 34:8 82:21 83:12,14
**embarrasses** 106:5
**emergency** 170:20 171:1,2
**employed** 42:5 55:14 89:5 95:9 95:12,15 98:17 107:16,18,21 127:5 184:21,23
**employee** 29:9,14 29:16,19 36:5,11 37:10 45:21 46:4 46:5 49:13 51:4 51:18 55:13 61:6 61:16 63:21 77:12 77:16 79:10 81:19 110:4 112:3 120:25 177:7 178:23 198:21 202:13 220:2 227:22 232:17
**employee's** 49:15
**employees** 1:14 41:19 46:17,24 47:10 50:16 75:4 120:24 121:16,17

126:4 128:11,22 132:10,11 175:6 208:8,12 227:19 228:20 229:1,13 230:5
**employer** 97:11,22 97:25 104:22
**employers** 94:9
**employment** 29:2 46:16 49:23,25 84:20 90:13 97:5 99:17 100:23 101:3,23 106:15 108:7 144:3
**emptying** 169:4
**enable** 67:4
**ended** 44:3 91:3 236:6
**endurance** 20:23
**enemy** 209:25
**enforce** 105:24
**enter** 109:5,6 148:22
**entertaining** 209:20
**entire** 29:21 153:25 154:1 202:14
**entirely** 101:25 104:3 170:6
**entirety** 138:24
**entities** 1:16 31:2 31:6,8,10,11,13 32:7,11,19,25 65:14 96:1 128:1
**entity** 1:10,10,11 36:3,8 37:3,7 94:15 232:2
**entry** 109:10
**envision** 127:24
**equipment** 27:1 133:1 190:4
**equipments** 132:25
**equivalent** 192:21
**eric** 93:1
**errata** 242:1
**especially** 232:18 232:24
**esq** 3:2 243:5,25
**essential** 13:22
**estimate** 20:10 116:8 155:6 157:15 158:13
**et** 15:17,17 101:21 242:3 243:6
**eugene** 236:10
**event** 108:6
**events** 107:22 108:5
**eventually** 110:19
**evidence** 204:25 205:1,1,2,4,5,8,9 205:16,19
**ex** 121:16,17 142:18,24 175:6 202:13 208:8,12 230:5
**exact** 116:7 226:4 234:17
**exactly** 77:1 82:19 83:22 85:13 115:17 125:24 134:25 161:18 210:17 216:25 227:1 228:3 232:24 234:24
**examination** 2:2 6:6,12,20 17:5 241:6,8
**examine** 114:18
**example** 14:2 156:19 215:25
**excel** 157:10,14 196:8,9
**excellent** 170:18
**excerpt** 74:24 136:15 137:4 139:10
**exchanging** 192:22
**exclaimed** 173:4
**exclamation** 224:18
**excuse** 19:18
**excused** 239:2
**executable** 45:4
**executed** 124:25
**exhausted** 216:20 216:21
**exhibit** 138:17,18
**exhibits** 78:19 147:6 225:14
**exist** 48:22 121:6
**existed** 121:6 232:25 234:16,16
**existence** 116:6
**expand** 186:9
**expect** 20:4 45:23 46:9 75:13 199:1
**expected** 199:5
**expended** 8:12
**expenses** 155:6 158:7,11,18,23 159:1,16,18,20
**experience** 95:4 111:25 119:3 120:5
**expires** 242:25
**explain** 25:21 39:22 138:15
**explained** 103:21 128:17
**explaining** 176:23
**explanation** 163:19 224:16
**explosion** 174:12
**exponential** 170:21
**express** 215:15
**expressed** 68:13 214:10
**expressly** 243:12
**extensive** 121:20
**extent** 23:15 54:15 230:22
**extra** 152:9 156:20 180:6
**eyes** 102:12,22 104:21 105:8

**f**

**f** 224:15 241:1
**face** 57:18
**facebook** 4:8,10 4:11,12,25 48:7 52:13 55:17,20,21 57:5,12,14,16,25 61:16 63:15 175:5 175:5 176:8,12 207:12 211:6,10 211:12 215:13,16 223:16,18 224:10 224:20 225:7 226:6 227:18 231:10 235:11,24
**fact** 39:23 42:8 69:23 84:6 165:1 213:3,6,8 220:25 222:12
**facts** 212:11,12,13 221:18,25 222:7,8 222:18 223:1

**failure** 12:1,22
**fair** 29:4 36:18 42:17 44:5 45:16 54:22 55:2
**fairly** 215:14
**faith** 106:4
**fake** 226:14,16 231:9
**falling** 200:16
**familiar** 54:13 69:5,7 70:1 72:12 110:8 115:10 119:6 121:5,8,19 122:21 125:2 131:16 134:9 177:8 202:15,17 238:8
**family** 149:16,18 149:19 153:15 161:22,23 162:5 175:18
**famous** 212:14
**far** 47:3 52:16 78:7 96:15 141:7 146:14 178:6 183:10
**fashion** 106:10,25
**fast** 155:25
**father's** 164:17,22 165:4
**favor** 41:1
**fax** 243:2
**fb** 207:9
**february** 67:18,20 71:2,2,3 173:16
**federal** 96:24 97:2 97:15 102:5
**feeds** 57:12
**fees** 8:11 12:14 149:5 194:2,2 216:22
**fellow** 220:1
**felony** 25:7
**female** 174:16
**ferrer** 226:12 227:4
**fictitious** 1:13,16 35:18 84:2,7 177:5
**fidgeting** 203:21
**fifteen** 8:2,24 166:6
**fifty** 154:15 192:24
**fight** 139:25 140:6 174:20,20 209:5 228:15
**fighting** 139:25 140:6
**figure** 227:3,9,17
**figured** 138:19
**figures** 170:20
**figuring** 232:20
**file** 26:25 74:25 144:17 149:4,7 167:14
**filed** 15:17 172:23 172:24 220:22 222:5,25 229:17 230:12 236:6
**files** 34:16
**filing** 6:5 212:4 221:14 222:7,9 223:23
**filings** 217:17
**filipino** 58:7 124:18
**fill** 97:10,24 100:3 105:17
**final** 21:19 35:13 62:14
**finance** 33:20 95:3 101:21
**finances** 173:5
**financial** 94:15 152:8 171:11 221:1
**financially** 16:3 101:9 168:7,21 238:16
**find** 59:5 63:23 73:7,9 76:10 212:10 226:13 240:3
**finding** 201:9
**fine** 11:7 138:9
**finish** 18:19 20:25 23:20 38:20,21 138:25 147:14 183:9
**finished** 66:2 137:6 166:15,16 213:17,18
**finishes** 205:20
**fire** 112:8
**fired** 211:24 217:18
**firing** 33:5
**firm** 15:24
**first** 14:11 18:18 42:12 49:10,11,11 87:6 89:13,15 90:20 110:10 120:16 136:23,23 137:2,5 139:12 147:11,17 170:9 171:21 185:16 186:4,6 187:24,25 191:2 198:24 213:21 231:5 232:2 236:4
**fit** 185:17
**fitness** 79:11
**five** 14:16 22:10 44:6 56:11,12 58:17 60:11
**fl** 113:7
**flip** 188:16 192:5 216:15
**flipping** 190:25 208:4
**floor** 2:7 3:6
**flour** 129:14
**flsa** 17:14 113:8,9 216:20
**focused** 45:14 212:7
**focusing** 165:6 166:8
**follow** 103:3 190:7 201:10
**following** 167:1 218:18
**follows** 17:4
**font** 43:8,12
**food** 113:6 125:10
**force** 6:10
**foregoing** 240:2
**foreign** 1:10,10,11
**forgot** 62:8 79:11 221:16
**form** 6:7 19:10 49:15 50:8 104:12 128:14 195:10
**formal** 129:4
**formally** 34:20
**format** 29:21
**formation** 116:15 116:17 125:12
**formed** 116:24,25 117:1,5

**former** 229:13
**forth** 40:19 102:6 103:24 241:7
**forty** 87:13
**forward** 14:19 32:21 39:25 83:4 106:24 132:4 164:2 165:11,13 167:17 171:21 196:18 221:11
**forwarded** 4:20 164:10
**forwarding** 163:12 164:14,19 165:7,9,18 171:15
**found** 214:6
**four** 53:2,3,6 60:13 155:13 169:19 171:25,25 188:24 189:2,7 196:19
**fourteen** 162:24
**fox** 222:15
**frame** 29:23 40:3 64:22 195:7 199:13
**free** 243:2
**fresh** 69:16,20 114:1,2,4 196:5
**friday** 111:11
**friend** 55:17,22 57:14 62:6 81:6 86:6 93:15 150:14 150:15 151:5 175:5 193:18 211:10 226:3 231:10 232:3,9
**friendly** 194:13
**friends** 55:20,21 63:16 64:13,14,16 177:10 215:9,10 218:1
**fritz** 62:9,25
**frivolous** 82:3
**front** 28:9 42:25 180:18 181:5 234:23
**fsla** 153:6 167:21 167:23 168:1 236:7
**fuck** 209:22,23 225:4
**fucked** 218:17
**fucking** 202:6,7 209:24 219:2
**full** 90:11,12 97:14 107:18 110:4 182:17 184:5
**fully** 33:22 45:14 51:11 116:21 119:5 209:15 225:20
**fun** 194:18
**function** 189:17
**fund** 169:5 207:14 207:16 220:14
**funder** 68:8,9
**funds** 139:22 171:5 207:15
**furnished** 6:21
**further** 6:18 13:23 25:21 123:24 139:20 189:21 194:3,6,20 201:22 208:18 238:23 241:10
**fuzzy** 162:8

**g**

**g** 70:16 81:18 217:12 219:25
**gain** 75:20
**gained** 112:1
**gap** 200:18
**garage** 12:19 13:14
**gas** 154:10 156:10 156:23,25 157:9 157:16 203:6
**gather** 144:25
**general** 18:2 25:4 199:14,15
**generally** 21:6 32:3 70:1 116:8 159:20
**generate** 66:18
**gent** 219:25
**gentry** 81:18,19 83:8,19,23 215:8 220:1,10,14,17,22 223:1
**george** 1:3 15:16 16:12 17:11 26:22 32:4 36:19 43:1 54:25 55:3 70:13 77:23 81:23 82:3 91:13,15 92:17 93:1 110:8 113:21 115:25 116:10,25 117:1,19 125:20 129:24 130:13,24 131:20 136:2 175:20,21 184:3 184:24 185:17 195:18 196:6 197:6,13,14 198:20 199:2 200:9,24 201:1,7 202:2 211:20 212:5 217:11,15 218:15 219:1 236:5 242:3 243:6
**george's** 65:14 111:9 125:7 130:19 232:7
**getting** 10:22 50:22 62:12,13 81:23 84:16 86:17 92:13 96:4 126:1 126:3 136:7 142:25 146:24 176:17 186:9 202:9 203:14 216:11 217:18 233:18 236:18
**ginger** 108:19
**girl** 75:11 207:23
**girlfriend** 142:18 142:24 190:16,17
**girls** 210:10
**give** 17:20 40:14 45:18,23 46:7 77:4,4 78:2,7 80:18 83:15 99:22 102:12 163:19,19 170:24 188:4 193:14 196:2 204:11 209:18
**given** 144:5 241:9
**gives** 76:11
**giveth** 56:1,3 57:1
**giving** 198:20
**glad** 198:14
**glorified** 129:18
**go** 8:3 11:14 12:12 14:19 15:14 22:9 28:8 29:13 33:8 33:12,23 37:20 38:6 39:4,6 40:25 63:10,23 64:7 65:4,24 67:13,16 67:17 68:3 72:10 75:7 78:7 86:18

86:25 87:2,5 90:8 99:23 104:23 107:7 123:8 130:21,23 141:7,9 145:1 163:2,19 171:4 180:23 181:16,18 185:4 188:4,10 190:2 191:1 199:5,7 203:5 204:7,14 205:15 207:16 219:7,19 224:15 224:17 229:24 231:12
**goes** 107:11 155:4
**going** 11:6 12:18 14:23 17:25 21:4 21:10,16 23:25 28:23 29:15 30:7 36:16,23 37:4,19 37:20 40:24 49:10 60:21 62:21 64:11 67:21 68:24,25 73:4 79:4 85:11 86:8 90:14 92:12 96:4 105:20 110:7 120:19 121:1,20 122:6 130:7,25 139:20 140:18 149:15 163:21 165:25 166:10 168:3 169:8 170:4 171:19 180:9,13 182:5 183:9,10 188:2,4,6,16 189:20 190:3 193:13 194:16,20 195:19 199:22,25 204:23 207:7 208:18,23 209:16 211:16 212:9 214:9,13 216:4,8 216:12 217:12,15 217:21 218:2 219:8 228:15 230:8 235:23 236:6 238:6,8
**good** 7:7 10:14,15 10:16 14:18 16:8 17:6,7 98:23 103:12,13,14 174:20 205:7
**google** 76:11 238:5
**googled** 205:10 222:1
**goose** 78:2
**gossip** 194:18
**grabowski** 1:23 2:5 15:25 241:3 241:16
**graduate** 87:9,17 88:8,10,15,24 89:1
**graduated** 90:17
**graduating** 90:20
**grandmother** 152:20 153:7,11
**grata** 235:13
**great** 106:23 164:5
**greggory** 3:8 15:23
**ground** 18:2 86:17
**grounds** 106:3
**group** 180:8
**guard** 93:24 94:2
**gucci** 93:22
**guess** 8:23 20:9 46:10 52:21,21 55:13 56:14 57:9 71:3 74:5 88:11 95:18 100:7 111:21 119:12,15 148:14 155:13 159:11 190:23 191:12 192:24 200:23 202:24 218:4
**guesses** 20:10
**guessing** 56:21 190:5
**guide** 18:18
**gullible** 76:13
**guy** 26:24 55:25 57:18 93:1 196:1 197:16,21 198:19 198:23 215:11 225:21 231:16 237:25
**guy's** 198:13
**guys** 57:12,23 76:17 77:2 78:13 80:24 85:16 175:12 199:19 202:14 212:4 214:25 216:2 226:20 229:24 235:20 236:17

**h**

**h** 4:5 67:24,25 190:7 208:5
**hacked** 230:23
**hackensack** 3:3
**half** 11:15 64:10 195:20 218:19
**hand** 54:2 177:22 241:14
**handed** 196:6
**handled** 104:25
**hands** 203:20
**happen** 172:16,17 203:9 215:23
**happened** 12:8 92:10 124:3 186:4 229:3 234:13
**happening** 60:23 128:6 171:3 185:13 208:15
**happens** 167:22 168:2 228:25
**happy** 98:14 164:17,22 165:4
**harass** 96:8 100:18
**harassing** 99:21 217:19
**harassment** 102:2 104:5,13
**hard** 139:21 214:5 234:12
**harlem** 27:18
**harming** 215:6
**hash** 173:24 174:1 174:4,6,8,11
**hate** 105:4 129:17 130:20 139:13
**he'll** 97:10 122:15
**head** 9:24 11:5 19:1
**headed** 10:6 13:8
**heading** 60:14 201:25
**hear** 66:25 106:7 200:24 212:3 222:14 231:19
**heard** 55:24 122:20 140:15 175:2,4,19 205:12 212:2 214:22,23 231:19 238:7
**heated** 123:2
**held** 15:21 204:5,6 227:6
**hell** 85:4 140:18
**help** 23:17 46:14 67:21 68:3 71:7

149:4 153:2 185:13,22,24 221:7
**helping** 93:17 185:15
**hereinbefore** 241:7
**hereto** 6:20 49:16
**hereunto** 241:14
**hey** 43:2 85:20 111:11 170:17 193:14 222:19 231:16 236:17
**hi** 98:23 99:8
**high** 86:18,20
**hijack** 188:25
**hire** 71:10,12 75:23 112:6
**hired** 90:23 178:21,22 186:19
**hires** 93:23
**hiring** 186:5
**hm** 212:21
**hmm** 28:21 45:11 49:4 66:13 69:14 75:15 76:3 101:12 121:4 143:24 144:9 158:16,19 172:2 192:8 194:9 200:12 206:16 220:5 235:9 237:22
**hold** 10:9 34:18 103:10
**holderman** 3:8 15:23
**holding** 226:21
**home** 92:17 142:7 143:16 144:8
**honda** 155:22,23 155:24 156:2
**honest** 13:12 29:24 45:4
**honor** 10:18 12:24 14:4,22 99:3 100:4 103:13 106:20 107:1
**honor's** 12:6
**hoover** 95:21
**hoping** 226:9,22 227:8 237:5
**hospital** 89:17,19 89:21,25 90:3,7
**hotel** 77:15 201:8
**hour** 8:2,3,23,23 9:2,7 11:15,23
**hours** 29:11 126:17,19,22
**house** 215:1
**hr** 46:10
**huh** 19:2 53:10 65:12 76:6 80:11 88:3 94:12 95:24 114:7 129:1 135:24 140:21 145:16 162:22 167:19 175:11 189:24 195:2 198:2 215:11 217:24
**hundred** 154:15
**hundreds** 69:12
**hurting** 215:6
**hypothetical** 46:2

**i**

**ibara** 58:13
**idea** 143:1 190:20 208:21 219:3
**identification** 35:6 35:9 41:5 47:18 48:3,25 49:2 53:4 53:6 56:13 58:17 61:10,12 74:12,14 136:12,14 138:13 138:22 141:2,21 147:4,8 150:18,20 161:7,12 162:25 163:6 166:7,12 169:16,19 180:3 181:11 182:3 219:18 224:3,6,10 224:23
**identify** 16:5 205:17
**identifying** 223:16
**identity** 58:5 227:4
**idiot** 202:6
**image** 234:12
**images** 74:6
**imagine** 171:23
**immediately** 10:6 13:8,17
**impacting** 106:14
**impair** 17:19
**important** 18:17 138:10
**impossible** 39:20 39:21,24
**improper** 170:6
**inception** 117:22
**incident** 91:25
**inclined** 208:8
**include** 158:7,10
**included** 101:18
**including** 8:17 28:3 46:17,23
**income** 143:6,9 144:11 146:12,19 159:7,10,14
**increased** 159:22 159:23 160:1
**independent** 30:6 30:9 36:4,10 37:9 46:6
**indicate** 147:21
**indicated** 182:4
**indicating** 173:23
**individual** 79:7 136:21 164:11 182:14
**individually** 1:3,9 38:12
**individuals** 1:14 160:5,12 228:25 229:13
**inducing** 165:20
**inevitable** 21:6
**influence** 17:18
**info** 205:10
**informal** 18:5
**information** 30:14 30:16 33:7 44:7 47:11,24 58:25 59:5,18 63:2,4,8 63:11 75:20 76:14 77:3 88:16 89:4 89:22,23,23 90:3 96:11 97:3,14 99:20,23 100:20 102:11,20,24 104:16 108:25 113:19,21 130:12 131:1 178:8,20 211:12,21,23 221:16 227:20,22 227:24 228:2 230:24 231:12 235:15
**infringement** 82:4 122:6,9 123:5 236:8

**initial** 93:9
**initially** 86:9
**initials** 41:9 42:15
**initiated** 140:7 237:1
**ink** 123:9,9
**innumerable** 101:2
**inquire** 101:22
**inquiry** 103:5
**institute** 87:23 229:8
**instruct** 105:22
**instructed** 21:7 125:20
**insurance** 155:14 155:16
**integral** 49:15
**intend** 107:9
**intended** 237:4,12
**intending** 144:17 184:11
**intention** 145:13
**interact** 93:6 108:24 113:1,15 119:24 232:11
**interacting** 113:17 114:14
**interactions** 116:3
**interest** 151:13,16 160:12,14
**interested** 16:4 24:25 147:11 241:12
**interesting** 21:3
**interests** 1:15,16
**interfere** 15:12
**internal** 33:19 55:6 177:13,14 179:23,25
**internationally** 78:9
**internet** 1:13
**interpretation** 212:17,18
**interrogatories** 23:2,11,18
**interruptions** 21:16
**interview** 81:7
**interviewing** 194:5,11
**introduce** 185:12
**introduced** 93:1 184:24 185:9 220:25
**invest** 136:1 162:13,20 170:23
**investigated** 68:18
**investigating** 101:20
**investing** 170:21
**investment** 137:18 137:25 138:1 162:18
**investments** 221:2
**invited** 10:2 13:1 81:7 186:15
**invoice** 69:16,20 70:12 109:7
**invoices** 112:19 125:23,25
**involved** 25:9,17 68:7 116:15 125:12,15,18 140:10 193:8 214:8
**involvement** 65:16 65:19 76:15,21,24 193:1 223:5
**involvements** 50:10
**ish** 162:4
**island** 92:23
**issue** 7:13,15 8:7 8:14,16,20,23 19:18 34:9 40:2 63:16,17 97:17 98:6,20 99:2,14,15 100:23 103:2,7 105:15 176:18 188:9 197:12,14 231:2
**issued** 25:15 38:5 45:8
**issues** 21:8 105:10 113:2 170:6 173:6 197:11
**it'll** 192:16
**items** 65:3,21,22 65:25 121:1 125:22 126:2 129:11,13,16 196:10

**j**

**j** 17:2 190:7
**jabien** 55:12 57:13 57:20
**jacob** 3:5 7:9 9:19 12:24 16:14 83:4 83:5 85:7 103:16 163:1 176:25 181:5 206:19 243:5
**jail** 214:9,13 217:13,21 218:3
**jamaica** 89:17,18 89:21,24 90:3,7
**january** 85:24,25 109:25 201:23 210:19 233:5,20 234:2,18
**jason** 81:18,19 83:8 214:10 215:7 215:7,10,11 219:25 220:1,10 220:13,17,22 222:25
**jealous** 181:7 221:15
**jeff** 68:10,11,12,18 237:20,21,24
**jerk** 198:1,14 235:21
**jerks** 235:20 236:17,18
**jersey** 3:3 85:22 122:22 156:20 243:2
**jm** 58:13
**job** 1:25 27:3 75:17,23 81:8 89:13,21 90:18,20 92:15 93:4,14 100:9 108:8,10,23 126:9 132:25 178:16,17 209:7 212:5
**jobs** 94:13
**john** 1:13
**joined** 111:13
**joke** 56:25 165:1 169:1
**joshua** 3:2 7:8,18 16:8 17:8 100:21 104:9 243:25
**journal** 109:9
**judge** 6:11 7:6 10:10,14,15,17 12:16 13:21 14:10 14:21 27:13 97:17 97:23 98:7,15,22

99:8 100:2 102:19 103:12,14 104:8 105:20 106:16,23 107:3 123:10,24 124:13,16 238:14
**judgment** 101:1 236:12
**july** 64:8 67:11 134:2,4,13,18,20 134:20 135:2 170:14 171:8,11 171:12 173:14,14 201:16
**jump** 23:25 32:21 98:15 132:4 196:18 223:3
**jumping** 213:14 217:3
**juncture** 8:4 110:20
**june** 1:21 15:3 53:25 55:7 59:8 60:4,7,11,12,13 64:20 66:11 120:18 121:2 162:10,12 167:5 241:15 243:4
**jurat** 243:18

**k**

**kal** 48:8,11 53:9 57:25 60:10 173:22
**kaltner** 1:3 9:16 13:2 15:17 16:13 17:11 26:22 30:23 32:4 54:25 55:3 81:24 98:24 99:9 104:6 110:8 111:6 116:11,25 117:2 136:2 156:1 175:20,21 185:10 185:12 186:1 188:10 199:3 220:23 242:3 243:6
**keep** 15:9 18:22 72:19 136:8 137:10 168:3 170:3 177:2 209:24 212:7 228:15
**keeps** 182:14
**kelly** 212:14
**ken** 194:6,12,14 218:22
**kick** 126:1,3 128:11,25
**kids** 153:4
**kind** 106:13 125:8 152:5 163:18 172:10 199:11 204:13 215:12
**kmk** 1:2 15:20
**knew** 14:16 57:16 112:3 121:25 184:25 186:13 187:8 226:5
**know** 8:14 13:15 19:23 20:11,13,22 22:4 23:24 28:9 28:22 29:11,11,18 29:20,24,25 33:14 34:6,25 39:21,25 40:4 43:3 45:20 46:11 47:4 50:24 50:25 51:6,9,12 52:1 55:19 57:4 57:14 58:9,10,19 58:20 59:2,4,7,8 59:10,12,15,15 60:19,21 61:4 62:3,4 63:7,9,18 64:1,2 66:1,9,17 66:24 67:9 69:18 74:17 75:9,13,18 77:1,21 78:1,2 82:14 83:13,18,25 84:6,9 85:10,14,22 96:3,21 97:18 99:14 102:18 103:22 104:10 110:16 111:22 113:19 115:14,16 115:17 116:2,3,4,5 116:18 117:7,10 118:18 119:17 120:3,3,4 121:14 122:3,14,18 123:1 123:4,11,17 124:1 124:2,2,5 126:9,13 126:17,23 127:17 127:19 130:3,11 135:2 137:4,9 138:2,4,7,9,14 140:11 142:1,9 143:7 144:14,21 144:23 146:2,10 147:15 148:7 149:8,9,14 151:20 153:1,14 154:6,22 155:17,24 157:11 157:13,20,22 158:24 159:4,5,24 160:8 161:18 163:17 164:16 165:11,12 166:14 168:9 169:1 170:20 172:6,12 173:24 174:6,24 182:21,25 184:20 185:16 186:8,12 186:18 187:20 189:6,7,12,16,19 190:9,9 192:2,4,11 192:16,21 193:13 194:19 195:24 196:2 198:21,25 199:17 200:2 202:18,19 203:1 203:11 205:10,10 205:22 206:17,18 207:4 208:1,3 209:4,5,9,12,14 210:7,8,10,12,15 210:17,20 211:3 211:21 212:6,23 214:5,14,17 215:17 216:7,25 219:8,23 222:10 222:13,14,19 223:2,22 225:19 226:1,11 227:1 229:25 230:17,25 231:11,16 232:2 232:22 233:2 234:24 235:20,25 236:5,7,19 237:13 237:23,25 238:14 238:14
**knowing** 203:6 225:20
**knowledge** 25:18 27:22 34:2 53:12 68:21 77:22 80:15 81:13 84:5 112:2 113:14 118:10,25 119:3 121:9,23 122:8,10 127:13 127:22 129:6 140:23 240:4
**known** 36:2 75:12 183:4
**kuvicin** 93:2

**l**

**l** 1:23 2:5 16:9 51:10 56:24,24 67:24,25 81:5,5 84:4 133:10 139:22,22 194:2,2 202:5 224:15
**l's** 76:5 202:4 223:19 224:17
**labor** 25:12 54:17
**language** 69:7,23 235:24
**laptop** 24:13,20 26:23,25 27:3 34:24 80:24 190:3 190:22 191:7
**laptops** 92:1
**large** 74:24
**larger** 43:11
**late** 7:21 8:2 9:4 11:1 107:11 210:24 236:25
**laugh** 169:1
**laughed** 82:4
**law** 12:6,6 99:9 103:17 120:1 232:22 233:3
**laws** 54:17 123:10 206:1
**lawsuit** 82:3 236:7
**lawsuits** 25:10 106:17 136:1 149:7 162:21 230:11,16
**lawyer** 21:24 80:5 124:9,10 145:1 164:20 165:8 171:25 194:2 203:17
**lawyers** 142:20 194:2 202:7 206:11
**leader** 179:9
**leads** 91:24
**leafing** 78:16
**learn** 206:21,24
**learned** 197:2
**leave** 90:6 91:7 97:7 102:15 111:2
**leaving** 99:25 189:1
**left** 13:18 18:8 54:2 74:3 79:14 90:1,8 193:7 229:14 235:18
**legal** 8:11 12:14 19:15 35:23 36:2 38:10,14 47:3 123:9,23 124:2,12 124:18 149:5 162:19 164:1 216:22 222:19,21 231:23,25 236:6 242:1 243:1
**legally** 150:11 164:2
**legible** 224:7,24
**legitimately** 104:17
**lend** 149:12,15
**letter** 84:25 188:23 190:2 197:1 201:8,11 203:12,14 204:11 236:4,9 243:19
**letters** 235:12
**level** 129:15 130:6
**liability** 1:9
**liberal** 215:20
**liberty** 26:2 83:15
**lie** 75:25 212:20,22 213:11
**life** 168:3 188:6 214:9 238:13
**light** 154:10
**limitation** 105:24
**limited** 1:9 78:5
**lincoln** 156:19
**line** 21:10 49:10 98:24 99:10 104:1 122:13 136:23 160:21 171:21 197:5,6,7 205:15 205:24 216:9 242:5
**lined** 150:21
**lines** 18:18 111:19 149:22
**link** 68:2 147:10 197:5 211:4 222:4
**liquidated** 131:21
**list** 72:25 73:1,19 77:2 129:18 133:17 136:7 188:11
**listen** 36:24 37:2 37:18 40:6,22 135:1
**lists** 73:15
**litigated** 17:14
**litigating** 140:4
**litigation** 48:20,22 121:20,24,25 140:10 141:6 176:15 220:14,18 221:2 229:9 230:8 232:22
**litigious** 230:21
**little** 7:19,20 8:19 10:22,25 11:12 18:1,3 21:2,14 25:3,21 26:1 27:23 28:20 32:21 40:18 76:2 79:4,5 79:8 81:17 86:7,9 92:13 111:18 132:4 136:20 137:22 139:20 147:14 178:10 188:14 189:21 194:3 195:20 200:10 201:22 219:20 222:3 223:3,13 235:2
**live** 72:15 152:15 224:16 225:3,24 226:17,18
**lived** 215:1
**lives** 146:3 153:3,7 162:2
**living** 145:25 146:1 158:18
**livingston** 243:2
**llc** 1:9,13 35:4,18 35:19 36:2 37:3 37:13
**llp** 3:2
**lms** 1:2 15:20
**load** 67:4
**loan** 165:17,20
**loaning** 148:23
**loans** 155:8,10
**located** 15:21 107:25 108:3
**location** 104:4 243:14
**logistic** 91:5
**logistics** 110:20
**logo** 203:7,13
**long** 29:20 64:9 65:5 89:24 93:12 169:20 182:5 188:7 224:16 225:24 226:17,18

**longer** 32:25 163:14,25 164:3 193:3,11 235:6
**look** 22:23 34:10 35:10 45:6 48:4 54:1 58:18 59:3,4 69:15 73:18,20 74:15 77:2 78:16 138:23 141:22 147:13 157:7 161:13 163:7 167:15 169:22 171:19 174:16 192:16 195:19 199:20,23 209:6 209:18 224:8 234:19
**looked** 154:5 223:22
**looking** 33:8 41:4 42:18 44:1 49:7 59:6 69:11 75:20 75:23 94:8 147:9 164:16,21 165:15 167:4 180:4 182:9 186:8 189:22 193:20 194:3 198:19 201:23 207:5 221:13 224:22 227:18 238:16,18
**looks** 161:19 221:16
**lose** 150:8 168:2
**losing** 131:20 132:3
**lost** 27:8,9 137:23 181:10
**lot** 12:17 33:6 64:14 120:4 126:7 147:5,9 148:17,20 168:13 176:1 177:24 185:20 188:7 194:23 195:1,4 209:19 215:13,24 216:3,7 217:23,25 220:15 222:14,14 226:13 227:4 232:11
**loud** 137:1
**love** 199:8 216:2,6 238:19
**low** 129:16 130:6 153:2,12
**lower** 54:2
**lozada** 61:5,19
**lucky** 224:14
**lunch** 79:3 85:21 85:21
**lurie** 3:2,2 4:4 7:3 7:7,8,10,16,18,23 8:6 9:2,12,15 10:11,15,18 13:11 13:13,21 14:4,15 14:21 16:8,8 17:5 17:8 22:9 24:24 29:15 30:3,12,25 31:3,7,15 35:25 36:16 38:6,9,13,15 38:19,23 39:2,6,15 43:13 44:19 47:15 47:21,25 48:21 52:14,18 53:2 56:11,16 61:8 67:25 70:18 72:8 78:18 95:23 96:14 96:22 97:12 98:1 98:4,10,18 99:11 99:15 100:15,21 100:21 101:15 102:16 103:2,7,14 103:20 104:8,9 105:11 106:10,16 107:3,12 122:17 136:7 138:4,11 140:24 141:9 147:5 160:21 161:5,9 162:23 163:1 166:4,8 169:14 176:25 177:2 180:4,15,20 180:22 181:2,4,7 187:25 188:4,14 189:4 195:9,12 196:20 199:14,24 204:2,6,14 209:20 213:19 216:12,15 223:13 234:11,15 234:22 235:1 243:25
**lurie's** 40:6 106:8
**lyft** 95:17,19 101:14 107:14 143:3 144:4 156:9 159:5,7

**m**

**m** 3:2 107:24 208:5 224:15 243:25
**macbook** 190:12 190:14
**magistrate** 7:12 8:15 41:2 97:17 97:23 100:2 102:19
**maintenance** 156:7
**major** 95:4
**making** 14:6 52:23 56:25 127:20 143:25 144:5 145:20
**man** 175:25 176:2 176:8,13,13 198:13 225:3
**man's** 177:22
**manage** 93:5 112:10 113:1 119:12 129:11,13
**managed** 90:22,23 91:1,7,10 92:5,6 110:11,18,22 111:17 112:3 184:17
**manager** 91:3,5 110:20
**managers** 1:14
**managing** 1:12
**manhattan** 86:23 108:3
**manila** 75:2,5,8,17
**manner** 106:4
**marby** 74:19 75:9 75:10,24 178:13 178:14 232:16
**marco** 55:12 57:13 57:20
**maria** 62:9,25
**mark** 35:1 44:3 47:16 52:10 140:24 170:19 190:1 207:9 218:20,23
**marked** 35:5,8 47:17 48:3,24 49:2 53:3,6 56:12 58:17 61:9,12 74:11,14 136:11 138:12,22 141:1 147:3,8 150:17,20 161:6,12 162:24 163:5 164:8 166:6 166:12 169:15,18

