Joshua M. Lurie, Esq. (JL7272)
Lurie|Strupinsky, LLP
Attorney for Plaintiffs
15 Warren Street, Suite 36
Hackensack, New Jersey 07601
Ph. 201-518-9999
Fax. 347-772-3074
Attorneys for Plaintiffs

| | |
|---|---|
| GEORGE KALTNER (individually), et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DAVID STEWART (individually), et al.,<br><br>Defendants. | UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK<br><br>Civil Case No. 7:16-cv-09337-KMK-LMS<br><br>DECLARATION OF JOSHUA LURIE IN SUPPORT OF PLAINTIFFS' MOTION TO AMEND THE COMPLAINT |

I, Joshua Lurie, of full age, under the penalty of perjury, do declare and say:

1. I am an Attorney-at-Law, duly licensed to practice law before the United States District Court for the Southern District of New York, and counsel for the Plaintiffs in the within matter.

2. I provide the within declaration based upon personal knowledge in support of the Plaintiffs' application to this Court for an Order granting Plaintiffs' motion to amend the complaint.

3. In addition to being counsel on this matter, I have also entered my appearance as co-counsel in the matter Mr. Stewart filed against my clients in the Manhattan Courthouse under Civil Case No. 1:17-cv-00565-JGK and co-counsel of record in a series of interconnected matters currently pending before New York State Department of Labor, Unemployment Appeals division under ALJ Case Nos. 016-24126; 016-24136; 016-21451; and 016-21458.

4. Discovery in this issue has been, for lack of better terms, difficult. Defendants have been less than forthcoming with respect to documentation/paper discovery, made it very difficult to get a deposition scheduled, hid witnesses (and then did not appear for one of their depositions), and have otherwise been less than compliant with the disclosure requirements under the Court Rules.

5. Multiple times discovery issues were raised to the Court resulting in the referral to Magistrate Smith who tried, as best as the Magistrate was able, to obtain compliance from Mr. Stewart and his attorney, Jacob Chen, Esq. of Dai and Associates.

6. One issue I was never able to rectify, and my clients could not understand, was how Mr. Chen and Mr. Stewart were producing so many privileged or confidential business documents or communications in discovery since Mr. Stewart's access to the computers and emails was stopped and barred on or about April 17, 2015 – when his, and his company David TPO's services were terminated. These should not have been in the possession of either Mr. Stewart or his counsel unless something more nefarious had taken place. We believed that this had to do with his multiple requests on social media for documents (and an issue that was before this Court several times, including the subject to two Order to Show Cause hearings). We hoped that this would be clarified as the matter continued. As discussed below, it was – on September 7, 2018.

7. During one of the hearings before the DOL, on August 31, 2017, Mr. Chen represented that there may not be a laptop and that the documents were ONLY emails to him of from him – and that was all in his possession. We now know that this was not just inaccurate, it was a willful and deliberate falsehood meant to thwart discovery and hide Mr. Stewarts criminal conduct as discussed herein below. (**Exhibit A**).

8. My recollection is also that Mr. Chen had previously represented that some of the documents in Mr. Stewart's possession were mailed to him from third-parties. This too is false as discussed below.

**The Finding of Willfully Withheld Discovery**

9. Part of my discovery requests sought to review and image Mr. Stewart's computer and cell phone for relevant information (also for reasonable fear of spoliation). This was ordered to take place and did so in early January 2018.

10. On December 22, 2017, shortly before the imaging, Mr. Chen advised that Mr. Stewart had two devices that were to be imaged. They were identified as a "MacBook Air (13-inch, Mid 2013[,] macOS Sierra version 10.12.6[; and] iPhone 6S plus." **Exhibit B.**

11. I retained, on behalf of my client, the services of Sygena Corp. and Justin Michalski, its principal, to perform the imaging.

12. Mr. Michalski was initially scheduled to perform the imaging on January 4, 2018 but, due to weather, he was unable to reach the office. He so advised Mr. Chen via email. However, in response, Mr. Chen chastised Mr. Michalski for short notice cancellation because he was, inter alia, unsure whether his client was able to be present. **Exhibit C**.

13. In, at that point, the 11 years that I have been practicing law, I have never had an adversary appear for a forensic imaging. This took both of us aback. Notwithstanding, it turns out to have been, to an extent, a blessing in disguise.

14. Mr. Michalski performed the imaging on January 5, 2018. While the majority of what occurred at that time is set forth in his declaration which accompanies this application, I was made aware of a lot of the issues he was confronting. Mr. Michalski would, periodically, call me to let me know if there had been any hiccups.