180:2 181:10 182:3 219:17 224:2,5,9
**marriage** 241:11
**married** 51:13 150:4,11
**master** 232:20
**match** 174:12
**matter** 2:3 15:16 17:11,14,14 23:12 25:11 26:7 27:7 54:11,14 69:23 80:23 81:15 94:6 100:24 102:9 241:13 243:11
**max** 188:25 232:19
**maxed** 171:10
**mean** 23:5 25:19 25:22 26:21 52:9 52:19 56:1 58:23 59:2 61:21 68:8 71:2 118:20 120:3 125:25 128:12,16 129:12 133:1 138:17 139:24 140:14,17 145:1 149:25 171:1,2 173:7 174:12 176:3 180:15 201:19 205:7 208:11 210:1,16 212:16 213:6,7 215:2,22 221:6,21 221:24 222:8 238:7
**meaning** 25:21 215:4
**means** 105:25 140:20 174:18,19 212:11 222:18
**meant** 10:1 19:10 205:4
**measures** 96:9
**media** 15:14 24:19
**meet** 64:19 110:10 110:12
**member** 1:13 161:23
**members** 161:22
**memorandum** 123:10
**memory** 136:4 169:11
**mental** 209:3
**mention** 222:11
**mentioned** 10:18 40:16 65:10 88:1 178:4
**merchants** 93:2,4 93:10
**message** 4:13 57:7 57:8,10 61:16 74:19 79:18 81:14 82:7 85:18 120:25 136:17,23 137:2 142:16 147:12 148:2 165:6,13 166:9,19 167:10 167:17 170:13 171:7,8,21,22 187:15 188:1 189:22 190:5,6,25 191:2,4 193:21,24 197:3 199:16 200:5,6,10,24 201:24 204:24 214:11 234:25
**messages** 57:21 85:23 139:11 167:5 180:8 182:6 182:10,15,15 191:3,5 192:3 202:10 211:4 216:16 217:4 220:9 234:1,17,20
**messed** 29:21
**met** 18:18 55:25 57:14,16 64:18 77:14 110:14 162:8
**method** 102:3
**mf** 214:5
**mia** 62:8,9,25
**mia's** 62:8
**michael** 177:3,6 177:12 178:24
**microphone** 173:18
**microphones** 15:4
**middle** 65:8 99:1 139:11 192:6 217:7
**mind** 13:5 29:23
**mine** 62:6 81:6 86:6 150:15 161:24 193:18
**mint** 107:22
**mints** 108:5
**minute** 8:24 79:4
**minutes** 8:2 11:25 14:17 22:10
**misdemeanor** 25:6
**missing** 115:3 173:5
**misspell** 139:17
**mistake** 11:18 13:12
**mistook** 7:25
**misunderstood** 9:23
**mixed** 13:3,5
**mm** 28:21 45:11 49:4 66:13 69:14 75:15 76:3 101:12 121:4 143:24 144:9 158:16,19 172:2 192:8 194:9 200:12 206:16 220:5 235:9 237:22
**mobile** 134:16
**model** 155:25
**moment** 22:19 48:4 74:15 91:25 99:5 141:10,21 161:13 193:22 213:16
**moments** 14:10
**money** 26:2 65:1 66:18 81:16 112:18 131:20 132:3 144:4 147:20 148:18,23 149:2,10,10,12 151:3,4,9,12 152:9 153:17 154:18,21 154:23,24 155:2 157:15 160:5,9 165:20,22 167:15 168:4 169:8 170:18,25 173:5 183:16,19,20,24 198:24 204:11 209:23 210:13 214:19,25 227:23 228:1
**monitary** 25:24
**monitor** 15:2 22:12,16 39:9,13 78:21,25 120:9,13 141:13,17 160:24 161:3 181:21,25

204:17,20 238:25
**monitored** 157:6
**monroe** 87:4 88:1 88:6,19,24 111:23 185:5
**month** 92:8 143:21,22 144:5 155:11 157:16,21 158:14,21,25 159:2,3 192:15 200:19 233:16
**monthly** 53:19 155:6 156:25 157:9 158:3 159:7 159:9
**months** 92:22 93:13,18 144:11 155:19 184:5 195:5,15 200:11 233:17
**morning** 7:7,11,17 8:10 10:14,15,16 10:21 16:8 17:6,7 167:13 193:25
**motion** 106:1,2,12
**motor** 26:17
**move** 106:24 107:12 216:13 235:11 238:20
**movement** 217:19
**moves** 207:21,22 207:25 208:2
**moving** 212:7 216:13 221:11
**mt** 243:1
**mueller** 215:25
**multiple** 44:13 100:23 230:11

**n**

**n** 3:1 4:1 67:24,25 81:18 84:4 107:24 107:24 219:25
**name** 1:13,14,16 15:23 17:8 48:11 51:9,11 55:24 62:8 76:9 79:12 84:2,5,7,10,12 97:22,25 104:4,21 110:6,17 121:8 122:11,11 132:23 142:2 147:22 175:2,4,15,18 177:5 203:13 220:12 233:1 237:8,10,12 242:3 242:4 243:6
**named** 50:24 61:4 93:1 174:24 226:23
**names** 22:25 47:9 137:11,12 197:23
**national** 91:18,18 91:21 92:15
**nbc** 222:15
**near** 138:6
**necessarily** 37:13
**necessary** 104:23 105:23 176:21 236:14
**need** 20:21 22:2 28:12 60:5 62:2,4 78:15 102:6,10 120:7 130:21 151:18 170:20 177:14 179:25 188:22 189:11,18 203:25 208:5 237:2
**needed** 41:14 139:22 142:19 152:9,11 171:4 177:18,19 185:13 185:22,24 189:7,7
**needs** 98:16 105:16 155:5
**negative** 159:2 167:25 216:3
**negatively** 167:24
**negatives** 195:6
**neglected** 139:13
**negligence** 101:17
**negotiated** 45:2
**nehls** 67:24 70:15 117:15,17,24 118:1 218:20
**net** 159:2
**never** 31:24 33:13 33:14 42:12 45:12 45:25 49:20,22 50:2,19,23 55:25 63:15 70:3 119:25 120:1,3 140:15 144:19 146:21 150:11 152:6,8 157:6,11,17 177:16,18 182:20 189:17 198:14 199:5 207:23 228:17 229:3 230:6,15 232:18 232:25 237:3,3
**new** 1:1,9 2:6,8,8 3:3,6,6 9:5 15:19 15:22,22,24 17:2,2 27:20 71:8 85:22 108:1 111:12 122:21 141:16 146:3,7,11 156:20 162:4 186:5,13 190:6,7 206:13 241:4 243:2
**news** 222:15
**nice** 215:11 232:10
**nicely** 221:18
**nickname** 175:20 175:23
**nicknames** 175:9 175:12
**nico** 174:21,24 175:2,4,7 225:16 225:21 226:5,11 226:19,23,24 227:8
**night** 225:4
**nights** 126:15
**nine** 138:11,12,17 138:22
**nineteen** 224:2
**nj2930894** 1:25
**noble** 168:1
**nodding** 19:2
**non** 4:7 35:2,2 43:24,24 122:7 228:20 229:2,4,7 229:18,25 230:1,3
**nonemployment** 29:3
**nonnegative** 195:8
**nonverbal** 19:1
**nope** 50:3 56:10 75:6 198:7,12
**normal** 23:24 182:18 221:15
**normally** 34:22 168:8
**notary** 2:5 6:10 17:3 240:12 241:4 242:21,24
**notation** 72:8 107:5

**note** 15:3 30:21 47:19 52:12 83:11 96:2 107:8
**noted** 52:18 96:14
**notice** 23:3,4,7,10 105:6
**noticed** 7:17 8:1 8:20 10:20 11:3 12:11,23
**november** 131:25 233:18,19
**number** 15:15,19 31:2,5,10,11 71:24 72:2,5,13,15 73:10 73:11,12 98:20 111:9 130:3,19 135:6,9 136:18,24 137:7,14 139:4 141:8 142:1,2,7,9 146:20 148:8 161:8,15,17 164:7 164:9 171:25 182:22 188:5 216:24 220:3,6 243:7
**numbers** 28:7 72:14 73:20 133:25 134:3 135:11,14 137:9 142:5 161:21 180:9,19 182:24 217:1

**o**

**o** 56:24 81:5 139:22 194:2 217:12 224:15
**o'clock** 7:17 8:10 10:21 11:3 193:25 217:5
**oath** 16:2 21:22
**object** 19:8 47:2 122:13 204:16 216:4,8
**objection** 42:20 47:19 78:11 96:14 96:24 97:8 103:25 128:14 170:6,8,8 195:9 223:9 227:11
**objections** 6:7 19:9
**obligation** 83:18 234:8
**obtain** 30:14
**obtained** 28:3
**obtaining** 89:8 165:22
**obviously** 8:6 137:3 163:20 181:13 188:7 191:15 216:4 234:7,22
**occasion** 107:15
**october** 131:4 139:12 142:12,13 143:4,6,7,9 145:9 145:15 200:10 233:19
**odd** 221:16
**offer** 227:20,23
**offered** 99:25 184:1,2,4
**offering** 228:1,4
**office** 10:24 11:2 18:5 42:22 74:4 91:2 112:25 133:19 142:7 206:12,13 218:15 218:19 243:13
**offices** 2:6 93:6
**official** 1:11,12 91:4 128:8,12,15 128:18 129:4 174:5
**officially** 91:11 109:19
**oh** 9:14 14:13 22:8 26:18 56:14 58:2 60:3,14 69:20 71:1 76:1 77:9 84:8 92:25 95:23 111:23 122:23 123:19 138:19 143:4 150:14,14 152:11 155:9,15 156:2 159:8,11 161:16,18 163:23 164:5,9 165:17 166:18 177:9,25 178:6 186:23 191:14,24 196:23 199:8 203:22,24 205:18 207:11 210:2 216:2 217:16 220:11 223:25 224:21 225:19,19 229:16 231:19 232:6,25 233:22 238:21
**okay** 7:14,22 8:5 9:18 10:9 14:17 18:24 27:6,11 30:11 38:6 39:8 40:8,18 43:15,21 43:22 46:8 51:6 51:15 52:25 54:7 61:7 68:15 76:15 89:17 92:2,10 98:18 99:5 100:8 100:14 103:10 113:10 119:16 120:5 132:9 138:16 146:23 147:16 151:8 163:8,15 166:18 167:7 169:23 170:9 173:21 181:7 183:12 190:20 193:23 201:21 204:15 209:21 211:15 214:1,2 216:19 217:9 218:12 219:16 221:20 229:16 230:7
**old** 168:10
**omit** 104:3
**once** 9:3 12:9 21:19 23:20 30:12 30:16 37:18 41:4 46:22 75:14 76:19 79:14 99:13 102:13 104:8 106:19 137:3 139:10 140:8 145:12 157:18 171:14 176:20 184:13 192:9 202:13 205:25 214:3 218:4 219:19 224:23 225:17 232:21 233:2 235:1,5
**ones** 175:22 188:22
**online** 24:17,19 46:12,14 47:13 63:1 133:3 207:22
**oops** 52:10,20
**open** 68:3 70:24 237:5,9

**opened** 229:14
**opening** 68:7 70:15 201:14 225:2
**operates** 119:4
**operating** 121:16 122:2,4,7,11 126:21 131:11,14
**operational** 71:4
**operators** 1:14
**opinion** 118:8
**opportunity** 21:23 137:5 138:25 163:9,20 195:21 196:21
**opposes** 102:17
**opposing** 99:22
**oppresses** 106:6
**optimism** 147:1
**opus** 237:14
**oral** 2:2
**order** 14:2 22:21 25:1 37:9 82:22 97:2 98:11 102:5 102:7,8 104:3,18 105:3 106:21 107:7 113:6 123:24
**ordered** 105:25 106:1 115:5 179:8
**orders** 100:4 101:6 102:19
**original** 43:9
**originally** 206:5
**os** 137:25
**oscar** 26:23 91:14 91:16 131:21 173:2 175:8,23,24 175:24,25 179:1 179:15 197:4,14 197:15 199:16 215:1 225:16 226:2 231:9
**oscar's** 177:21
**ounce** 76:18
**outcome** 16:4 27:7 241:12
**outlook** 238:13
**outrageous** 192:16
**outs** 105:5
**outside** 19:18 22:19 74:3 122:7
**outsourcing** 1:3 31:23 32:1 224:12
**outstanding** 160:11
**overspend** 125:21
**owe** 160:5,9
**owned** 45:25 46:2 115:12,14,16,17 115:18,20
**owner** 27:4,5,6 130:22 226:22 227:7
**owners** 1:14 224:14
**ownership** 115:23
**owns** 116:1 152:19 152:21 202:20

**p**

**p** 3:1,1 169:21
**p.c.** 2:7 3:5 15:21
**p.m.** 2:8 39:10,14 78:22 79:1 120:10 120:14 141:14,18 142:17 160:25 161:4 165:7 170:14,17 171:8 181:22 182:1 200:7 204:17,21 208:24 217:5 221:14 239:1,2
**padding** 125:23,25
**page** 4:6 35:13 41:7,9 44:1,5 49:7 49:7,11 69:19 136:9 137:3 139:12 166:10 171:6,20 181:12 187:23,24,25 188:5,12,16 189:20 190:25 192:5,6 193:20 195:19,20 196:18 199:21 200:3 204:23 207:5,6,8 208:4,18,23 209:16 212:9,10 213:14,24 216:13 216:14 217:3,7,7 218:5,8 221:11 226:6 231:10 242:5
**pages** 5:2 24:3 28:1 47:25 69:17 69:22 166:5,14,17 169:20 180:1,24 180:25 182:4 188:11 209:19 216:15 219:20
**paid** 47:10 50:22 62:12,13 119:25 153:13,22 156:14 157:17 167:22 183:20 193:14 227:21 228:17 230:15 238:1
**pandora's** 225:2
**paper** 14:2 24:21 28:1 115:15,17,18 115:19 116:3,24 117:1,12,13,13,17 117:18,24 118:9 118:16,17,19 150:22 180:13
**papers** 61:23,25 62:22 237:3
**paragraph** 29:20 44:8 49:11 221:15 222:7,8,10
**paranoia** 178:2
**park** 86:20
**parking** 12:16,17 12:19 13:14
**part** 13:12 24:13 49:15 76:25 80:24 90:11 153:20 156:14 176:22 190:5,23 215:4,5 223:8
**parties** 6:4,14,19 15:13 16:3 17:15 25:12,23 94:5 98:24 99:9 106:18 229:7 241:11
**partner** 150:2,2,2 150:9 153:4
**parts** 136:19 205:6
**party** 31:4 48:19 48:21 106:6 108:6 164:15,20
**pass** 75:22 77:24 196:11 211:11
**passed** 45:8 196:12,12 227:6
**passenger** 156:17 156:18
**passing** 205:13,22 206:2 226:9 232:13
**paste** 171:22 196:9
**patient** 89:22,23 90:3

**pattern** 221:5
**pay** 26:24 36:10 37:9 46:18,24 101:1 114:19,21 114:23 115:1 134:7 135:19,23 145:3,17,19 148:3 148:15,18 151:11 151:13,18 152:5 152:23,25 153:17 154:7,9,11,13,17 154:24 155:8,10 155:13,14 156:7 160:14,18 182:20 193:6 194:2 205:20 227:20,23 228:4 230:17,18
**payable** 184:18
**payday** 167:20
**paydays** 167:16
**paying** 36:3 101:7 158:17,25
**payment** 34:9 109:6 115:6 157:1 158:3 237:16
**payments** 36:15 36:20 108:11 109:5,14 156:5
**paypal** 147:10
**payroll** 46:17,23 47:5 48:13 50:10 50:12 51:20,20 52:7 59:22 60:16 63:3 184:17 189:12,15 193:1,7 193:8
**pays** 153:11
**pending** 20:24 56:16 78:15 101:17 120:6 204:1,2
**people** 61:2 65:1 65:24 67:4 68:6 75:23 76:25 78:10 117:2,4 119:11 120:3 125:22 126:1,3,12 130:12 133:18 136:1 137:10 142:4 144:17 145:4 146:4,23 148:17 154:19 160:7,9 162:11,13,20 165:19 176:1 178:7,21 202:11 215:24 218:2 220:16 223:7,15 226:9 231:6,7 236:22
**people's** 137:9
**percent** 36:22 144:7 146:12,18 148:4 151:16 162:15,21 207:2
**percentage** 116:2 148:19
**perfectly** 20:12
**perform** 50:5
**performance** 101:25
**performing** 118:25
**period** 8:24 9:1,2 9:7 30:17 42:25 43:16 65:5 66:7 66:10 85:3 143:12 144:10,18 145:8 190:3 197:1 200:14,19 236:1
**periods** 192:10
**permitted** 62:18
**person** 50:25 58:14 63:19 73:7 73:9,13 105:22 138:1,6 142:2 146:3 148:6 164:17 165:8,12 166:18 198:11 208:3 209:7 223:10 227:1
**person's** 56:23
**persona** 235:13
**personal** 26:23 27:3 34:24 57:7,8 57:10 139:5 185:17,19 210:7,9
**personally** 24:14 25:1 41:11 119:14 172:24 206:21 213:7
**personnel** 126:7
**perverse** 223:21
**peso** 192:23
**pesos** 53:21 192:19
**peter** 218:20
**peter's** 115:5
**ph** 50:24 55:12 58:13 74:20 79:12 218:21,21
**philippine** 192:23
**philippines** 25:14 31:2,3 48:14,17 49:14,21 50:11,14 50:19,20 51:5,21 52:6,8 53:17 54:24 55:7,16 57:17 59:23 60:14 60:15,22,22 61:6 61:17,24 62:6,15 62:19 63:8,9 64:5 64:7,12,14,17,23 64:24 65:5,15 67:10,13,17,20 70:15,16 73:16 74:20 77:4,9,11,13 77:14,17,18,19 81:20 112:15,16 115:8,20,24 116:6 116:12,16,19,20 116:24 117:2,4,8 117:14,21 118:2 118:11,17,22,22 119:1 120:17,20 120:23 121:12,13 121:20 123:8 124:6,14,22 125:1 126:18,20,24,25 127:1,2,11,15,18 127:20 128:21 133:12,13 172:4,5 172:8,11,14,22 173:13 190:13,15 190:17 193:7,9 197:17 198:25 201:6,13 210:4,11 210:20 211:15 229:14 232:11,17 237:2,6,9 238:19
**phone** 7:4 24:20 66:24 72:6 73:2 73:11,11,15,19,23 73:24 74:2 79:16 97:13 100:6 111:9 111:10 133:25 134:2,7,9,12,15,19 135:4 136:17 137:11,13 157:20 158:10 190:5 191:4,6,10 197:8 203:18 214:7 234:11,14

**phones** 15:8 133:20 135:8,16 135:23 234:10
**phonetically** 70:18
**photo** 43:9 53:14 83:22
**photograph** 53:16 150:21,23
**photographs** 83:20
**phrase** 140:16,17 150:8 174:2 195:8 212:14 216:25
**picked** 111:10
**pickup** 15:5
**picture** 54:2 74:6 219:24
**pictures** 83:20,22 212:5
**piece** 71:15 150:22
**pissed** 197:3
**place** 9:6,22 10:23 13:3,6 18:4 26:14 40:19 92:24 94:3 102:9 219:10,13 219:15 238:19
**placed** 35:7 48:2 49:1 53:5 61:11 74:13 126:4,6,8,14 141:19
**places** 215:16
**placing** 138:21
**plaintiff** 100:17,17 172:20
**plaintiff's** 7:18
**plaintiffs** 1:6 3:4 10:2 16:10 83:13 100:22 104:9 173:1
**plan** 135:18 156:7 190:6,8,21,23
**planning** 210:13
**players** 142:19
**playing** 214:5
**plaza** 3:3
**pleading** 221:5
**pleadings** 28:5
**pleasant** 243:1
**please** 7:15 15:3,7 15:9 16:5,17 18:19,25 19:22 20:13,22 24:2 36:21 37:18 38:19 46:14 47:6 48:4 49:11 55:5 58:3 58:18 74:15 76:19 103:11 107:23 120:15 130:5,10 137:4 141:21 169:22 243:13
**plenty** 120:5
**plug** 137:14
**plus** 160:12
**pm** 56:23 57:2
**point** 11:4 12:4 14:12 24:25 30:15 31:16 43:8 67:14 96:3 97:3,16 99:19 103:19 111:20 123:7 134:17 146:25 164:10 195:3 216:10 223:12 224:11,16,18 238:17
**points** 21:6,14
**policy** 33:14
**political** 215:15,17 216:9
**pool** 232:11
**popped** 11:5
**pose** 75:19
**position** 35:16,21 35:23 36:1,6,18 37:8,9,25 38:1,16 41:1 42:2 53:22 76:20 91:1 94:1 99:18 106:19 127:14 133:10 140:4,8 146:9,17 184:15 186:18
**positions** 40:20 90:2
**positive** 215:25
**possession** 32:18
**possible** 14:13 19:15,23 20:10 39:22 40:10 202:2
**possibly** 120:24 145:6,11
**post** 46:12 48:10 52:10,13,20 59:17 59:19,24 60:5,10 60:24 63:1,10 173:22 215:13,19 215:24 223:16 224:10,25 225:7 225:19 226:17 231:12 235:11
**posted** 46:14 47:13 59:1,16,25 198:16 225:12
**poster** 53:9
**posting** 59:20,22 60:1,16 63:13 110:13 176:7,11 223:17 224:20 225:23 235:24
**postponed** 155:12
**pound** 174:10,11
**poverty** 139:19 145:15,20,22,25 146:1,18,22,24
**practice** 2:4 182:18
**precise** 20:17
**predicate** 231:5
**preemptively** 97:13
**prefer** 243:15
**prejudiced** 103:4
**prejudicing** 31:12
**preliminary** 17:12
**premarked** 136:14 141:20
**prep** 12:5
**preparation** 9:20 13:1 209:1
**prepare** 22:21,23 114:23 115:1
**prepared** 8:3,22 13:10 21:15 208:25 209:9,13
**preparing** 14:7 209:2,11
**presence** 19:17,19
**present** 3:8 8:9,9 37:23 58:16 106:1 166:11 218:19
**presented** 38:4 169:17 181:9
**presenting** 136:13 147:7 150:19 161:11 163:4,24
**preserve** 19:10 105:24
**president** 119:18
**presume** 69:12 108:10 142:20 171:2
**pretty** 43:10 79:17 84:16 104:6 130:20 131:18

176:1 186:25 211:18 217:2 222:1
**pretzels** 125:3,5,6 125:9,13,16,19 126:15 128:9,21 129:5,9,21 131:11 131:19
**previous** 97:17
**previously** 42:1 44:10 45:5 48:7 62:17 64:3 65:10 115:7 157:19 173:11 184:25 202:15 205:21 220:13 222:3 223:4 228:24 229:6,12,22
**primo** 1:10,15,17
**print** 82:25 83:3 166:1
**prior** 21:9 26:15 27:2 45:10 104:14 134:16 136:19 144:3,7 159:14 186:18 225:20 237:3
**priority** 53:17,18
**private** 15:5 25:23 57:21
**privilege** 19:15 105:24 163:25 221:17
**privileged** 163:14 163:22 164:3,11 165:18
**pro** 92:17,20 165:10 206:5,10 206:12,13 224:11
**probably** 26:10 163:21 180:11
206:19 219:24 222:1
**problem** 10:17
**problems** 171:11
**procedure** 2:4
**procedures** 34:23
**proceed** 10:8
**proceeding** 123:23 124:2
**process** 195:25 204:13
**processes** 196:4,15
**processing** 93:2
**produce** 34:13 80:3,18,20,20,23 81:2 82:13,22 86:1 130:3 169:10
**produced** 24:3,12 24:17,22 27:24,24 28:2 80:7,17 83:9 86:2,4 101:8
**producing** 32:13 33:24 34:7
**production** 105:9 243:23
**professional** 101:16 108:22
**profile** 48:8 58:1 69:21,21 147:22
**profiles** 66:17
**profit** 1:10,10,11
**programs** 122:22
**project** 91:13,15 111:12 216:21
**projects** 67:8 111:18 125:7 216:23
**promised** 148:18
**promising** 162:15 162:21
**promissory** 148:22
**pronounce** 84:11
**proof** 214:21 230:22,25
**properly** 18:21 19:5
**property** 139:14 139:15
**proposal** 192:13
**propose** 102:14 105:12 192:17
**proposing** 98:12
**proposition** 99:25
**protected** 141:4
**protection** 96:19
**protective** 97:2 98:11 102:4,7,8 104:3,17 105:2 106:21 107:6
**prove** 58:5 197:23
**proverb** 140:13
**provide** 17:22 18:6 19:21,25 20:4,5,9,14 30:4 31:25 40:17 50:21 50:22 62:19 79:23 80:1 82:11,16 83:19,23 92:19 97:14 102:12 108:24 111:5 113:10 114:22 154:23,24 155:2 177:12,16 228:2,5
**provided** 6:13,14 25:2 28:10 29:4 30:5,8 31:10,13 34:20 48:16 49:20 49:22 60:17 63:15 83:8 95:25 225:15 228:11
**providing** 18:20 21:22 28:17 29:1 29:6,25 30:18 31:9,16 32:3,10,18 32:22,25 34:4,13 37:21 42:8 44:11 45:17 54:5 64:4 92:15 94:10,14 95:7 109:23 110:1 112:4,23 116:10 123:23 132:5,12 143:14,17 145:23 159:17 160:2 175:10,13 179:16 183:13,24 185:23 187:10 193:3 199:2 202:21,22 228:8,24 230:9,12 235:7
**proving** 208:13
**public** 2:6 6:10 58:25 59:5,18,20 63:2,3,8,11 104:20 115:22 240:12 241:4 242:24
**pull** 171:19 178:11 180:10
**purchase** 129:14 190:12
**purchased** 60:15 126:2 129:11,13 243:16
**purpose** 36:9 63:13 64:11 67:19 77:24 123:17,20 149:2,6,9 151:9 152:3 164:14,19 165:9 227:8 231:11
**purposes** 6:13 35:9 36:3 41:5

48:4 49:3 53:7 58:18 61:13 74:15 99:21 136:15 138:23 141:5,21 147:9 150:21 161:13 163:6 165:19 166:12 169:19 181:11 182:4 224:10,23
**pursuant** 2:3 25:2 81:1 97:1 98:7 102:5 104:18
**put** 35:25 36:25 41:18 72:8 97:22 105:16 129:23 139:5 147:12 157:10,14 169:8 170:13 193:18 203:5 206:5 208:1 214:13 217:12,21 218:2 226:3,15 235:12,22
**putting** 133:3 207:9,12 214:9 226:8

**q**

**qualifications** 112:1
**qualified** 47:20 50:3,5
**queen** 225:4
**queens** 87:3,7,14 89:16 233:12
**question** 18:20 19:10,12,13,22,23 20:3,14,16,24 23:21 29:12 36:24 36:25 37:1,2,3,19 37:19,21 38:8 39:16,17,18,19 40:3,7 43:16 44:3 44:18 45:20 46:22 47:7,8 52:10 56:16,19,20 70:8 70:10,11 75:1,19 76:20 78:15 80:19 96:16 98:5,16 99:3,6 104:11 118:3 120:6 135:1 135:2 137:21 142:10 147:17 164:18 170:18,19 176:23 183:9 190:1 195:10,12 198:18 199:15 204:1,2 207:8,9 213:23 214:3 218:20,22 220:21 223:11 231:5 238:5
**questioning** 21:17 31:12 47:2 122:14 160:22 195:7 216:9
**questions** 13:16,19 17:12 19:9 21:5 21:10 25:5 29:20 37:24 40:18,22,23 40:23,24 43:18 96:10 99:16 103:4 103:20 104:1 177:3 188:12 194:8 225:17,18 238:23
**quick** 96:2 160:22 199:22
**quickbooks** 108:17 109:8 113:22,24 114:1
**quickly** 10:6 105:1 181:17 204:8
**quite** 230:7,10
**quote** 42:4,5 101:10,11 123:8,8 123:9,9 130:22,22 202:1 219:2,2 222:17,17 226:16 226:16
**quotes** 177:4

**r**

**r** 3:1 5:1 16:9 71:16 81:18 95:23 190:7 202:5,5 241:1
**raid** 219:5,6,8,10 219:13,14
**rainbow** 58:8,15 65:11,13,16,19 125:2,5,6,8,13,15 125:19 126:5,6 128:9,21 129:5,9 129:20 131:11,16 131:19
**rainy** 169:5
**raise** 13:22 97:8 97:23 99:3 192:12 207:15
**raised** 97:17 101:3
**raising** 170:5 207:14
**ran** 117:7,9,19 118:11
**random** 73:12
**randy** 218:21
**rate** 192:22
**rauti** 81:5,6,6 114:23 115:1 132:19 149:1,3 160:10,15 165:23 233:7 234:3
**reach** 10:5 11:12 13:8 85:17 179:22 227:19
**reached** 13:18 85:14 177:16
**reaching** 78:9 178:19 179:5,6,7 179:10,13
**read** 18:12 42:12 43:4,6,19,21 44:7 44:9,23 45:12,14 49:10,12,16 54:11 56:23 57:23 70:3 123:14 136:22,25 137:1,5 138:24 140:15 146:21 170:1,10 181:14 195:22 196:21 201:21 205:18,23 205:23 217:9 218:12 219:23 221:14,22 222:6 230:16 240:2
**reading** 45:7 137:6 138:25 141:25 147:14 162:16 166:13,15 170:15 199:25 213:17 215:19 218:24 225:5 243:11,19
**ready** 10:7 11:14 12:11 13:15,16 98:20
**real** 95:4 118:4 207:22,25 208:2 235:20 236:17
**realize** 10:4
**realizing** 10:1
**really** 12:8 38:3 104:10 105:3 142:10 144:19 152:14 153:1

182:8 201:25 208:1 210:21 214:21 215:17 226:11 228:17
**realm** 103:23
**realty** 225:14
**reason** 20:22 60:20 120:20,21 166:1 242:5
**reasonable** 102:14
**reasoning** 42:4 132:1
**reasonings** 100:25
**reasons** 65:4 217:18
**reboot** 112:25
**recall** 26:12,13 33:24 34:7,13 61:18 72:14,15 85:13,19 87:12 89:9 123:7 131:23 132:1 138:5,14 145:4 168:19,24 169:3,7,12,13,25 183:6 188:9 218:14 223:17 224:20 225:12,21 228:1,3,4,7,14 231:1 236:9
**receipt** 101:7 243:19
**receive** 23:9 88:12 88:15 89:3 109:5 183:23 184:11 185:6 194:22 207:20 208:4 237:16
**received** 54:3 83:7 84:25 94:10 137:2 155:25 184:12 187:16 214:7
**receiving** 106:12 128:25 236:9
**recharge** 162:15
**recognize** 35:11 53:7 58:21 61:13 137:7 139:2 141:23,25 150:23 161:15 182:22,24 219:21,22 220:6
**recollection** 34:12 69:10 120:16 142:23 222:23,25
**recommend** 187:1
**reconcile** 109:9
**reconciliations** 114:12
**reconciling** 114:10
**record** 15:2,14 16:7 19:11 22:9 22:12,16,18 24:16 29:21 37:1 38:7 39:1,5,6,9,13 41:3 43:7 44:2 46:19 47:1 51:20 72:9 78:21,25 83:12 98:19 102:18 107:4,9 120:9,13 139:6 141:10,13 141:17 160:24 161:3 169:19 181:17,18,21,25 198:23 204:14,16 204:20 235:3 238:25 241:8
**recorded** 15:15 18:16
**recording** 7:2 10:13 14:24 15:13 18:10 19:4
**records** 33:9,16 45:18 46:8,16 52:3 59:22 60:16 63:3 76:17 104:20 115:22 211:14
**rector** 93:3
**recurring** 66:17
**redacted** 72:9 105:7,17
**redaction** 104:20
**redirect** 4:2
**reduce** 192:18 218:18
**reed** 175:24
**refer** 84:18,21 175:25
**reference** 208:21 215:7 243:7
**referenced** 178:10 178:14 190:21 243:10
**references** 202:10
**referencing** 139:16 142:24 190:8 205:16 216:23 219:4
**referred** 84:17 110:13 150:6 176:13 188:18 223:18
**referring** 60:9 140:10 180:9 187:21 189:5
**reflect** 44:2
**refresh** 54:15 83:21 120:15 136:4 169:11
**refuse** 40:24
**refused** 99:24 219:9
**regard** 173:3
**regarding** 33:20 123:10 193:6 206:2
**regularly** 71:22
**reimburse** 156:9 156:12
**reimbursed** 13:25 156:15
**related** 16:2 63:14 106:17 149:21 241:10
**relates** 101:15 170:1
**relating** 82:12
**relation** 234:25
**relationship** 46:9 54:25 85:19 149:23
**relative** 135:15
**relatives** 135:16 135:21
**relay** 214:11
**release** 12:19 92:4
**released** 199:3
**relevance** 138:7 138:10
**relevant** 83:2,24 83:25 96:13 99:19 102:1 103:6
**rely** 20:15
**remains** 102:25
**remember** 20:13 22:25 27:12,14 57:18,18 60:3 89:13 92:9 93:16 128:5 134:25 135:11 142:5 148:1 152:3 153:16 186:3 203:14 208:25 211:1,20,24,25 219:6 226:4 229:11

**reminder** 10:12
**remote** 109:6
**remove** 83:18
**rent** 152:13,14,23 152:25 153:2,11 153:13,17,25 154:1,3
**reorder** 129:16
**rep** 89:22,23,23 90:4
**repaired** 13:19
**repeat** 21:5 28:18 36:7 44:18 95:10 228:22
**repeatedly** 223:10
**replaced** 224:18
**reply** 226:4,24
**report** 53:17,18,18 55:6 178:8 187:13
**reported** 1:23
**reporter** 2:5 8:8 12:11 15:25 16:17 16:19 18:8,11,21 131:10 241:3
**reporter's** 23:23
**reports** 59:15
**represent** 1:14,16 16:6 17:8 28:1 31:5,9 52:5 136:15 164:25
**representation** 36:5
**representative** 18:1
**representing** 6:22 30:23 170:5
**republic** 151:25
**request** 23:10 80:9 80:14 81:1 148:10 175:5
**requested** 33:6 63:19 80:16 81:3 226:3
**requesting** 148:12 148:13
**requests** 23:11 25:3 28:13 56:2,3 57:1
**require** 22:6
**required** 14:18 19:11 94:24 242:21
**research** 206:8
**researching** 197:15,21
**reserve** 113:6 236:13
**reserved** 6:7
**residential** 122:22
**resolve** 97:19 106:9
**respect** 6:17 7:12 11:18 12:3 21:21 21:24 26:11 94:21 97:3 98:2 101:7 103:5 108:25 121:21 124:24 129:8 135:7 171:16 206:22 220:18
**respectfully** 14:4
**respective** 6:4,19
**respond** 98:4 170:17 192:17 194:25 195:3,13 201:24 202:1 207:19,22 208:5 213:5 231:15
**responded** 56:25 223:20 231:17
**responding** 56:14
**responds** 194:3,20 201:25
**response** 20:16,18 56:21 100:24 196:2 207:19,20 208:5 209:8 213:22 214:5 226:15 227:17 231:18,23
**responses** 19:1 20:5,6
**responsibilities** 128:9 193:12
**restate** 195:12
**restroom** 78:16 120:7
**result** 12:22 32:10 105:3 168:17 169:8 199:10
**results** 206:20
**resume** 76:4 186:24
**retain** 44:17,22,25 182:18
**retention** 70:2
**retrieve** 58:4
**return** 33:3,9 34:23 44:6,12,16 44:21 131:2 185:6 199:2
**returned** 65:9 131:12 201:5 243:18
**returns** 170:21
**review** 23:14 58:19 80:6,8,14 163:9 169:10 188:12 193:22 243:13
**reviewed** 22:20 182:6
**right** 10:9,9 13:22 14:3,23 18:8 40:14 44:23 51:7 73:19 96:12,16,25 97:4 100:7,13 101:22 118:21 140:3 163:3 177:22,24 182:2 185:16 194:1 195:1 198:1,6 201:4 209:14 217:6,7 225:20,21 233:1 237:6 238:12
**rights** 6:14 236:13
**risk** 102:2
**road** 37:20
**room** 38:24 39:3
**rose** 175:15,16,17 175:18,18
**roughly** 145:9
**route** 21:17 36:17 37:4 104:23 105:21 163:2
**rpi** 122:22,24 123:1 219:7 230:23 231:2
**ruin** 214:9
**rule** 21:19 83:19 97:2,15 98:10 102:5 105:21,21 106:2
**ruled** 27:13
**rules** 2:4 18:2 63:9 96:24 174:5
**run** 117:24
**running** 7:20 118:12 133:14