15. The first issue I was advised of was that, despite being prepared to image one computer and one cell phone, Mr. Stewart appeared with two MacBook Air laptops.

16. Later, I was advised that Mr. Stewart was refusing to provide passwords to one of the laptops. I suggested to Mr. Michalski that he infer that, without finishing the imaging, Mr. Stewart would not get any of his devices back. I understand that this threat caused Mr. Stewart to log into the system for Mr. Michalski.

17. On January 25, 2018, I was advised that the images were processed and appeared to be intact without any issues. However, for the MacBooks to work in such a way as to make review easier – an effective method of seeing the systems in the same way as the user would upon use, we would need exact copies of the computers (the same model, year, RAM, processor, etc.) to load the image and that the second, surprise computer was encrypted so we needed the encryption information from Mr. Stewart.

18. At approximately the same time, I was able to have a first look at documents contained within the iPhone – specifically the text messages – nearly 3700 pages of them.

19. While there was some very good information which was derived out from the text messages, by way of the forensic production, there were 724 partial messages which, I understand, are deleted messages where some portion remained on the system in memory.

20. Reviewing some of the messages it became evident that Mr. Stewart was texting with Mr. Chen and, therefore, there were extensive privileged discussions therein. I avoided them as best as possible – though many of the messages, or pieces of emails, were forwarded to third parties destroying any privilege that may have existed. Included third-parties are Mr. Stewart's daughter, wife/common law wife, friends, family members, parties to which he sought to obtain financial support to bring more actions, Jason Gentry (who has brought a separate

action against my clients and before this Court), and others who he attempted to solicit to bring actions against my clients as co-conspirators of Mr. Stewart.

21.  In February, as a result of what we obtained, I attempted to work with Mr. Chen on a viable protective order.

22.  Similarly, on February 20, 2018, the companion FLSA matter was referred to mediation.  My client, hopeful about a potential global settlement to stop the bleeding, requested that we limit the time spent on discovery in an effort to keep costs down.  This did not mean to stop prosecuting the case, but to take all acts to reduce the amount of time spent reviewing documents including the thousands upon thousands of documents contained in the iPhone as well as holding off placing the images on iMacs to review their contents.  I did not have an opportunity, at that time, to review the emails on the phone as there were several email addresses.  I was also having trouble reviewing notes and other documents on this phone.

23.  Less than two weeks later, as a requirement of a prior order, there were mutual motions for summary judgment filed in the FLSA matter while still awaiting mediation.

24.  During the same time frame, I worked with Mr. Chen on crafting a protective order which would take into consideration the realities on the ground for the multiple ongoing actions between the same parties.  It was entered on March 8, 2018.  At that point, I was permitted to, and did, forward copies of the text messages to my co-counsel.

25.  Mediation took place the second week of April 2018 while I was away on a family vacation.  However, in the later parts, I had a conference call with my client and co-counsel in the FLSA matter, Nolan Klein, Esq., for updates on the mediation.  Eventually, the mediation was not successful, and I was provided with marching orders to move forward zealously on this matter.

26. It was at that point that we scheduled the depositions of the parties. It was my hope that, through the deposition of Mr. Stewart, not only would I obtain relevant information about the contents of the systems addressed above, but I may also be provided with a road map. My fear, which – as discussed below came to fruition – was that the content of these computers would be so voluminous that it would be impossible to properly review them and find everything relevant.

27. Deposition scheduling was difficult due to various schedules – but were initially scheduled for the last week in May.

28. Mr. Chen also continued to inquire whether we would be amenable to settlement, and we tried to push off the depositions until we could get to that point.

29. During this same time, and part of the reason that I was attempting to delay the depositions, was that I was working with an attorney named Steven Schuster in New Jersey who represented Edevict Valenzuela, a former employee of my client who, through review of the text messages, it became evident had assisted Mr. Stewart with stealing documents (along with another former employee named Raudy Ulloa who we have brought suit against in the Eastern District of New York under Civil Case No. 1:18-cv-02501 and are currently awaiting a decision on a judgment by default for various conduct which included his logging into Plaintiffs systems after termination and deleting documents – I am counsel as well on that matter). I was attempting to work out an agreement with Mr. Schuster that would permit for Ms. Valenzuela's deposition and settle any claims with her.