**s**

**s** 3:1 4:5 5:1,1 67:24,25 76:9 84:4 107:24,24 169:21 175:16,17 190:7 242:5
**salary** 62:14 184:5 193:10 195:15 218:19
**sales** 1:4 16:11 17:10 31:18 36:9 51:4 79:11 81:7,9 92:17,19 94:4 112:5,23 113:11 114:11,15 116:11 127:24 143:18 145:24 184:15 193:4 224:11,13
**salespeople** 114:14 114:21
**salt** 79:12
**sanction** 106:13
**sanctions** 100:25
**sara** 226:12 227:4
**sat** 12:14,15
**satisfy** 13:24
**saturday** 218:18
**savings** 169:4
**saw** 126:12 212:3 228:25 230:7
**saying** 10:25 52:7 109:8 118:8,19 130:9 137:18 145:6 164:1,21 176:8 189:16 191:13 192:17 195:13 196:14 201:24 202:11 203:13,17 204:11 210:17 213:4,11 225:24 226:17 235:12 236:7
**says** 11:16 39:16 60:7 75:1 76:4 115:19 139:11,23 142:18 165:3 171:7,9 190:1 191:2,4 194:6,20 203:6 207:8,21 220:3 222:16 224:25
**scheduled** 7:11
**scheduling** 8:18
**school** 86:19,20 87:4 88:20 90:8 120:1,4 185:3,4,5
**scope** 78:5
**screaming** 218:17
**screen** 180:13 181:8
**scroll** 76:2
**se** 165:10 206:6,10 206:12,13
**sealing** 6:5
**search** 24:11 82:21 83:15
**sec** 209:18
**second** 10:10 25:4 44:5 103:10 166:18 171:6,7,20 187:15,25 199:23 204:24 205:24 214:2
**secretary** 103:17 130:13 185:18
**section** 44:6 137:5 147:15
**sections** 6:16
**security** 93:16,18 93:19,20,21,22,24 94:2
**see** 10:10 33:22 37:15 49:25 55:9 58:10 60:3,4 64:13 65:24 98:13 100:6 142:2,18 145:6 162:1,8 165:16 170:1 172:1 176:17 182:17 197:13 198:17 200:25 203:20 207:8,10 219:23 225:13 227:25 228:7 229:10,20 234:20 236:23
**seeing** 228:14
**seek** 21:7 76:13 77:3
**seeking** 75:4 106:13 162:11,20 165:17 168:4
**seen** 49:5 52:5 55:1 79:14 228:17 229:3
**seized** 26:25
**seizure** 26:18,19
**sell** 125:8 126:15
**selling** 140:9,13,19 148:11
**semicolon** 221:17 225:1
**send** 62:23,24 76:4 80:4 108:11 109:14 129:22,24 142:16,19 148:3 180:16 190:13,14 197:13 199:16 200:10 204:10 230:17,18
**sending** 70:5 190:22 202:10
**sense** 19:3,4 106:24 108:22 183:22 202:19
**sensed** 238:10
**sensitive** 15:4
**sent** 43:1 52:3,9,20 52:22,23 60:23 63:11 64:23,25,25 65:6 69:3,12,23 82:14 120:23 123:12 128:20 130:12 133:12 148:6 164:23 184:7 193:21,24 194:1 197:7,8 200:5,6 201:8 211:4 212:5 218:17 222:4 235:15 236:7 243:16
**separate** 40:21 54:16 72:24 73:1 102:10 108:21 156:15 227:13
**separately** 87:6
**september** 64:20 64:21 66:12 131:3 131:3 151:21,24
**serious** 190:1 197:16,18
**seriously** 204:12
**serve** 201:10
**served** 206:4
**server** 230:24
**servers** 112:25 133:2,4,14
**service** 28:17 29:25 63:15 113:3 113:4 179:16 185:14

**services** 29:1,3,7,8 30:4,8,18 31:9,10 31:14,17,25 32:3 32:10,19,23,25 34:4,20 42:8 44:12 45:17 48:16 49:20,22 50:21,22 50:23 54:6 60:18 64:4 92:15,19 94:10,14 95:7,25 108:13 109:24 111:5 112:4,23 116:10 132:5,12 143:15,17 145:24 159:17 160:2 175:10,13 183:13 183:25 185:22 193:4 199:2 202:22,25 228:8 228:11,24 230:9 230:12 235:7
**serving** 237:2
**session** 9:20 12:5 13:1
**set** 40:19 71:7 102:6 199:18 241:7,14
**setting** 18:5
**settle** 208:6
**settled** 213:23 214:4
**settling** 34:8
**seven** 74:10,11,14 224:14
**seventeen** 180:2
**sexually** 217:19
**shaking** 19:1 203:24
**shared** 80:2 207:23
**sharing** 207:21
**sheet** 129:10,13,15 129:24 157:18 196:8 242:1
**sheets** 130:2
**shifted** 126:10
**shit** 139:14,15 146:24 217:13
**shock** 154:6
**shopping** 129:18
**short** 14:25 22:14 39:11 103:18 120:11 141:15 161:1 181:23 183:12 204:18
**shortened** 196:2
**shorthand** 2:5 241:3
**shortly** 64:3
**show** 23:3,4 47:15 74:23 115:22 136:3 196:10 199:19
**showed** 111:13 187:7 196:7
**shows** 53:19 129:15
**shrunk** 43:10
**shut** 123:21
**shutting** 123:25 131:19
**sic** 134:18
**side** 27:19 64:2
**sign** 43:2 147:22 174:10,11 203:5 236:12
**signature** 35:14 38:1,11 41:6 49:8 241:18 243:13
**signatures** 42:13
**signed** 6:9,11 37:13,15 41:15 42:10,12,18,22 45:3,7
**significant** 8:16
**signing** 42:6 220:11 243:11,19
**similar** 63:10 122:12 173:4 227:4
**simple** 104:19 199:24
**simpler** 31:16
**sincerely** 243:22
**single** 18:2 69:19
**sir** 100:10 243:9
**sit** 91:23
**sits** 51:5
**sitting** 8:12 11:14 11:23 12:9,13 172:15 185:21
**six** 47:25 61:8,9,12 93:13,18 94:9 135:18 155:19 180:22 184:5 195:5,15 233:17
**sixteen** 169:15
**sizable** 28:11 181:13
**skeptical** 126:1
**skip** 218:5
**slime** 238:12
**slushies** 125:3,5,6 125:9,13,16,19 128:9,21 129:5,9 129:20 131:11,19
**slushy** 58:8,15 65:11,13,17,20 126:5,6 131:16
**small** 26:6,8 27:18 27:21 43:8
**smith's** 7:6 98:22 99:9
**smoke** 177:21 232:16
**smoking** 210:10 211:16
**snitched** 217:10
**snoop** 64:25
**social** 24:19
**software** 67:4 71:16
**sold** 139:23 140:1 140:5
**soliciting** 148:9,12
**solutions** 242:1 243:1
**somebody** 148:3,7 174:24 176:11
**someone's** 193:6
**somewhat** 130:6 176:3 223:21
**song** 174:13,14,15
**soon** 13:7,7,17,18 189:1 203:25 209:22
**sorry** 14:13 23:4 36:7 70:16 72:15 87:20 92:18 103:15 114:25 119:19 137:21 170:9 171:8 180:25 187:23 195:6 203:24 218:8 231:20
**sort** 21:17 79:2 91:23 96:19 104:6 215:15
**soul** 139:23 140:1 140:5,9,13,20
**sound** 28:5 215:12

**sounds** 12:16 19:2
**sources** 143:6,9
**sourcing** 207:17
**southern** 1:1 15:19 17:15
**space** 27:5,6 169:21,21 218:16
**spaced** 43:11
**speak** 7:12 18:20 21:20,24 22:2,19 73:8 85:7 164:2 170:8 191:19
**speaking** 40:5 77:2 202:7 211:2 216:22 232:3
**special** 13:14
**specific** 20:8 34:11 110:7 124:1 176:15 216:10 225:11
**specifically** 19:13 26:3 100:24 101:3 101:8 147:11 150:21 189:22 221:13 223:14 234:22
**specifics** 20:9 123:11 230:17
**specify** 43:2
**speculate** 119:15
**spell** 70:17 107:23
**spend** 29:11 125:21 128:23 157:16
**spending** 168:11 168:17
**spends** 168:10
**spent** 167:2 217:2
**spies** 77:6 177:22 177:24 178:1,5 179:4 231:7
**spoke** 11:9 84:24 115:7 132:18,18 132:19,19 178:22 202:12 233:9,10 234:3
**spoken** 57:13
**spouse** 135:22
**spread** 44:13 129:10,13,15,24 130:2 157:18
**spreadsheet** 157:10
**sprint** 134:14,14 135:5
**spy** 75:12 128:10 128:22 178:15,17 178:24 232:5,7
**spying** 121:18,18 178:7 179:2,3 231:7
**square** 9:6 10:24
**staff** 65:23 112:15 112:16 127:5 131:21 186:5
**stalking** 212:4
**stamp** 52:16 53:24 54:3 63:20 180:9 187:16 196:25 207:6 208:24 221:13
**stamped** 169:20 171:7,20 180:8 195:21 208:19,23 209:17 218:6
**stamps** 181:12
**stand** 57:3
**standard** 104:11
**standings** 59:7,9 59:10
**star** 91:17,18,21 92:15
**start** 9:4 11:1 21:10,16 67:21 70:21,24 71:1,3 142:8 179:16 182:5 237:2
**started** 14:6 27:23 74:23 75:19 78:6 91:2 110:11 111:5 111:15 132:5 213:4 236:3
**starting** 7:21 91:20 131:9 162:1 166:9 192:6 196:24 204:24 207:6 208:24 213:21
**starts** 131:10
**stash** 170:19
**state** 2:6 16:6 24:15,15 39:18 93:2,4,9 101:18 216:20 222:6 227:16 241:4
**state's** 102:17
**stated** 35:22 76:8 120:25 186:17 205:21 221:19
**statement** 20:15 38:20,22 44:3 92:13 96:23 174:2 205:18 213:5,21 229:11
**statements** 18:13 187:20 188:22 189:5,6,10,19 226:13 227:5 228:5
**staten** 92:22
**states** 1:1 15:18 51:7 67:2 86:10 86:12 101:4 131:12 194:4 197:1
**stating** 193:25
**status** 62:3,4 198:21
**stay** 29:17 98:19 167:15 168:4 212:7
**steal** 65:21,22 225:2,3,3,3
**stealing** 65:1,25 120:24 198:24 214:19,25
**step** 22:19 28:19 38:24 39:3 79:4 89:10 222:3
**steph** 188:18
**stephanie** 84:1,12 132:18 150:13,14 151:5 160:10 165:23 183:3 188:19 196:12,12 200:14 201:24 207:21 214:4
**stepping** 39:7
**stewart** 1:8,9,11 1:12 2:1 4:3 9:16 9:17,20,21 10:20 11:20 12:25 14:5 15:16,17 16:15 17:1,6 35:1,5,7,8 36:21,23 37:14,16 37:18 38:23 39:2 40:16 41:4,5 43:19 47:16,17 48:2,3,22,24 49:1 49:2,13 52:7,19,25 53:3,5,6 56:11,12 56:17,22 58:16,17 60:1,11,13 61:8,9 61:11,12 71:15

74:10,11,13,14 76:19 79:2 82:21 98:16,25 99:1,16 99:21 100:10,22 101:9 103:17,20 103:23 104:1,12 105:17 107:13 120:15 133:20 136:11,13,14 138:12,21,22 140:12,24 141:1 141:19,20,24 143:2 147:2,3,7,8 150:16,17,19,20 161:5,6,11,12 162:23,24 163:4,5 164:8 166:4,6,11 166:12 167:11,18 169:14,15,17,18 170:3 171:1,10,20 175:18 180:1,2 181:9,11 182:2,3 195:24 197:9 198:22 199:1,20 200:3 202:9 203:18 204:22 205:21,25 215:13 219:16,17 224:2,5 224:9,22 235:5 240:7 242:3,4,20 243:6,8
**stewart's** 12:1,22
**stipulated** 6:3,18
**stipulations** 6:1
**stop** 14:24 21:12 37:2 41:1 174:6 225:1,25
**stopped** 45:22 179:18 200:20
**stores** 125:8
**story** 52:23 221:7
**straight** 39:25
**strain** 168:12
**street** 17:2 86:22 93:3 108:1 206:11
**strike** 33:15 37:25 51:19 54:10 57:2 58:23 67:16 73:14 86:4 92:13 94:25 108:22 112:21 116:22 124:4 127:19 128:7 129:7,12 132:9,10 142:12,22 144:1 144:16 146:10 151:8 154:23 156:9 157:19,23 162:11 170:22 173:12,23 174:23 175:1 176:11 182:12,21 185:9 202:21 203:4 208:18 215:23 220:20 222:16,24 223:17 231:3
**strong** 179:15 197:22
**struggles** 152:8
**struggling** 144:13 144:14 152:6,7 168:7,21 238:15
**strupinsky** 3:2 124:11 236:10
**stuck** 7:19 10:21 10:25
**student** 155:8,10
**study** 90:16
**stuff** 59:16 82:15 113:7 125:23 130:4,14 137:11 154:19 159:19 173:5 185:21 186:15 188:25 191:8 194:18 202:25 207:9,12
**sub** 49:11
**subject** 12:21 104:16 106:21
**submission** 14:14
**submitted** 14:1 186:24
**subpoena** 124:21 208:22
**subpoenas** 124:25 208:19,20
**subscribed** 242:21
**subsequent** 42:9 95:7 96:25 101:23 134:18 135:2 233:5 234:19
**substantial** 24:6,8
**successful** 165:22
**suck** 224:15,17
**sudden** 79:3
**sued** 81:23 84:17
**sugar** 129:14
**suggest** 106:9
**suggested** 193:10
**suggestion** 106:8 193:13
**suing** 25:23 202:3
**suite** 3:3 243:1
**summary** 46:23 48:13 51:20 52:8
**super** 197:3
**supplement** 56:20
**support** 208:13
**supposed** 124:15 139:18 142:18 191:20 194:22,23 195:1,4,14,14
**supreme** 2:3
**sure** 7:16 12:4 24:5 28:19 29:5 33:18 34:5,15 41:24 43:3 44:19 45:2 46:1,13 51:24 53:25 55:8 55:24 56:4 57:22 59:25 61:1 65:21 66:16,17,18 68:23 70:17 72:11 78:6 79:17,22,25 81:4 82:14,19 83:17,21 84:16,23 89:12 91:4,22,24 92:16 109:19 115:2 116:4 118:3,7 125:21,24 126:16 128:23,24 131:4 131:18,24 133:17 135:12 136:3,5 137:19 141:11 143:10 144:19 148:7,21 151:19 152:1,12 154:12 154:16 155:12 157:2 162:9 165:4 165:15 168:18 169:6,6 171:3 173:19 174:15 175:21 176:1 186:12,25 187:22 188:21 190:24 200:15,17 201:12 202:24 203:8,23 207:13 208:15 211:5,13,18 213:9 217:2 220:11,15 221:9 222:1 223:22 228:23 229:5,10 233:12

235:4 237:15
**surprise** 146:6,14
**surrogate** 121:7 121:10,14,21 123:21 219:6 229:15 230:23
**survive** 144:15
**suspect** 96:6
**suspected** 226:2
**swear** 16:17
**switch** 207:24
**sworn** 16:18 17:3 240:9 241:7 242:21
**symbol** 174:8
**system** 53:17,18 111:14 124:19 180:7 196:5
**systems** 90:22,23 91:1,7,10 92:5,6 110:11,19,22 111:17 112:3

**t**

**t** 4:5 5:1 51:10 81:18 84:3 107:24 107:24 133:10 134:16 169:21 190:7,7 197:8 203:6 219:25 241:1,1
**table** 15:10
**tag** 173:24 174:1,4 174:6,8,11
**take** 22:4,8 34:10 35:10 48:4 54:1 58:18 73:18 74:5 74:15 78:14 79:3 96:9 137:13 138:23 141:21 143:16 144:7 147:13 149:4 151:19,21 154:3 154:19 157:7 160:18,22 161:13 163:7 169:22 188:6 193:22 195:19 199:20,22 204:8 206:20,24 213:16 219:13 224:8 225:4 230:19 231:21
**taken** 2:3 13:10,16 13:20 14:25 22:14 26:2 35:23 39:11 120:11 136:16,17 141:15 161:1 181:23 204:18 243:10
**takes** 104:14 155:5
**taketh** 56:1,3 57:1
**tal** 51:9,10 133:8,9
**talk** 18:19 79:16 81:17 82:5 85:12 85:12 145:15 168:13 169:1 184:8 235:2
**talked** 57:11 125:1 173:11 178:11 223:4,14 228:19 236:20
**talking** 9:7 27:23 29:3 137:24 144:16 183:3 191:11 192:9,12 192:19 200:20 201:1,7 214:14 222:4 229:19
**tally** 130:3
**tame** 211:1
**tan** 174:21,24 175:2,4,7 225:16 225:21 226:5,11 226:20,23,24 227:8
**tches** 224:17
**tci** 87:3,21,22,24 88:8 90:9,11,14,17 90:21
**tdi** 87:20
**team** 129:22
**technical** 87:3,23
**technically** 144:22
**technologies** 1:3,4 1:4 16:11,11,12 17:9,10,10 31:4,20 33:25 34:1,4 35:3 36:9,10 42:9 48:14,17 49:14,21 50:11,13 51:4,21 52:8 54:24 55:7 55:16 57:17 58:8 59:23 66:2,4,14,20 66:22 67:2 68:13 68:19,22 69:1 70:6 79:10,11 81:8,10,20 84:2 94:4 95:17,17,21 112:5,5,23,24 113:11,13 114:11 114:15 115:8,20 115:24 116:5,11 116:11,12,16,18 116:23 117:7,14 117:20,20 121:7 121:10,15,21 123:3,21 126:18 126:19,23 127:2 127:10,12,15,16 127:20,23,24 132:12,14 133:13 143:18 145:24,25 159:17 184:15,16 184:21 193:4 196:16 202:6 224:12,13,14 229:14,15
**technologist** 31:18
**technology** 88:16 89:4
**ted** 67:24 70:15 117:15,17,24 118:1,6 124:16 209:22,23 210:4 210:14,22,23 211:8,12,17,19,22 212:2,3 214:5,7,8 214:12,18 217:10 217:12,14,15,21 218:20 238:11,14
**tehada** 115:19,21 116:24 117:1
**telephone** 71:24 72:2,12,17,20 73:20 82:5 103:1 135:6 136:18,24 137:7,9 142:5 161:15,17,21 164:7 182:22,24 220:3,6 234:13
**tell** 20:12 24:11 35:10 48:5 49:11 52:16 55:5 69:11 82:2 85:6 111:8 119:15 124:4 130:10,24 137:14 142:5 149:6 150:22 157:8 189:1 191:14 197:6 211:3 217:10 218:2 222:11
**telling** 76:25 145:4 146:23 169:7 191:5,16 194:10

213:7,10 223:7 236:11
**ten** 140:25 141:1 141:20
**tenant** 152:21,22
**term** 30:17 72:25 140:9 150:6 174:18 205:12 212:11 222:17,19 222:21 236:20
**terminated** 46:4 111:1,3 191:19
**terms** 41:12 42:11 70:2,11 86:17
**test** 20:23
**testified** 17:3 18:12 42:1,3 44:10 45:5 62:18 64:3 153:5 228:25 229:6,22 231:6
**testify** 30:13 208:8 229:12
**testifying** 6:22 18:7
**testimony** 17:20 18:6,6 21:8,23 40:17 110:19 116:23 128:8,20 227:12 230:2 241:8
**texas** 34:8
**text** 79:18 81:14 82:7 85:15,17,20 85:23 136:16,19 136:21,23 137:2 139:11 142:16 147:12,12 148:2 166:19 167:14 180:8 182:6,10,14 182:15 187:15 195:25 217:4 233:25 234:1,17 234:20,25
**texted** 85:14
**texts** 4:14,15,16,17 4:19,21,22,23,24
**thank** 7:3 10:11 14:22 16:16 24:24 72:11 83:17 106:19 107:1,3 173:19,21 176:25
**theft** 121:1 122:5 197:5
**thereto** 6:17
**thing** 100:11 113:3 122:5 133:11 135:7 181:15 189:13 215:6 219:5,6 236:5
**things** 18:3 59:12 59:15 68:16 101:6 101:16,19 124:17 135:7 142:17 168:8 172:15,17 173:4 179:23 186:9 187:7 188:14 197:2 199:9 209:6 210:5 210:7,9 211:20 212:6 214:17,20 214:21,23 215:25 216:3,7 219:7 227:13 228:17 232:20 235:21
**think** 13:3,4 17:17 43:4 44:15,20 45:4,14,16 46:12 46:16 47:13 50:18 53:18 56:19 58:15 60:4,15 62:5,11 63:20 69:24 77:18 78:3 80:2 86:9,16 87:25 89:23 90:1 90:24,25,25 91:3 106:7,23 109:19 109:20,20 110:16 111:11 143:13 146:4 148:10 151:25 165:24 167:24 172:6 173:17 174:18,19 176:16,22 179:10 179:13 180:24 185:13 186:4,7,12 186:24 199:9 203:9,24 204:3,9 205:6 211:10 218:8 219:1,11 221:9 223:9,10 231:3 232:12,18 232:25 234:3,6 236:16,21 237:14
**thinking** 164:22 207:15
**thinks** 202:4
**third** 38:16 49:7 159:13 164:15,20 166:1,8 200:5
**thirteen** 161:6,9 161:10
**thirty** 87:13 243:18
**thoroughly** 68:18
**thought** 9:24 11:5 13:5 63:22 141:3 144:19 146:1 177:11 180:5 187:19 197:9 198:24 209:13,15 238:11
**thoughts** 145:20 206:19
**thousand** 152:4,11 152:12 155:7 158:5,6,17,18,20 192:15
**thousands** 69:12
**threatened** 173:9
**threatening** 236:19
**threating** 173:6,7
**three** 22:24 27:13 48:23,24 49:2 52:13 64:10 67:11 128:1 172:6,8,22 172:23 180:22 216:16 217:6 223:11
**throw** 75:24 215:18
**throwing** 217:1
**throws** 29:24
**thursday** 9:23 13:3,6
**tickets** 60:15 113:6 185:15
**tightly** 43:10
**till** 131:11
**time** 6:8 7:4 9:8 10:3 11:4,13,21 12:12,14,23 14:3 14:11,19 15:2 16:18 18:21 20:21 22:2,4,6,8,12,16 28:16 29:6,12,16 30:17 32:6 33:5,6 38:17 39:7,9,13 40:21 42:25 52:16 60:21 63:5 64:22 65:5 66:7,9,11,15 70:19 71:5 78:8 78:21,25 80:9 84:24 85:3 90:11

90:11,12 94:9 97:20 107:18 110:4 111:14 112:1 116:12 120:9,13,16,20 126:21 131:12 132:17 133:19 141:13,17,19 143:11,14 144:18 145:9,18 153:13 153:16 156:16 159:21 160:2,24 161:3 170:20 171:2 178:21 181:21,25 183:12 192:10 195:13,21 196:6,24,25 197:17 199:13 200:14 201:13 202:7,23 203:18 204:16,20 206:21 206:24 207:6 208:16,18,24 209:16 210:22 211:1 215:19 218:6 220:13 221:13 224:4 228:14,23 231:1 233:9,10 234:16 234:17 236:2,6 238:25

**timely** 9:9 12:2

**times** 9:6 10:24 19:8,12 27:13 85:21 89:6 100:23 101:2 110:7 111:17 150:7 159:25 171:2 199:12 223:11 228:19

**tired** 126:14

**title** 91:4,4 93:9 108:10 118:23 129:4

**today** 8:18 10:4 15:25 17:20,23 18:10 20:6 22:21 22:23 40:22 45:10 73:25 107:10,11 116:23 128:8,20 182:7

**told** 9:21 12:6 13:4 37:4 44:12,16,21 77:1 82:1 84:16 114:18 163:1 197:13 206:18 217:15,16 223:20

**toll** 243:2

**tolls** 156:12,15

**tomorrow** 14:2 107:10 194:1,5

**ton** 34:16 67:4

**top** 146:11,18

**torrez** 68:10,11,12 68:18 237:20,21 237:24

**total** 159:7,9,11 172:7 209:23 216:16,21

**totals** 129:23

**touch** 11:17 21:15 68:16,24 154:18

**touched** 184:14 189:17

**tpo** 1:9,13 35:4,17 35:19 36:2,19 37:3,13,25 38:2,2 38:12 147:23,25

**track** 18:22 72:19 136:8

**trademark** 122:19 202:18,23,25 203:1 206:1 228:16 232:22 233:2

**trademarks** 202:16

**traffic** 7:20 9:5 10:22 11:1

**train** 112:12,14,17 187:6

**trained** 187:9,12

**transcript** 2:1 6:9 18:11,13 19:4,5 97:8 100:1,3 102:15,21,25 105:5,13 240:2 243:10,15

**transcripts** 105:8

**transfer** 93:6 147:19

**translate** 19:5

**trap** 199:18

**travel** 156:16 238:18,21

**traveled** 67:10 120:17

**tremendous** 24:23

**trending** 174:2

**tria** 58:6,10

**trial** 6:6,8,12,20 27:11 105:9

**tried** 58:2 142:6

**trip** 65:7,8 67:19 151:20,21,22 237:1

**trivial** 12:15

**true** 17:22 19:25 20:4,5,17 213:13 240:3 241:8

**trump** 216:3,6,6

**truth** 40:4,5 212:19,24 213:1,2

**truthful** 17:20

**try** 36:25 39:17 40:9,12 106:9 107:12 122:15 177:2 179:22 194:6,21 202:1,8 206:21 218:13 227:9 231:10,13 238:13

**trying** 13:13 58:4 60:4 71:12 77:6 122:1,1 162:13 163:1 190:12 207:14,14 212:8,9 225:13 227:2,3 235:5

**tunnel** 156:19

**turn** 15:7 204:23

**turned** 24:17,18 24:19,22 83:12 200:2

**turns** 7:24

**tutorial** 196:1

**tv** 222:14

**twelve** 150:17

**twenty** 224:5

**twice** 79:14

**two** 18:17 25:23 26:10 29:11 41:20 42:5 44:1 47:16 47:17 48:3 52:14 52:15 64:10 76:5 80:2 88:11 92:3 94:23,24 119:23 128:1 130:19 139:21 153:4 160:6,7,9 166:5,14 180:24 191:4,6

196:7 202:4 205:6 210:18,19 216:15 216:24 217:4 223:19 224:17 227:13
**type** 26:17 40:25 53:13 54:25 93:21 104:15 108:5 109:15 113:3 125:10 137:25 147:10 169:4 221:16 231:13,21
**typed** 56:7,9
**typical** 104:25
**typically** 19:14 104:16
**typo** 219:12
**typos** 167:16 202:2

**u**

**u** 5:1 16:9 81:5 84:4 95:23 188:23 190:7 197:1 208:5 217:12
**u.s.** 51:14 53:1 64:2 66:2,4,20,22 68:13,19,22 69:1 77:5,10,20 78:8 117:20 118:21 123:10 127:7,12 127:16,23,25 131:2 132:14,15
**uber** 95:17,22,23 101:5,11,14 107:14 143:3 144:4 156:9 157:5 157:7,12 159:4,7
**uh** 19:2,3,3 53:10 65:12 76:6 80:11 88:3 94:12 95:24 114:7 129:1
135:24 140:21 145:16 162:22 167:19 189:24 198:2
**uhm** 208:5
**ulloa** 81:5,6 218:21 233:7,21
**ultimate** 209:25
**um** 9:18 23:13 27:12,12,18 48:1 92:11 122:10 159:11 210:2
**un** 105:7
**unable** 11:12 15:9 101:10 145:17
**unclear** 8:19
**uncomfortable** 96:7
**understand** 12:8 13:11 14:15 15:8 18:14,22 19:6,19 19:22 20:1,19,25 21:3 25:19 28:10 29:18 30:22 35:16 39:18,19 40:1,11 40:11 47:22 96:9 98:3,9 118:20 119:23 122:17 124:18,21,24 125:24 128:16 130:5 134:24 136:19 142:4 165:3 166:13 201:12 206:1 226:20 235:1,6
**understanding** 42:7 43:22 67:1,6 119:9 140:13,19 212:10
**understands** 30:5
**understood** 20:16
**unfortunately** 43:13 225:14
**unit** 15:14
**united** 1:1 15:18 51:6 67:2 86:10 86:12 127:23 131:12
**university** 3:3
**unnecessarily** 9:8
**unofficially** 91:11 109:23
**unplug** 181:16
**unreasonably** 106:5
**updates** 194:13
**upset** 145:13
**upsetting** 176:9 201:10
**upstate** 162:2,3
**use** 14:2,19 18:25 20:21 36:14 78:15 100:17 120:7 128:15 144:23
**utilities** 154:7,9
**utilization** 173:12
**utilize** 28:23 48:7 71:15,22 72:10,25 99:20 147:25
**utilized** 6:13 196:15 236:20
**utilizing** 30:16 203:18 231:10
**uttered** 232:2

**v**

**v** 9:16 15:17 71:16 84:3,4 107:24 202:5 242:3 243:6
**vacation** 64:13 201:16
**valdez** 84:1 183:4
**van** 175:21
**vaneeszula** 84:3,4 84:12
**varies** 91:2 153:20 154:22 159:4
**various** 28:5 32:9
**varuk** 173:2 175:8 231:9
**vehicle** 26:17 156:3
**velez** 183:2 188:20
**vender** 93:23 125:10
**veneeszula** 183:4 184:14 218:21
**vent** 217:23,25
**verbal** 18:24 19:2
**veritext** 15:24 16:1 242:1 243:1 243:7
**verizon** 134:17
**version** 146:5
**versions** 105:7
**versus** 29:2 98:25
**viber** 71:16,20,25 72:3,12,16,20,25 73:5 74:6,8 79:7
**video** 15:2,15 19:3 22:12,16 39:9,13 78:21,25 80:2 120:9,13 141:13 141:17 160:24 161:3 181:21,25 204:16,20 238:25
**videographer** 3:8 7:1 8:8 10:12 12:10 14:23 15:1 15:24 16:16 18:9 22:11,15 38:25 39:4,8,12 78:20,24

120:8,12 141:12 141:16 160:23 161:2 173:17,21 181:18,20,24 204:15,19 238:24
**videos** 80:23 81:2 83:23
**view** 146:21
**views** 215:15,18
**violate** 229:2,4,7
**violated** 228:20 230:6
**violating** 229:17 229:25 230:2 236:11
**violation** 97:15
**violations** 54:17
**voice** 44:4
**voiceless** 1:3 16:12 17:10 31:4 224:13
**voted** 215:21
**vp** 53:23
**vs** 1:7

**w**

**w** 132:24 243:1
**wage** 146:2,7,10
**waisting** 97:20
**wait** 14:16 23:20 213:24,24
**waiting** 8:12,25 11:23 12:9,13,15 172:15 214:8
**waived** 6:6,15 243:12,20
**walk** 66:1 193:16 194:17 197:10 235:14 236:24
**walked** 237:1
**want** 8:25,25 19:24,25 20:10 23:25 24:15 29:10 29:17,24 30:15 32:23 36:22 39:6 40:25 43:7 52:12 59:10 66:8,25 75:2 83:11 86:7 96:3 97:16 100:11 106:12,17 107:5,8 119:14 132:8 133:17 136:25 141:8 142:10 149:8,9 173:20 178:24 180:10 190:2,14 191:9 199:7 200:23 203:23 206:17,18 208:6 217:3 231:14 236:21,22 236:23,23 238:20
**wanted** 63:18 73:8 75:16 78:3 151:19 189:14 193:11,16 194:17 226:11,24 235:6
**wanting** 197:10
**wants** 8:15 56:19 75:7 78:1 103:22
**warned** 147:5
**wasted** 9:8
**wasting** 202:6
**watch** 125:20,22 222:14
**way** 11:19 14:16 29:1 31:12 35:25 49:20 52:10,21 63:21 91:12 99:23 102:23 125:15,18 126:17 129:18 147:12 167:4 172:19 176:5 179:19 188:6,15 195:8,20 205:7 213:14,14,14 221:18 241:12
**ways** 18:17 109:3
**we've** 11:23 12:9 12:11 35:22,23 41:6
**wearing** 15:4,11
**web** 76:9,10
**webb** 132:24
**website** 63:23
**wedding** 233:10
**week** 8:17 233:14
**weekend** 196:7
**weekends** 196:7
**weekly** 129:23
**weeks** 64:10 67:11
**weigh** 193:15
**weird** 86:9 215:12
**welcome** 199:11
**welcoming** 199:17
**went** 26:25,25 27:2,12 64:5 71:1 87:6 88:19 111:13 111:23 120:1,3 128:19 151:25 175:15 185:3 201:16 206:12 217:11 230:1,23 232:10
**west** 17:1 86:20
**wet** 123:9,9
**when's** 153:13
**whereof** 241:14
**whispering** 15:5
**wife** 149:24 150:6 214:20,24
**wife's** 149:25
**willing** 174:20 231:12
**win** 205:19 208:25
**wind** 7:21
**wires** 15:10,11 112:19
**wisely** 14:3
**wish** 167:14 199:18
**witness** 4:2 6:22 8:22 9:11 16:17 16:18 29:13,23 30:11 38:21 40:2 40:8,14 47:12 48:1 56:14 70:20 84:19,21 95:11 120:2 137:22 138:18,20 141:3,7 177:1 187:24 213:18 218:10 239:2 240:1,7 241:6,9,14 242:4 243:8
**woman** 178:10
**women** 211:17
**woo** 110:17
**word** 128:15 144:22 213:12 215:3 232:3
**words** 18:25 56:5 122:20 129:17
**work** 13:9,18 18:3 50:16,19 62:19 63:6 66:3,5,8,14 67:1 75:2,4,8 78:13 90:15 91:10 94:15,17,19 95:4 98:13,14 108:16 110:2,16 118:5 129:25 133:12 170:12 185:20,24 187:4,9,11 234:5
**worked** 50:18,19 57:17 58:7,11,14

59:14 75:11 77:8 77:9,10,19,22 81:9 81:20 89:17 91:13 92:16,24 93:17 94:3 127:9 130:23 130:23 139:21 228:10 229:21
**working** 23:17 24:14 26:22 41:20 45:23 89:11,18,24 90:6 93:15 96:12 96:16,21 100:13 103:23 109:17 110:18 111:12,17 126:14 143:11 198:5,8 199:2 210:22
**workplace** 96:9
**works** 28:24 46:11 77:3 96:3,7 98:2 101:14 103:21 104:5 110:17 124:19,22 166:23
**world** 210:15,16
**wow** 92:25 200:18 221:18
**write** 102:20 171:23 174:3 195:24 209:22 217:10 218:13 221:7,10,14
**writes** 187:19 188:21 189:25
**writing** 14:20 200:9
**writings** 197:23
**written** 148:22 222:24
**wrong** 44:11 130:6 130:10,18 213:24 215:3 218:9 225:1
**wrote** 61:22 124:5 131:20

**x**

**x** 4:1,5 182:23
**xxx** 72:4,4 135:7,7 135:10,10,11,13 135:13 136:18,18 139:4,4 182:23,23 220:3,3
**xxxx** 72:4 135:7 135:10,13 136:18 139:4 182:23 220:3

**y**

**y** 81:18 95:19
**yeah** 22:8 23:13 23:15 24:1 25:18 26:20 27:10,22 40:2 57:9 64:15 65:8,18 67:8 69:20,25 70:7,20 73:10,17 74:5,5,8 76:1 77:14 78:18 79:19 82:1,6,8,10 82:12 83:10 84:8 84:13 85:22 86:24 88:23 90:25 91:18 92:6,8,16 93:25 95:11 96:4 108:4 109:20 110:17 111:21 115:22 117:23,25 118:13 118:15,17 119:8 120:2 122:17,20 122:23 123:22 125:4,11 127:4 128:5 131:6 133:5 134:14,22 135:11 135:20 137:12 138:20 139:8 140:6 141:11 142:15,21 143:4 144:25 145:6 147:1 148:5,24 149:20,22 153:8 154:8 155:15 156:2,4,22 157:24 158:22 159:12,15 159:18 160:4,20 161:16 162:6,8,17 162:17 163:11 164:9,13 165:3 168:15 175:24 176:16 177:1,25 178:6,16,18 179:6 179:7 181:19 182:11,20 184:10 185:20,21 187:18 189:6 190:23 191:14,24 193:2 195:23 196:17,23 197:12 200:23 202:17 204:6 205:9 206:14 207:11,18 208:2 208:10 209:10 210:20 211:18 212:18,25 213:20 218:1,4 220:12 222:22 225:19 227:10 229:19 230:22 232:6,8,10 233:8 234:5 238:3 238:7
**year** 53:25 87:24 88:10 89:1 92:2 109:21 134:13 135:3,5 143:23 145:15,21 146:7 146:15,20 151:16 155:18 162:11,13 168:10 171:11 186:5,6,7,11 215:22 217:12 233:6
**years** 41:21 42:5 88:11 92:3 94:23 94:24 130:24 134:22 139:21 145:23 155:13 209:1 210:18,19
**yelling** 218:17 219:1
**yep** 148:16 161:14 200:4,8 201:19 218:25
**yesterday** 9:21 12:5 142:7
**yesterday's** 12:25
**yoledy** 150:9 155:1
**york** 1:1,9 2:6,8,8 3:6,6 9:5 15:19,22 15:22,24 17:2,2 27:21 108:1 146:3 146:7,11 156:20 162:4 206:13 241:4
**yup** 42:16 44:14 53:15 56:6,8 147:24 151:17

**z**

**z** 84:4
**zelle** 147:19
**zero** 76:17 204:25 205:2

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

**E**
**X**
**H**
**I**
**B**
**I**
**T**

**B**

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF
NEW YORK
Civil Case No: 7:16-cv-09337-KMK-LMS

GEORGE KALTNER (individually), COMPLIANT DIALER, INC d/b/a AVATAR OUTSOURCING, VOICELESS TECHNOLOGIES INC; SALES TECHNOLOGIES, INC (defunct) and AVATAR TECHNOLOGIES, INC (defunct),
Plaintiffs,

-vs-

DAVID STEWART (individually); DAVID TPO, LLC (a New York Limited Liability Company; AVATAR DIALLER, LTD, (a foreign for-profit entity); DIALER360, LTD.(a foreign for-profit entity); PRIMO DIALLER, LTD (a foreign for-profit entity, DAVID STEWART (in his official capacity as an agent of Avatar Dialler, Ltd, et al,
Defendants.