30. Mr. Stewart was eventually deposed on June 5, 2018 where he admitted, *inter alia*, that he had not produced a lot of documentation and inferred that some of it was on the computers --- so I could just find it myself. They also made clear that they had not kept up with their continuing discovery obligations and Mr. Chen promised to update all relevant

documentation shortly – which he did not do. He apparently believed that an image of a computer and phone was like having a second copy – not that it was an "image" of the systems as they existed at that time and do not update themselves as Mr. Stewart continued to use them (indeed, they do not connect to the internet since, based upon Mr. Chen's version, Mr. Stewart could just delete everything and we would have lost all documents).

31. On June 18, 2018, I deposed Ms. Valenzuela. Mr. Chen declined to appear. During the deposition she advised of numerous issues that were relevant to the FLSA case (for example, that her supervisor was Mr. Stewart who also trained her and created all of the procedures, etc.) and that she helped to get documents to him.

32. Ms. Valenzuela also discussed documents which she had taken for Mr. Stewart and not produced in this action and discussed Mr. Stewart's conduct and his demeanor becoming more irrational.

33. As a result, I sought that the Magistrate issue sanctions for the willful withholding of documentation and information from me in discovery by Mr. Stewart and his counsel. Once again, part of the reason was that I wanted more information for the review of the laptops so that I was not blindly searching the systems.

34. The Magistrate did not rule on my request until August 24, 2018 [ECF Doc. No. 108] and denied the relief sought. Therefore, I directed that Mr. Michalski finalize the processing of the laptops and I would search, blindly, through them at additional substantial cost to my client.

35. The first laptop was not of issue. The password provided worked to open the system.

36. Interestingly, it appeared that Mr. Chen had been using the computer that was imaged. Upon loading up the web browser to perform history searches, it loaded to Google's

gmail system and to log into an email of "jchen@daiassociates.com." There was also a folder called "Dai and Associates" which contained thousands of documents – I did not search that folder, initially.

37. However, this computer also contained tens of thousands of documents and emails. I attempted to perform searches, but was stymied due to the voluminous nature of the documents. However, upon some targeted searches, I was made aware of multiple times that Mr. Stewart destroyed privilege by forwarding emails and other discussions with Mr. Chen to third-parties. This allowed me to learn that Mr. Stewart had, through Mr. Chen, brought an IRS whistleblower action against my client in late 2015 which was never disclosed. This also appeared to have taken place shortly after my partner, Eugene Strupinsky, sent Mr. Stewart a letter advising him to cease attempting to extort money from my clients under threats of "destroying" my client.

38. The IRS whistleblower action was relevant to several causes of action in the complaint, including Count 9 (professional negligence regarding accounting discrepancies from the work performed by Mr. Stewart and David TPO) and Count 10 (fraud for misrepresenting the ability to provide the financial services that Mr. Stewart and David TPO claimed they were able to perform). Indeed, it appears as a clear-cut issue of unclean hands – Mr. Stewart performed extensive accounting errors and improper categorizing of expenses for Plaintiffs and then, after his services were terminated, he ran to the IRS to investigate my client for the issues he created. Based upon other emails and communications from Mr. Stewart, the categorizing of expenses was likely deliberate. Further, a review of Mr. Stewart's taxes shows that he performed the same high-level accounting services upon his own expenses and those of David TPO, LLC which resulted in writing off almost every purchase as a business expense.

39. Going through other documents, it gives support to the claims now sought that Mr. Stewart also solicited the assistance of Mr. Peter Vazquez, a licensed CPA, to assist him in committing fraud. Mr. Vazquez was, for a time in 2013-2014, employed by Sasserath & Zoraian, LLP which is my clients' accounting firm. Mr. Vazquez was terminated from Sasserath & Zorian, upon information and belief, for cause. However, subsequent to his termination, Mr. Stewart remained in communication, used him for his own business (David TPO, LLC) and personal taxes, and conferred with him about the stolen records and to falsely create allegations of tax fraud against my clients – all the while as Mr. Vazquez assisted Mr. Stewart in committing tax fraud.

40. It is frustrating that Mr. Chen did not disclose this claim and that Mr. Stewart failed to advise of his claims in the deposition.

41. Much of the documentation discovered on this first laptop was relevant to the FLSA matter as well, and I am working with my co-counsel there to prepare for trial. Indeed, based upon these documents which have been willfully withheld, we have requested additional time before trial to review them.

42. The second laptop has been a whole other issue.

43. I was advised by Mr. Michalski that he could not access the system upon uploading the image. It was doing something he had never seen before. When the "welcome" screen loaded, it presented two users. One of them was named "David Stewart." Upon entering the password, it returned to the same screen, but the password no longer worked.