DEPOSITION OF: EDIVICT VALENZUELA

---

TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before DEBORAH A. GAUGHAN, a Certified Shorthand Reporter and Notary Public of the State of New Jersey, License No. X100687, held at the office of STEVEN SCHUSTER, ESQ. 75 Essex Street, Hackensack, New Jersey, on June 18, 2018 commencing at 1:40 p.m. Job No. NJ2944365

A P P E A R A N C E S:

LURIE STRUPINSKY LLP
Two University Plaza
Hackensack, New Jersey 07601
BY: JOSHUA M. LURIE, ESQ.
Attorneys for the Plaintiff

STEVEN SCHUSTER, ESQ.
75 Essex Street
Hackensack, New Jersey 07601
Attorney for the Witness



I N D E X


WITNESS PAGE
EDIVICT VALENZUELA

EXAMINATION BY MR. LURIE 4


E X H I B I T S

NO. DESCRIPTION PAGE
No exhibits marked



EDIVICT VALENZUELA, 186 Wiermus Street, East Orange, New Jersey, having been duly sworn by the Notary Public, testified as follows:

EXAMINATION BY MR. LURIE:

Q. My name is Joshua Lurie. I represent a client, Dialer Avatar Technologies, Sales Technologies, Voiceless Technologies and George Kaltner in this matter.

MR. LURIE: Before we begin, I have to make a preliminary statement on the record. I'm going to ask some preliminary questions and some instructions.

The first thing what I want to make sure is on the record here is that the attorney for David Stewart, Jacob Chen was notified that this deposition was taking place today. He earlier this morning notified me he would not be attending today. He has not challenged your deposition. He has not put any opposition to your deposition. He just decided not to come here.

Q. Before we begin, have you ever been deposed before?

A. No.

Q. Are you currently under the influence of any drugs or alcohol?



A. No.

Q. Will you able to provide me with true and complete answers today?

A. Yes.

Q. I'll go over some of the rules. It has two things, get you more used to the question and answer process and it will also go over how they work the deposition.

A. Okay.

Q. This is a deposition. While it's in an informal setting which is your attorney's office, you're here to provide testimony. This testimony is the same as if you were testifying in court.

The court reporter seated to my left and your right will be taking down everything we say today and will create a transcript which could be read in court as though you testified to a statement in the transcript. Do you understand?

A. Yes.

Q. Now, because this is being recorded by the court reporter, it's very important a few guidelines are met.

The first is we do not talk over one another. Please allow me to finish my question before providing an answer. If you speak at the same

time, the reporter cannot keep track of the discussion. Do you understand?

A. Yes.

Q. Now, in addition, all of your answers must be verbal. That is with words, yes, no. Please not use nonverbal responses such as shaking your head or nodding or using verbal sounds that are not words such as uh-huh or uh-hum. These noises are not translatable properly in the transcript. Do you understand?

A. Yes.

Q. At times your attorney may object to my question. Most often these are objections to the form of the question. They're largely to preserve the record. You're still required to answer the question if you can.

The only time you should not answer my question is if you were specifically directed not to do so. Typically this is because of a legal privilege. It's possible we attorneys may have a brief discussion either within your presence or rare circumstances after you excuse me so we can discuss it outside of your presence. Do you understand?

A. Yes.

Q. If you cannot provide an answer because



you did not understand the question, let me know. It's very likely I asked you a question which is confusing. We don't want you to be confused. We want you to be able to provide true and complete answers. Do you understand?

A. Yes.

Q. Also, when answering questions please provide me with a complete response. Okay?

A. Yes.

Q. If I ask you for something specific, you don't know, you cannot provide me with any information, do not guess. One thing we do not want are any guesses. You can estimate if possible. Also, if you do not know the answer, that's perfectly acceptable as well.

Please remember if you provide an answer, we will rely upon your statement so we'll consider your response being you understood the question, that you're being precise and that you are being true, accurate and complete in your responses.

If at any time you need to take a break bathroom or any other reason, please let me know. The only rule is if there's a pending question I ask that you finish answering the question and we can take a break.



A. Okay.

Q. Final rule is once we begin, not to speak to your lawyer about anything related to this deposition until the deposition is over.

You're under oath when providing testimony. So before we truly begin the questions, have you had an opportunity to speak to your lawyer with respect to this deposition?

A. Yes.

Q. Do you need any additional time to speak to him before we begin?

A. No.

Q. Do you have any questions for me before we begin?

A. No.

Q. Have you reviewed any documents in order to prepare yourself for today?

A. Yes.

Q. What did you review?

A. I reviewed the of the text messages.

Q. While I haven't marked it specifically, in front of you is a a stack of papers previously indicated and identified as Stewart-17 in another deposition that has Bates stamp beginning at ST IP 003536 ending in Bates stamp ST IP 003673.



Does this appear to be the same documents that you reviewed?

A. Yes.

Q. Did you review any other documents?

A. Yes.

Q. What other documents did you review?

A. The recording of the phone interview that we had.

Q. You were asked today to bring some additional documents; is that correct?

A. I'm not sure, no.

MR. SCHUSTER: Just for the record upon receiving request for additional records, these were provided to me and we have them available today.

THE WITNESS: I'm sorry.

MR. SCHUSTER: We haven't numbered these pages or anything like that other than they're present for today.

Q. Now, these are a bunch of e-mails; is that correct?

A. Yes.

Q. Did you review these e-mails?

A. No, not really.

Q. Can you just briefly tell me what you did to collect these e-mails that you provided to

Page 10

your attorney?
A. Yes. I went into my e-mail application and I searched for David, all of the the e-mails that will come up and then I forward each of the ones that I got to my lawyer.
Q. I want to make sure we're on the same page. When you say David, we're talking about David Stewart?
A. Correct.
Q. Some of these questions are going to sound a little bit weird. I apologize. These are some of the standard questions attorneys ask at depositions.
Have you ever been convicted of a crime?
A. No.
Q. Have you ever been involved in any civil lawsuit?
A. No.
Q. You were not born in the United States, correct?
A. Correct.
Q. This is not for what it's going to sound like, are you a citizen?
A. Yes.
Q. When did you to the United States?

Page 11

A. 2006.
(Discussion off record.)
Q. Did you attend high school in the United States?
A. Yes.
Q. What high school did you go to?
A. Christopher Columbus High School.
Q. Where is that located?
A. In the Bronx, New York.
Q. Where is that located?
A. I'm not sure. Sorry.
Q. Did you graduate from high school?
A. Yes.
Q. What year did you graduate?
A. 2008.
Q. Before coming to the United States in 2006 where did you reside?
A. In Puerto Rico.
Q. So you're Puerto Rican?
A. No.
Q. You're not Puerto Rican?
A. No.
Q. When are you originally from?
A. Dominican Republic.
Q. You went from the Dominican Republic to

Page 12

Puerto Rico?
A. Correct.
Q. What year did you go to Puerto Rico?
A. 2005.
Q. Did you go to high school in Puerto Rico?
A. Yes.
Q. Did you graduate high school in 2008? Did you attend college or university?
A. Yes.
Q. Where did you attend college or a university?
A. I attend Monroe College in New York.
Q. Did you graduate?
A. Yes.
Q. What year did you graduate?
A. 2011.
Q. What degree did you receive?
A. I received a business administration, public accountant.
Q. Is that a bachelors degree?
A. Yes.
Q. After you graduated from Monroe College, did you attend any other schooling?
A. No.

Page 13

Q. After you graduated from college were you employed?
A. Yes.
Q. Were you employed immediately after graduation?
A. Not immediately.
Q. Approximately how long after you graduated was it that you were employed?
A. I want to say maybe a month.
Q. So approximately a month after?
A. Yes, a month after.
Q. What was the name of the company or person that you worked for?
A. I worked for VIV Car Service.
Q. V-I-T?
A. V as in Victor.
Q. I-P as in Peter, T as in Thomas?
Q. What was your position at VIP Car Service?
A. I was administrative assistant.
Q. That was I understand approximately July of 2011 that you were employed by them?
A. No. I finished college in December 2011 and I got employed. I believe it was in January 2012.

Page 14

Q. And how long were you with VIP Car Service?
A. For about three months.
Q. Where did you go to work after that?
A. Martinez A & and F Inc.
Q. What type of business is Martinez A & F?
A. They rent the cars for taxi drivers.
Q. Where is that located?
A. That was also in Bronx.
Q. Approximately when were you hired by Martinez?
A. I would say maybe April 2012.
Q. Approximately how long were you employed by Martinez A & F?
A. A little over a year.
Q. Where were you employed after Martinez A & F?
A. I was employed in Metro PTF.
Q. What was your job at Metro PTF?
A. Sales.
Q. Where was this Metro PTF located?
A. Also in the Bronx.
Q. Approximately when were you hired by Metro PTF?
A. This I don't remember exactly, but I'm

Page 15

going to estimate it was maybe August 2013.
Q. How long were you with Metro PTF?
A. Approximately three months.
Q. And where were you employed after that?
A. After that I was employed in Avatar Technologies.
Q. Do you recall when you were hired by Avatar Technologies?
A. November 2013.
Q. How did you first learn about Avatar Technologies?
A. I learned through David Stewart.
Q. Did Mr. Stewart reach out to you or did you reach out to him?
A. He reached out to me.
Q. How did you know David Stewart? I want to make a note. I know you've explained a lot of this. Part of the reason these questions is because of the need to have them on the transcript.
A. I understand.
Q. How did you meet David Stewart?
A. We met in college.
Q. Were you friends or --
A. He was a friend of a friend of mine.
Q. Were you in regular contact with him

Page 16

since graduating from college in December of 2011?
A. Not really, no.
Q. So in approximately November of 2013 he reached out to you?
A. He reached out to me. Before that I remember I was in Puerto Rico when he called me and my grandmother had passed away and I reached a phone call and he asked me if I knew anybody with an accounting--he remembered I did accounting so he wanted to ask me if I knew anybody for an accounting position with accounting experience.
Q. Did you have any accounting experience at the time?
A. No, I didn't.
Q. Did Mr. Stewart describe anything else about this possible position?
A. Not at the time. That was the first time he contacted me about a job. He didn't say the name of the company.

There was a second time when he called me and he might invited me to come over to the office to see what he was doing at that job.
Q. Did Mr. Stewart tell you at that time what his position was with the business?
A. I don't recall.

Page 17

Q. Do you know what Mr. Stewart's position was at the business?
A. I'm not sure.
Q. What was your understanding of what Mr. Stewart's position was with the business?
A. To me he was somewhere close to controller position, definitely some type of management of the finance department of the company.
Q. To the best of your knowledge did Mr. Stewart have the ability to hire people?
A. That's what I understood at the time.
Q. Did you see him hire anybody?
A. Only me.
Q. Do you know if Mr. Stewart had the ability to fire anybody?
A. I'm not sure.
Q. During the time that you were employed by Avatar, did you ever see Mr. Stewart fire anyone?
A. Not that I recall.
Q. Did Mr. Stewart have employees working under him?
A. Yes.
Q. How many employees did he have working for him?

MR. SCHUSTER: Just for the record we're

only talking about Avatar Technologies, correct?
MR. LURIE: That's correct.
A. Yes. I believe it was probably five or six. I'm sorry. This--you're asking me how many people he had working for him at a time, correct?
Q. Yes, at one time.
A. Okay.
Q. So he had approximately at most five or six people working for him?
A. Correct.
Q. You mentioned Avatar Technologies. Are you also familiar with the company that's called Sales Technologies?
A. Yes.
Q. What is your understanding of what Sales Technologies was?
A. Sales Technologies worked closely with Avatar Technologies and that's where I got paid from also. They rented call center services and air time to businesses.
Q. Are you familiar with a company that's called Avatar Technologies Philippines?
A. No.
Q. Are you familiar with a company called Voiceless Technologies?



A. I think I heard the name before, but I'm not familiar with it.
Q. Are you familiar with a company called Avatar Outsourcing?
A. Yes.
Q. What is your understanding of what Avatar Outsourcing did?
A. My understanding is that Avatar Outsourcing is the name to which Avatar Technologies was changed to. It's the same as Avatar Technologies.
Q. Were you still providing services for Avatar Technologies when Avatar Outsourcing came into existence?
A. I don't recall.
Q. But at the time when you were providing services you were being paid from Avatar Sales Technologies?
A. Yes.
Q. What was your position with Sales Technologies or Avatar Technologies?
A. Well, as to my understanding, I was in charge of performing different duties within the finance department, for example, being customer service, accounts receivable.



Q. Who was your direct supervisor?
A. David Stewart.
Q. Are you familiar with a person named George Kaltner?
A. Yes.
Q. Who is George Kaltner?
A. As of my understanding, he's the owner of both Avatar and he was the president of both of them as well.
Q. Do you recall when you first met George Kaltner?
A. I believe so.
Q. Approximately when did you meet Mr. Kaltner?
A. It was approximately the time that I got hired. I think I visited Mr. Stewart at Avatar Technologies office about three times. One of those times he introduced me to George and then there was a phone call that George made to me where he asked me-- he talked to me with all the people on the phone, all the people from the company and he asked me a question and welcomed me to the company.
Q. Do you recall who else was on the call that you just mentioned?
A. Yes. I believe Bria Christian, Julia, I



don't recall her last name. I believe Matt I think.
Q. Matt?
A. Yes.
Q. M-a-t-t?
A. I think that's his name.
Q. Do you know the last name?
A. I don't recall. Peter Kefalas, Raudy. I think there were more people, but they only say hi to me. I don't know exactly. I don't recall exactly who else.
Q. To the best of your understanding who was Bria Christian?
A. At the time that I got hired she was in the position I came to work for.
Q. You were hired. What position did she take?
A. I believe she went to work with George directly as I understood. It was something like assistant.
Q. Like a personal assistant?
A. I'm not sure, but she was working closely with him and helping him on different projects beside Avatar Technologies.
Q. This person Julia, do you know what her position was?

Page 22

A. She was in charge of marketing, my understanding.
Q. This individual Matt, what's your understanding of what his position was?
A. First of all, I want to apologize. I don't remember exactly his name right now. I believe it's Matt. He's the person that was in charge of the IT department.
Q. Would that be Max?
A. Max, yes.
Q. Or Maxium D-a-u-m-k-i-n-e?
A. Yes. I believe so.
MR. LURIE: M-a-x-i-u-m D-a-u-m-k-i-n-e, we want to make sure we're all on the same page here.
Q. To your understanding what was Peter's position with the business?
A. He was salesperson.
Q. And what was your understanding of what Raudy's position was?
A. I believe he worked closely with Max. He was also an IT technician I would say.
Q. We mentioned you started working approximately November of 2013. How long did you work for Avatar or Sales Technologies?
A. A little bit over a year.

Page 23

Q. Do you recall when you stopped working for them?
A. I'm sorry. Can I revise that?
Q. Of course.
A. I believe almost two years, year and a half. I stopped working around June 2015.
Q. I'm going to jump around a little bit, backward.
When you first were contacted by Mr. Stewart, did he ask you about your background and qualifications?
A. Not in a formal way. He did ask me--I remember him asking me what I knew about certain things, for example, my Excel, Word, how comfortable I felt with basic accounting, if I have seen it, if I had experience with it.
Q. Am I correct in my understanding, it was Mr. Stewart who was interviewing you?
MR. SCHUSTER: Object to form. Answer it if you can.
A. He never formally interviewed me.
Q. Did anyone formally interview you?
A. No.
Q. Was it all an informal process?
A. Yes.

Page 24

Q. Do you know who made the final decision on hiring you?
A. I believe so.
Q. And who do you know who made the decision of hiring you?
A. George Kaltner.
Q. At the time that you were hired did you have accounting experience?
A. No.
Q. At the time that you were hired did you have experience using Microsoft, Excel?
A. I would say I had intermediate experience or basic to intermediate.
Q. After you were hired did you receive any training on how to use Microsoft, Excel?
A. Yes.
Q. After you were hired were you trained in any office procedures?
A. Can you define what you mean by office procedures?
Q. Sure. My understanding was you were doing billing; is that correct?
A. Yes.
Q. Did somebody show you how to do the billing?

Page 25

A. Yes.
Q. Who showed you how to do the billing?
A. David Stewart.
Q. You said you were also doing some customer service work, correct?
A. Yes.
Q. Who taught you how to do customer service work there?
A. David Stewart.
Q. Did David Stewart basically teach you how to do everything for your job?
A. Yes.
Q. Did anyone else provide any training to you?
A. Val I think is his name. He worked with Max.
Q. What did Val train you on?
A. This was a project we were doing a little before I left and it had something to do with having some tracking process for the air time I believe.
Q. What were they training you to do?
A. He was training me on how to access the different air time totals I believe they're called. Excuse me if I'm wrong. I don't remember exactly

Page 26

everything. He was teaching how to access them, how to read them.

I remember they had-- there was a particular time in the day where they will show how much air time was used and then I would kind of import that information into a spread sheet. I think it's V-a-l, you know who I am talking about?

Q. Yes.

A. I think his name is longer, but that's what they used to call him?

Q. Are you familiar with an individual named Ted Knells?

A. Yes.

Q. Who is Ted Knells to the best of your knowledge?

A. To the best of my knowledge he used to be high official within the company and then he was demoted. His salary was in half. I believe also--I know. That's what I know, who he is.

Q. You wanted to continue that. What was it that you were going to continue with that?

A. The only thing I recall knowing about him is that David Stewart used to claim that he was one of the persons that put--David Stewart claimed that Mr. Knells was one of the people that put George

Page 27

Kaltner against him and also at some point later on they got in communication between each other to get together to sue Mr. Kaltner.

Q. I will return to this a little bit later.

How did you come to know that Mr. Stewart and Mr. Knells got together to plan to sue Mr. Kaltner?

A. Mr. Stewart told me.

Q. Did he tell you what it was that he planned to sue Mr. Kaltner over?

A. Honestly, I don't recall if he did.

Q. It was just we were getting together and trying to come up with a way to sue him?

A. No.

MR. SCHUSTER: Object to form.

Q. You may answer.

MR. SCHUSTER: Go ahead.

A. It was something more about along the lines of--I know something with text messages with that which is I'm trying to reference. He was also going to sue him for everything that George did for him and then he stopped hearing, from that then it was something along those lines.

Q. You just stated what George did to him.

Page 28

Can you elaborate? What did you mean by he was going to sue for what George did to him?

MR. SCHUSTER: Object to form. Go ahead.

A. I'm not sure what he meant completely, but to the best of my knowledge he demoted him. He put him in a lower position and cut his salary in half. The way it was explained to me, it looked like it was done in unfair way with no reason to do so. That's all I know about that.

Q. We'll get back to this as well. I'm trying to not-- what's your understanding of why Mr. Stewart ceased working with Mr. Kaltner's companies?

A. My understanding at that time or my understanding--

Q. Your understanding at that time.

A. At the time my understanding was that different people gossip about David Stewart against-- with Mr. George Kaltner and they--George Kaltner against him. That was my understanding at that time.

Q. How did you obtain that understanding?

A. This was what David Stewart told me was going on.

Q. Now, you said you provided services when you were employed by Sales Technologies or Avatar

Page 29

Technologies in 2015, correct?

A. Yes.

Q. Why did you leave?

A. I left because there was too many reasons. The first one was I felt it was too much of stressful environment. Sometimes I felt I was back in high school because there was a lot of wrong people, but a lot of gossip and a lot of unstable relationships between companies that made me feel uncomfortable.

The other reason was I felt that George was being unfair by treating some of his employees like that.

Q. Which employees do you think were being treated unfairly?

A. Well, at that moment I thought Mr. David Stewart. I'm not sure what was the situation with Mr. Knells, but at the time it looked like him too was not being treated fairly.

Although Mr. Stewart established Mr. Knells did not do his job well lately and he probably earned it. I thought the same thing might happen to me into the future if I put all my efforts in working for the company and if something went wrong I would be in the position where I would not be

Page 30

treated right.
Q. Were there any other employees that you believe were being treated unfairly?
A. Well, not really. The only thing I thought was not fair, it was payment wise. Another employee, I didn't think that he was being paid the right amount of money or good amount of money for the work I would see him put into the company.
Q. Who was that individual?
A. Alan.
Q. Do you know Alan's last name?
A. I believe it's W-e-b-b.
Q. What was Alan Webb's position?
A. He used to work with Max. I'm not sure what his title was. He used to be in charge of everything related on site. If the computers were down or servers were down, he would give maintenance to the servers. He will back them up. He will follow orders from Max.
Q. Do you recall how much he was getting paid?
A. I don't recall the amount, but I know it was less than what I was making at the time and at the time I was making, I believe it was something between 34 to 36,000 a year.

Page 31

Q. Did you happen to know Mr. Webb's background at all?
A. We spoke about what he did before, but I don't recall exactly.
Q. Do you know how many employees there were for Avatar Technologies?
A. I know we were about maybe between 10 and 20 in the Mount Vernon office. I don't know what the total, but I know in the Philippines there were a lot more, maybe a hundred people. I'm guessing.
MR. SCHUSTER: The instructions were don't guess. Give your best estimate. Okay?
THE WITNESS: Okay.
Q. That's your best estimate, 100 employees?
A. Yes.
Q. And that's best of your recollection?
A. Yes.
Q. Is it your belief that the Avatar company in the Philippines was the same company as Avatar company in the United States?
MR. SCHUSTER: Object to form. You can answer.
A. Yes.
Q. Are you familiar with someone named

Page 32

Jason Gentry?
A. Yes.
Q. Who is Jason Gentry to the best of your knowledge?
A. To the best of my knowledge Jason Gentry was the CFO at some point in the Philippines. He got fired. I believe he was put in jail too.
Q. What's your understanding of why Mr. Gentry was fired?
A. I never had a clear understanding of that. I don't know.
Q. How did you come to learn that Mr. Gentry was put in jail?
A. David Stewart mentioned that to me.
Q. Do you recall when Mr. Stewart mentioned that to you?
A. I don't recall.
Q. Was it while you were employed by Avatar?
A. Not that I recall. I believe it was after.
Q. Would it have been within the past year that you learned of this?
A. I believe he mentioned it to me shortly after I left, but he might have mentioned it again

Page 33

because maybe I didn't remember about last year.
Q. What's your understanding of why Mr. Gentry went to jail?
A. Mr. Stewart put it to me. He looked like he was sent to jail unfairly by Mr. Kaltner.
Q. By Mr. Kaltner?
A. Yes.
Q. Was Mr. Kaltner a resident of the Philippines?
A. I don't know.
Q. Did Mr. Kaltner to the best of your knowledge work for the government in the Philippines?
A. Not that I know.
Q. To the best of your knowledge was Mr. Kaltner a judge in the Philippines?
A. Not that I know.
Q. Can you explain to me in your own words your understanding of how Mr. Kaltner could have somebody put in jail?
MR. SCHUSTER: Object to form. You can answer. Go ahead.
A. There was something going on in the Philippines with another company stealing company information or another company stealing the companies lines. What I believe is that Mr. Stewart tried to

Page 34

make it look like that Jason Gentry.
Mr. Gentry was being accused. He was being put in charge as responsible person in the company. I think there was an accusation of him having something to do with letting somebody or letting company information leak out of the company.
Q. It's your understanding conveyed to you by Mr. Stewart that this resulted in Mr. Gentry being put in jail?
A. Well, again, that's what he said. He said he was sent to jail unfairly. I believe it has something to do with that situation.
Q. Did you ever hear of a business called Intelacall?
A. Not that I recall.
Q. Do you recall hearing about a business called Callvation?
A. Not that I recall.
Q. Do you recall hearing about a company called Surrogate Technologies?
A. Yes.
Q. To the best of your knowledge what is Surrogate Technologies?
A. They are a company that were stealing George's clients and they were selling them the same

Page 35

services as Avatar Technologies did.
Q. Were you in any way involved in the litigation with Surrogate Technologies in the Philippines?
MR. SCHUSTER: Object to form. You can answer if you can.
A. No, not that I recall.
Q. Beyond doing the billing and customer services, some of these other tasks for the business, was there any other--were you in management for Avatar Technologies?
MR. SCHUSTER: Object to form. You can answer if you can.
A. I'm not sure.
Q. Do you believe that you were manager for Avatar Technologies?
A. I don't believe so.
Q. Do you believe that you were in management for Sales Technologies?
A. Yes.
Q. Did you have people who worked for you?
A. I had people that assisted me.
Q. Who was that that assisted you?
A. It was A-g-r-a-i-n, Kenneth and Katrina.
Q. Did any of these individuals in the

Page 36

United States?
A. No.
Q. Were you aware at the time of Sales Technologies business structure? If you don't understand what I mean, please tell me you don't understand.
A. I don't understand what you mean.
Q. We talked about a bunch of companies, Sales Technologies, Avatar Technologies, Avatar Technologies in the Philippines, eventually Avatar Outsourcing.
Did you have any specific knowledge of how all these businesses were related?
A. No.
Q. Did you ever receive a paycheck from any business in the Philippines?
A. Yes.
Q. What business in the Philippines did you receive a paycheck from?
A. Avatar Technologies.
Q. Avatar Technologies in the Philippines or Avatar Technologies?
A. Well, the money came from the bank from the Philippines.
Q. Do you recall what bank that was?

Page 37

A. No.
Q. Was it Metro Bank?
A. I don't know.
Q. Did that become your primary source of where you received your payment at any point?
A. No.
Q. Just additional checks that you received that came from this company in the Philippines?
A. No.
Q. Can you explain to me how it was that you received paychecks from this business in the Philippines?
MR. SCHUSTER: Objection to form.
A. I received these payments. When I first started payroll was not yet established in the Mount Vernon office so I received my first paycheck from the Philippines.
Q. Who set up the payroll in the United States?
A. I believe it was David Stewart and I believe there was someone else, but I don't recall who it was.
Q. Do you remember if it was a man or woman?
A. No. I think one of the external

companies that provided services for George, maybe the accounting firm.

Q. Beside yourself, do you know if David Stewart recruited any other people to work for either Avatar or Sales Technologies?

A. I believe he recruited some of the employees in the Philippines.

Q. Were these people who worked in the payroll department in the Philippines or billing department in the Philippines?

A. They were the accountants. That's what he described them as.

Q. Do you remember any of their names?

A. Yes.

Q. What were their names?

A. K-i-r-b-y, Jennufer, same as Jennifer with a U.

Q. Did Kirby and Jennifer report to Mr. Stewart to the best of your knowledge?

A. Yes.

Q. To the best of your knowledge was David Stewart ever George Kaltner's personal assistant?

A. I'm not sure. There was a time in between the process of his demotion where he appeared to me that he was for a short period of time. He was



changed around two or three times.

Q. Approximately when was this period of time that you're referencing?

A. I believe it was 2015. I'm not sure about which month.

Q. Let me jump to that time frame. You mentioned that David Stewart appeared to be demoted; is that how you referenced it?

A. Yes.

Q. What's your understanding of the reason why David Stewart was demoted?

A. Well, like I said before, my understanding at the time was because a couple of people got together against him and they spread rumors and gossip so they went to George and gossiped against him.

Q. This was Ted Knells you said?

A. Ted Knells and what David had told me before, Mr. Oscar Razzouk.

Q. And it was Mr. Stewart who told you this was what happened?

A. Yes.

Q. Do you know what the rumors or gossip was that was going around the office?

A. Well, they were talking about him not



being so focused on his job because he was basically having intimate relationships with different women in the Philippines.

Q. Are you able to elaborate on that at all?

A. I don't understand what you mean.

Q. Do you know if Mr. Stewart took any women from the Philippines on a team building event?

A. Not that I recall. I don't recall.

Q. Do you recall Mr. Stewart asking for reimbursement for any events while he was in the Philippines?

A. I don't recall.

Q. Were you involved when an employee or agent would ask for reimbursement?

A. I don't believe so.

Q. I'm jumping around a little bit. Do you know who brought Bria to the company?

A. Yes.

Q. Who brought Bria to the company?

A. It was David Stewart.

Q. How do you know she was brought to the company by Mr. Stewart?

A. Well, what I learned from Mr. Stewart is that she also had an accounting degree, then he met



her at her job, at her previous job. I'm not sure how the process evolved. He told me that she was working there because of him so I understood that he brought her in.

Q. This is a very weird question. Did David Stewart ask you to cook him lunch ever?

A. Not really I would say.

Q. What do you mean by not really?

A. Well, Mr. Stewart often give me a ride to work. We had a kitchen. I thought as a nice way to pay him back by fixing him lunch. Maybe at some point, I don't know if he got used to it or not, but he would often times--I live in the Bronx. I did it for him. He might have been after I implemented that. That's why I don't want to say he brought it up first.

Q. Do you recall Mr. Kaltner ever reprimanding Mr. Stewart for having you to prepare lunches at work?

A. Maybe he mentioned something once, but he didn't really get in between.

Q. Do you recall Mr. Stewart ordering food for the office?

A. Yes.

MR. SCHUSTER: Object.