44. On September 5, 2018, Mr. Michalski came to my office to deliver the laptops and work to open the second system that appeared to have some kind of encryption on it.

45. At approximately 8:30PM, Mr. Michalski was finally successful in opening the second laptop and, upon getting through the initial code, we were shocked at what we

discovered. Rather than a single login for Mr. Stewart, there were five user accounts on the system. Two were called "David Stewart" and one called "David Rose" which was a nickname that Mr. Stewart used while providing services for my clients (the other two appeared to be an account set up for his children and one for some other business he was developing).

46. Mr. Michalski then advised that he was going to reset the passwords and turn off the keychains for these users so that these accounts could be reviewed. Mr. Michalski worked in my office's conference room while I returned to my office.

47. Several minutes later I heard a surprised response from Mr. Michalski and he brought the computer in to me.

48. First, one of the "David Stewart" login accounts was innocuous. The second, was actually with two spaces between David and Stewart. That user name was an exact copy of Mr. Stewart's computer that he used when he provided services for my client. He had, somehow, made an exact copy of the "user data" and placed it on his laptop – thereby having full access to the files of my client's systems *after* his right to access them was revoked. This was filled with financial documents, emails, communications, audits and other documents not disclosed. It also had access to several email accounts for my clients' businesses still accessed LONG AFTER his authorization to access these files was revoked.

49. While this was shocking, it was nothing compared to the "David Rose" account.

50. I opened the David Rose account and was confronted with a whole different group of documents.

51. Mr. Michalski first directed my attention to the "name" of the account in the upper right-hand corner of the screen. It did not say David Rose, David Stewart, or anything of the like. It said "gkaltner." I suspected that this was a copy of data from Mr. Kaltner's

computer. I reviewed, briefly, the emails and they were not Mr. Stewarts, they were Mr. Kaltner's emails – including what appeared to be personal emails.

52. Mr. Kaltner, who resides in Puerto Rico, advised me that he was coming to New York the following weekend, and we arranged to meet on September 7, 2018.

53. I sat with Mr. Kaltner for several hours as we reviewed this laptop. He advised me that this appeared to be his computer from 2012 (he frequently updates his computer) and contained his personal documents.

54. Mr. Kaltner, while reviewing the emails, also realized that this was not limited to his own emails. They were also the emails in 2012 for Maxim Doumkine (the Chief Technology Officer), and Peter Kefalas (who was the VP of sales) and other employees or agents of Plaintiffs during the first half of 2012 (Kyle Armistad among others).

55. Innumerable highly confidential business records were present on this system. Mr. Kaltner also advised that he thought he saw an email between himself and his wife on there through targeted search – though this may only be contact information.

56. Mr. Stewart never had a right to this system, never had a right to these files, and absolutely had no right to access Mr. Kaltner, Mr. Doumkine, Mr. Kefalas and others' emails from 2012!

57. It also appears that there are client lists, and various other documents which are highly confidential business records which Mr. Stewart stole and, as we believe, misappropriated.

58. Due to the voluminous nature of the documents contained therein, we are only scratching the surface of these stolen documents which were obtained and/or retained, improperly, by Mr. Stewart and later forwarded to his counsel who knew, or should have known, that Mr. Stewart had no right to have these documents.

59. This also explained why my co-counsel in the unemployment actions, Jane Gould, Esq., was shocked to see documents from Mr. Doumkine produced by Mr. Chen. Mr. Stewart hacked these emails, or had someone do so, and gave the documents to his attorney. Mr. Chen should have known that Mr. Stewart did not have the right to access these documents and should have destroyed them – or, at the very least, advised all parties that his client had provided him with documents to which the origination was . . . questionable.

60. If this was not bad enough, on Friday, September 12, 2018, Mr. Michalski advised me that his forensic software had been updated since January of that year and, through the new version, the review of iPhones now allowed for better recovery of deleted files. He brought a system to my office and I was able to review some of the deleted text messages. Again, more relevant information withheld.

61. We found a text message between Mr. Stewart and another former employee named Theodore Nehls. Mr. Nehls was the CEO of Avatar Technologies, Phl., Inc. in the Philippines and, later, took the same position for a budding fast food company that my clients opened called Rainbow Slushies and Pretzels – also in the Philippines.