Page 42

Q. Do you have any recollection of Mr. Kaltner reprimanded Mr. Stewart for ordering food at the office?
A. I don't have a recollection of witnessing Mr. Kaltner doing that, but David said that he did.
Q. Do you have any knowledge of what that whole situation was about, the ordering of food for the office?
MR. SCHUSTER: Object to form. If you can answer go ahead.
A. This is confusing to me. What I learned, Mr. Stewart, there was an issue with him ordering shrimp and salmon.
Q. Do you know if there was a cleaning service for the Mount Vernon office?
A. Yes.
Q. Was Mr. Stewart the cleaning service for the Mount Vernon office?
A. No.
Q. Did Mr. Stewart ever tell you that he was an employee?
MR. SCHUSTER: Object to form. Employee of who?
Q. I'll clarify this. Do you know if

Page 43

Mr. Stewart was employed by Sales Technologies?
A. I know he was working for both companies.
Q. Were you involved in payroll?
A. Partially.
MR. SCHUSTER: I want to make sure we're clear which entity we're talking about. Sometimes it's not clear. We're talking about the whole company or different parts of the entities involved in this whole corporate universe.
MR. LURIE: Off record.
(Discussion off record.)
MR. LURIE: I apologize. We went off the record for a moment. Your attorney and I had a brief discussion. Part of the reason why is because some of the questions that have been coming to you are things that you may or may not understand how the business was set up.
I have been somewhat deliberately vague about some of the questions because I don't know if you know the answer to some of these business questions and I don't want to put into your mind and allow you to answer to the best of your knowledge. Let me step back a little bit.
Q. We were just talking about--to make

Page 44

things easier please read back the last question.
(Reporter reads back.)
Q. Were you working in payroll for Sales Technologies?
A. Partially.
Q. When you say partially what does that mean?
A. We had an external payroll company do payroll. I assisted in the payroll process. I contacted when I had a question or whenever, I had to understand the charges the payroll company incurred. At first there was some things in regard to adjusting pay period that --
Q. Did you also have the same responsibility with Avatar Technologies?
A. I don't recall exactly. I want to say like most of anything has to do with both companies. I remember I added new employees to the payroll.
Q. Have you ever heard of an entity called DAVIDTPO, LLC?
A. Yes.
Q. To the best of your knowledge what is DAVIDTPO, LLC?
A. To the best of my knowledge this is a company that was set up for David Stewart so he could

Page 45

get his paychecks through the company.
Q. Do you have any knowledge about who set up DAVIDTPO, LLC?
A. The only knowledge I have is what Mr. Stewart told me.
Q. What did Mr. Stewart tell you?
A. That Mr. George Kaltner set up the company for him.
Q. Approximately when did Mr. Stewart tell this to you?
A. Around the time that I started working for Avatar. There was some rumors that I too was probably going to get a company set up for myself because they didn't have payroll back then. That's how they were paying employees at the time.
Q. So it's your understanding that back in approximately November of 2013 there was a payroll service set up?
A. Yes.
Q. Do you know, you mentioned a company was providing the outside payroll services. Do you recall which company that was?
A. I believe the name of the company, Paychex.
Q. Paychex with the X at the end of it?

A. Yes.
Q. Do you recall if Mr. Stewart had set hours he was in the office?
A. Can you repeat the question?
Q. Do you recall Mr. Stewart having set hours that he was always in the Mount Vernon office?
A. I have an idea.
Q. And what is your idea?
A. I remember he was always there early, sometimes the first person to be there, maybe 8:00, 7:30, 8:00 in the morning. Sometimes I will come to the office with him. He would give me a ride also so I too would be there early and we get to work sooner. I would go.
He would leave late. Sometimes I would leave earlier. He would stay I would say the earliest time that I know he was there was maybe 6:00, sometimes 7:00. The first because I was new and in training there was even one day we stayed in the office until 9:00. That was one day. The other days 7:00, 7:30, 6:00. Toward the end, of course, he started leaving earlier toward the end of his time in the company.
Q. Sitting here today what is your understanding of why Mr. Stewart no longer provided



services for Sales Technologies and Avatar Technologies?
A. Sitting here today I believe there is a little bit of both. What I mentioned before, gossip and rumors. People trying to make him look bad and also I believe there has to be something about his performance in regard to whatever when he was sent to the Philippines. I believe there was something about his job that he didn't make George happy with how he performed.
Q. What's your understanding of why Mr. Stewart went to the Philippines?
A. He went there to do an audit for a new company at that time called Rainbow Slushy.
Q. Do you know if Mr. Stewart performed the audit for Rainbow Slushy?
A. I believe he did.
Q. Did you ever see the audit for Rainbow Slushy?
A. No.
Q. What makes you believe that he did do the audit for Rainbow Slushy?
A. I never heard otherwise in the company.
Q. Were you involved in commission payments?



A. Yes.
MR. SCHUSTER: Object to form.
Q. Who was in charge of insuring payment if you know?
A. I don't understand it.
Q. Were there salespeople for Avatar Technologies?
A. Yes.
Q. Were there salespeople for Sales Technologies?
A. Yes.
Q. Were they paid a commission?
A. Yes.
Q. Do you know how that calculated, how much commission to pay these people?
A. I don't know exactly how. I know there was a formula that I believe Mr. Kaltner established and we were to follow by the formula and verify with Mr. Kaltner before commission was paid.
Q. Did Mr. Stewart do those calculations?
A. At some point I think he did.
Q. Did Mr. Kaltner ever ask you to withdraw any cash from the checking accounts?
A. No, not that I recall.
Q. Did you have access to the books to



Sales Technologies?
MR. SCHUSTER: Objection to form.
Q. I'll clarify that. When I say books, the financial records for Sales Technologies?
A. I have partial access.
Q. Were you able to view the checking accounts?
A. Yes.
Q. Did you have access to view the checking account statements for Avatar Technologies?
A. Yes.
Q. Do you ever recall seeing large cash withdrawal from any checking account for Sales Technologies or Avatar Technologies?
MR. SCHUSTER: Objection to form. What do you mean by large?
Q. Let me ask you this, if you saw a withdrawal for 10,000 dollars in cash from a checking account, do you believe that's a large amount of money?
A. Yes.
Q. Do you recall ever seeing a cash withdrawal for 10,000 dollars?
A. When you say withdrawal, you're not including transfers.

Q. Not transfers, cash.
A. I don't recall.
Q. Do you recall at any time Mr. Kaltner directing that Mr. Stewart bring an amount of cash to the Philippines?
A. I don't recall that.
Q. You don't think he ever did?
A. I don't think he did.
Q. Do you recall Mr. Stewart going to the Philippines any time?
A. Yes.
Q. How many times do you recall Mr. Stewart going to the Philippines while you were employed by Sales Technologies or Avatar Technologies?
A. I don't know the exact amount of times, but I'm going to estimate between two to three times.
Q. You mentioned one of those times was to do an audit for Rainbow Slushy; is that correct?
A. Yes.
Q. Do you know the reason that he went the other one or two times?
A. I don't recall.
Q. Did Sales Technologies and/or Avatar Technologies have an accounting firm they used in the United States?



A. Yes.
Q. Do you recall the name of that accounting firm?
A. I don't recall.
Q. To the best of your knowledge did Mr. Stewart work with the accounting firm?
A. Not that I recall.
Q. To the best of your knowledge was Mr. Stewart in contact with the accounting firm?
A. Probably, yes.
Q. Did you ever meet any of the accountants?
A. Yes.
Q. Do you recall the name of the accountant that you met?
A. Not at the moment.
Q. Does the name Alan Sasserath mean anything to you?
A. Yes.
Q. Did you ever meet Mr. Sasserath?
A. Yes.
Q. Did you have e-mails with Mr. Sasserath?
A. I believe so.
Q. Did Mr. Stewart to the best of your knowledge have e-mails with Mr. Sasserath?



A. To the best of my knowledge I think so.
Q. Were there e-mails with Mr. Sasserath, to the best of your recollection was Mr. Stewart also on those e-mails?
A. I don't recall. I'm sorry. Pertaining to your last question, Mr. Stewart was oftentimes included in I would say most of the e-mails I was included in.
Q. That's with the accountants?
A. I'm talking about overall, everything. Of course, shortly before he was let go of the company.
Q. That's because he was your supervisor?
A. Yes.
Q. Forgetting about Mr. Stewart or any rumors that you heard, did you have any issues with Mr. Kaltner personally?
A. No.
Q. Do you believe he treated you fairly?
A. Yes.
Q. We're going to get to the text messages. I'm sure that's what you expect.
Beside these text messages, did you have any conversations with Mr. Stewart after he stopped providing services where you discussed Ted Knells?



A. Outside of the text messages?
Q. Yes.
A. Specifically about Mr. Ted Knells, not that I recall.
Q. Did you have any discussions with Mr. Stewart seeing him telephonically, in person not with text messages about Jason Gentry?
A. Yes.
Q. What were the discussions that you had with Mr. Stewart regarding Mr. Gentry?
A. It was basically the same, repetitive comment. Mr. Stewart summarizing things that George did to some of his employees unfairly and he gave Mr. Gentry as an example of how he was treated unfairly and because of accusations against him he was sent to jail.
Q. False accusations against him?
A. According to Mr. Stewart, he claimed that had something to do with information was leaked to this other company that was stealing George's clients.
Q. Mr. Stewart ever mention to you that Mr. Gentry was in the Philippines illegally?
A. Not that I recall.
Q. Mr. Stewart ever mention to you

Mr. Gentry did not have a work Visa for the Philippines?

A. He did mention something about a work Visa, but honestly I don't recall what he said.

Q. Do you have any personal knowledge of why Mr. Gentry was arrested?

A. To be honest with you, I don't know.

Q. Did Mr. Stewart ever talk to you about how he was working with Mr. Gentry on creating a lawsuit against Mr. Kaltner?

A. He spoke a little bit of it. He said Mr. Gentry was also suing George or that he was going to be suing him separately.

Q. Did Mr. Stewart tell you what the lawsuit was that Mr. Gentry was going to file?

A. He did mention legal terms that I honestly don't think I understood and I don't remember them.

Q. Do you recall when this took place?

A. No.

Q. Now, I believe relatively recently you had discussion with Mr. Stewart's lawyer. Prior to 2018 had you ever heard of Mr. Stewart's lawyer, Jacob Chen?

A. No.



Q. Did Mr. Stewart ever talk to you about any of the lawsuits that he was involved in?

A. Yes.

Q. To the best of your recollection what did he tell you about these lawsuits?

A. I remember he said something about employment lawsuit that I believe he said he won. The most recent lawsuit was he was working on was a labor, New York Labor case, something to do with breach of labor at law from George. He mentioned another project, but he never mentioned what that was. I didn't ask him.

Q. At some point you received a letter, correct?

A. Yes.

Q. After you received that letter did you contact Mr. Stewart?

A. Yes.

Q. Can you tell me how you contacted Mr. Stewart?

A. I contacted Mr. Stewart via telephone call.

Q. You called him?

A. I called him.

Q. Do you recall when it was you called



Mr. Stewart?

A. Around the same week that I received the letter, April.

Q. So that would have been approximately beginning of April; sound about accurate?

A. Yes.

Q. What did you tell Mr. Stewart when you called him?

A. I told him I received a phone call from Mr. Kaltner and I also received a letter from his lawyer. I read the letter to him and I told him I read the letter to Mr. Stewart and I also told him a little bit of the phone call that I received from George.

Q. What did you tell him with respect to the phone call that you had with Mr. Kaltner?

A. That he called me when I was at work and spoke with me for about 20 minutes and he told me a lot of things that he was upset. He said I broke a law and that I could get in trouble for that, I got myself involved in this, some of those things he mentioned.

Q. Do you know what law it was Mr. Kaltner claimed you broke?

A. He mentioned it, but I don't recall.



Q. Then you told that to Mr. Stewart, correct?

A. Yes.

Q. What did Mr. Stewart say?

A. He said not to worry about it, that he was trying to intimidate me. I didn't do anything wrong, how was I going to be in trouble. I asked him if he should tell me why would I be in trouble, you guys were pressing accusations against me in the letter, that I didn't understand why you had that idea.

I also told Mr. Stewart that you guys had a copy of the text messages and I think he said that's false, that's not true. Mr. Kaltner read some of those written text messages to me so I know he had the text messages, but I didn't recall a lot of the content of the text messages.

I thought maybe if I could talk to Mr. Stewart, I would get insight of what happened that made you guys under the impression I was working with him against Mr. George.

Q. What else did you discuss on this call?

MR. SCHUSTER: This is the Stewart call?

Q. We're talking about the call with Mr. Stewart at this point.

Page 58

A. From what I can recall, I told him that I was going to--he was joking around saying that he will pay for my lawyer. He was laughing when he said that. Well, you might be joking, but I am planning to get legal counsel.

(A discussion is held off the record.)

A. I told him even if he was not taking it seriously, he told me I always worry about everything, when was I going to stop worrying and I said well, this letter from lawyers, I do plan on seeking legal counsel.

So he said okay, if you really want to speak to a lawyer, you can speak to my lawyer if you want, he will advise you for free. There was nothing that--there was nothing wrong that I said. They just trying to intimidate you. There is the transcript of what I said in court. It's public record. You could have access to it if you want. There's the copy of the text messages I have to give them to court to prove that I did not plan to do harm to George and you can also have access to that as well. You can ask my lawyer for it. I said sure, I would like to see them because I don't remember.

Q. Did you discuss anything else with Mr. Stewart at that time?

Page 59

A. If I did, it was around the same subject we were talking about. I'm sorry. I asked him what was the lawsuit about even though he had mentioned some of this to me. At the time I didn't remember. Sometimes we stop talking for a short period of time. He told me about the New Jersey labor case. That's what he told me again. I think he had three lawsuits, that the ones that he made against George and then counter lawsuits. I believe that's about what I remember.

Q. Subsequent to your call with Mr. Stewart, did you exchange any text messages with him?

MR. SCHUSTER: This is the call about the lawsuit.

MR. LURIE: After the letter she called Mr. Stewart. Still we're talking just about that call in early April of this year.

A. Not that I recall.

Q. How did Mr. Stewart provide you with his lawyer's contact information?

A. I asked his wife for his wife's phone number.

Q. Who is Mr. Stewart's wife?

A. Yoladi Espinosa I believe is her last

Page 60

name.

Q. Do you know if he's married to her?

A. Legally married, I don't know.

Q. Are you in regular contact with Yoladi Espinosa?

A. No.

Q. Did you call her to get that information or did she call you? How did that come about?

A. We text.

Q. You were texting with her?

A. Yes.

Q. Did you regularly text with Yoladi?

A. No.

Q. Prior to texting to get the information for the lawyer, did you have any conversations or texts with Yoladi?

A. Yes.

Q. Any of those conversations did you discuss any of these lawsuits that Mr. Stewart was involved in?

A. No.

Q. Were your discussions with Yoladi basically limited to pleasantries, things friendly back and forth?

A. No. I contacted her after I received

Page 61

the letter to tell her I needed to speak with her husband and to let me know when he was available at home so we could speak.

Q. So you received the lawyer's information. What did you do next?

A. We set up a call, conference call.

Q. Who was on the conference call?

A. He was. I told him about the letter. I read it to him. I told him about the phone call. I didn't tell him as much details as I did with Mr. Stewart, but I told him I would take the phone call. That was about what I told him initially.

Q. Other than asking him for any legal advice, did you discuss, did you tell Mr. Chen any facts about your time working for Avatar Technologies or Sales Technologies?

A. What do you mean by facts?

Q. Did you talk to Mr. Chen about who you were employed by?

A. Yes.

Q. Did you tell him--I mean with respect to my clients, but who you were employed by, you told him that?

A. Yes.

Q. Did you tell him what your hours were

that you worked?
A. Yes.
Q. What you tell him your hours were that you worked?
A. I told him I didn't remember exactly. I didn't keep records. He asked me something about if there were any systems in the office to record the hours everybody worked and I said no system to record that. I personally didn't record them. I told him what I think. I worked at the time on the phone. I was guessing. This was a short period of the conversation devoted to that subject. I didn't elaborate too much.
Q. Other than discussing my letter to you, did you discuss Mr. Stewart's case?
A. He mentioned some details of the case, but he didn't say much because I guess he had his own client and privilege with Mr. Stewart and he didn't want to discuss a lot of things of the case with me unless I came to party of the case.
Q. So my understanding then is Mr. Chen was unwilling to provide a lot of information about the case unless you --
A. Not exactly like that, but that was my understanding. He did not say I'm not providing it to



you unless you join. He just said I can't provide legal to you because I have my client, Mr. Stewart. On the other hand, if you were to decide to join, that's-- I could fill you in.
Q. What information did he provide to you?
MR. SCHUSTER: Mr. Chen we're talking about now?
MR. LURIE: Mr. Chen, yes.
Q. Not about advice, not a request for advice or advice provided to you, but what he told you was the David Stewart lawsuits?
MR. SCHUSTER: Talking about the facts, no.
Q. Just facts.
A. I'm going to try to remember understanding Mr. Stewart was claiming or he was suing George for--let me take that back. He tried to explain to me a little bit of--I don't remember exactly the name of the Labor Acts. About he explained to me how George's responsibility to record everybodys time and how close had the right to record the time that they were working too and how this act if you do overtime past I believe 40 hours a week you're entitled to an hour and a half and how Mr. Stewart have all of this overtime if he worked



for George and that George already said in court he did not have any records of the time. Somehow that gave Mr. Stewart the leeway to have the case because he had his records, a lot of overtime was owed to him.
Q. Did Mr. Chen tell you he had records of Mr. Stewart's time that he was working for Mr. Kaltner?
A. Not exactly. I understood that Mr. Stewart had records, but he didn't explicitly say that I recall if he had. I didn't ask him any questions. He just elaborated so I could understand.
Q. When you called Mr. Chen, were you looking for a labor attorney?
A. No.
Q. Did you raise issues with him about having issues with your employment with Avatar Technologies or Sales Technologies?
A. No.
Q. So the issue of this labor law he brought to your attention?
A. He put it as an option on the table as part of his advice on things I could do in regard to the letter. He explained to me how in the State of New York basically anybody could sue anybody for



basically anything. It doesn't necessarily require for the suing party to have evidence against you or not and you already bring damage because a lot of money to call the people he said one of the ways to avoid it, make a sort of possibility of you being sued so he said I could sue first or also an option would be I could join their case. I wouldn't have to pay anything because he was on contingency is the term.
After he mentioned that, I said I was not interested in joining the lawsuit. I just wanted to get counsel as to what to do in regard to the letter and I don't remember what he said again about the option of joining the lawsuit.
I remember I told him well, even if I were to consider that option, I don't think he mentioned something about if I would be qualifying body. He doesn't know if I was qualifying body. He said even if I decide to consider that option, I don't think--I wouldn't be qualified body. I'm trying to avoid getting out of the problem by getting more involved in the problem.
Q. Did David Stewart ever ask for you to invest in his lawsuits?
A. I recall. I don't remember him

explicitly saying or inviting me to invest in the form of investment.
Q. Did he ask to borrow money from you?
A. Not that I recall.
Q. Did you give him any money?
A. No.
Q. Did Mr. Stewart ever talk about supporting Mr. Kaltner?
MR. SCHUSTER: Objection.
Q. Do you recall what the term extortion is?
A. Same as blackmail.
Q. That's a fair way to categorize. Mr. Stewart ever talk to you about blackmailing Mr. Kaltner?
A. Not directly. You can expect as of my understanding, at one point he mentioned he knew a lot of things. He's working for George for a long time, even before George came up with the company Avatar Sales Technology and that he knew a lot of things of the businesses and himself. So at some point I got under the impression he intended to do so.
Q. Do you know whether or not Mr. Stewart had access to Avatar Technologies or Sales



Technologies client lists?
A. Yes.
Q. Did he have access to those lists?
A. Yes.
Q. Do you know whether or not Mr. Stewart had a copy of those client lists after he ceased providing services to my client?
A. No.
Q. Did Mr. Stewart at any time ever ask you to provide him a copy of the client list?
A. No.
Q. Did Mr. Stewart tell you whether any people provided him with money to finance his lawsuits?
A. No, not that I recall.
Q. You mentioned somebody was on the call many years before this Raudy. Other than working in the tech office at Avatar, did you know Raudy on a personal level?
MR. SCHUSTER: Object to form.
A. We went out to lunch with Bria a couple of times out of the office.
Q. Do you know whether Raudy and Mr. Stewart were related?
A. I know they were not directly related.



Q. What is their relationship to the best of your knowledge?
A. I believe Raudy's wife is cousin with Mr. Stewart's wife.
Q. Ms. Valenzuela, in front of you right now previously marked as Stewart-17 during the deposition of David Stewart on June 5, 2018.
I ask you to take a brief look at that document, just look through it.
MR. SCHUSTER: Just for the record these are the same documents that were forwarded to me by e-mail earlier today.
MR. LURIE: Yes, the full, complete document production.
MR. SCHUSTER: She did have the opportunity to review that earlier today. I started a little bit later rather than have her go through this for an hour.
MR. LURIE: I appreciate that.
Q. Let me ask you a few questions about this document looking at the first page here.
This number, we'll put a redaction on this for after the deposition cell phone number 347-782-3255. Do you recognize that number?
A. Yes.



Q. What number is that?
A. That's my cell phone.
Q. Did you have a work cell phone when you were working for Avatar or Sales Technologies?
A. Yes.
Q. What was the telephone number for that phone if you remember?
A. I don't recall.
Q. When you left the employment of Sales Technologies and/or Avatar Technologies did you return that telephone?
A. Yes.
Q. Did you erase that telephone before you returned it?
A. I believe I did.
Q. Why did you erase the telephone?
A. I erased the telephone because there were a lot of--I'm not sure why I erased the telephone. I know Mr. Stewart told me to do so. I'm not sure if that's the reason I I actually did it.
Q. Were you having conversations with Mr. Stewart on your work phone?
A. Yes.
Q. Were you having conversations with Mr. Stewart on your work phone even after he left

providing services for Sales Technologies or Avatar Technologies?
A. Yes.
Q. Do you recall the content of any of those discussions that you had with Mr. Stewart on your work cell phone?
A. I recall the content of a particular conversation which is probably the one relevant to this matter.
Q. What was that conversation?
A. This was about his severance package.
Q. What was Mr. Stewart's severance package?
A. I don't recall the details. He got paid what I thought was a good amount of money for somebody that was being let go under the terms he was being let go.
Q. Do you have any recollection of what those were?
A. No, not exactly.
Q. Do you know if Mr. Stewart received a vehicle as part of his settlement?
A. Not that I know.
Q. Do you know if there was a cash payment to Mr. Stewart?



A. He was wired money.
Q. Beside wired, did he receive any check?
A. I don't recall if he received a check.
Q. The document is in front of you. Has Bates stamp number which is for brevity, I'm going to identify the last four digits on there, 3536. Second comment from you, second text message from you states "I thought you took all of those statements." What did you mean by that?
A. I believe I was talking about his statements were kept at office.
Q. What type of statements are these?
A. They were bank statements.
Q. Are you familiar with whether or not there was a folder on Avatar or Sales Technologies computers that was labeled DAVIDTPO?
A. There might be. There might have been a folder.
Q. If there was a folder, would you have had access to that folder?
A. I don't think so. Not that I recall.
Q. Do you know why Mr. Stewart would ask you to take statements from that folder?
A. As of my understanding for the record this was a physical folder with physical bank



statements. Even though Mr. George, he was the one keeping the accounting of the company paying taxes and everything.
Q. That's DAVIDTPO?
A. Yes. So he kept DAVIDTPO records on Mount Vernon office and as of my own, it belonged to him.
Q. Look at the next page, about the middle of the page, "make sure you have statements or which ones do you need so I can get them to you. We basically have four days only to get anything. I'm assuming he'll have Max hijack all of my stuff as soon as I tell him I'm leaving."
Can you tell me what you meant by that?
A. Again, statements I believe when I asked him if he had DAVIDTPO statements. I don't know if I received a concrete answer. Since I was approaching the day of my departure from the company, I wanted to make sure he had them because he was not allowed access to the office so I'm sure once I left probably he was not going to get them.
Q. Please continue.
A. Also, I remember when this happened was around the day he left. He didn't leave on good terms. There was an argument between him and George



and that's why I believe he didn't have time to take all of his belongings including his bank statements.
Q. Were you present at the time of this argument?
A. I was present in the office, but not in the exact office where this argument took place.
Q. To the best of your recollection what was this argument in reference to?
A. I didn't hear what was going on. I heard people yelling, screaming and Mr. Stewart told him something, but I don't recall what they were.
Q. People, was it people yelling?
A. Yes.
Q. Do you know who was yelling?
A. Mr. George Kaltner and also some point Mr. Stewart, I believe there was something about his trip to the Philippines and this argument.
Q. I'll ask you to go two pages forward, 3539. Looking at this document which is marked page 3539, there's a statement. Mr. Stewart sends you a text message on 8/9/2015 "delete all messages between you and I on your corporate phone." Did you see that?
A. Yes.
Q. You were discussing where your

Page 74

recollection was Mr. Stewart was telling you to delete your phone?
A. Yes.
Q. To the best of your recollection this was not the reason that you deleted all the messages on your phone?
A. Maybe part of the reason why.
(A discussion is held off the record.)
(There is a recess.)
Q. I ask you to turn to page 3542, three more pages right in the middle. There's a message from Mr. Stewart. He writes ported. Do you know what he means by that?
A. I'm not sure. I don't recall.
Q. Do you know what page called fiverr.com is?
A. Yes. I believe this is web site to provide multiple services for minimum fee at the time five dollars. One of the services is creating or updating resume.
Q. After Mr. Stewart writes ported, you write back and say "Great. Thanks for updating. Now I can stop sabotaging LOL, couldn't wait to tell you." What did you mean by that?
A. I couldn't wait to tell you belongs to

Page 75

the message below that one, the previous message where it says "Great. Thanks for updating." I don't remember exactly what he was referring to, term sabotaging when we were negotiating with Mr. Stewart's severance package.
When I say we, I mean Mr. George Kaltner and Mr. David Stewart and because I was in the process myself, I will communicate to Mr. Kaltner Mr. Stewart's demands basically on the text messages he was sending to me on my work phone.
Beside that, he would talk about it in my personal phone re-dial so we would agree on what to do next in regard to that. For example, if he didn't--if he wanted money sooner he will tell I need the money sooner, can you ask him to wire me the money sooner so I will do it in a way as if it came from me.
When Mr. Stewart demands where I said "Thanks. Now I can stop sabotaging" is because even though I said it in the form of a joke, I sort of felt I was sabotaging in a way because I was making it look like I was giving honest opinion of the matter when Mr. Stewart was behind that opinion.
Q. Now, look to the next page, 3543, top of the page Mr. Stewart writes to you and said also that

Page 76

"5 K should be sent tomorrow, right. I got to pay lawyers fees, lol."
Further down about halfway down you do write "I'll try to 5 K, but it's 4K actually." Were you attempting to work with, I want to be clear, there's been a relief in this case. I'm going to ask about that.
Were you working with Mr. Stewart to increase the amount of money that he was receiving beyond the money he was supposed to receive?
A. No. He said 5 K. When I answer, I tried to 5 K. I will try to ask George if he could send 5 K, one K more. I will not take a stand and wire that amount of money other than the way he will receive.
Q. The next line below it says "I don't even have an excuse to Alan, lol." Is that just a typo?
A. No.
Q. What is that?
A. If we go back to the same page, the first message where it says "there was donation letter day, are you Alan." Alan is this other employee I mentioned earlier today and he was sort of unhappy because of the payment that he was getting at

Page 77

the company so he had constantly stress. He will leave the company. He wanted to find another job, but he would never do so.
In this case is replacement for something, will you chicken out, will you just not do it, will you be scared to do it.
Q. You can turn to page 3544, below halfway down Mr. Stewart writes "all three are alike, they don't cultivate and nuture and support." Do you know every process in billing system completely from me. The guy just gave me one day tutorial back in 2011" and you respond and say "I know, that's what stress alone is to what is moving me to leave. I know every work environment is stressful, but there are many pluses."
Is it your understanding that Mr. Stewart developed all of the billing processes for Avatar Technologies and Sales Technologies?
A. Yes.
Q. Do you know of anyone else who developed any of the processes for billing for Avatar Technologies or Sales Technologies?
A. George might have on some of those.
Q. There would be at the beginning of this process?

A. I was not with the company in the beginning. I don't know the answer to that.

Q. But responded back "I know you created." Did Mr. Stewart say that he created all of the billing processes?

A. Yes, he did.

Q. To the best of your knowledge did he create all the billing processes?

A. That's what I understood.

Q. Turn to 3548, there's a link here from Mr. Stewart provides to you and before that Mr. Stewart next time he asks you about me states "I learned something about Avatar. I'm super pissed off for one is convicted criminal, link below that, theft by deception, below that says if George asks, I'll send it to the other phone." Is that an accurate reading?

A. Yes.

Q. He said "sent it to the other phone." Is he referencing your work phone?

A. Yes.

Q. Previously we talked about your belief that Mr. Stewart was trying to blackmail Mr. Kaltner is one of the discussions you were referencing about being blackmailed?



A. Not exactly. I would say this could have been part of it. I don't know how exactly Mr. George--This is part of what I was talking about.

Q. Do you know anything else about the allegations of Mr. Razzouk being a convicted criminal?

A. Not that I recall.

Q. Did you look into what Mr. Stewart talking about with respect to Mr. Razzouk?

A. I believe I opened a link provided and I'm not sure. My recollection is not too clear that much. I don't recall exactly what he said.

Q. Moving forward now, page 3551 starting at the top Mr. Stewart writes and says "so now I just need that balance ASAP, what do we need to do to get it SAP."

You respond by "what balance, your 4k you mean." What is that discussion referencing?

A. This reference to the remaining balance of his severance package.

Q. Do you recall how it was to be paid out to Mr. Stewart?

A. There were wire transfers.

Q. Do you recall how many there were to be?

A. Maybe three, I believe Mr. Kaltner made 5,5, 4 or something like that.



Q. So it accurate to say it was 14,000 dollars being paid out?

A. Around.

Q. Do you recall the frequency of these wires?

A. No.

Q. Do you know if Mr. Stewart had filed any documents in order to get the severance?

A. I don't recall.

Q. Turn to 3555, third message down from Mr. Stewart--strike that. Looking at the message right before that, he writes "MIA, are you okay."

Do you know what he's referencing?

A. I guess he means missing in action. I think that's sometimes for a while you don't hear from someone. I believe we might have had a little bit of time not communicating at the time that he sent me that message.

Q. It's not a nickname or anything?

A. No.

Q. Next message down he writes "it's on with me and George." Do you see that?

A. Yes.

Q. Did you talk with Mr. Stewart after he sent you that message on the telephone?



A. I don't recall if I spoke to him right after I received that text message. I did speak with Mr. Stewart a couple of times on the phone, but I don't recall exactly to this.

Q. Do you have any understanding what Mr. Stewart meant by writing "it's on with me and George."

A. Well, I believe this might have been around the same time of one of the e-mails he sent me that it showed the the whole e-mail thread between Mr. Kaltner and David Stewart where they were going back and forth about the demands of Mr. Stewart and Mr. Kaltner answering back to him not abiding and telling him how he was responsible for a lot of money, that his business is lost and that he could be sued for this.

They were just going back and forth. I cannot tell you exactly, but as far as I remember the end of the thread, I saw they just challenged each other, I'm not abiding by your terms, you're not abiding by my terms so bring it on. That's one of the words.

Q. Were these forwarded to you?

A. Yes.

Q. Are they in the e-mails that you provided today?
A. Yes.
Q. I ask you to move to page 3559. Starting at the top of the page you write to Mr. Stewart, "what were you doing around here, George." Mr. Stewart responds "my Filipino friend that I met in back lived up state B-a-g-u-i-o. Do you know who that person is that Mr. Stewart is referencing?
A. He mentioned him to me, but I don't know the person.
Q. Is that a man?
A. I think it's a man.
Q. Do you have any remembrance of what that person's name is?
A. I'm sorry. I do not.
Q. If you can step back to 3555, the page you were on before, after you had that text message you received from Mr. Stewart that you just mentioned before, the date on that is August 10, 2015. The next text message is October 11, 2016, more than a year later. In that approximately 14 month period did you have any communications with Mr. Stewart?
A. I don't believe so. Like I said, we



spoke on the phone a couple of times. Maybe once, one of those times might have been between that time period, but I remember I tried to avoid communicating with Mr. Stewart as much as I could.
Q. Can you explain since we're on the record what the reasoning was that you didn't want to have any communications with Mr. Stewart?
A. Well, he wouldn't stop talking about his experience while working with George Kaltner and how he was dismissed from the company, how he was mistreated unfairly and he wouldn't stop trying to update me on little details that sometimes would come up out of nowhere.
I didn't really understand. I didn't know about or I didn't want to have anything to do with partially because after I left the company, I wanted to leave the experience that I had in regard to the stressful environment and gossip. I wanted to leave that behind me. I wanted to close the chapter.
By Mr. Stewart bringing it up, his issues with Mr. George Kaltner, he was not allowing me to do. I believe I tried to ask him to stop. Maybe I wasn't expressively direct enough for him to understand it, but he wouldn't stop talking to me.
This is all he would talk about George,



what was going on, what they talked about and he found a lawyer. Some point I stopped paying attention. I didn't want to listen to it. Eventually he took me to not bore me as much as possible in the hopes he will get over the whole situation, come back to being a friend. Stop talking about it, about that matter all the time and just be a friend, talk about other things, maybe help me with things like find a job.
I wasn't employed for over a year. I didn't have anybody helping me review my resume or cover letter. Someone that had more knowledge and more intelligent that I would appreciate a little bit of help with things like that beside just listening to his problem.
Q. Was it your impression Mr. Stewart was someone obsessed with this situation?
A. Absolutely. Yes.
Q. You mentioned you were unemployed for more than a year, correct?
A. Yes.
Q. Did you seek unemployment at the time?
A. No.
Q. So you left and then you just were trying to find another job?



A. Yes.
Q. At any point did you consider going back to Mr. Kaltner or return to Avatar or Sales Technologies?
A. To be honest, it crossed my mind maybe once, but then I thought it wouldn't be a good idea.
Q. Why did you think it would not be a good idea?
A. Well, beside the whole issue between him and David, a couple of reasons. The first one is they would probably try to use that in their favor, make me do things or ask me to do things.
Q. Do you mean spy for him?
A. Maybe, I don't know, but it crossed my mind maybe not a good idea. As soon as he learned I'm working for George even in this text messages, he out of nowhere came up with the idea of me going back to work for him, asking him for outrageous amount of money compared to what I was being paid. That was also confirmation. That's not an if idea I didn't feel good after a while that I was texting about his severance package behind George's back. We didn't have any issues between George.
Q. Issues with George; is that right?
A. Yes.

Q. I ask you to turn to page 3564 starting toward the bottom of the page about halfway through the page Mr. Stewart writes to you, says "heading to court. You respond "really, I didn't?" Mr. Stewart then writes "George is such a dumb d-i-c, suing me for Avatar Dialler with two l's.com. He think I own that company at time, arrival one word arrival to Avatar Technologies. He's a fuckin idiot and wasted my fuckin time so I'm speaking to lawyers to counter sue and try to get 250,000 dollars out of him." You respond back and says "is this about your fight."

Moving to the next page Mr. Stewart responds back and says, now page 3565, "another fight, completely different, he has zero evidence and of course I have all the evidence. I just need one of these three cases to pay out so I can fund the others and take all his money.

Q. What's your understanding about what Mr. Stewart was talking about at this time?

A. Well, the impression that I had at the time, the text message talking about the 250,000 account, he would try to get back from George was that he was pissed. He was upset because George making accusations about AVATAR DIALLER which at the time of this message I understood he was, Mr. George



Kaltner, AVATAR DIALLER.

I didn't know the difference between the L's. I wasn't sure what he meant by he thinks I own that company and I'm arrival. I know him meant George thought he owned the company, but I didn't understand why would what George say he owns the company that belongs to him. That's my rationale. I understood that he was upset because of this and as a result, he wanted to get back at George for making that accusation against him and take all their amount of money from him so he could fund his other cases against him and take even more money.