62. We are aware that, subsequent to Mr. Stewart and his company's termination of providing services for my client, in violation of their non-compete agreements (Mr. Stewarts is already a subject of this matter), Mr. Stewart and Mr. Nehls opened a competing call center to Plaintiffs in the Philippines along with other individuals (a Mr. Torres who has recently been indicted in Florida for telemarketing fraud and Jason Gentry who, as this Court knows, filed a complaint also before this Court against Mr. Kaltner alleging all forms of wrongdoing) called Callvation (we also found many notes from Mr. Stewart setting up the pitch and other evidence of theft of intellectual property but no evidence).

63. It was always suspected that they had stolen Plaintiff's copyrighted software and client list. In the text messages, it was clear that this happened through Mr. Ulloa.

64. In a text dated November 24, 2015, Mr. Nehls inquires from Mr. Stewart whether he has "the customer list for avatat? (sp)" and Mr. Stewart responds with "No but I can check with Raudy" (sp) (Raudy being Mr. Ulloa identified above).

65. My client has good cause to believe that this client list was misappropriated by Mr. Ulloa and Mr. Stewart and that Mr. Ulloa continued to provide Mr. Stewart with the client lists for the remainder of his tenure through January of this year when he was terminated.

66. On September 20, 2016, while preparing to file the within action, my partner, Mr. Strupinsky, interviewed Mr. Nehls with his attorney and worked out an arrangement with him which, *inter alia*, included providing of information to my client with respect to Mr. Stewart's conduct. This is how my clients were aware of the full range of Mr. Stewart's conduct and were advised as to the full level of the Avatar Dialler involvement with Mr. Stewart.

67. This is when the issues get even worse for the lack of disclosure from Mr. Stewart and his counsel.

68. During the prior reviews of the iPhone, I expressed frustration that I could not review anything from Viber – a messaging and telephone application that we were aware Mr. Stewart used extensively. This program, along with Whatsapp, has been in the headlines recently since those were the applications that, allegedly, Mr. Manafort had been using to tamper with witnesses. I had told Mr. Michalski multiple times that I hoped we could access them.

69. On September 14, 2018, my wish came true. Mr. Michalski advised that there was a recent update to his software and now we could review Viber. He set up a secure screen share for me and I looked at the Viber conversations.

70. Contained therein, in December of last year, Mr. Stewart was communicating over Viber with two other co-conspirators of his conduct, Benjamin and Agrien Tal. Contained in the conversation, Mr. Stewart advises that his lawyer, Mr. Chen, had just contacted him to advise that he (Mr. Chen) had been in contact with Mr. Nehls and Mr. Nehls provided information and would testify for Mr. Stewart at trial.

71. These statements were not disclosed by Mr. Chen. They are highly relevant to this action as Mr. Nehls is a co-conspirator.

**CONCLUSION**

72. Discovery aside, the documents willfully withheld or hidden (contained in hidden files, deleted files, or behind encryptions), evidence that Mr. Stewart violated the Computer Fraud and Abuse Act (18 U.S.C. 1030) and we seek to amend to include claims under the civil provisions thereto (subsection (g)) against Mr. Stewart as well as those who assisted him in his misappropriation – Mr. Nehls and Mr. Ulloa.[1]

73. Similarly, the evidence now shows that Mr. Stewart misappropriated Plaintiffs trade secrets, including through the theft and misappropriation of Plaintiffs' client lists, in violation of the Defend Trade Secrets Act (18 U.S.C. 1836, *et seq*.) along with Mr. Nehls, Mr. Ulloa, Mr. and Mrs. Tal, and the notes in the phone also indicate that this was done with the assistance and support of Mr. Gentry.

74. The documentation and communications also show that Mr. Stewart conspired with his girlfriend/wife/common law wife, Yolaydy Espinol and his accountant to commit fraud and other wrongful acts against Plaintiffs.

---

[1] In the current matter before the EDNY against Mr. Ulloa, there are claims that he stole the client lists – but after termination. There are no claims of conspiracy to do so or violations of the CFAA for prior to January of 2018.

-15-

75. My client, having reviewed the documentation, desires to fix the issues created by the Defendants' truculence with discovery and consolidate the potential claims together. Thus, Plaintiffs seek to amend the Complaint to name these new parties and bring these additional causes of action as discovered in the past few weeks.

76. The exhibits attached hereto are true and accurate copies of what they purport to be.

I declare under the penalty of perjury that the foregoing is true to the best of my knowledge.

                                              _____/s/Joshua M. Lurie, Esq._____
                                                      Joshua M. Lurie

Dated: September 24, 2018