Q. Do you use Facebook?

A. Yes.

Q. Are you a Facebook friend of David Stewart?

A. Yes.

Q. Are you familiar with his postings?

A. Not at the moment, but before I saw some of his postings, I seen done posting in a while. I don't know if he elected for them not to be showed to me because I know that's option or if he's not posting.

Q. Do you recall seeing Mr. Stewart posting business records of Avatar Technologies on Facebook?



A. Not that I recall.

Q. Do you have any recollection of seeing Mr. Stewart posting payroll records for Avatar Technologies on Facebook?

A. Not that I recall.

Q. Do you have any recollection of Mr. Stewart posting saying "my company, Avatar Dialler will not be taken down, don't mess with me, my company will destroy you or something to that extent?

A. To be honest with you I don't recall that.

Q. Do you recall ever seeing any online posts from Mr. Stewart referencing a company called Avatar Dialler with two l's?

A. I don't recall seeing that.

Q. Did Mr. Stewart ever send you an e-mail using his e-mail address as DavidssAvatarDialler with two ll's.com?

A. No.

Q. Mr. Stewart ever call you and say you could reach me at that same e-mail address?

A. No, not that I recall.

Q. Did Mr. Stewart ever send you an e-mail from e-mail address DavidssDialler360.com?



A. Not that I recall.

Q. Do you recall him ever telling you that was an e-mail address which he could be reached at?

A. Not that I recall.

Q. Turn to page 3566, about the middle of the page starts with "how was your court appointment going on the same date. The next line is "why are you putting that stuff on FB. "I presume FB is Facebook?

A. Yes.

Q. His next response to you is "I need to get like 10 to 20K." You respond "but you're sharing your moves online." He responds back "my real moves are never shared, girl. This is just the bait and switch."

The next page 3567 you respond back "um" and then he writes "I need them to settle, I don't want the case to be dragged out, it's attracting attention to all the ex-employees will be inclined to testify on my behalf."

What is it Mr. Stewart was posting on Facebook to the best of your recollection?

A. To the best of my recollection again that I saw maybe one or two postings about him needing money to continue his fight. His employer

Page 90

elaborated on this posting. He said something along the lines of he needed money to continue the cases against his employer.

I think he put some of the accusations that he brought to court in the posting, but I'm not sure. That's what I was trying to be a friend and advice to my knowledge, you should not be posting things about litigation or any legal matter on Facebook. It will counter-attack you or it could be detrimental to you. It's something you're not supposed to talk about and talking about. That's what I mean.

Q. You recall seeing that message, but you have no recollection seeing any messages around the same time of Avatar Dialler or court can't stop him?

MR. SCHUSTER: I'm a little unclear what we're talking about. Are you talking about Facebook posting she may have seen? I don't know if you've established she visited the site. I assume she did in question. We didn't put that as part of the record she ever visited the site.

Q. Did you ever log onto Mr. Stewart's Facebook page to view it?

A. You mean logging into his personal account or visiting his Facebook page?

Page 91

Q. Visiting his Facebook page.

A. Not for a long time, not after we spoke about.

Q. There would be in approximately January of 2017, January 3rd of 2017. You recall visiting his Facebook profile?

A. I would not say it like that. Things that people post will come up on your feet. Sometimes if the person posts it in the morning and I log into my Facebook in the afternoon, I might not seen the posting because every other posting are being made within after that person made the posting or covering. That might be unless I'm scrolling all the way down. Sometimes I had nothing else to see and I was scrolling down and I would see things. Sometimes there would be things you would not see because so many other people posted.

They would crawl that all the way down or take it out of there completely. I don't recall specifically something I might have went to his profile, but I don't recall going for the sole purpose of seeing what he was posting.

Q. So to the best of your recollection these posts about needing money to the best of your recollection, it was part of your amusement?

Page 92

A. Yes.

Q. Switch to page 3568 starting about less than halfway through Mr. Stewart writes "they can't win against me. Remember that I prepared for this, years of preparation" and you respond back and say "yes, I know you prepared."

What is it to the best of your understanding that Mr. Stewart was preparing for?

A. Well, I remember that Mr. Stewart was doing a lot of reading online at the time that he--I believe he started doing a lot of reading at the time that he started being demoted and that his salary was being cut in half. He was getting educated in law, unemployment law especially after he was let go of the company.

As far as I believe he was looking for a way to counter the disposition of his demotion and salary being cut in half. His impression, he was doing nothing illegal. He could claim it was not legal to maybe get his full pay to what he wants.

But then I know after that sometimes he would share it with me, that he was reading on employment law. He would encourage me to read it. Preparing for the time for he found a lawyer so he could know exactly what he wanted to get advice on,

Page 93

he would be educated on that.

Q. So I understand this, even prior to Mr. Stewart no longer providing services for Avatar Technologies or Sales Technologies he was preparing for a lawsuit to be filed?

MR. SCHUSTER: Object to form. You can answer.

A. No. I would not say he was preparing for a lawsuit. I don't believe he believed there was ever going to be a lawsuit. I don't know if this will answer the question. Mr. Stewart sometimes, oftentimes he is the type of person did not believe what was going on. He was going on. After a while he was in trouble because he was being demoted and he acted as if nothing was wrong, things would go back to normal.

I guess he was really just to get educated as to what was being done to him, if it was being legal so he do process with something to back up his process.

Q. Do you recall approximately when it was that Mr. Stewart was, a term you used, demoted and his pay cut in half?

A. I don't recall exactly.

Q. Switching now to page 3569 starting with

messages that Mr. Stewart is writing, first one he references Ted. Is that Ted Knells?
A. Yes.
Q. The second messages about Mr. Knells, he makes some derogatory comment about him and then writes, "I keep him close though because I'm the ultimate enemy." What do you understand Mr. Stewart to be talking about there?
A. To be honest with you, this is one of the many comments that I wasn't sure what he meant. I believe he was referring to Mr. Ted no longer communicating with him, cooperating with Mr. George Kaltner, I'm not sure what he meant by "I keep him close." Maybe he was going to try to keep contact and text so maybe he could get some insight from whatever he was talking with George. It was my understanding Ted was not answering Mr. Stewart's phone calls. I don't know exactly what he meant here.
Q. Go to 3570, right in the middle Mr. Stewart writes "what's the girl from Concord that entered the transaction in Quick Books, Shat, got it." You respond back "yes, Shay. Mr. Stewart writes and says "Shay, what was her last name."
What is your understanding Mr. Stewart



was talking about with respect to entering the transaction in Quick Books?
A. So around the time Mr. Stewart was being demoted, Mr. Kaltner hired and as part of their CFO we hired a temp to answer data in Quick Books.
Q. This was all transactions into Quick Books?
A. I don't recall exactly what they were. I know that the purpose was to enter anything that was supposed to be in the books and was not in the books yet.
Q. Go to the next page, 3571, continuation of this conversation Mr. Stewart writes "Shay is to refute accounting debacle, their trip to PLN on me, but I don't know. I'm smarter than them. Did I ever send you the e-mail of what they claim I'm responsible for, breaking this up."
Do you know what accounting debacle Mr. Stewart was referencing?
A. No, not that I recall.
Q. Then?
A. I'm sorry, debacle a word.
Q. It's a word. Do you know what that word means?
A. No.



Q. Was there an accounting issue that Mr. Stewart was referencing at that time?
A. There was a problem with our books because it turns out they were not--the company was not brought up in the right order from the beginning. Things had to kind of be turned around, upside down for them to be straight if that makes sense.
Q. Do you know what it was that was done in error?
A. There were many things. I don't recall what they were. That's why the people were hired. He was in charge of finding what was wrong and fixing it. There was so many things. It was broken down in parts. I'm not sure what the whole thing looked like. I know it had to do with the books not being in the right order. It looked like everything was upside down. We needed to do many different steps to make it right. That was the purpose.
Q. Do you believe that any of these issues was due to the conduct of Mr. Stewart?
MR. SCHUSTER: Object to form. You can answer the question.
A. I don't think I can answer that question.
Q. Do you believe that any of the issues



that they were trying to address that you mentioned were caused by Mr. Stewart?
MR. SCHUSTER: Object to form again. You can answer it.
A. I don't know.
Q. The next message says "did I ever send you the e-mail they claim I'm responsible for." You respond "I think you sent me the one for Avatar Dialler" and you respond "I got her number, but you can't ever say you got it from me, I ignored her texts remember. It's not polite to take a phone number without the owner's permission even if I don't know the owner."
Who is this person you came to report?
A. I was referring to Shay, the temp.
Q. How did you receive her telephone number?
A. When she was hired I was overseeing the instructions from CFO. She was supposed to follow the CFO who was not always there. They asked me to follow-up on some of the things. Since she was working closely with me because we were working in the same room.
We interchanged phone numbers in the event that she was not able to come in and she was

Page 98

coming in late, she would call me or text me, communication to the company that she --
Q. Did you have this telephone number on your personal phone?
A. I don't remember.
Q. Do you still have a company phone from Avatar at this point?
A. No.
Q. Turn to page 3575, looking toward the top of the page, talking about a new job you write "I'm learning from bookkeeping prior to this job that you had in approximately January 11, 2017." Do you have any training on how to be a bookkeeper?
A. No.
Q. Were you providing any bookkeeping services for Avatar Technologies or Sales Technologies?
A. I was updating bank and Quick Books. As I learned later on, it's not bookkeeping itself.
Q. Was it your understanding you were working for Avatar Technologies, Sales Technologies that you were doing bookkeeping services?
A. No.
Q. Do you know the name M-a-r-e-l?
A. Yes.

Page 99

Q. Who is Marel?
A. Marel, she was hired in the Philippines to help us with billing before we got Kenneth and Katrina.
Q. Turn to page 3612, Mr Stewart writes "I'm coming to work with you. I'm on Facebook talking to Marel." Do you know--Mr. Stewart tell you what he was talking to Marel about?
A. Not that I remember.
Q. Further down on the page, last line you write "Marel question bitch Marel." Why did you state that?
A. This is how Mr. Stewart used to refer to her because we trained her to do billing. She was very good at it. I believe she had something to--I know she did something wrong and after we trained her she betrayed us.
I believe she was working with her boyfriend in the Philippines to steal Avatar documents, information. I don't know exactly what, but it might be client lists is one of them.
Q. That was the allegation at the time?
A. I believe so.
Q. Do you know if that allegation was ever verified by anyone?

Page 100

A. Well, she got fired from the company. I remember hearing George talk about how she betrayed the company. She has something to do with a boyfriend of her working outside Avatar, against Avatar and she was helping him.
Q. Do you know what the name of the boyfriend was?
A. No.
Q. Page 3618, text message from Mr. Stewart, "I got a secret for you. I'll update you tomorrow." You respond back "okay." Mr. Stewart writes "dollar sign, dollar sign &&&." Message with four dollar signs and lol. Do you know what Mr. Stewart was talking about?
A. He might have been talking about--
MR. SCHUSTER: If you know.
A. I'm not sure, but I think it was talking about leave, something going on with Uber where he mentioned he might be able to find they were doing something wrong and stealing money from drivers.
Mr. Stewart worked as a taxi driver for Uber and left some period of time so did my boyfriend. I remember more than once we spoke about the apps in regard to sometimes he would text me tell your boyfriend, it's more expensive around this area

Page 101

this time.
There was a time we spoke about receipts I got as customer so he could compare it to the report that he would get from Uber so he will see things they were probably not showing. He told me whatever he found, he will share with it so we also could call Uber and demand if anything was owed to my boyfriend. I believe this is what he was talking about here.
Q. Do you recall having a telephone conversation with him after that text message?
A. Probably, yes. I'm not sure.
Q. Do you recall that telephone conversation?
A. No, I don't.
Q. Jumping way forward, page 3664, toward the bottom of the page continuing to the next page Mr. Stewart writes "I saw George Thursday at the Department of Labor hearing, was that a good morning scoop for you." You respond back "although GM." GM is good morning?
A. Yes.
Q. "So the case is settled. Mr. Stewart responds back "no. The MF is playing hardball and instead of collaborating with him against me. I

found out when he received a phone call from Ted while he was in the waiting area. If Ted gets involved, I'm going to ruin his life by putting him in jail for conspiracy. I expressed that to Jason a couple of days ago and to rely that message to him. FYI, there are three cases, unemployment case is just the first one or second, lol."

Do you know what Mr. Stewart is referencing when he says he would put Ted, Ted Knells in jail for conspiracy?

A. I have a mild knowledge of this. After my understanding Ted Knells was not an honest person so as for Mr. Stewart, he did a lot of things that are not ethical and maybe not legal and Mr. Stewart claimed to know about him. He didn't share these things specifically with me.

While he was venting in one of those conversations he said that he knew a lot of things about Mr. Ted Knells. I'm guessing he was referencing to things he believes against him.

Q. Did he tell you any of these things specifically about Mr. Knells?

A. If he did, I don't recall.

Q. He mention Jason?

A. I'm sorry. Going back to Mr. Ted



Knells, he used to mention more than once that Mr. Ted Knells--how do I say this?

Q. It's fine. We can try not to sound improper. You can put it on the record that way.

A. So he will repeatedly, Mr. Ted had sexual relationships with a lot of sexual relationships with a lot of women that work in the company and he would give them raises just because he had intimacy with them. That's one of the things he would mention often that I recall.

Q. So in other words, he alleged that Mr. Knells was exchanging sexual favors for employment benefits?

A. Yes.

Q. Anything else you recall about Mr. Knells that may be something that could be held against him?

A. Honestly, I don't recall specifics. He would use terms as him being a dirty person. I understood that it was a person that did not go by the books all the time. Personally I don't know exactly how.

Q. Do you know if Mr. Knells and Mr. Gentry friendly?

A. I think they're friendly.



Q. Do you have any communications with Mr. Gentry?

A. No.

Q. Have you ever had any communications with Mr. Gentry?

A. While I was working, while we were both working in the company for Mr. George Kaltner we would communicate as part of our job duties.

Q. Do you recall what Mr. Gentry's position was with the company?

A. Again, I believe he was a CFO prior to Mr. Oscar Razzouk.

MR. LURIE: Let me get that spelling now before we forget. R-a-z-z-o-u-k.

Q. Did Mr. Stewart ever talk about Mr. Gentry prior to say September of last year? Do you have any recollection hearing about Mr. Gentry prior to September 2017?

A. He mentioned him a couple of times. I'm not sure around what time, but in reference to things, inferred things Mr. Kaltner would say. The part where he will collaborate against George in the form of a lawsuit. I believe it was last year only that I heard about that.

Q. Is it your understanding that the



lawsuit that was filed by Mr. Gentry was based upon false accusations if you know?

MR. SCHUSTER: If you know.

A. I don't know about that.

Q. Do you know if the allegations are against Mr. Kaltner by Mr. Gentry?

MR. SCHUSTER: If you know.

A. I read something on Google. I Googled their names. Honestly, I didn't understand what it is. I don't know.

Q. I'll ask a couple of very direct questions on this. Did Mr. Kaltner ever travel to the Philippines with a large amount of money for bribing judges?

A. I don't know.

Q. Did Mr. Kaltner, Mr. Kaltner have the ability to control the Philippine government?

MR. SCHUSTER: Didn't you ask that at the onset of this deposition?

MR. LURIE: We did. Maybe I'll be a little more specific.

Q. Do you know about Mr. Stewart having power over judges in the Philippines?

A. Not that I know of.

Q. Did you ever hear of a black list that

bars people from entering the Philippines?
A. The term sounds familiar.
Q. Do you know if Mr. Kaltner controls the black list for people entering the Philippines?
A. Not that I know of or that I recall.
Q. Let's jump ahead to page 3668. Mr. Stewart writes "I got a bombshell for you, call me back soon." Did you speak to Mr. Stewart after that?
A. I don't believe I did.
Q. Follows up "nerve called me." Do you recall ever trying to find out what he was referencing about this bombshell?
A. I remember trying not to find out.
Q. Going to the next page, 3669 in the middle of the page Mr. Stewart writes "did I tell you Ted snitched on me to George about when I went to Baguio last year. I'm going to put Ted in jail for that shit."
Did you ever have any further communications with Mr. Stewart with respect to Mr. Stewart's threats to put Ted Knells in jail for snitching?
A. I don't believe I did. For a fact I remember not being interested in learning those



details.
Q. 3671 Mr. Stewart writes "when you get a chance, try to recall this day, April 10, 2014. This is the date that George came to my office and brutally attacked me out of nowhere yelling and screaming "you fucked up."
Next, he sent you that e-mail on the following Saturday to reduce my salary to half. Who was present at the office that day, Ted Knells, Peter Kefalas, Raudy. Was Bria, Ken or Dylan also there question mark."
Do you recall receiving this text message from Mr. Stewart?
A. I recall.
Q. Do you recall April 10, 2014?
Q. What happened on April 10, 2014?
A. If this is the day that he's implying this argument happened, George met with Mr. Stewart to claim to him or discuss his performance. That's my only understanding. His performance on the job he was sent to do in the Philippines.
There was a discussion. This expression fucked up was said. I don't remember a lot of details. I know George was upset. He was letting David know how he felt and what he thought of the



whole situation.
Q. Do you recall who else was at the office at the time?
A. No. I could guess.
Q. Is it your belief that Mr. Stewart was suffering from any type of emotional distress?
MR. SCHUSTER: Object to form.
Q. Let me, did Mr. Stewart come off as being upset?
A. Are you asking while he was working there or after he wasn't employed?
Q. After.
A. Yes. He seemed to be upset a lot of the time.
Q. Mr. Stewart appear depressed?
MR. SCHUSTER: Objection to the form.
A. Not that I know. Depression is not recognizable.
Q. Did he ever tell you he was depressed?
A. No. I know he was feeling down sometimes, but I don't know recall him saying expressly the word depression.
Q. Turn to the last page, 3673, last two by Mr. Stewart, "what drama am I in, I'm having fun, I'm not stressed, you should be a part of it, call me for



a one minute chat. It seems as if I'm the only one who believes."
Do you know what Mr. Stewart was talking about at that time?
A. Well, previous text message from him where he was asking me why wasn't I communicating, if I too was stopped from talking to him. I told him nobody can tell me who I can talk to or not. I think he asked me something along the lines of if I wasn't interested on having communications with him anymore and I said I do, but you're involved in too much drama. This was his response to that.
Q. The last message takes place on December 14, 2017. Did you have any other text messages with Mr. Stewart after December 14, 2017?
A. No.
Q. Prior to your reaching out to him after you received the letter from my office, did you have any communications with Mr. Stewart between you received that letter and the date of December 14, 2017?
A. No.
Q. Are you familiar with the program called viber, v-i-b-e-r?
A. Yes.

Page 110

Q. Do you have a viber on your phone?
A. No.
Q. Did you ever have viber on your phone?
A. Yes.
Q. Did you communicate with Mr. Stewart over viber?
A. Yes.
Q. What's your understanding of what viber is as a program?
A. My understanding is viber is a texting app or chatting similar to other texting apps.
Q. But nothing in particular special about viber otherwise?
A. Well, I think if you use--you can use it overseas with what is app. You get Internet access you don't need to have your phone number connected. That's what I believe. You don't need to have your phone number connected to a service. You can use it with Internet, do phone calls and text messages I believe.
Q. Do you recall what your discussions with Mr. Stewart were over viber?
A. Well, we had very few discussions over viber. I remember the purpose of the app was to talk about another emotional corner. He had like a second

Page 111

wife. His wife here in the States would go to the phone and will look at the messages he didn't want her to see. I think she still doesn't know about his wife.
Q. Your understanding is he wanted to utilize this program to discuss affairs he was having?
A. Yes. Sometimes he would talk to me about personal things like that, this was a person he cared for. He would tell me about how she was doing, if they were going to see each other again. He would vent to me about how he felt with her or of her. He misses her, things like that. She's not dating anyone else, things like that. He didn't want his wife to see. He asked me to down load viber and that's when we started talking about that.
Q. How long were you utilizing vibe?
A. I'm not sure, maybe a couple of months.
Q. Were you aware of Raudy providing David Stewart 10,000 dollars to fund the lawsuits?
A. Not that I recall.
Q. Do you recall Mr. Stewart ever talking to you about trying to get people to invest in his lawsuits?
A. Yes. I don't recall if he used the word

Page 112

investment. He did say he was trying to get people to collaborate and help him in his case.
Q. Did he ever ask you directly to loan him any money?
A. Not that I recall.
MR. SCHUSTER: You asked that already.
Q. Are you familiar with an individual named Jeff Torrez?
A. Prior to you mentioning I have no recollection of this person.
Q. Since I mentioned that, has anything about Jeff Torrez refreshed your recollection about him?
A. I tried to think if I know or heard the name, but I can't recall. I believe I didn't hear of this person.
Q. Are you familiar with the company that Mr. Stewart and Mr. Knells formed in the Philippines?
A. No.
Q. Do you know if Mr. Stewart and Mr. Knells formed a business in the Philippines?
A. No.
Q. Mr. Stewart in text messages talking about Ted with Baguio. Do you know what he was referencing about Baguio?

Page 113

A. One of the trips, as of my understanding he made a couple of trips to the Philippines after he was no longer working for George. He might have visited this state. I don't know what Baguio is, looks like a community in the Philippines.
Q. Do you know if Mr. Stewart opened up a competing center, call center in the Philippines?
A. What I know about that is he was working for a call center in the Philippines. I don't know for a fact if he did. He didn't tell me that.
Q. Do you know who else was working at that call center in the Philippines?
A. I don't think he mentioned.
Q. Do you know of any other Avatar employees were working there?
A. Not that I recall.
Q. Mr. Stewart ever talk to you about where he was working in the Philippines getting shut down?
A. I'm sorry.
Q. Did Mr. Stewart ever discuss with you about this other call center in the Philippines getting shut down?
A. I believe he did.
Q. To the best of your recollection what did he tell you about that?

Page 114

A. He said George found out about him working in call center over there. He was pissed and now he cannot return to the Philippines.

Q. Did he tell you why he cannot return to the Philippines?

A. I believe George pressed charges against David for doing that.

Q. Is that what Mr. Stewart told you?

A. Whatever he told me made me come to that conclusion.

Q. Do you recall Mr. Kaltner ever asking Mr. Stewart to become the CEO of Rainbow Slushy?

A. I don't recall that.

Q. Do you know if Mr. Stewart was the CEO of Rainbow Slushy?

A. Not that I know of.

MR. LURIE: I'm going through my notes.

(There is a recess.)

Q. One last question, do you know why Rainbow Slushy closed?

MR. SCHUSTER: Do you know if he closed it.

A. I think I have an idea.

Q. What's your understanding of why it closed?

Page 115

A. Rainbow Slushy could not make a profit for various months. They, I think they never took money and invested to create a business.

MR. LURIE: No further questions.

MR. SCHUSTER: No questions.

(Whereupon deposition is concluded at 4:55 p.m.)

Page 116

C E R T I F I C A T E

I, DEBORAH A. GAUGHAN, a Notary Public and Certified Shorthand Reporter of the State of New Jersey, do hereby certify that prior to the commencing of the examination EDIVICT VALENZUELA was duly sworn by me to testify the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

Deborah A. Gaughan

Notary Public of the State of New Jersey
My Commission Expires: 4/8/23

**&**

**&** 14:5,6,14,17
**&&&** 100:12

**0**

**003536** 8:25
**003673** 8:25
**07601** 2:7,10
**09337** 1:5

**1**

**10** 31:7 82:21 89:12 107:3,15,16
**10,000** 49:18,23 111:20
**100** 31:14
**11** 82:22 98:12
**14** 82:23 109:14,15 109:20
**14,000** 80:2
**17** 8:23 68:6
**18** 1:24
**186** 4:1
**1:40** 1:24

**2**

**20** 31:8 56:18
**2005** 12:4
**2006** 11:1,17
**2008** 11:15 12:8
**2011** 12:17 13:22 13:23 16:1 77:11
**2012** 13:25 14:12
**2013** 15:1,9 16:3 22:23 45:17
**2014** 107:3,15,16
**2015** 23:6 29:1 39:4 82:21
**2016** 82:22
**2017** 91:5,5 98:12 104:18 109:14,15 109:21
**2018** 1:24 54:23 68:7
**20k** 89:12
**250,000** 86:10,21

**3**

**34** 30:25
**347-782-3255** 68:24
**3536** 71:6
**3539** 73:19,20
**3542** 74:10
**3543** 75:24
**3544** 77:7
**3548** 78:10
**3551** 79:13
**3555** 80:11 82:18
**3559** 82:4
**3564** 86:1
**3565** 86:13
**3566** 89:5
**3567** 89:16
**3568** 92:2
**3569** 93:25
**3570** 94:20
**3571** 95:12
**3575** 98:9
**36,000** 30:25
**3612** 99:5
**3618** 100:9
**3664** 101:16
**3668** 106:6
**3669** 106:15
**3671** 107:2
**3673** 108:23
**3rd** 91:5

**4**

**4** 3:6 80:1
**4/8/23** 116:23
**40** 63:23
**4:55** 115:7
**4k** 76:4 79:17

**5**

**5** 68:7 76:1,4,11,12 76:13
**5,5** 80:1

**6**

**6:00** 46:18,21

**7**

**75** 1:23 2:9
**7:00** 46:18,21
**7:16** 1:5
**7:30** 46:11,21

**8**

**8/9/2015** 73:21
**8:00** 46:10,11

**9**

**9:00** 46:20

**a**

**abiding** 81:14,21 81:22
**ability** 17:10,15 105:17
**able** 5:2 7:4 40:4 49:6 97:25 100:19
**absolutely** 84:18
**acceptable** 7:15
**access** 25:23 26:1 48:25 49:5,9 58:18,21 66:25 67:3 71:20 72:20 110:15
**account** 49:10,13 49:19 86:22 90:25
**accountant** 12:20 51:14
**accountants** 38:11 51:12 52:9
**accounting** 16:9,9 16:10,11,12 23:15 24:8 38:2 40:25 50:24 51:3,6,9 72:2 95:14,18 96:1
**accounts** 19:25 48:23 49:7
**accurate** 7:20 56:5 78:16 80:2 116:10
**accusation** 34:4 87:10
**accusations** 53:15 53:17 57:9 86:24 90:4 105:2
**accused** 34:2
**act** 63:22
**acted** 93:15
**action** 80:15 116:15,18
**acts** 63:19
**added** 44:18
**addition** 6:4
**additional** 8:10 9:10,13 37:7
**address** 88:18,22 88:25 89:3 97:1
**adjusting** 44:12
**administration** 12:19
**administrative** 13:20
**advice** 61:14 63:9 63:10,10 64:23 90:7 92:25
**advise** 58:14
**affairs** 111:6
**afternoon** 91:10
**agent** 1:16 40:15
**ago** 102:5

**agree** 75:12
**ahead** 27:18 28:3 33:21 42:11 106:6
**air** 18:19 25:20,24 26:5
**al** 1:17
**alan** 30:10,13 51:17 76:17,23,23
**alan's** 30:11
**alcohol** 4:25
**alike** 77:8
**allegation** 99:22 99:24
**allegations** 79:5 105:5
**alleged** 103:11
**allow** 5:24 43:23
**allowed** 72:19
**allowing** 83:21
**amount** 30:7,7,22 49:19 50:4,15 70:15 76:9,14 85:18 87:10 105:13
**amusement** 91:25
**answer** 5:7,25 6:15,17,25 7:14,17 23:19 27:17 31:23 33:21 35:6,13 42:11 43:21,23 72:17 76:11 78:2 93:7,11 95:5 96:22,23 97:4
**answering** 7:7,24 81:14 94:17
**answers** 5:3 6:4 7:4
**anybody** 16:8,10 17:12,15 64:25,25 84:11
**anymore** 109:10
**apologize** 10:11 22:5 43:13
**app** 110:11,15,24
**appear** 9:1 108:15
**appeared** 38:24 39:7
**application** 10:2
**appointment** 89:6
**appreciate** 68:19 84:13
**approaching** 72:17
**approximately** 13:7,10,21 14:10 14:13,23 15:3 16:3 18:8 20:13 20:15 22:23 39:2 45:9,17 56:4 82:23 91:4 93:21 98:12
**apps** 100:24 110:11
**april** 14:12 56:3,5 59:18 107:3,15,16
**area** 100:25 102:2
**argument** 72:25 73:4,6,8,17 107:18
**arrested** 54:6
**arrival** 86:7,7 87:4
**asap** 79:15
**asked** 7:2 9:9 16:8 20:19,21 57:7 59:2,22 62:6 72:15 97:20 109:9 111:15 112:6
**asking** 18:4 23:13 40:10 61:13 85:18 108:10 109:6 114:11
**asks** 78:12,15
**assistant** 13:20 21:19,20 38:22
**assisted** 35:22,23 44:9
**assume** 90:19
**assuming** 72:12
**attack** 90:9
**attacked** 107:5
**attempting** 76:5
**attend** 11:3 12:9 12:11,13,24
**attending** 4:17
**attention** 64:21 84:3 89:19
**attorney** 2:10 4:14 6:12 10:1 43:14 64:14 116:14,16
**attorney's** 5:11
**attorneys** 2:8 6:20 10:12
**attracting** 89:18
**audit** 47:13,16,18 47:22 50:18
**august** 15:1 82:21
**available** 9:14 61:2
**avatar** 1:7,9,13,16 4:6 15:5,8,10 17:18 18:1,11,18 18:22 19:4,7,8,9 19:10,13,13,17,21 20:8,16 21:23 22:24 28:25 31:6 31:19,21 32:19 35:1,11,16 36:9,9 36:10,20,21,22 38:5 44:15 45:12 47:1 48:6 49:10 49:14 50:14,23 61:15 64:17 66:20 66:25 67:18 69:4 69:10 70:1 71:15 77:18,21 78:13 85:3 86:6,8,24 87:1,25 88:3,7,15 90:15 93:3 97:8 98:7,16,21 99:19 100:4,5 113:14
**avoid** 65:5,21 83:3
**aware** 36:3 111:19

**b**

**b** 1:7 3:10 30:12 30:12 38:16 82:8 109:24
**bachelors** 12:21
**back** 28:10 29:6 30:18 41:11 43:24 44:1,2 45:14,16 60:24 63:17 74:22 76:21 77:11 78:3 81:13,14,18 82:8 82:18 84:6 85:2 85:17,22 86:11,13 86:22 87:9 89:13 89:16 92:5 93:15 93:19 94:23 100:11 101:20,24 102:25 106:8
**background** 23:10 31:2
**backward** 23:8
**bad** 47:5
**baguio** 106:18 112:24,25 113:4
**bait** 89:14
**balance** 79:15,17 79:19
**bank** 36:23,25 37:2 71:13,25 73:2 98:18

**bars** 106:1
**based** 105:1
**basic** 23:15 24:13
**basically** 25:10 40:1 53:11 60:23 64:25 65:1 72:11 75:9
**bates** 8:24,25 71:5
**bathroom** 7:22
**beginning** 8:24 56:5 77:24 78:2 96:5
**behalf** 89:20
**belief** 31:19 78:22 108:5
**believe** 13:24 18:3 20:12,25 21:1,17 22:6,12,20 23:5 24:3 25:21,24 26:18 30:3,12,24 32:7,20,24 33:25 34:11 35:15,17,18 37:20,21 38:6 39:4 40:16 45:23 47:3,6,8,17,21 48:17 49:19 51:23 52:19 54:21 55:7 59:9,25 63:23 68:3 69:15 71:10 72:15 73:1,16 74:17 79:10,25 80:17 81:9 82:25 83:22 92:11,16 93:9,12 94:11 96:19,25 99:15,18 99:23 101:8 104:11,23 106:10 106:24 110:17,20 112:15 113:23 114:6
**believed** 93:9
**believes** 102:20 109:2
**belonged** 72:6
**belongings** 73:2
**belongs** 74:25 87:7
**benefits** 103:13
**best** 17:9 21:11 26:14,16 28:5 31:12,14,17 32:3,5 33:11,14 34:22 38:19,21 43:23 44:22,24 51:5,8,24 52:1,3 55:4 68:1 73:7 74:4 78:7 89:22,23 91:23,24 92:7 113:24
**betrayed** 99:17 100:2
**beyond** 35:8 76:10
**billing** 24:22,25 25:2 35:8 38:9 77:10,17,21 78:5,8 99:3,14
**bit** 10:11 22:25 23:7 27:4 40:17 43:24 47:4 54:11 56:13 63:18 68:17 80:18 84:13
**bitch** 99:11
**black** 105:25 106:4
**blackmail** 66:12 78:23
**blackmailed** 78:25
**blackmailing** 66:14
**body** 65:18,18,20
**bombshell** 106:7 106:13
**bookkeeper** 98:13
**bookkeeping** 98:11,15,19,22
**books** 48:25 49:3 94:22 95:2,5,7,10 95:11 96:3,15 98:18 103:21
**bore** 84:4
**born** 10:19
**borrow** 66:3
**bottom** 86:2 101:17
**boyfriend** 99:19 100:4,7,23,25 101:8
**breach** 55:10
**break** 7:21,25
**breaking** 95:17
**brevity** 71:5
**bria** 20:25 21:12 40:18,20 67:21 107:10
**bribing** 105:14
**brief** 6:21 43:14 68:8
**briefly** 9:24
**bring** 9:9 50:4 65:3 81:22
**bringing** 83:20
**broke** 56:19,24
**broken** 96:13
**bronx** 11:9 14:9 14:22 41:13
**brought** 40:18,20 40:22 41:4,15 64:21 90:5 96:5
**brutally** 107:5
**building** 40:8
**bunch** 9:19 36:8
**business** 12:19 14:6 16:24 17:2,5 22:16 34:13,16 35:9 36:4,16,18 37:11 43:18,21 81:16 87:25 112:21 115:3
**businesses** 18:20 36:13 66:21

**c**

**c** 2:4 86:5 116:1,1
**calculated** 48:14
**calculations** 48:20
**call** 16:8 18:19 20:19,23 26:10 55:22 56:9,13,16 57:22,23,24 59:11 59:14,18 60:7,8 61:6,6,7,9,12 65:4 67:16 88:21 98:1 101:7 102:1 106:7 108:25 113:7,9,12 113:21 114:2
**called** 16:6,20 18:12,22,24 19:3 25:24 34:13,17,20 44:19 47:14 55:23 55:24,25 56:8,17 59:16 64:13 74:15 88:14 106:11 109:23
**calls** 94:18 110:19
**callvation** 34:17
**capacity** 1:16
**car** 13:14,18 14:1
**cared** 111:10
**cars** 14:7
**case** 1:5 55:9 59:6 62:15,16,19,20,23 64:3 65:7 76:6 77:4 89:18 101:23 102:6 112:2

**cases** 86:16 87:11 90:2 102:6
**cash** 48:23 49:12 49:18,22 50:1,4 70:24
**categorize** 66:13
**caused** 97:2
**ceased** 28:12 67:6
**cell** 68:23 69:2,3 70:6
**center** 18:19 113:7 113:7,9,12,21 114:2
**ceo** 114:12,14
**certain** 23:13
**certified** 1:22 116:4
**certify** 116:5,9,13
**cfo** 32:6 95:4 97:19,20 104:11
**challenged** 4:18 81:20
**chance** 107:3
**changed** 19:10 39:1
**chapter** 83:19
**charge** 19:23 22:1 22:7 30:15 34:3 48:3 96:12
**charges** 44:11 114:6
**chat** 109:1
**chatting** 110:11
**check** 71:2,3
**checking** 48:23 49:6,9,13,18
**checks** 37:7
**chen** 4:15 54:24 61:14,18 62:21 63:6,8 64:6,13
**chicken** 77:5
**christian** 20:25 21:12
**christopher** 11:7
**circumstances** 6:22
**citizen** 10:23
**civil** 1:5 10:16
**claim** 26:23 92:19 95:16 97:7 107:19
**claimed** 26:24 53:18 56:24 102:15
**claiming** 63:16
**clarify** 42:25 49:3
**cleaning** 42:15,18
**clear** 32:10 43:7,8 76:5 79:11
**client** 4:6 62:18 63:2 67:1,6,7,10 99:21
**clients** 34:25 53:21 61:22
**close** 17:6 63:21 83:19 94:6,14
**closed** 114:20,21 114:25
**closely** 18:17 21:22 22:20 97:22
**collaborate** 104:22 112:2
**collaborating** 101:25
**collect** 9:25
**college** 12:9,11,13 12:23 13:1,23 15:22 16:1
**columbus** 11:7
**come** 4:20 10:4 16:21 27:6,14 32:12 46:11 60:8 83:12 84:6 91:8 97:25 108:8 114:9
**comfortable** 23:14
**coming** 11:16 43:16 98:1 99:6
**commencing** 1:24 116:6
**comment** 53:12 71:7 94:5
**comments** 94:10
**commission** 47:24 48:12,15,19 116:23
**communicate** 75:8 104:8 110:5
**communicating** 80:18 83:3 94:12 109:6
**communication** 27:2 98:2
**communications** 82:24 83:7 104:1 104:4 106:21 109:10,19
**community** 113:5
**companies** 28:13 29:9 33:24 36:8 38:1 43:3 44:17
**company** 1:13 13:12 16:19 17:8 18:12,21,24 19:3 20:21,22 26:17 29:24 30:8 31:20 31:20,21 33:23,23 33:24 34:4,6,6,19 34:24 37:8 40:18 40:20,23 43:9 44:8,11,25 45:1,8 45:13,20,22,23 46:23 47:14,23 52:12 53:20 66:19 72:2,18 77:1,2 78:1 83:10,16 86:7 87:4,5,7 88:7 88:9,14 92:15 96:4 98:2,6 100:1 100:3 103:8 104:7 104:10 112:17
**compare** 101:3
**compared** 85:19
**competing** 113:7
**complete** 5:3 7:4,8 7:20 68:13
**completely** 28:4 77:10 86:14 91:19
**compliant** 1:7
**computers** 30:16 71:16
**concluded** 115:6
**conclusion** 114:10
**concord** 94:21
**concrete** 72:17
**conduct** 96:20
**conference** 61:6,7
**confirmation** 85:20
**confused** 7:3
**confusing** 7:3 42:12
**connected** 110:16 110:18
**consider** 7:18 65:16,19 85:2
**conspiracy** 102:4 102:10
**constantly** 77:1
**contact** 15:25 51:9 55:17 59:21 60:4 94:14
**contacted** 16:18 23:9 44:10 55:19 55:21 60:25

**content** 57:17 70:4 70:7
**contingency** 65:8
**continuation** 95:12
**continue** 26:20,21 72:22 89:25 90:2
**continuing** 101:17
**control** 105:17
**controller** 17:7
**controls** 106:3
**conversation** 62:12 70:8,10 95:13 101:11,14
**conversations** 52:24 60:15,18 69:21,24 102:18
**conveyed** 34:7
**convicted** 10:14 78:14 79:5
**cook** 41:6
**cooperating** 94:12
**copy** 57:13 58:18 67:6,10
**corner** 110:25
**corporate** 43:10 73:22
**correct** 9:10,20 10:9,20,21 12:2 18:1,2,5,10 23:17 24:22 25:5 29:1 50:18 55:14 57:2 84:20
**counsel** 58:5,11 65:12 116:14,16
**counter** 59:9 86:9 90:9 92:17
**couple** 39:13 67:21 81:4 83:1 85:10 102:5 104:19 105:11 111:18 113:2
**course** 23:4 46:21 52:11 86:15
**court** 1:2 5:13,14 5:17,21 58:17,19 64:1 86:4 89:6 90:5,15
**cousin** 68:3
**cover** 84:12
**covering** 91:13
**crawl** 91:18
**create** 5:16 78:8 115:3
**created** 78:3,4
**creating** 54:9 74:19
**crime** 10:14
**criminal** 78:14 79:6
**crossed** 85:5,14
**cultivate** 77:9
**currently** 4:24
**customer** 19:24 25:5,7 35:8 101:3
**cut** 28:6 92:13,18 93:23
**cv** 1:5

**d**

**d** 1:7 3:1 22:11,13 86:5
**damage** 65:3
**data** 95:5
**date** 82:21 89:7 107:4 109:20 116:12
**dating** 111:13
**david** 1:12,12,16 4:14 10:3,7,7 15:12,16,21 20:2 25:3,9,10 26:23,24 28:18,22 29:16 32:14 37:20 38:3 38:21 39:7,11,18 40:21 41:6 42:5 44:25 63:11 65:23 68:7 75:7 81:12 85:10 87:15 107:25 111:19 114:7
**davidssavatardia...** 88:18
**davidssdialler36...** 88:25
**davidtpo** 44:20,23 45:3 71:16 72:4,5 72:16
**day** 26:4 46:19,20 72:18,24 76:23 77:11 107:3,9,17
**days** 46:21 72:11 102:5
**debacle** 95:14,18 95:22
**deborah** 1:22 116:3
**december** 13:23 16:1 109:13,15,20
**deception** 78:15
**decide** 63:3 65:19
**decided** 4:19
**decision** 24:1,5
**defendants** 1:18
**define** 24:19
**definitely** 17:7
**defunct** 1:8,9
**degree** 12:18,21 40:25
**delete** 73:21 74:2
**deleted** 74:5
**deliberately** 43:19
**demand** 101:7
**demands** 75:9,18 81:13
**demoted** 26:18 28:5 39:7,11 92:12 93:14,22 95:4
**demotion** 38:24 92:17
**department** 17:8 19:24 22:8 38:9 38:10 101:19
**departure** 72:18
**deposed** 4:22
**deposition** 1:8 4:15,18,19 5:8,10 8:4,4,8,24 68:7,23 105:19 115:6
**depositions** 10:13
**depressed** 108:15 108:19
**depression** 108:17 108:22
**derogatory** 94:5
**describe** 16:15
**described** 38:12
**description** 3:12
**destroy** 88:9
**details** 61:10 62:16 70:14 83:12 107:1,24
**detrimental** 90:10
**developed** 77:17 77:20
**devoted** 62:12
**dial** 75:12
**dialer** 1:7 4:6
**dialer360** 1:14
**dialler** 1:13,15,17 86:6,24 87:1 88:8 88:15 90:15 97:9

**difference** 87:2
**different** 19:23 21:22 25:24 28:18 40:2 43:9 86:14 96:17
**digits** 71:6
**direct** 20:1 83:23 105:11
**directed** 6:18
**directing** 50:4
**directly** 21:18 66:16 67:25 112:3
**dirty** 103:19
**discuss** 6:22 57:22 58:24 60:19 61:14 62:15,19 107:19 111:6 113:20
**discussed** 52:25
**discussing** 62:14 73:25
**discussion** 6:2,21 11:2 43:12,15 54:22 58:6 74:8 79:18 107:22
**discussions** 53:5,9 60:22 70:5 78:24 110:21,23
**dismissed** 83:10
**disposition** 92:17
**distress** 108:6
**district** 1:2,3
**document** 68:9,14 68:21 71:4 73:19
**documents** 8:16 9:2,4,6,10 68:11 80:9 99:20
**doing** 16:22 24:22 25:4,18 35:8 42:5 82:6 92:10,11,19 98:22 100:19 111:10 114:7
**dollar** 100:12,12 100:13
**dollars** 49:18,23 74:19 80:3 86:10 111:20
**dominican** 11:24 11:25
**donation** 76:22
**dragged** 89:18
**drama** 108:24 109:12
**driver** 100:21
**drivers** 14:7 100:20
**drugs** 4:25
**due** 96:20
**duly** 4:2 116:7
**dumb** 86:5
**duties** 19:23 104:8
**dylan** 107:10

**e**

**e** 2:4,4 3:1,10 9:19 9:22,25 10:2,3 22:11,13 30:12 51:22,25 52:2,4,7 68:12 81:10,11 82:1 88:17,18,22 88:24,25 89:3 95:16 97:7 98:24 107:7 109:24 116:1,1
**earlier** 4:16 46:16 46:22 68:12,16 76:24
**earliest** 46:17
**early** 46:9,13 59:18
**earned** 29:22
**easier** 44:1
**east** 4:1
**edivict** 1:9 3:4 4:1 116:6
**educated** 92:13 93:1,18
**efforts** 29:23
**either** 6:21 38:4
**elaborate** 28:1 40:4 62:13
**elaborated** 64:12 90:1
**elected** 87:21
**emotional** 108:6 110:25
**employed** 13:2,4,8 13:22,24 14:13,16 14:18 15:4,5 17:17 28:25 32:18 43:1 50:13 61:19 61:22 84:10 108:11
**employee** 30:6 40:14 42:22,23 76:24 116:14,16
**employees** 17:20 17:23 29:12,14 30:2 31:5,15 38:7 44:18 45:15 53:13 89:19 113:15
**employer** 89:25 90:3
**employment** 55:7 64:17 69:9 92:23 103:13
**encourage** 92:23
**enemy** 94:7
**enter** 95:9
**entered** 94:22
**entering** 95:1 106:1,4
**entities** 43:9
**entitled** 1:21 63:24
**entity** 1:14,15,15 43:7 44:19
**environment** 29:6 77:14 83:18
**erase** 69:13,16
**erased** 69:17,18
**error** 96:9
**especially** 92:14
**espinosa** 59:25 60:5
**esq** 1:23 2:7,9
**essex** 1:23 2:9
**established** 29:20 37:15 48:17 90:19
**estimate** 7:13 15:1 31:12,14 50:16
**et** 1:17
**ethical** 102:14
**event** 40:8 97:25
**events** 40:11
**eventually** 36:10 84:4
**everybody** 62:8
**everybodys** 63:21
**evidence** 65:2 86:14,15
**evolved** 41:2
**ex** 89:19
**exact** 50:15 73:6
**exactly** 14:25 21:9 21:9 22:6 25:25 31:4 44:16 48:16 62:5,24 63:19 64:9 70:20 75:3 79:1,2,12 81:5,19 92:25 93:24 94:18 95:8 99:20 103:22
**examination** 3:6 4:4 116:6

**example** 19:24 23:14 53:14 75:13
**excel** 23:14 24:11 24:15
**exchange** 59:12
**exchanging** 103:12
**excuse** 6:22 25:25 76:17
**exhibits** 3:13
**existence** 19:14
**expect** 52:22 66:16
**expensive** 100:25
**experience** 16:11 16:12 23:16 24:8 24:11,13 83:9,17
**expires** 116:23
**explain** 33:17 37:10 63:18 83:5
**explained** 15:17 28:7 63:20 64:24
**explicitly** 64:10 66:1
**expressed** 102:4
**expression** 107:22
**expressively** 83:23
**expressly** 108:22
**extent** 88:10
**external** 37:25 44:8
**extortion** 66:10

**f**

**f** 14:5,6,14,17 116:1
**facebook** 87:13,15 87:25 88:4 89:9 89:22 90:9,17,23 90:25 91:1,6,10 99:6
**fact** 106:24 113:10
**facts** 61:15,17 63:12,14
**fair** 30:5 66:13
**fairly** 29:19 52:19
**false** 53:17 57:14 105:2
**familiar** 18:12,21 18:24 19:2,3 20:3 26:11 31:25 71:14 87:18 106:2 109:23 112:7,17
**far** 81:19 92:16
**favor** 85:11
**favors** 103:12
**fb** 89:8,8
**fee** 74:18
**feel** 29:9 85:21
**feeling** 108:20
**fees** 76:2
**feet** 91:8
**felt** 23:15 29:5,6 29:11 75:21 107:25 111:12
**fight** 86:11,14 89:25
**file** 54:15
**filed** 80:8 93:5 105:1
**filipino** 82:7
**fill** 63:4
**final** 8:2 24:1
**finance** 17:8 19:24 67:13
**financial** 49:4
**financially** 116:17
**find** 77:2 84:9,25 100:19 106:12,14
**finding** 96:12
**fine** 103:3
**finish** 5:24 7:24
**finished** 13:23
**fire** 17:15,18
**fired** 32:7,9 100:1
**firm** 38:2 50:24 51:3,6,9
**first** 4:13 5:23 15:10 16:17 20:10 22:5 23:9 29:5 37:14,16 41:16 44:12 46:10,18 65:6 68:21 76:22 85:10 94:1 102:7
**five** 18:3,8 74:19
**fiverr.com** 74:15
**fixing** 41:11 96:12
**focused** 40:1
**folder** 71:15,18,19 71:20,23,25
**follow** 30:18 48:18 97:19,21
**following** 107:8
**follows** 4:3 106:11
**food** 41:22 42:2,8
**foregoing** 116:9
**foreign** 1:13,14,15
**forget** 104:14
**forgetting** 52:15
**form** 6:14 23:19 27:16 28:3 31:22 33:20 35:5,12 37:13 42:10,23 48:2 49:2,15 66:2 67:20 75:20 93:6 96:21 97:3 104:23 108:7,16
**formal** 23:12
**formally** 23:21,22
**formed** 112:18,21
**formula** 48:17,18
**forth** 60:24 81:13 81:18 116:12
**forward** 10:4 73:18 79:13 101:16
**forwarded** 68:11 81:24
**found** 84:2 92:24 101:6 102:1 114:1
**four** 71:6 72:11 100:13
**frame** 39:6
**free** 58:14
**frequency** 80:5
**friend** 15:24,24 82:7 84:6,8 87:15 90:6
**friendly** 60:23 103:24,25
**friends** 15:23
**front** 8:22 68:5 71:4
**fucked** 107:6,23
**fuckin** 86:8,9
**full** 68:13 92:20
**fun** 108:24
**fund** 86:16 87:11 111:20
**further** 76:3 99:10 106:20 115:4 116:9,13
**future** 29:23
**fyi** 102:6

**g**

**g** 35:24 82:8
**gaughan** 1:22 116:3
**gentry** 32:1,3,5,9 32:13 33:3 34:1,2 34:8 53:7,10,14,23 54:1,6,9,12,15 103:23 104:2,5,16 104:17 105:1,6

**gentry's** 104:9
**george** 1:6 4:7 20:4,6,10,18,19 21:17 24:6 26:25 27:22,25 28:2,19 28:19 29:11 38:1 38:22 39:15 45:7 47:9 53:12 54:12 55:10 56:14 57:21 58:20 59:8 63:17 64:1,1 66:18,19 72:1,25 73:15 75:6 76:12 77:23 78:15 79:3 80:23 81:8 82:7 83:9,21 83:25 85:16,23,24 86:5,22,23,25 87:5 87:6,9 94:12,16 100:2 101:18 104:7,22 106:17 107:4,18,24 113:3 114:1,6
**george's** 34:25 53:20 63:20 85:22
**getting** 27:13 30:20 65:21,21 76:25 92:13 113:18,22
**girl** 89:14 94:21
**give** 30:17 31:12 41:9 46:12 58:19 66:5 103:8
**giving** 75:22
**gm** 101:20,20
**go** 5:5,7 11:6 12:3 12:5 14:4 27:18 28:3 33:21 42:11 46:14 52:11 68:17 70:16,17 73:18 76:21 92:14 93:15 94:20 95:12 103:20 111:1
**going** 4:10 10:10 10:22 15:1 23:7 26:21 27:22 28:1 28:23 33:22 39:24 45:13 50:9,13,16 52:21 54:12,15 57:7 58:2,9 63:15 71:5 72:21 73:9 76:6 81:12,18 84:1 85:2,17 89:7 91:21 93:10,13,13 94:14 100:18 102:3,25 106:15 106:18 111:11 114:17
**good** 30:7 70:15 72:24 85:6,7,15,21 99:15 101:19,21
**google** 105:8
**googled** 105:8
**gossip** 28:18 29:8 39:15,23 47:4 83:18
**gossiped** 39:15
**government** 33:12 105:17
**graduate** 11:12,14 12:8,14,16
**graduated** 12:23 13:1,8
**graduating** 16:1
**graduation** 13:5
**grandmother** 16:7
**great** 74:22 75:2
**guess** 7:12 31:12 62:17 80:15 93:17 108:4
**guesses** 7:13
**guessing** 31:10 62:11 102:19
**guidelines** 5:22
**guy** 77:11
**guys** 57:9,12,20

**h**

**h** 3:10
**hackensack** 1:23 2:7,10
**half** 23:6 26:18 28:7 63:24 92:13 92:18 93:23 107:8
**halfway** 76:3 77:7 86:2 92:3
**hand** 63:3
**happen** 29:23 31:1
**happened** 39:21 57:19 72:23 107:16,18
**happy** 47:9
**hardball** 101:24
**harm** 58:20
**he'll** 72:12
**head** 6:6
**heading** 86:3
**hear** 34:13 73:9 80:16 105:25 112:15
**heard** 19:1 44:19 47:23 52:16 54:23 73:10 104:24 112:14
**hearing** 27:23 34:16,19 100:2 101:19 104:17
**held** 1:23 58:6 74:8 103:16
**help** 84:8,14 99:3 112:2
**helping** 21:22 84:11 100:5
**hereinbefore** 116:12
**hi** 21:8
**high** 11:3,6,7,12 12:5,8 26:17 29:7
**hijack** 72:12
**hire** 17:10,12
**hired** 14:10,23 15:7 20:16 21:13 21:15 24:7,10,14 24:17 95:4,5 96:11 97:18 99:2
**hiring** 24:2,5
**home** 61:3
**honest** 54:7 75:22 85:5 88:11 94:9 102:12
**honestly** 27:12 54:4,17 103:18 105:9
**hopes** 84:5
**hour** 63:24 68:18
**hours** 46:3,6 61:25 62:3,8 63:23
**huh** 6:8
**hum** 6:8
**hundred** 31:10
**husband** 61:2

**i**

**idea** 46:7,8 57:11 85:6,8,15,17,20 114:23
**identified** 8:23
**identify** 71:6
**idiot** 86:8
**ignored** 97:10
**illegal** 92:19
**illegally** 53:23
**immediately** 13:4 13:6
**implemented** 41:14

**implying** 107:17
**import** 26:6
**important** 5:21
**impression** 57:20 66:22 84:16 86:20 92:18
**improper** 103:4
**inclined** 89:19
**included** 52:7,8
**including** 49:25 73:2
**increase** 76:9
**incurred** 44:11
**indicated** 8:23
**individual** 22:3 26:11 30:9 112:7
**individually** 1:6 1:12
**individuals** 35:25
**inferred** 104:21
**influence** 4:24
**informal** 5:11 23:24
**information** 7:12 26:6 33:24 34:6 53:19 59:21 60:7 60:14 61:5 62:22 63:5 99:20
**initially** 61:12
**insight** 57:19 94:15
**instructions** 4:12 31:11 97:19
**insuring** 48:3
**intelacall** 34:14
**intelligent** 84:13
**intended** 66:22
**interchanged** 97:24
**interested** 65:11 106:25 109:10 116:17
**intermediate** 24:12,13
**internet** 110:15,19
**interview** 9:7 23:22
**interviewed** 23:21
**interviewing** 23:18
**intimacy** 103:9
**intimate** 40:2
**intimidate** 57:6 58:16
**introduced** 20:18
**invest** 65:24 66:1 111:23
**invested** 115:3
**investment** 66:2 112:1
**invited** 16:21
**inviting** 66:1
**involved** 10:16 35:2 40:14 43:4,9 47:24 55:2 56:21 60:20 65:22 102:3 109:11
**ip** 8:24,25
**issue** 42:13 64:20 85:9 96:1
**issues** 52:16 64:16 64:17 83:21 85:23 85:24 96:19,25

**j**

**jacob** 4:15 54:24
**jail** 32:7,13 33:3,5 33:19 34:9,11 53:16 102:4,10 106:18,22
**january** 13:24 91:4,5 98:12
**jason** 32:1,3,5 34:1 53:7 102:4 102:24
**jeff** 112:8,12
**jennifer** 38:16,18
**jennufer** 38:16
**jersey** 1:23,24 2:7 2:10 4:2 59:6 116:5,22
**job** 1:25 14:19 16:18,22 25:11 29:21 40:1 41:1,1 47:9 77:2 84:9,25 98:10,11 104:8 107:20
**join** 63:1,3 65:7
**joining** 65:11,14
**joke** 75:20
**joking** 58:2,4
**joshua** 2:7 4:5
**judge** 33:15
**judges** 105:14,23
**julia** 20:25 21:24
**july** 13:21
**jump** 23:7 39:6 106:6
**jumping** 40:17 101:16
**june** 1:24 23:6 68:7

**k**

**k** 22:11,13 38:16 76:1,4,11,12,13,13 104:14
**kaltner** 1:6 4:8 20:4,6,11,14 24:6 27:1,3,8,11 28:19 28:19 33:5,6,8,11 33:15,18 41:17 42:2,5 45:7 48:17 48:19,22 50:3 52:17 54:10 56:10 56:16,23 57:14 64:8 66:8,15 73:15 75:6,8 78:23 79:25 81:12 81:14 83:9,21 85:3 87:1 94:13 95:4 104:7,21 105:6,12,16,16 106:3 114:11
**kaltner's** 28:12 38:22
**katrina** 35:24 99:4
**keep** 6:1 62:6 94:6 94:13,14
**keeping** 72:2
**kefalas** 21:7 107:10
**ken** 107:10
**kenneth** 35:24 99:3
**kept** 71:11 72:5
**kind** 26:5 96:6
**kirby** 38:18
**kitchen** 41:10
**kmk** 1:5
**knells** 26:12,14,25 27:7 29:18,21 39:17,18 52:25 53:3 94:2,4 102:9 102:12,19,22 103:1,2,12,16,23 106:22 107:9 112:18,21
**knew** 16:8,10 23:13 66:17,20 102:18
**know** 7:1,11,14,22 15:16,17 17:1,14 21:6,9,24 24:1,4 26:7,19,19 27:6,20

28:9 30:11,22 31:1,5,7,8,9 32:11 33:10,13,16 37:3 38:3 39:23 40:7 40:18,22 41:12 42:15,25 43:2,20 43:21 45:20 46:17 47:15 48:4,14,16 48:16 50:15,20 54:7 56:23 57:15 60:2,3 61:2 65:18 66:24 67:5,18,23 67:25 69:19 70:21 70:23,24 71:22 72:16 73:14 74:12 74:15 77:9,12,13 77:20 78:2,3 79:2 79:4 80:8,14 82:9 82:11 83:15 85:14 87:2,4,21,22 90:18 92:6,21,25 93:10 94:18 95:9,15,18 95:23 96:8,15 97:5,13 98:24 99:7,16,20,24 100:6,13,16 102:8 102:15 103:21,23 105:2,3,4,5,7,10 105:15,22,24 106:3,5 107:24,25 108:17,20,21 109:3 111:3 112:14,20,24 113:4,6,8,9,11,14 114:14,16,19,21
**knowing** 26:22
**knowledge** 17:9 26:15,16 28:5 32:4,5 33:12,14 34:22 36:12 38:19 38:21 42:7 43:23 44:22,24 45:2,4 51:5,8,25 52:1 54:5 68:2 78:7 84:12 90:7 102:11

**l**

**l** 26:7 98:24
**l's** 87:3 88:15
**l's.com.** 86:6
**labeled** 71:16
**labor** 55:9,9,10 59:6 63:19 64:14 64:20 101:19
**large** 49:12,16,19 105:13
**largely** 6:14
**late** 46:15 98:1
**lately** 29:21
**laughing** 58:3
**law** 55:10 56:20 56:23 64:20 92:13 92:14,23
**lawsuit** 10:17 54:10,15 55:7,8 59:3,15 65:11,14 93:5,9,10 104:23 105:1
**lawsuits** 55:2,5 59:8,9 60:19 63:11 65:24 67:14 111:20,24
**lawyer** 8:3,7 10:5 54:22,23 56:11 58:3,13,13,22 60:15 84:2 92:24
**lawyer's** 59:21 61:4
**lawyers** 58:10 76:2 86:9
**leak** 34:6
**leaked** 53:19
**learn** 15:10 32:12
**learned** 15:12 32:23 40:24 42:13 78:13 85:15 98:19
**learning** 98:11 106:25
**leave** 29:3 46:15 46:16 72:24 77:2 77:13 83:17,19 100:18
**leaving** 46:22 72:13
**leeway** 64:3
**left** 5:14 25:19 29:4 32:25 69:9 69:25 72:20,24 83:16 84:24 100:22
**legal** 6:19 54:16 58:5,11 61:13 63:2 90:8 92:20 93:19 102:14
**legally** 60:3
**letter** 55:13,16 56:3,10,11,12 57:10 58:10 59:16 61:1,8 62:14 64:24 65:13 76:23 84:12 109:18,20
**letting** 34:5,6 107:24
**level** 67:19
**liability** 1:13
**license** 1:23
**life** 102:3
**limited** 1:13 60:23
**line** 76:16 89:7 99:10
**lines** 27:20,24 33:25 90:2 109:9
**link** 78:10,14 79:10
**list** 67:10 105:25 106:4
**listen** 84:3
**listening** 84:14
**lists** 67:1,3,6 99:21
**litigation** 35:3 90:8
**little** 10:11 14:15 22:25 23:7 25:19 27:4 40:17 43:24 47:4 54:11 56:13 63:18 68:17 80:17 83:12 84:13 90:16 105:21
**live** 41:13
**lived** 82:8
**ll's.com** 88:19
**llc** 1:12 44:20,23 45:3
**llp** 2:6
**lms** 1:5
**load** 111:15
**loan** 112:3
**located** 11:8,10 14:8,21
**log** 90:22 91:10
**logging** 90:24
**lol** 74:23 76:2,17 100:13 102:7
**long** 13:7 14:1,13 15:2 22:23 66:18 91:2 111:17
**longer** 26:9 46:25 93:3 94:11 113:3
**look** 34:1 47:5 68:8,9 72:8 75:22 75:24 79:8 111:2
**looked** 28:7 29:18 33:4 96:14,16

**looking** 64:14 68:21 73:19 80:12 92:16 98:9
**looks** 113:5
**lost** 81:16
**lot** 15:17 29:7,8,8 31:10 56:19 57:16 62:19,22 64:4 65:3 66:18,20 69:18 81:15 92:10 92:11 102:13,18 103:6,7 107:23 108:13
**lower** 28:6
**lunch** 41:6,11 67:21
**lunches** 41:19
**lurie** 2:6,7 3:6 4:4 4:5,9 18:2 22:13 43:11,13 59:16 63:8 68:13,19 104:13 105:20 114:17 115:4

**m**

**m** 2:7 21:4 22:11 22:13,13,13 98:24
**mail** 10:2 68:12 81:11 88:17,18,22 88:24,25 89:3 95:16 97:7 107:7
**mails** 9:19,22,25 10:3 51:22,25 52:2,4,7 81:10 82:1
**maintenance** 30:17
**making** 30:23,24 75:21 86:24 87:9
**man** 37:23 82:13 82:14
**management** 17:8 35:10,19
**manager** 35:15
**marel** 99:1,2,7,8 99:11,11
**mark** 107:11
**marked** 3:13 8:21 68:6 73:19
**marketing** 22:1
**married** 60:2,3
**martinez** 14:5,6 14:11,14,16
**matt** 21:1,2 22:3,7
**matter** 1:21 4:8 70:9 75:23 84:7 90:8
**max** 22:9,10,20 25:16 30:14,19 72:12
**maxium** 22:11
**mean** 24:19 28:1 36:5,7 40:6 41:8 44:7 49:16 51:17 61:17,21 71:9 74:24 75:6 79:18 85:13 90:12,24
**means** 74:13 80:15 95:24
**meant** 28:4 72:14 81:7 87:3,4 94:10 94:13,18
**meet** 15:21 20:13 51:11,20
**mention** 53:22,25 54:3,16 102:24 103:1,10
**mentioned** 18:11 20:24 22:22 32:14 32:15,24,25 39:7 41:20 45:20 47:4 50:17 55:10,11 56:22,25 59:3 62:16 65:10,17 66:17 67:16 76:24 82:11,20 84:19 97:1 100:19 104:19 112:11 113:13
**mentioning** 112:9
**mess** 88:8
**message** 71:7 73:21 74:11 75:1 75:1 76:22 80:11 80:12,19,22 81:1,3 82:19,22 86:21,25 90:13 97:6 100:9 100:12 101:11 102:5 107:13 109:5,13
**messages** 8:20 27:20 52:21,23 53:1,7 57:13,15,16 57:17 58:19 59:12 73:21 74:5 75:9 85:16 90:14 94:1 94:4 109:14 110:19 111:2 112:23
**met** 5:22 15:22 20:10 40:25 51:15 82:8 107:18
**metro** 14:18,19,21 14:24 15:2 37:2
**mf** 101:24
**mia** 80:13
**microsoft** 24:11 24:15
**middle** 72:8 74:11 89:5 94:20 106:16
**mild** 102:11
**mind** 43:22 85:5 85:15
**mine** 15:24
**minimum** 74:18
**minute** 109:1
**minutes** 56:18
**misses** 111:13
**missing** 80:15
**mistreated** 83:11
**moment** 29:16 43:14 51:16 87:19
**money** 30:7,7 36:23 49:20 65:4 66:3,5 67:13 70:15 71:1 75:14 75:15,16 76:9,10 76:14 81:16 85:19 86:17 87:11,12 89:25 90:2 91:24 100:20 105:13 112:4 115:3
**monroe** 12:13,23
**month** 13:9,10,11 39:5 82:23
**months** 14:3 15:3 111:18 115:2
**morning** 4:16 46:11 91:9 101:19 101:21
**mount** 31:8 37:15 42:16,19 46:6 72:6
**move** 82:4
**moves** 89:13,13
**moving** 77:13 79:13 86:12
**multiple** 74:18

**n**

**n** 2:4 3:1 22:11,13 35:24
**name** 4:5 13:12 16:19 19:1,9 21:1 21:5,6 22:6 25:15

26:9 30:11 45:23 51:2,14,17 60:1 63:19 82:16 94:24 98:24 100:6 112:15
**named** 20:3 26:12 31:25 112:8
**names** 38:13,15 105:9
**necessarily** 65:1
**need** 7:21 8:10 15:19 72:10 75:14 79:15,15 86:15 89:11,17 110:16 110:17
**needed** 61:1 90:2 96:17
**needing** 89:25 91:24
**negotiating** 75:4
**neither** 116:13,15
**nerve** 106:11
**never** 23:21 32:10 47:23 55:11 77:3 89:14 115:2
**new** 1:4,12,23,24 2:7,10 4:2 11:9 12:13 44:18 46:18 47:13 55:9 59:6 64:25 98:10 116:4 116:22
**nice** 41:10
**nickname** 80:20
**nj2944365** 1:25
**nodding** 6:7
**noises** 6:8
**nonverbal** 6:6
**normal** 93:16
**notary** 1:22 4:2 116:3,22
**note** 15:17
**notes** 1:21 114:17
**notified** 4:15,17
**november** 15:9 16:3 22:23 45:17
**number** 59:23 68:22,23,24 69:1,6 71:5 97:9,12,17 98:3 110:16,18
**numbered** 9:16
**numbers** 97:24
**nuture** 77:9

**o**

**o** 82:8 104:14
**oath** 8:5
**object** 6:12 23:19 27:16 28:3 31:22 33:20 35:5,12 41:25 42:10,23 48:2 67:20 93:6 96:21 97:3 108:7
**objection** 37:13 49:2,15 66:9 108:16
**objections** 6:13
**obsessed** 84:17
**obtain** 28:21
**october** 82:22
**office** 1:23 5:11 16:21 20:17 24:18 24:19 31:8 37:16 39:24 41:23 42:3 42:9,16,19 46:3,6 46:12,20 62:7 67:18,22 71:11 72:6,20 73:5,6 107:4,9 108:2 109:18
**official** 1:16 26:17
**oftentimes** 52:6 93:12
**okay** 5:9 7:8 8:1 18:7 31:12,13 58:12 80:13 100:11
**once** 8:2 41:20 72:20 83:1 85:6 100:23 103:1
**ones** 10:4 59:8 72:10
**online** 88:13 89:13 92:10
**onset** 105:19
**opened** 79:10 113:6
**opinion** 75:22,23
**opportunity** 8:7 68:16
**opposition** 4:19
**option** 64:22 65:6 65:14,16,19 87:22
**orange** 4:1
**order** 8:16 80:9 96:5,16
**ordering** 41:22 42:2,8,14
**orders** 30:19
**originally** 11:23
**oscar** 39:19 104:12
**outrageous** 85:18
**outside** 6:23 45:21 53:1 100:4
**outsourcing** 1:7 19:4,7,9,13 36:11
**overall** 52:10
**overseas** 110:15
**overseeing** 97:18
**overtime** 63:23,25 64:4
**owed** 64:4 101:7
**owned** 87:5
**owner** 20:7 97:13
**owner's** 97:12
**owns** 87:6

**p**

**p** 2:4,4 13:17
**p.m.** 1:24 115:7
**package** 70:11,13 75:5 79:20 85:22
**page** 3:3,12 10:7 22:14 68:21 72:8 72:9 73:19 74:10 74:15 75:24,25 76:21 77:7 79:13 82:4,5,18 86:1,2,3 86:12,13 89:5,6,16 90:23,25 91:1 92:2 93:25 95:12 98:9,10 99:5,10 100:9 101:16,17 101:17 106:6,15 106:16 108:23
**pages** 9:17 73:18 74:11
**paid** 18:18 19:17 30:6,21 48:12,19 70:14 79:21 80:3 85:19
**papers** 8:22
**part** 15:18 43:15 64:23 70:22 74:7 79:2,3 90:20 91:25 95:4 104:8 104:22 108:25
**partial** 49:5
**partially** 43:5 44:5 44:6 83:16
**particular** 26:4 70:7 110:12
**parties** 116:15

**parts** 43:9 96:14
**party** 62:20 65:2
**passed** 16:7
**pay** 41:11 44:13 48:15 58:3 65:8 76:1 86:16 92:20 93:23
**paycheck** 36:15,19 37:16
**paychecks** 37:11 45:1
**paychex** 45:24,25
**paying** 45:15 72:2 84:2
**payment** 30:5 37:5 48:3 70:24 76:25
**payments** 37:14 47:25
**payroll** 37:15,18 38:9 43:4 44:3,8,9 44:9,11,18 45:14 45:17,21 88:3
**pending** 7:23
**people** 17:10 18:5 18:9 20:20,21 21:8 26:25 28:18 29:8 31:10 35:21 35:22 38:4,8 39:14 47:5 48:15 65:4 67:13 73:10 73:12,12 91:8,17 96:11 106:1,4 111:23 112:1
**perfectly** 7:14
**performance** 47:7 107:19,20
**performed** 47:10 47:15
**performing** 19:23
**period** 38:25 39:2 44:13 59:5 62:11 82:23 83:3 100:22
**permission** 97:12
**person** 13:13 20:3 21:24 22:7 34:3 46:10 53:6 82:9 82:12 91:9,12 93:12 97:14 102:12 103:19,20 111:9 112:10,16
**person's** 82:16
**personal** 21:20 38:22 54:5 67:19 75:12 90:24 98:4 111:9
**personally** 52:17 62:9 103:21
**persons** 26:24
**pertaining** 52:5
**peter** 13:17 21:7 107:9
**peter's** 22:15
**philippine** 105:17
**philippines** 18:22 31:9,20 32:6 33:9 33:12,15,23 35:4 36:10,16,18,21,24 37:8,12,17 38:7,9 38:10 40:3,8,12 47:8,12 50:5,10,13 53:23 54:2 73:17 99:2,19 105:13,23 106:1,4 107:21 112:18,21 113:2,5 113:7,9,12,18,21 114:3,5
**phone** 9:7 16:7 20:19,20 56:9,13 56:16 59:22 61:9 61:11 62:10 68:23 69:2,3,7,22,25 70:6 73:22 74:2,6 75:10,12 78:16,19 78:20 81:4 83:1 94:18 97:11,24 98:4,6 102:1 110:1,3,16,18,19 111:2
**physical** 71:25,25
**pissed** 78:13 86:23 114:2
**place** 4:16 54:19 73:6 109:13 116:12
**plaintiff** 2:8
**plaintiffs** 1:10
**plan** 27:7 58:10,20
**planned** 27:11
**planning** 58:4
**playing** 101:24
**plaza** 2:6
**pleasantries** 60:23
**please** 5:24 6:5 7:7 7:16,22 36:5 44:1 72:22
**pln** 95:14
**pluses** 77:15
**point** 27:1 32:6 37:5 41:12 48:21 55:13 57:25 66:17 66:22 73:15 84:2 85:2 98:7
**polite** 97:11
**ported** 74:12,21
**position** 13:18 16:11,16,24 17:1,5 17:7 19:20 21:14 21:15,25 22:4,16 22:19 28:6 29:25 30:13 104:9
**possibility** 65:5
**possible** 6:20 7:13 16:16 84:5
**post** 91:8
**posted** 91:17
**posting** 87:20,23 87:24 88:3,7 89:21 90:1,5,7,18 91:11,11,12,22
**postings** 87:18,20 89:24
**posts** 88:14 91:9 91:24
**power** 105:23
**precise** 7:19
**preliminary** 4:10 4:11
**preparation** 92:5
**prepare** 8:17 41:18
**prepared** 92:4,6
**preparing** 92:8,24 93:4,8
**presence** 6:21,23
**present** 9:18 73:3 73:5 107:9
**preserve** 6:14
**president** 20:8
**pressed** 114:6
**pressing** 57:9
**presume** 89:8
**previous** 41:1 75:1 109:5
**previously** 8:22 68:6 78:22
**primary** 37:4
**primo** 1:15
**prior** 54:22 60:14 93:2 98:11 104:11 104:16,18 109:17 112:9 116:5
**privilege** 6:20 62:18

**probably** 18:3 29:22 45:13 51:10 70:8 72:20 85:11 101:5,12
**problem** 65:21,22 84:15 96:3
**procedures** 24:18 24:20
**proceedings** 1:21
**process** 5:7 23:24 25:20 38:24 41:2 44:9 75:8 77:10 77:25 93:19,20
**processes** 77:17,21 78:5,8
**production** 68:14
**profile** 91:6,21
**profit** 1:14,14,15 115:1
**program** 109:23 110:9 111:6
**project** 25:18 55:11
**projects** 21:23
**properly** 6:9
**prove** 58:20
**provide** 5:2,12 6:25 7:4,8,11,16 25:13 59:20 62:22 63:1,5 67:10 74:18
**provided** 9:14,25 28:24 38:1 46:25 63:10 67:13 79:10 82:2
**provides** 78:11
**providing** 5:25 8:5 19:12,16 45:21 52:25 62:25 67:7 70:1 93:3 98:15 111:19
**ptf** 14:18,19,21,24 15:2
**public** 1:22 4:3 12:20 58:17 116:3 116:22
**puerto** 11:18,19 11:21 12:1,3,5 16:6
**purpose** 91:22 95:9 96:18 110:24
**put** 4:18 26:24,25 28:6 29:23 30:8 32:7,13 33:4,19 34:3,9 43:22 64:22 68:22 90:4 90:20 102:9 103:4 106:18,22
**putting** 89:8 102:3

**q**

**qualifications** 23:11
**qualified** 65:20
**qualifying** 65:17 65:18
**question** 5:6,24 6:13,14,16,18 7:1 7:2,19,23,24 20:22 41:5 44:1,10 46:4 52:6 90:20 93:11 96:22,24 99:11 107:11 114:19
**questions** 4:11 7:7 8:6,13 10:10,12 15:18 43:16,20,22 64:12 68:20 105:12 115:4,5
**quick** 94:22 95:2,5 95:6 98:18

**r**

**r** 2:4 35:24 38:16 98:24 104:14 109:24 116:1
**rainbow** 47:14,16 47:18,22 50:18 114:12,15,20 115:1
**raise** 64:16
**raises** 103:8
**rare** 6:21
**rationale** 87:7
**raudy** 21:7 67:17 67:18,23 107:10 111:19
**raudy's** 22:19 68:3
**razzouk** 39:19 79:5,9 104:12
**reach** 15:13,14 88:22
**reached** 15:15 16:4,5,7 89:3
**reaching** 109:17
**read** 5:17 26:2 44:1 56:11,12 57:14 61:9 92:23 105:8
**reading** 78:17 92:10,11,22
**reads** 44:2
**real** 89:13
**really** 9:23 16:2 30:4 41:7,8,21 58:12 83:14 86:4 93:17
**reason** 7:22 15:18 28:8 29:11 39:10 43:15 50:20 69:20 74:5,7
**reasoning** 83:6
**reasons** 29:5 85:10
**recall** 15:7 16:25 17:19 19:15 20:10 20:23 21:1,7,9 23:1 26:22 27:12 30:20,22 31:4 32:15,17,20 34:15 34:16,18,19 35:7 36:25 37:21 40:9 40:9,10,13 41:17 41:22 44:16 45:22 46:2,5 48:24 49:12,22 50:2,3,6 50:9,12,22 51:2,4 51:7,14 52:5 53:4 53:24 54:4,19 55:25 56:25 57:16 58:1 59:19 64:11 65:25 66:4,10 67:15 69:8 70:4,7 70:14 71:3,21 73:11 74:14 79:7 79:12,21,24 80:5 80:10 81:2,5 87:24 88:1,5,11,13 88:16,23 89:1,2,4 90:13 91:5,19,21 93:21,24 95:8,20 96:10 101:10,13 102:23 103:10,15 103:18 104:9 106:5,12 107:3,12 107:14,15 108:2 108:21 110:21 111:21,22,25 112:5,15 113:16 114:11,13
**receipts** 101:2
**receivable** 19:25
**receive** 12:18 24:14 36:15,19

71:2 76:10,15 97:16
**received** 12:19 37:5,7,11,14,16 55:13,16 56:2,9,10 56:13 60:25 61:4 70:21 71:3 72:17 81:3 82:20 102:1 109:18,20
**receiving** 9:13 76:9 107:12
**recess** 74:9 114:18
**recognizable** 108:18
**recognize** 68:24
**recollection** 31:17 42:1,4 52:3 55:4 70:18 73:7 74:1,4 79:11 88:2,6 89:22,23 90:14 91:23,25 104:17 112:10,12 113:24
**record** 4:10,14 6:15 9:12 11:2 17:25 43:11,12,14 58:6,17 62:7,8,9 63:20,21 68:10 71:24 74:8 83:6 90:21 103:4
**recorded** 5:20
**recording** 9:7
**records** 9:13 49:4 62:6 64:2,4,6,10 72:5 87:25 88:3
**recruited** 38:4,6
**redaction** 68:22
**reduce** 107:8
**refer** 99:13
**reference** 27:21 73:8 79:19 104:20
**referenced** 39:8
**references** 94:2
**referencing** 39:3 78:20,24 79:18 80:14 82:10 88:14 95:19 96:2 102:9 102:19 106:13 112:25
**referring** 75:3 94:11 97:15
**refreshed** 112:12
**refute** 95:14
**regard** 44:12 47:7 64:23 65:12 75:13 83:17 100:24
**regarding** 53:10
**regular** 15:25 60:4
**regularly** 60:12
**reimbursement** 40:11,15
**related** 8:3 30:16 36:13 67:24,25
**relationship** 68:1
**relationships** 29:9 40:2 103:6,7
**relative** 116:14,16
**relatively** 54:21
**relevant** 70:8
**relief** 76:6
**rely** 7:17 102:5
**remaining** 79:19
**remember** 7:16 14:25 16:6 22:6 23:13 25:25 26:3 33:1 37:23 38:13 44:18 46:9 54:18 55:6 58:23 59:4 59:10 62:5 63:15 63:18 65:13,15,25 69:7 72:23 75:3 81:19 83:3 92:4,9 97:11 98:5 99:9 100:2,23 106:14 106:25 107:23 110:24
**remembered** 16:9
**remembrance** 82:15
**rent** 14:7
**rented** 18:19
**repeat** 46:4
**repeatedly** 103:5
**repetitive** 53:11
**replacement** 77:4
**report** 38:18 97:14 101:4
**reporter** 1:22 5:14 5:21 6:1 44:2 116:4
**represent** 4:5
**reprimanded** 42:2
**reprimanding** 41:18
**republic** 11:24,25
**request** 9:13 63:9
**require** 65:1
**required** 6:15
**reside** 11:17
**resident** 33:8
**respect** 8:8 56:15 61:21 79:9 95:1 106:21
**respond** 77:12 79:17 86:4,11 89:12,16 92:5 94:23 97:8,9 100:11 101:20
**responded** 78:3
**responds** 82:7 86:13 89:13 101:24
**response** 7:8,18 89:11 109:12
**responses** 6:6 7:20
**responsibility** 44:15 63:20
**responsible** 34:3 81:15 95:17 97:7
**result** 87:9
**resulted** 34:8
**resume** 74:20 84:11
**return** 27:4 69:11 85:3 114:3,4
**returned** 69:14
**review** 8:19 9:4,6 9:22 68:16 84:11
**reviewed** 8:16,20 9:2
**revise** 23:3
**rican** 11:19,21
**rico** 11:18 12:1,3,6 16:6
**ride** 41:9 46:12
**right** 5:15 22:6 30:1,7 63:21 68:5 74:11 76:1 80:13 81:2 85:24 94:20 96:5,16,18
**room** 97:23
**ruin** 102:3
**rule** 7:23 8:2
**rules** 5:5
**rumors** 39:15,23 45:12 47:5 52:16

**s**

**s** 2:4 3:10
**sabotaging** 74:23 75:4,19,21
**salary** 26:18 28:6 92:12,18 107:8

**sales** 1:8 4:6 14:20 18:13,15,17 19:17 19:20 22:24 28:25 35:19 36:3,9 38:5 43:1 44:3 47:1 48:9 49:1,4,13 50:14,23 61:16 64:18 66:20,25 69:4,9 70:1 71:15 77:18,22 85:3 93:4 98:16,21
**salespeople** 48:6,9
**salesperson** 22:17
**salmon** 42:14
**sap** 79:16
**sasserath** 51:17,20 51:22,25 52:2
**saturday** 107:8
**saw** 49:17 81:20 87:19 89:24 101:18
**saying** 58:2 66:1 88:7 108:21
**says** 75:2 76:16,22 78:15 79:14 86:3 86:11,13 94:24 97:6 102:9
**scared** 77:6
**school** 11:3,6,7,12 12:5,8 29:7
**schooling** 12:24
**schuster** 1:23 2:9 9:12,16 17:25 23:19 27:16,18 28:3 31:11,22 33:20 35:5,12 37:13 41:25 42:10 42:23 43:6 48:2 49:2,15 57:23 59:14 63:6,12 66:9 67:20 68:10 68:15 90:16 93:6 96:21 97:3 100:16 105:3,7,18 108:7 108:16 112:6 114:21 115:5
**scoop** 101:20
**screaming** 73:10 107:6
**scrolling** 91:13,15
**searched** 10:3
**seated** 5:14
**second** 16:20 71:6 71:7 94:4 102:7 110:25
**secret** 100:10
**see** 16:22 17:12,18 30:8 47:18 58:23 73:22 80:23 91:14 91:15,16 101:4 111:3,11,15
**seeing** 49:12,22 53:6 87:24 88:2 88:13,16 90:13,14 91:22
**seek** 84:22
**seeking** 58:11
**seen** 23:15 87:20 90:18 91:11
**selling** 34:25
**send** 76:13 78:16 88:17,24 95:16 97:6
**sending** 75:10
**sends** 73:20
**sense** 96:7
**sent** 33:5 34:11 47:7 53:16 76:1 78:19 80:19 81:1 81:10 97:8 107:7 107:21
**separately** 54:13
**september** 104:16 104:18
**seriously** 58:8
**servers** 30:17,18
**service** 13:14,19 14:2 19:25 25:5,8 42:16,18 45:18 110:18
**services** 18:19 19:12,17 28:24 35:1,9 38:1 45:21 47:1 52:25 67:7 70:1 74:18,19 93:3 98:16,22
**set** 37:18 43:18 44:25 45:2,7,13,18 46:2,5 61:6 116:12
**setting** 5:11
**settle** 89:17
**settled** 101:23
**settlement** 70:22
**severance** 70:11 70:12 75:5 79:20 80:9 85:22
**sexual** 103:6,6,12
**shaking** 6:6
**share** 92:22 101:6 102:15
**shared** 89:14
**sharing** 89:12
**shat** 94:22
**shay** 94:23,24 95:13 97:15
**sheet** 26:6
**shit** 106:19
**short** 38:25 59:5 62:11
**shorthand** 1:22 116:4
**shortly** 32:24 52:11
**show** 24:24 26:4
**showed** 25:2 81:11 87:21
**showing** 101:5
**shrimp** 42:14
**shut** 113:18,22
**sign** 100:12,12
**signature** 116:20
**signs** 100:13
**similar** 110:11
**site** 30:16 74:17 90:19,21
**sitting** 46:24 47:3
**situation** 29:17 34:12 42:8 84:6 84:17 108:1
**six** 18:4,9
**slushy** 47:14,16,19 47:22 50:18 114:12,15,20 115:1
**smarter** 95:15
**snitched** 106:17
**snitching** 106:23
**sole** 91:21
**somebody** 24:24 33:19 34:5 67:16 70:16
**somewhat** 43:19
**soon** 72:13 85:15 106:8
**sooner** 46:13 75:14,15,16
**sorry** 9:15 11:11 18:4 23:3 52:5 59:2 82:17 95:22 102:25 113:19
**sort** 65:5 75:20 76:24

**sound** 10:11,22 56:5 103:3
**sounds** 6:7 106:2
**source** 37:4
**southern** 1:3
**speak** 5:25 8:3,7 8:10 58:13,13 61:1,3 81:3 106:8
**speaking** 86:9
**special** 110:12
**specific** 7:10 36:12 105:21
**specifically** 6:18 8:21 53:3 91:20 102:16,22
**specifics** 103:18
**spelling** 104:13
**spoke** 31:3 54:11 56:18 81:2 83:1 91:2 100:23 101:2
**spread** 26:6 39:14
**spy** 85:13
**st** 8:24,25
**stack** 8:22
**stamp** 8:24,25 71:5
**stand** 76:13
**standard** 10:12
**started** 22:22 37:15 45:11 46:22 68:16 92:11,12 111:16
**starting** 79:13 82:5 86:1 92:2 93:25
**starts** 89:6
**state** 1:22 64:24 82:8 99:11 113:4 116:4,22
**stated** 27:25
**statement** 4:10 5:17 7:17 73:20
**statements** 49:10 71:8,11,12,13,23 72:1,9,15,16 73:2
**states** 1:2 10:19,25 11:4,16 31:21 36:1 37:19 50:25 71:7 78:12 111:1
**stay** 46:16
**stayed** 46:19
**steal** 99:19
**stealing** 33:23,24 34:24 53:20 100:20
**stenographic** 1:21
**stenographically** 116:11
**step** 43:24 82:18
**steps** 96:17
**steven** 1:23 2:9
**stewart** 1:12,16 4:15 8:23 10:8 15:12,13,16,21 16:15,23 17:10,14 17:18,20 20:2,16 23:10,18 25:3,9,10 26:23,24 27:7,9 28:12,18,22 29:17 29:20 32:14,15 33:4,25 34:8 37:20 38:4,19,22 39:7,11,20 40:7,10 40:21,23,24 41:6,9 41:18,22 42:2,13 42:18,21 43:1 44:25 45:5,6,9 46:2,5,25 47:12,15 48:20 50:4,9,12 51:6,9,24 52:3,6 52:15,24 53:6,10 53:12,18,22,25 54:8,14 55:1,17,20 55:21 56:1,7,12 57:1,4,12,19,23,25 58:25 59:12,17,20 60:19 61:11 62:18 63:2,11,16,25 64:3 64:10 65:23 66:7 66:14,24 67:5,9,12 67:24 68:6,7 69:19,22,25 70:5 70:21,25 71:22 73:10,16,20 74:1 74:12,21 75:7,18 75:23,25 76:8 77:8,17 78:4,11,12 78:23 79:8,14,22 80:8,12,25 81:4,7 81:12,13 82:6,7,9 82:20,24 83:4,7,20 84:16 86:3,4,12,19 87:16,24 88:3,7,14 88:17,21,24 89:21 92:3,8,9 93:3,11 93:22 94:1,7,21,23 94:25 95:3,13,19 96:2,20 97:2 99:5 99:7,13 100:10,11 100:14,21 101:18 101:23 102:8,13 102:14 104:15 105:22 106:7,8,16 106:21 107:2,13 107:18 108:5,8,15 108:24 109:3,15 109:19 110:5,22 111:20,22 112:18 112:20,23 113:6 113:17,20 114:8 114:12,14
**stewart's** 17:1,5 54:22,23 59:24 62:15 64:7 68:4 70:12 75:5,9 90:22 94:17 106:22
**stop** 58:9 59:5 74:23 75:19 83:8 83:11,22,24 84:6 90:15
**stopped** 23:1,6 27:23 52:24 84:2 109:7
**straight** 96:7
**street** 1:23 2:9 4:1
**stress** 77:1,12
**stressed** 108:25
**stressful** 29:6 77:14 83:18
**strike** 80:12
**structure** 36:4
**strupinsky** 2:6
**stuff** 72:12 89:8
**subject** 59:1 62:12
**subsequent** 59:11
**sue** 27:3,8,11,14 27:22 28:2 64:25 65:6 86:10
**sued** 65:6 81:17
**suffering** 108:6
**suing** 54:12,13 63:17 65:2 86:5
**summarizing** 53:12
**super** 78:13
**supervisor** 20:1 52:13
**support** 77:9
**supporting** 66:8
**supposed** 76:10 90:11 95:10 97:19

**sure** 4:13 9:11 10:6 11:11 17:3 17:16 21:21 22:14 24:21 28:4 29:17 30:14 35:14 38:23 39:4 41:1 43:6 52:22 58:22 69:18 69:20 72:9,19,20 74:14 79:11 87:3 90:6 94:10,13 96:14 100:17 101:12 104:20 111:18
**surrogate** 34:20 34:23 35:3
**switch** 89:15 92:2
**switching** 93:25
**sworn** 4:2 116:7
**system** 62:8 77:10
**systems** 62:7

**t**

**t** 3:10 13:15,17 21:4,4 116:1,1
**table** 64:22
**take** 7:21,25 21:16 61:11 63:17 68:8 71:23 73:1 76:13 86:17 87:10,12 91:19 97:11
**taken** 1:22 88:8 116:11
**takes** 109:13
**talk** 5:23 54:8 55:1 57:18 61:18 66:7 66:14 75:11 80:25 83:25 84:8 90:11 100:2 104:15 109:8 110:24 111:8 113:17
**talked** 20:20 36:8 78:22 84:1
**talking** 10:7 18:1 26:7 39:25 43:7,8 43:25 52:10 57:24 59:2,5,17 63:6,12 71:10 79:3,9 83:8 83:24 84:6 86:19 86:21 90:11,17,17 94:8,16 95:1 98:10 99:7,8 100:14,15,17 101:8 109:3,7 111:16,22 112:23
**tasks** 35:9
**taught** 25:7
**taxes** 72:2
**taxi** 14:7 100:21
**teach** 25:10
**teaching** 26:1
**team** 40:8
**tech** 67:18
**technician** 22:21
**technologies** 1:8,8 1:9 4:6,7,7 15:6,8 15:11 18:1,11,13 18:16,17,18,22,25 19:9,11,13,18,21 19:21 20:17 21:23 22:24 28:25 29:1 31:6 34:20,23 35:1,3,11,16,19 36:4,9,9,10,20,21 36:22 38:5 43:1 44:4,15 47:1,2 48:7,10 49:1,4,10 49:14,14 50:14,14 50:23,24 61:15,16 64:18,18 66:25 67:1 69:4,10,10 70:1,2 71:15 77:18,18,22,22 85:4 86:8 87:25 88:4 93:4,4 98:16 98:17,21,21
**technology** 66:20
**ted** 26:12,14 39:17 39:18 52:25 53:3 94:2,2,11,17 102:1 102:2,9,9,12,19,25 103:2,5 106:17,18 106:22 107:9 112:24
**telephone** 55:21 69:6,11,13,16,17 69:19 81:1 97:16 98:3 101:10,13
**telephonically** 53:6
**tell** 9:24 16:23 27:10 36:5 42:21 45:6,9 54:14 55:5 55:19 56:7,15 57:8 61:1,10,14,21 61:25 62:3 64:6 67:12 72:13,14 74:23,25 75:14 81:19 99:7 100:24 102:21 106:16 108:19 109:8 111:10 113:10,25 114:4
**telling** 74:1 81:15 89:2
**temp** 95:5 97:15
**term** 65:9 66:10 75:3 93:22 106:2
**terms** 54:16 70:16 72:25 81:21,22 103:19
**testified** 4:3 5:17
**testify** 89:20 116:7
**testifying** 5:13
**testimony** 5:12,12 8:6 116:10
**text** 8:20 27:20 52:21,23 53:1,7 57:13,15,16,17 58:19 59:12 60:9 60:12 71:7 73:21 75:9 81:3 82:19 82:22 85:16 86:21 94:15 98:1 100:9 100:24 101:11 107:12 109:5,14 110:19 112:23
**texting** 60:10,14 85:21 110:10,11
**texts** 60:16 97:11
**thanks** 74:22 75:2 75:19
**theft** 78:14
**thing** 4:13 7:12 26:22 29:22 30:4 96:14
**things** 5:6 23:14 43:17 44:1,12 53:12 56:19,21 60:23 62:19 64:23 66:18,21 84:8,9,14 85:12,12 90:8 91:7,15,16 93:15 96:6,10,13 97:21 101:5 102:13,16 102:18,20,21 103:9 104:21,21 111:9,13,14
**think** 19:1 20:16 21:1,5,8 25:15 26:6,9 29:14 30:6 34:4 37:25 48:21 50:7,8 52:1 54:17 57:13 59:7 62:10 65:16,20 71:21

80:16 82:14 85:7 86:6 90:4 96:23 97:8 100:17 103:25 109:8 110:14 111:3 112:14 113:13 114:23 115:2
**thinks** 87:3
**third** 80:11
**thomas** 13:17
**thought** 29:16,22 30:5 41:10 57:18 70:15 71:8 85:6 87:5 107:25
**thread** 81:11,20
**threats** 106:22
**three** 14:3 15:3 20:17 39:1 50:16 59:7 74:10 77:8 79:25 86:16 102:6
**thursday** 101:18
**time** 6:1,17 7:21 8:10 16:13,17,18 16:20,23 17:11,17 18:5,6,19 19:16 20:15 21:13 24:7 24:10 25:20,24 26:4,5 28:14,16,17 28:20 29:18 30:23 30:24 36:3 38:23 38:25 39:3,6,13 45:11,15 46:17,22 47:14 50:3,10 58:25 59:4,5 61:15 62:10 63:21 63:22 64:2,7 66:19 67:9 73:1,3 74:18 78:12 80:18 80:18 81:10 83:2 84:7,22 86:7,9,19 86:21,25 90:15 91:2 92:10,11,24 95:3 96:2 99:22 100:22 101:1,2 103:21 104:20 108:3,14 109:4 116:11
**times** 6:12 20:17 20:18 39:1 41:13 50:12,15,16,17,21 67:22 81:4 83:1,2 104:19
**title** 30:15
**today** 4:16,17 5:3 5:16 8:17 9:9,14 9:18 46:24 47:3 68:12,16 76:24 82:2
**told** 27:9 28:22 39:18,20 41:2 45:5 56:9,11,12,18 57:1,12 58:1,7,8 59:6,7 61:8,9,11 61:12,22 62:5,9 63:10 65:15 69:19 73:10 101:5 109:7 114:8,9
**tomorrow** 76:1 100:11
**top** 75:24 79:14 82:5 98:10
**torrez** 112:8,12
**total** 31:9
**totals** 25:24
**tpo** 1:12
**track** 6:1
**tracking** 25:20
**train** 25:17
**trained** 24:17 99:14,16
**training** 24:15 25:13,22,23 46:19 98:13
**transaction** 94:22 95:2
**transactions** 95:6
**transcript** 1:21 5:16,18 6:9 15:19 58:16 116:10
**transfers** 49:25 50:1 79:23
**translatable** 6:9
**travel** 105:12
**treated** 29:15,19 30:1,3 52:19 53:14
**treating** 29:12
**tried** 33:25 63:17 76:12 83:3,22 112:14
**trip** 73:17 95:14
**trips** 113:1,2
**trouble** 56:20 57:7 57:8 93:14
**true** 5:2 7:4,20 57:14 116:10
**truly** 8:6
**truth** 116:7,8,8
**try** 63:15 76:4,12 85:11 86:10,22 94:14 103:3 107:3
**trying** 27:14,21 28:11 47:5 57:6 58:16 65:21 78:23 83:11 84:25 90:6 97:1 106:12,14 111:23 112:1
**turn** 74:10 77:7 78:10 80:11 86:1 89:5 98:9 99:5 108:23
**turned** 96:6
**turns** 96:4
**tutorial** 77:11
**two** 2:6 5:6 23:5 39:1 50:16,21 73:18 86:6 88:15 88:19 89:24 108:23
**type** 14:6 17:7 71:12 93:12 108:6
**typically** 6:19
**typo** 76:18

**u**

**u** 22:11,13,13 38:17 82:8 104:14
**uber** 100:18,22 101:4,7
**uh** 6:8,8
**ultimate** 94:7
**um** 89:16
**unclear** 90:16
**uncomfortable** 29:10
**understand** 5:18 6:2,10,23 7:1,5 13:21 15:20 36:5 36:6,7 40:6 43:17 44:11 48:5 57:10 64:12 83:14,24 87:6 93:2 94:7 105:9
**understanding** 17:4 18:15 19:6,8 19:22 20:7 21:11 22:2,4,15,18 23:17 24:21 28:11,14,15 28:16,17,20,21 32:8,10 33:2,18 34:7 39:10,13 45:16 46:25 47:11 62:21,25 63:16 66:17 71:24 77:16

81:6 86:18 92:8 94:17,25 98:20 102:12 104:25 107:20 110:8,10 111:5 113:1 114:24
**understood** 7:18 17:11 21:18 41:3 54:17 64:9 78:9 86:25 87:8 103:20
**unemployed** 84:19
**unemployment** 84:22 92:14 102:6
**unfair** 28:8 29:12
**unfairly** 29:15 30:3 33:5 34:11 53:13,15 83:11
**unhappy** 76:25
**united** 1:2 10:19 10:25 11:3,16 31:21 36:1 37:18 50:25
**universe** 43:10
**university** 2:6 12:9,12
**unstable** 29:8
**unwilling** 62:22
**update** 83:12 100:10
**updating** 74:20,22 75:2 98:18
**upset** 56:19 86:23 87:8 107:24 108:9 108:13
**upside** 96:6,16
**use** 6:6 24:15 85:11 87:13 103:19 110:14,14 110:18
**utilize** 111:6
**utilizing** 111:17

**v**

**v** 13:15,16 26:7 109:24
**vague** 43:19
**val** 25:15,17
**valenzuela** 1:10 3:4 4:1 68:5 116:6
**various** 115:2
**vehicle** 70:22
**vent** 111:12
**venting** 102:17
**verbal** 6:5,7
**verified** 99:25
**verify** 48:18
**vernon** 31:8 37:16 42:16,19 46:6 72:6
**vibe** 111:17
**viber** 109:24 110:1 110:3,6,8,10,13,22 110:24 111:15
**victor** 13:16
**view** 49:6,9 90:23
**vip** 13:18 14:1
**visa** 54:1,4
**visited** 20:16 90:19,21 113:4
**visiting** 90:25 91:1 91:5
**viv** 13:14
**voiceless** 1:7 4:7 18:25
**vs** 1:11

**w**

**w** 30:12
**wait** 74:23,25
**waiting** 102:2
**want** 4:13 7:3,3,12 10:6 13:9 15:16 22:5,14 41:15 43:6,22 44:16 58:12,14,18 62:19 76:5 83:6,15 84:3 89:18 111:2,14
**wanted** 16:10 26:20 65:11 72:18 75:14 77:2 83:17 83:18,19 87:9 92:25 111:5
**wants** 92:20
**wasted** 86:8
**way** 23:12 27:14 28:7,8 35:2 41:10 66:13 75:16,21 76:14 91:14,18 92:17 101:16 103:4
**ways** 65:4
**web** 74:17
**webb's** 30:13 31:1
**week** 56:2 63:23
**weird** 10:11 41:5
**welcomed** 20:22
**went** 10:2 11:25 21:17 29:24 33:3 39:15 43:13 47:12 47:13 50:20 67:21 91:20 106:17
**wiermus** 4:1
**wife** 59:22,24 68:3 68:4 111:1,1,4,14
**wife's** 59:22
**win** 92:4
**wire** 75:15 76:14 79:23
**wired** 71:1,2
**wires** 80:6
**wise** 30:5
**withdraw** 48:22
**withdrawal** 49:13 49:18,23,24
**witness** 2:10 3:3 9:15 31:13
**witnessing** 42:5
**woman** 37:24
**women** 40:2,8 103:7
**won** 55:7
**word** 23:14 86:7 95:22,23,23 108:22 111:25
**words** 6:5,7 33:17 81:23 103:11
**work** 5:7 14:4 21:14,17 22:24 25:5,8 30:8,14 33:12 38:4 41:10 41:19 46:13 51:6 54:1,3 56:17 69:3 69:22,25 70:6 75:10 76:5 77:14 78:20 85:18 99:6 103:7
**worked** 13:13,14 18:17 22:20 25:15 35:21 38:8 62:1,4 62:8,10 63:25 100:21
**working** 17:20,23 18:5,9 21:21 22:22 23:1,6 28:12 29:24 41:3 43:2 44:3 45:11 54:9 55:8 57:20 61:15 63:22 64:7 66:18 67:17 69:4 76:8 83:9 85:16 97:22,22 98:21 99:18 100:4 104:6 104:7 108:10

113:3,8,11,15,18 114:2
**worry** 57:5 58:8
**worrying** 58:9
**write** 74:22 76:4 82:5 98:10 99:11
**writes** 74:12,21 75:25 77:8 79:14 80:13,22 86:3,5 89:17 92:3 94:6 94:21,23 95:13 99:5 100:12 101:18 106:7,16 107:2
**writing** 81:7 94:1
**written** 57:15
**wrong** 25:25 29:7 29:25 57:7 58:15 93:15 96:12 99:16 100:20

**x**

**x** 3:1,10 22:13 45:25
**x100687** 1:23

**y**

**y** 38:16
**year** 11:14 12:3,16 14:15 22:25 23:5 30:25 32:22 33:1 59:18 82:23 84:10 84:20 104:16,23 106:18
**years** 23:5 67:17 92:5
**yelling** 73:10,12 73:14 107:5
**yoladi** 59:25 60:4 60:12,16,22
**york** 1:4,12 11:9 12:13 55:9 64:25

**z**

**z** 104:14,14
**zero** 86:14

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

**E**
**X**
**H**
**I**
**B**
**I**
**T**

**C**

# EXHIBIT C

**Apple iPhone8,2 Quick Image.zip** 11/6/2017 6:20:08 PM

Where do you wok and what's up with now calling me

Sent

**Apple iPhone8,2 Quick Image.zip** 11/17/2017 9:05:32 PM

Divorce pending!

Sent

**Apple iPhone8,2 Quick Image.zip** 11/18/2017 9:17:56 AM

Happy Birthday Ex-Office wife...

Sent

**Apple iPhone8,2 Quick Image.zip** 11/27/2017 6:54:48 PM

Why won't you respond? Is there something wrong?

Received

**+13477823255** 11/27/2017 7:37:39 PM

Hey Dave!
Sorry, there have a lot going on personally. Can I call you back later on the week? I a bit busy now

Sent

**Apple iPhone8,2 Quick Image.zip** 11/27/2017 8:00:42 PM

Ok, I'm happy to know you're well. Take care

Received

**+13477823255** 11/27/2017 8:04:41 PM

Thanks, i hope you are well too

Sent

**Apple iPhone8,2 Quick Image.zip** 11/28/2017 7:17:00 AM

When you get a chance, try to recall this day April 10, 2014. This is the date that George came to my office and brutally attacked me out of no where, yelling and screaming you fucked up. Next, he sent you that email on the following Saturday to reduce my salary to half. Who was present at the office that day?
Ted Nehls
Peter Kefalas
Raudy Ulloa Edivict
Valenzuela
Was Bria, Ken or Dylan also there?

Sent

**Apple iPhone8,2 Quick Image.zip** 12/8/2017 9:21:00 PM

Hey

ST IP - 003671